UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

+---------------------------------------+
| USDC SDNY                             |
| DOCUMENT                              |
| ELECTRONICALLY FILED                  |
| DOC #: _____               |
| DATE FILED: April 10, 2012            |
+---------------------------------------+

-----------------------------------------------------------------X

KICKSTARTER, INC.                          :
                                           :
                         Plaintiff,        :
                                           :
            - against -                    :          11 Civ. 6909 (PAC)
                                           :
ARTISTSHARE, INC. and                      :          OPINION & ORDER
FAN FUNDED, LLC,                           :
                                           :
                         Defendants.       :
-----------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Kickstarter, Inc. ("Kickstarter") seek a declaratory judgment that U.S. Patent No.

7,885,887 (the "'887 patent"), issued to ArtistShare, Inc. ("ArtistShare") and owned by Fan Funded,

LLC (collectively, the "Defendants") is invalid, and that Kickstarter does not infringe the '887

patent through its website or other means.  Defendants move to dismiss Kickstarter's complaint,

pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, arguing that there is

no case or controversy here because the parties were in a business negotiation that did not

involve a claim of infringement or threat of suit.

For the following reasons, Defendants' motion to dismiss is DENIED.

## BACKGROUND

In or around 2003-2004, Brian Camelio ("Camelio") founded ArtistShare, an online

platform for artists to seek funding from anyone interested in a project, which is referred to as a

"crowdfunding" platform.  (Feb. 3 Camelio Decl. ¶ 3.)  In 2009, Kickstarter launched its own

online crowdfunding platform, for those looking to raise money for creative projects.  (Cohen

Decl. ¶ 2.)  Kickstarter has since become the largest (or one of the largest) crowdfunding

platforms in the world.  (Cohen Decl. ¶ 2.)

ArtistShare filed for a patent regarding its "invention relating to funding projects." (Feb. 3 Camelio Decl. ¶ 4.)  On September 14, 2010, Camelio sent Kickstarter a letter, via Kickstarter's registered agent for service of process, regarding the "Availability of ArtistShare, Inc.['s] Patent Application for Licensing" explaining that "[u]pon review of [Kickstarter's] current website, we believe you may be interested in securing licensing rights to ArtistShare's software platform, which includes rights to U.S. Patent Application Publication No. 2004/0015427, a copy of which is attached." (Cheng Decl. Ex. A.)

On February 8, 2011, ArtistShare's '887 patent was issued, entitled "Methods and Apparatuses for Financing and Marketing a Creative Work." (Feb. 3 Camelio Decl. ¶ 5.)

On March 1, 2011, shortly after the '887 patent issued, Camelio sent a letter to Kickstarter executives, again via its registered agent for service of process, attaching a copy of the '887 patent and stating that he "will be contacting you in the immediate future to discuss ArtistShare's patent and software licensing terms for Kickstarter." (Cheng Decl. Ex. B.)  On March 23, 2011, Camelio sent another letter to Kickstarter, also by its registered agent for service of process, "to discuss software licensing opportunities." (Compl. ¶ 11.)  On April 13, 2011, Camelio personally visited, not the registered agent for service of process, but rather Kickstarter's corporate headquarters.  He did so without an appointment and attempted, unsuccessfully, to meet with a co-founder of Kickstarter.  (Compl. ¶ 12.)

On May 2, 2011, Kickstarter's outside counsel sent Camelio a letter asking whether "ArtistShare believes Kickstarter should license the '887 patent as a potential business opportunity or whether ArtistShare contends that Kickstarter is infringing the patent." (Cheng Decl. Ex. C.) On May 11, 2011, Camelio responded that "[y]es[,] ArtistShare has a patent which may or may not be relevant to your future business plans" and that "[a]s far as the patent infringement claims

go, that I leave up to the attorneys." (Cheng Decl. Ex. D.) Camelio then stated that he "suggest[s] we look first to collaborate together before we get distracted by getting pulled into an analysis about patent infringement." (Id.)

On June 9, 2011, Kickstarter's General Counsel, Jared Cohen ("Cohen"), met with Camelio. (Cohen Decl. ¶ 13.) Camelio and Cohen's accounts of their conversation at this meeting and in subsequent conversations vary dramatically. Based on the meeting and what Camelio said, Cohen believed that Camelio "was going to use the patent to force Kickstarter to pay him for a license or other protection from suit." (Cohen Decl. ¶ 15.) Camelio claims that they discussed: ArtistShare's business model; ArtistShare's software; the possibility of Kickstarter licensing ArtistShare's software; and Camelio's interest in establishing a business collaboration. (Feb. 24 Camelio Decl. ¶¶ 2-4.)

