| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------- x<br>KICKSTARTER, INC.,                                         :<br>                                                                              :<br>     Plaintiff and Counterclaim Defendant      :<br>                                                                              :<br>     -against-                                                         :<br>                                                                              :<br>FAN FUNDED, LLC and ARTISTSHARE, INC.   :<br>                                                                              :<br>     Defendants and Counterclaim Plaintiffs    :<br>------------------------------------------------------------- x | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED:  January 18, 2013<br><br>11 Civ. 6909<br><br>**OPINION & ORDER** |

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Kickstarter, Inc. ("Kickstarter") brings this action against Defendants Fan Funded, LLC and ArtistShare, Inc. (collectively, "ArtistShare"), seeking declaratory relief that U.S. Patent No. 7,885,887 for "Methods and apparatuses for financing and marketing a creative work," issued on February 8, 2011 (the "'887 Patent") is invalid and that Kickstarter does not infringe it.  Compl. at ¶ 1, Sept. 30, 2011, Dkt. No. 1.  ArtistShare filed a Counterclaim for patent infringement, seeking preliminary and permanent injunctive relief, as well as compensatory damages.  Answer & Countercl. at 9-10, Apr. 24, 2012, Dkt. No. 30 ("Ans.").  The parties now move for claim construction under Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) and have extensively briefed the meaning of the relevant claim terms.  See Dkt. Nos. 42-45, 47, 52.

## BACKGROUND

Brian Camelio ("Camelio") founded ArtistShare to develop novel ways for artists to promote and obtain funding for their projects.  Ans. at 6.  In July 2002, ArtistShare Inc. filed a patent application for its "fan-funding systems that allow artists to create a project, market the project, and get the project funded."  The '887 Patent was issued on February 8, 2011.  Id.;

1

Def.'s Opening Claim Construction Br., Nov. 6, 2012, Dkt. No. 44 ("Def.'s Br."). ArtistShare, Inc. assigned the patent to Fan Funded LLC, its wholly owned subsidiary. Ans. at 6.

Kickstarter is the "largest funding platform for creative projects in the world." Compl. ¶ 9. In summer, 2011, Kickstarter and ArtistShare met to discuss ArtistShare's proposal that Kickstarter license the '887 Patent, under threat of an infringement suit should the parties fail to reach an agreement. Id. ¶¶ 15-17; Ans. at 8. After discussions between Kickstarter and ArtistShare failed to reach an amicable resolution, Kickstarter concluded that it is likely to be sued for patent infringement and instituted this declaratory judgment action. Compl. ¶ 21; see also Ans. at 8.

The disputed language is contained in claims 1, 17, 18, 35 and 36 of the '887 Patent.[1] See Def.'s Br. at 5. The claims read as follows, with emphasis added to the disputed terms:

Claim 1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:
providing **software tools** to an artist or Account Manager **to manage at least one project**, the project comprising at least one creative work;
receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;
transmitting offer data from a server to a **client** via a network, the offer data comprising an offer to **Fans** concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;
receiving at the **client** such offer data and presenting the offer to the **Fan**;
transmitting acceptance data back to the server from the **client** accepting the offer;
registering contact and marketing information regarding **Patrons** in a database; and
providing the artist or Account Manager **software tools to manage communications, through said Patron database**, to **Patrons** regarding the sales and marketing of one or more projects.

Claim 17. A system for raising funds for and marketing one or more of an artist's projects to Patrons through the internet, without the necessity of a recording contract with a recording company and without the necessity of a production company, comprising a server having application programs operable from a remote site for:

---

[1] ArtistShare contends that Kickstarter infringes twenty-five claims of the '887 patent, but that only these five are independent claims. The rest are dependent claims, meaning that they cannot be infringed if the independent claims have not been infringed. Pl.'s Br. at 10 n.6 (citing Wolverine World Wide v. Nike, Inc., 38 F.3d 1192, 1196-99 (Fed. Cir. 1994)).

  allowing Patrons to demonstrate interest in one or more projects prior to, during, and after creation and publication of the project's artistic work;
  registering contact information regarding interested Patrons in a searchable database;
  providing to the artist or Account Manager **software tools** to design, create, and implement **an artist-specific web page** for the purpose of marketing said artist's projects to existing and new Patrons[2] without the necessity of a contract with a recording company and without the necessity of a production company;
  **managing communications**, through said patron database, from the artist or Account Manager to Patrons regarding sales and marketing of one or more projects; and
  managing and viewing financial and marketing information relative to projects supported through the system.