On August 5, 2011, Cohen and Camelio met again. Cohen claims that Camelio told him that "he and his lawyer believed that Kickstarter is infringing the '887 patent and that he must enforce his patent." (Cohen Decl. ¶ 16.) Camelio then presented three options: (1) Kickstarter could reach a business deal with ArtistShare and license the '887 patent; (2) Kickstarter could license the '887 patent for a royalty payment of 10% of Kickstarter's revenues; or (3) the parties could litigate the issue. (Cohen Decl. ¶ 16.) Camelio disputes only the allegations that he claimed Kickstarter was infringing the '887 patent and threatened litigation; he agrees that he offered a business deal and license for the '887 patent, and alternatively offered a license for the '887 patent with a royalty payment of 10% of the Kickstarter's revenue. (Feb. 24 Camelio Decl. ¶¶ 5-6.) On August 8, 2011, Camelio formed and founded Defendants Fan Funded, which now owns the '887 patent. (Compl. ¶ 17; Feb. 3 Camelio Decl. ¶ 1.)

Cohen claims that, on September 12, 2011, he told Camelio that Kickstarter was not interested in a business deal; that it does not believe it is infringing the '887 patent; and that it does not believe that the '887 patent is valid.  (Cohen Decl. ¶ 19.)  Camelio disputes this account and claims that Cohen told him that Kickstarter was interested in Defendants' license but that it wanted better licensing terms, at which point Camelio stated that Defendants would consider a counter-offer.  (Feb. 24 Camelio Decl. ¶ 7.)

On September 23, 2011, Kickstarter offered to buy the '887 patent "in order to permanently remove the threat of litigation." (Cohen Decl. ¶ 20.)  Kickstarter's offer was rejected.  Cohen claims that Camelio then indicated that if the parties did not reach an agreement by October 1, 2011, that "the other plan or action would be executed," and "Kickstarter's situation would get much worse." (Cohen Decl. ¶ 20.)  Camelio claims that he told Cohen that his prior offer would be withdrawn on October 1, 2011, at which point ArtistShare would pursue other opportunities. (Feb. 24 Camelio Decl. ¶ 8.)

## LEGAL STANDARD

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28. U.S.C. § 2201(a).  The availability of declaratory relief is limited to "cases" or "controversies," as provided in Article III, Section 2 of the Constitution.  Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 878 -879 (Fed. Cir. 2008).

A court has subject matter jurisdiction under the Declaratory Judgment Act only if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance

4

of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)

(quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).

In patent cases, declaratory judgment jurisdiction exists "where a patentee asserts rights

under a patent based on certain identified ongoing or planned activity of another party, and

where that party contends that it has the right to engage in the accused activity without license."

Sandisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1381 (Fed. Cir. 2007).  A plaintiff

must have taken significant, concrete steps towards conducting the infringing activity, such that

the dispute is "immediate" and "real." Cat Tech LLC, 528 F.3d at 879-80.  The Declaratory

Judgment Act "has long been understood 'to confer on federal courts unique and substantial

discretion in deciding whether to declare the rights of litigants.'" MedImmune, 549 U.S. at 136

(quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

Where a Rule 12(b)(1) motion challenges a complaint's allegations of jurisdiction in fact,

"the factual allegations in the complaint are not controlling and only uncontroverted factual

allegations are accepted as true." Shoshone Indian Tribe of Wind River Reservation, Wyo. v.

United States, --- F.3d ---, 2012 WL 34382, at *5 (Fed. Cir. Jan. 9, 2012). "In establishing the

predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review

evidence extrinsic to the pleadings, including affidavits and deposition testimony." Cedars-Sinai

Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed.Cir.1993).  Accordingly, the Court considers the

parties' affidavits.

## DISCUSSION

### A. A Sufficient Controversy Exists

Defendants claim that no actual controversy of sufficient immediacy exists, because the

parties were merely negotiating a business opportunity, which involved exchanging proposals for

5

Kickstarter to either license or purchase Defendants' '887 patent.  As discussed above, there is a factual dispute as to whether these negotiations involved a claim that Kickstarter was infringing Defendants' '887 patent or a threat of suit.  Camelio and Cohen present substantially different views of their two meetings and subsequent conversations and what was said at each.  The undisputed facts, however, are sufficient to establish an actual controversy of sufficient immediacy exists between the parties giving this Court statutory and constitutional authority to hear this declaratory judgment case.