  Claim 18.  System for funding and marketing at least one project of an artist comprising:
  a server having application programs operable for:
  receiving data from an artist or Account Manager regarding at least one project by an Artist;
  providing **tools** for the artist or Account Manager **to present the at least one project** to at least one of Fans and Patrons;
  receiving data from the artist or Account Manager regarding at least one entitlement associated with at least one of the Artist and the project, said **entitlement including at least one of a product, a service, and patronage**, but not ownership in the project;
  transmitting offer data to said Fans or Patrons, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project,
  the project comprising at least one creative work; and
  receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron.

  Claim 35.  System for funding and marketing at least one project of an artist comprising:
  A server having application programs operable for:
  receiving data from an artist or Account Manager regarding at least one project by an Artist;
  providing **tools** for the artist or Account Manager, without the necessity of a recording company and without the necessity of a production company, **to present the at least one project** to at least one of **Fans** and **Patrons**;
  receiving data from the artist or Account Manager regarding entitlements associated with at least one of the Artist and project;
  transmitting offer data to said **Fans** and/or **Patrons**, the offer data comprising an offer for at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work; and
  receiving acceptance data for an entitlement at a predetermined level of patronage from a **Patron**.

  Claim 36.  System for funding and marketing a plurality of projects of an artist, the system comprising:
  a server having application programs operable for:
  receiving data from an artist or Account Manager regarding a first project by an Artist;
  providing tools for the artist or Account Manager to present the first project to **Fans** of the artist;
  receiving data from the artist or Account Manager regarding at least one entitlement associated with the first project, said **entitlement including at least one of a product, a service, and patronage**;

---

[2] While the parties previously disputed the construction of the term "existing and new Patrons," they have subsequently agreed that it should be construed as "current and prospective Patrons."  Defs.' Br. at 10.

transmitting offer data to said **Fans**, the offer data comprising an offer for said at least one entitlement at a predetermined level of patronage in exchange for funds for the project, the project comprising at least one creative work;
    receiving acceptance data from a **Fan** for an entitlement at a predetermined level of patronage;
    registering the **Fan** as a **Patron** in a **Patron database** and storing contact information regarding the **Patron**; and
    managing communications, through said Patron database, from the artist or Account Manager to **Patrons** regarding sales and marketing of one or more additional projects.

## DISCUSSION

### I. Legal Standard

"The words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. Additionally, "[a] patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description." Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1381 (Fed. Cir. 2012).

A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313. Where the meaning of claim language is not readily apparent, courts "should also consider the patent's prosecution history" because, "[l]ike the specification, the prosecution history provides evidence of how the [Patent and Trademark Office ("PTO")] and the inventor understood the patent." Id. at 1317. Through "a clear disavowal in the specification or the prosecution history," Thorner v. Sony Computer

Entm't Am. LLC, 669 F.3d 1362, 1366 (Fed. Cir. 2012), a patentee may "limit[] the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317; see also Thorner, 559 F.3d at 1366 ("Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal.").

## II.   "Person of Ordinary Skill in the Art"

The parties disagree as to whom is a "person of ordinary skill in the art." Kickstarter would define it as "a hypothetical person with a bachelors [sic] degree in either business or computer arts, who has some practical experience and/or would include a team of members having such individual expertise," Pl.'s Opening Claim Construction Br. at 8 n.5, Nov. 6, 2012, Dkt. No. 42 ("Pl.'s Br."), while ArtistShare contends that it should be defined as "a self-taught computer programmer with some understanding of the music industry." Def.'s Responsive Claim Construction Br. at 1 n.2, Dec. 10, 2012, Dkt. No. 52 ("Def.'s Opp'n").