'[D]eclaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." Sandisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1381(Fed. Cir. 2007).  "Of course, if 'a party has actually been charged with infringement of the patent, there is *necessarily*, a case or controversy adequate to support [declaratory judgment] jurisdiction." Hewlett-Packard Co. v. Acceleron LLC, 587 F.3d 1358, 1362 (Fed.Cir.2009) (quoting Cardinal Chem. Co. v. Morton Int'l, 508 U.S. 83, 96 (1993)). Declaratory judgment jurisdiction cannot be defeated, however, "simply by the stratagem of a correspondence that avoids the magic words such as 'litigation' or 'infringement'." Id.  Accordingly, "even if the parties' interactions . . . could be characterized as '[business] negotiations'" declaratory judgment jurisdiction may still arise.  See e.g., Sony Electronics, Inc., v. Guardian Media Tech., Ltd., 497 F.3d 1271, 1286 (Fed. Cir. 2007).

It is undisputed that Camelio sent Kickstarter three letters to notify Kickstarter about Defendants' '887 patent, the '887 patent's potential relevance to Kickstarter's website, and which attached (at various points) a copy of the patent application, and the issued patent.  (See Cheng Decl. Exs. A, B; Compl. ¶ 11.)  Oddly, each of the three letters was sent to Kickstarter's

registered agent for service of process, rather than Kickstarter's normal business address.  These

letters raised concerns for Kickstarter, which directly asked "whether ArtistShare contends that

Kickstarter is infringing the patent." (Cheng Decl. Ex. C)  Camelio's response acknowledged that

it had a patent "which may or may not be relevant to your future business plans," and proposed that

"before" they get "into an analysis about patent infringement"—which he would "leave up to the

attorneys"—that they try to "collaborate" first.  (Cheng Decl. Ex. D.)  It is relevant to the Court's

analysis that it was Defendants, "the patentee, that approached [Plaintiff], not the reverse" and that

in proposing a collaboration Defendants "did not simply invite [Plaintiff] to engage in licensing

negotiations, but specifically alluded to the prospect of 'contentious legal activity'" should the

negotiations fail.  EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed.Cir.1996), but see,

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).[1]  Under the totality of the

circumstances, it is reasonable to interpret Camelio's actions as implicitly asserting Defendants'

rights under their '887 patent.  Hewlett-Packard, 587 F.3d at 1363-64 (finding that there was an

implied assertion of defendant's rights in its patent, where defendant: "took the affirmative step of

twice contacting [plaintiff] directly"; asserted that its patent was "relevant" to the plaintiff's

production line; set a two-week deadline for discussions; and insisted that plaintiff not file suit.)

Moreover, there is no dispute that Defendants offered, as an alternative to a business deal

and licensing option, a pure licensing agreement whereby Kickstarter would make royalty

---

[1]  MedImmune rejected the reasonable apprehension of suit test set forth in EMC as the sole determinant
for declaratory judgment jurisdiction in favor of a totality of the circumstances test.  See 549 U.S. at
127. MedImmune, however, "did not completely do away with the relevance of a reasonable
apprehension of suit" and courts still consider a reasonable apprehension of suit as "one of multiple
ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to
establish that an action presents a justiciable Article III controversy."  Prasco, LLC v. Medicis Pharm.
Corp., 537 F.3d 1329, 1336 (Fed. Cir. 2008).  Since Medimmune, in effect, simply "lowered the bar for
determining declaratory judgment jurisdiction in all patent cases,"  Hewlett–Packard, 587 F.3d at 1361,
the Federal Circuit's reasoning in EMC is still relevant in considering all of the circumstances to
determine whether there is a sufficient Article III controversy.