The Court has been unable to find other decisions that define a person of ordinary skill in the art in similar contexts and neither side has provided "more than conclusory arguments concerning the issue." Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254, 1257 (Fed. Cir. 2007); see also id. at 1256 (listing factors that may be considered). In this instance, the Court finds that a combination of the definitions provided by both parties is appropriate. First, given the breadth of fields that may make use of the patent for marketing and financing purposes, it makes little sense to restrict those skilled in the art only to people familiar with the music industry. See, e.g., '877 Patent at 6; Compl. ¶ 9. Rather, this seems an improper attempt to draw lines with sufficient specificity so as to include Camelio but to exclude others from similarly creative fields. Second, it is clear that in the website programming and design realm in

particular, many entrepreneurs and inventors, like Camelio, are self-taught rather than having received formal education.  See, e.g., Alex Williams, The Old College Try? No Way, N.Y. Times, Dec. 2, 2012, at Styles 1; see also Keating v. N.Y. 708 F. Supp. 2d 292, 293 n.1 (E.D.N.Y. 2011) (taking judicial notice of New York Times article); Darvin v. Bache Halsey Stuart Shields, Inc., 479 F. Supp. 460, 462 n.1 (S.D.N.Y. 1979) (same); Mamiye Bros. v. Barber S.S. Lines, Inc., 241 F. Supp. 99, 116-17 (S.D.N.Y. 1965) (same).  The Court determines that, for the purpose of this matter, "a person of ordinary skill in the art" is an individual with (1) either formal or informal training in computer engineering and programming, and (2) either experience in or an understanding of artistic and creative industries.

### III.   Disputed Terms

####   A.   Patron

The parties dispute whether a "patron" is someone who merely registers with the system in question, or whether they must also make some form of contribution to a project.  The claims do not provide guidance as to how "patron" should be interpreted, and the specifications provide some support for both arguments.  ArtistShare relies on the specification's explanation that "A Patron may be, but is not limited to, a fan . . . that registers with ArtistShare *and/or* contributes to or purchases an Artist's project, work or the actual Artist."  '887 Patent at 6:64-67 (emphasis added).  Nevertheless, the language "may be, but is not limited to" denotes that this was not meant to be either an exhaustive or exclusive definition.  Kickstarter's proposed definition is supported by a definition also contained in the specification, without similarly limiting language: "A patron is a fan who registers with an artist . . . and who provides a monetary contribution to a project of an artist."  Id. at 18:55-59.

6

Throughout the specification, "patron" and the related term "patronage" are more generally used to describe someone who has made a contribution to an artist. See, e.g., id. at 13:24-28; id. at 13:41-45; id. at 14:20-23; 17:18-23. Moreover, this comports with the general usage and common understanding of the term, which has been defined, *inter alia*, as "one who buys the goods or uses the services offered especially by an establishment," "one that uses wealth or influence to help an individual, an institution or a cause," and "a social or financial sponsor of a social function (as a ball or concert)." Merriam-Webster Dictionary and Thesaurus, available at http://www.merriam-webster.com/dictionary/patron. Accordingly, "patron" is construed as "a fan who registers with an artist and who provides a contribution to a project of an artist in exchange for certain entitlements."

> B.   *Patron Database*

The parties dispute whether the term "Patron database" needs to be specifically construed or whether it should be defined simply as a database containing information regarding patrons. Claims must be interpreted from the perspective of "a person of ordinary skill in the art," Phillips, 415 F.3d at 1312-13, which, in the instant matter, means someone with formal or informal training in computer engineering and programming. Such a person could not simply take the word "database" at face value, but would surely have specific questions regarding the size and scope of the database to be created. Accordingly, a more specific definition would not "introduce unnecessary verbiage." Stanacard, LLC v. Rebtel Networks, AB, 680 F. Supp. 2d 483, 495 (S.D.N.Y. 2010).

First, the claims establish that the database must contain both contact and marketing information regarding the Patrons. See, e.g., '887 Patent 21:58-59. The specifications and prosecution history further clarify that it is to contain demographic and sales-related information

as well.  Id. at 3:30-35, 11:56-60, 19:58-65; Bickham Decl. Ex. 2 ("Pros. Hist.") at 363, Dkt. No. 43.  Second, the specifications and prosecution history explain that ArtistShare's system does not create one centralized database containing information regarding all patrons and to which any artist has access, but rather it creates multiple databases, each containing information pertaining to patrons of a specific artist, to which only that artist has access, and which applies across all projects by that artist.  See, e.g., Pros. Hist. at 362, 437; '887 Patent at 12:45-48; see also id. at 23:34-35.  The term "patron database" will be construed as "an artist-specific database that contains contact, marketing,[3] sales, and demographic information of the artist's patron gathered from an artist's projects."