payment of 10% of its revenues.  This offer "was sufficiently large to make the prospect of ultimate litigation . . . realistic." EMC, 89 F.3d at 813 (finding a licensing offer of $1.5 million plus *two* percent of the sales for a nonexclusive license was sufficiently large so that the implied threat of litigation should negotiations not work out was sufficiently real).  There is no dispute that Kickstarter rejected the offer on September 12, 2011.  Camelio urged Kickstarter "to finalize our negotiations as soon as possible," and set a September 30, 2011 deadline.  (Feb. 3 Camelio Decl. ¶¶ 15-19.)  Kickstarter then proposed buying the patent to remove any possibility of infringement, but its offer was rejected.  While Defendants claim that they anticipated a counter-offer rather than the filing of this declaratory judgment action, Kickstarter was "within its rights to terminate [the negotiations] when it determined that further negotiations would be unproductive." Sony, 497 F.3d at 1286.  At that point, the September 30, 2011 deadline was rapidly approaching, and there were no communications between the parties to suggest that Defendants would not, as they had implied, conduct a patent infringement analysis should business negotiations fail.  All of these circumstances taken together—Defendants' multiple implicit assertion of their rights under the '887 patent, unannounced visits, references to the '887 patent's relevance to Kickstarter's business plans, a sufficiently high royalty payment offer, the suggestion that the parties conduct business negotiations "before" Defendants' lawyers undergo an infringement analysis, Kickstarter's failed attempts to remove the threat of litigation, a rapidly approaching deadline, and Kickstarter's belief that it could continue to use its own crowdfunding platform without a license—presents a sufficient controversy within the meaning of the Declaratory Judgment Act.  See EMC, 89 F.3d at 809, 812-13 (finding sufficient controversy existed where: patentee sent multiple letters to plaintiff to engage in licensing negotiations to "perhaps avoid this matter escalating into a contentious legal activity"; the patentee made a sufficiently large licensing

offer; and the negotiations failed to produce any result); <u>see also</u> <u>Sony</u>, 497 F.3d at 1286; <u>Hewlett-Packard</u>, 587 F.3d at 1364.  Since Kickstarter has been using its crowdfunding platform since 2009, there is no dispute that the controversy is sufficiently "immediate" and "real."  <u>See generally</u>, <u>Cat Tech LLC v. TubeMaster, Inc.</u>, 528 F.3d 871, 881-882 (Fed. Cir. 2008).

## B.  The Court's Discretion

Defendants, relying in large part on <u>EMC Corp. v. Norand Corp.</u>, argue that the Court should exercise its discretion to decline to exercise jurisdiction over this case because, they argue, Kickstarter filed this litigation in order to negotiate a better deal with Defendants.  In <u>EMC</u> the federal circuit affirmed a district court's exercise of its discretion to dismiss a suit where the declaratory judgment plaintiff called the defendant the day after filing suit and "explained that the declaratory judgment complaint had been filed as 'merely a defensive step' and that [the plaintiff] 'would like to continue to discuss with you all the options hopefully in a more meaningful manner over the near term.'" 89 F.3d 815.  The federal circuit held that under such circumstances it may be appropriate to view the declaratory judgment complaint "as a tactical measure filed in order to improve [the plaintiff's] posture in the ongoing negotiations—not a purpose that the Declaratory Judgment Act was designed to serve." <u>Id.</u>

The federal circuit has since cautioned district courts against assuming "that a nefarious motive . . . can be so easily inferred" where "there is no affirmative evidence to suggest that [plaintiffs] filed [their] suit in order to obtain a more favorable bargaining position in any ongoing license negotiations." <u>Sony</u>, 497 F.3d at 1289.  Kickstarter filed this suit on September 30, 2011, the day Defendants' offer was set to expire, and after the parties failed to reach any agreement.  After filing this suit, Kickstarter sent Defendants a covenant not to sue, which Defendants have not signed.  Otherwise, there is no evidence that either party has in any way

attempted to continue their negotiations.  As the federal circuit advised, the Court will not assume that Kickstarter was acting with a "nefarious motive" in filing this suit without evidence to support that allegation.

While a district court is given "the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion." Sandisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1383 (Fed. Cir. 2007). "When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." Id. (quoting Genentech v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed. Cir.1993).)

The Court has not considered Cohen's sworn statements that there was a claim of infringement and threat of suit.  Even so, it is clear that the Court has jurisdiction and by accepting jurisdiction, the Court can settle the legal relations between the parties and afford Kickstarter relief from uncertainty.  Accordingly, the Court will not exercise its discretion to dismiss the declaratory judgment action.

<u>CONCLUSION</u>

There is a sufficient controversy between the parties that is both immediate and real. Accordingly, Defendants' motion to dismiss the declaratory judgment action is DENIED.  The Clerk of the Court is directed to close this motion.

The parties are directed to meet and confer and to submit a civil case management plan. Dated:  New York, New York

The parties are directed to meet and confer and to submit a civil case management plan.

Dated:  New York, New York
      April 10, 2012                       SO ORDERED

                                             PAUL A. CROTTY
                                             United States District Judge