### C. Client

The Court finds that the ordinary meaning of this claim term applies and is self-explanatory to a person of ordinary skill in the art.  This term will not be further defined, and Kickstarter's preferred construction is rejected because it would "introduce unnecessary verbiage," Stanacard, 680 F. Supp. 2d at 495, and deprive ArtistShare of the "full scope of [its] claims."  Kara Tech., Inc. v. Stamps.com, Inc., 582 F.3d 1341, 1348 (Fed. Cir. 2009).

### D. Fan(s)

The parties dispute whether a "fan" can be "any individual" or whether it is limited to "a consumer, admirer or follower, mentor, and any other individual(s) interested in the Artist's work."  In contrast with the parties' arguments regarding the term "patron," supra, Kickstarter now relies on the definition set out in the specification's terminology section, while ArtistShare points to the limiting language that "[a] Fan may be, but is not limited to" the aforementioned

---

[3] Neither party's proposed definition includes the term "marketing," but it is included in the Patent's claims.  See, e.g., '887 Patent at 24:47-49.

description. Id. Unlike "patron," however, the specifications and prosecution history provide little help in construing the term "fan." While the prosecution history mentions the "general nature of [the] term[]" and contrasts it with the "more narrowly defined" term "patron," the argument that a fan should be defined as "any individual" is unavailing.[4] Pros. Hist. at 382. Despite the "may be, but is not limited to" language, the best guide to the intended definition of "fan" remains the narrower definition set out in the patent's specification. See '887 Patent at 6:61-63. Moreover, the narrower definition accords with the general understanding of the term and avoids the bizarre result that would occur if "fan" included any individual, including those uninterested in or disdainful of the artist in question. A person of ordinary skill in the art would not understand an artist's "fans" to include those with no appreciation of or interest in their work. Accordingly, the term "fan" is construed as "a consumer, admirer or follower, mentor, and any other individual(s) interested in the Artist's work." Id.

     *E.     Entitlement including at least one of a product, a service, and patronage*

The parties disagree over whether the definition of what an entitlement is to include should be construed in the disjunctive ("at least one product *or* service *or* patronage") or conjunctive ("at least one product, *and* at least one service, *and* at least one patronage."). This precise question has been addressed by the Federal Circuit, which addressed a similarly worded patent in which "[t]he phrase 'at least one of' precedes a series of categories of criteria," finding that where "the patentee used the term 'and' to separate the categories of criteria . . . [it] connotes a conjunctive list." Superguide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 886 (Fed. Cir.

---

[4] This portion of the prosecution history, filed on May 5, 2010, Pros. Hist. at 384, appears to be responsive to a March 18, 2010 telephone call between Camelio, his counsel, and the PTO, during which Camelio was instructed to "better define the claims/terms." Id. at 373. Without a more specific record of what this conversation entailed, and what was said regarding the term "fan" in particular, Camelio's appreciation of and purported agreement with "the examiner's comments" is ambiguous. Id. at 382.

2004). Relying on William Strunk and E.B. White's classic treatise on grammar, The Elements of Style (4th ed. 2000), the term was construed "as requiring . . . at least one value for each category." Id. Courts generally rely on Superguide, see, e.g., Civix-DDI, LLC v. Hotels.Com LP, 809 F. Supp. 2d 882, 900 (N.D. Ill. 2011); TouchTunes Music Corp. v. Rowe Intern. Corp., 727 F. Supp. 2d 226, 238-39 (S.D.N.Y. 2010); Inventio AG v. ThyssenKrupp Elevator Ams. Corp., 718 F. Supp. 2d 529, 552-56 (D. Del. 2010), rev'd in part on other grounds, 649 F.3d 1350 (Fed. Cir. 2011); except where a conjunctive construction "does not make any sense" in the context of the patent in dispute and would "render the claims utter nonsense." Joao v. Sleepy Hollow Bank, 348 F. Supp. 2d 120, 123-26 (S.D.N.Y. 2004). This exception is not applicable to the '887 Patent.

Furthermore, the doctrine of "[p]rosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process," Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 733 (2002), and precludes "a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571, 1577-78 (Fed. Cir. 1997). Many amendments filed throughout the prosecution history focused on the term "entitlement." For example, in an application amendment filed on April 28, 2008, a claim defined an entitlement as being "at least one of" several products or services "and any combination thereof," such that an entitlement did not necessarily include all of the enumerated products or services. Pros. Hist. at 227. This language was removed in an April 7, 2009, application amendment. Id. at 298. Several subsequent amendments similarly defined entitlements in a disjunctive manner. See, e.g., id. at 348-49, 382. The disputed term was added into the final amendment to the application, filed on September 7, 2010. Id. at 423,

426. Unlike previous versions of the application, the September 7, 2010 iteration does not include disjunctive language with regard to entitlements, nor does its "Remarks" section suggest that the finalized language regarding entitlements is meant to be read disjunctively.  See generally id. at 427-38.  That disjunctive language is used elsewhere in the patent's claims – specifically, the phrase "at least one of the following," followed by a list – suggests that this choice of language was intentional.  See, e.g., '887 Patent at 22:15-18; 24:10-13.

Accordingly, the term is construed as an "entitlement that includes at least one product, and at least one service, and at least one patronage."

### F. Software-Related Terms

The '887 Patent protects a system that uses various "software tools" for myriad purposes, without explicitly defining the term "software tools" generally or in the context of the term's specific usages.  See, e.g., '887 Patent at 21:37-38 1; 21:60-61; 23:28-30; 23:44-45.  Throughout their papers, ArtistShare generally construes "software tools" as "computer aided features," itself a vague and amorphous term with no clear definition.  Kickstarter prefers "computer programs," a widely used and easily understood term.  ArtistShare argues that this construction is problematic because it does not account for the possibility of using web-based applications.  The lone cite offered by ArtistShare in support of this assertion does not demonstrate that the use of web-based applications was meant to be encapsulated by "software tools," however; ArtistShare merely directs the Court to a section of the specifications discussing websites from which an artist or account manager "may obtain information."  '887 Patent at 15:25. This hardly demonstrates that "computer programs" is not a proper or sufficiently broad construction.  Accordingly, "software tools" and the related term "tools" are construed as "computer programs."

#### 1. Software tools . . . to manage at least one project

ArtistShare asserts that the term should be construed "in a manner broad enough to

include the embodiments disclosed in the specification, without limiting the claims to a specific embodiment." Def.'s Br. at 15.  The prosecution history makes clear, however, that Figure 7, '887 Patent at 9, contains "[t]he full listing of management tools available to the Artist," and that the patent application was amended to include the eleven specified functionalities to "differentiate the instant invention from all cited prior art."  Pros. Hist. at 383; see also id. at 363-64.  Accordingly, the software tools for the management of projects are limited to those enumerated in Figure 7 of the Patent itself, and the term is construed as "computer programs that consist of a suite of features, including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows and images."

        2.      Software tools . . . to manage communications, through said Patron database

The parties largely agree as to how "managing communications" should be construed, compare Def.'s Br. at 17 and Pl.'s Br. at 12, but dispute whether "through said Patron database" should be construed more liberally, as "with the aid of the Patron database," Def.'s Br. at 17, or more literally, as requiring that "the Patron receives the information directly from the Patron database."  Pl.'s Br. at 17.  The language of the claim itself provides support for the latter; the choice of the word "through" suggests that the Patron database should play a larger role than mere facilitation.

The latter interpretation of "directly from the patron database" is also clearly supported by the prosecution history.  An earlier draft of the patent application included a claim for "providing the artist software tools to manage communications *directly* to Patrons regarding the sales and marketing of one or more projects."  Pros. Hist. at 358 (emphasis added).  This was rejected by the PTO, based on prior art, because "Massey discloses providing the artist or

Account Manager software tools . . . to manage communications directly to Patrons" and because "Boyle (an analogous art) discloses . . . providing software tools to an Artist or Account Manager . . . to manage communications directly to Patrons." Id. at 395-96. Camelio subsequently amended the claim by substituting the phrase "through said Patron database" in place of the word "directly." Id. at 419. This was meant to differentiate the instant patent from prior art, which did not provide "any mechanism for managing communication, through a Patron database, to Patrons regarding the sales and marketing of a project." Id. at 428. The specific choice of words, namely "through a Patron database," was thus used to distinguish the instant patent from one in which software tools, such as a database, might be used to facilitate direct communications with patrons. By now seeking to have the instant term construed as allowing the patron database to aid in communications, rather than to actually function as the means of communication, ArtistShare is attempting to recapture precisely what it previously disclaimed. The term is therefore construed as "computer programs that enable and control the exchange of information with a patron wherein the patron receives the information directly from the Patron database."

### 3. Software tools . . . to design, create, and implement an artist-specific web page

The parties agree that this term should be construed as software tools[5] "to design, create and implement an artist-specific web page," but disagree as to the meaning of "artist-specific web page." Pl.'s Br. at 14. ArtistShare points to three distinctions between the parties' proposed constructions: (1) whether this is limited to a single web page, (2) whether the web page's purpose is limited to "marketing," and (3) whether web pages must be specific to a single artist.

---

[5] In its motion papers, Kickstarter argued that the term "should be construed as computer programs . . ." but also stated that it agrees with Artistshare's construction of "computer-aided features . . ." Pl.'s Br. at 14. At oral argument, Kickstarter clarified that, in the context of this term, software tools should be construed as "computer programs," as elsewhere. See, e.g., Dec. 17, 2012 Hr'g Tr. at 66-67; see also id. at 81.

First, it is well established that the use of an indefinite article in a patent does not necessarily connote the singular.  The Court of Appeals for the Federal Circuit has "'repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning 'one or more' . . . unless 'the language of the claims themselves, the specification, or the prosecution history necessitates a departure from the rule.'"  SanDisk Corp. v. Kingston Tech. Co., Inc., 695 F.3d 1348, 1360 (Fed. Cir. 2012) (quoting Baldwin Graphic Sys., Inc. v. Siebert, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008)).  The '887 Patent does not provide grounds for deviating from this general rule.[6]  Accordingly, "an . . . web page" is properly read in this context as "one or more web pages."

Second, ArtistShare contends that "the artist-specific webpage may include multiple features" and "is not solely dedicated to the promotion of an artist's projects."  Def.'s Br. at 20.  However, Claim 17 explains that the "artist-specific web page [is] for the purpose of marketing said artist's projects."  '887 Patent at 23:30.  ArtistShare does not provide any reason to set this language aside in construing the term at issue.

Third, construing an "artist-specific web page" as a web page relating to multiple artists would conflict with the plain language of the claim.  It is unclear how something relating to multiple artists could be described as "artist-specific."  The term should therefore be construed as referring to a website for a single artist.  This does not, however, "preclude[] joint-authorship of a project," Def.'s Opp'n at 9, because an artist is not synonymous with an individual; an "artist

---

[6] ArtistShare suggests that the specifications clarify that "artists can create 'one or more web-pages.'"  Def.'s Br. at 19 (citing '887 Patent at 16:57-65).  This is an incorrect reading of the patent.  The specification in question refers to the "website/homepage of the artist," and a separate "web-page for managing such information" that the Artist has access to.  '887 Patent at 16:57-58.  It is this latter website, designed to enable the artist to manage their public website, that "may include . . . one or more web-pages."  Id. at 16:59.  Nevertheless, the fact that the patent discusses "A web-page" . . . [that] may include . . . one or more web-pages" provides support for the more general proposition that the '887 Patent was drafted with full knowledge of the rule that "a patentee must 'evince a clear intent' to limit 'a' or 'an' to 'one.'"  Siebert, 512 F.3d at 1342; see also '887 Patent at 11:50-53.

may comprise a single person (musician, writer, actor, educator, programmer, artist, manager, and the like) or an entity (such as a band)." '887 Patent at 10:19-22. The possibility of joint-authorship is therefore recognized where the artist is a collaborative entity working together on a project or projects.

Accordingly, this term is construed as "computer programs to design, create and implement one or more web pages dedicated to the marketing of a single artist's one or more projects.

4.  Tools . . . to present the at least one project

The meaning of the term "present the at least one project" is self-explanatory to a person of ordinary skill in the art. The Court therefore declines to further construe this term. Kickstarter's proposed construction is be rejected because it would deprive ArtistShare of the "full scope of [its] claims" by unnecessarily and improperly "limit[ing the patentee] to his preferred embodiment." Kara Tech., 582 F.3d at 1348.

## CONCLUSION

The foregoing constitutes the Court's ruling on all outstanding matters of claim construction. The Clerk of the Court is directed to terminate the motion at Docket No. 39.

Dated: New York, New York
January 16, 2013

SO ORDERED

*[signature]*

PAUL A. CROTTY

United States District Judge