MANMKICC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KICKSTARTER, INC.,

4                  Plaintiff,

5           v.                                  11 Civ. 6909 (KPF)

6   FAN FUNDED, LLC and
    ARTISTSHARE, INC.,
7
                   Defendants.
8
    ------------------------------x
9                                               New York, N.Y.
                                                October 23, 2013
10                                              4:45 p.m.

11  Before:

12                    HON. KATHERINE POLK FAILLA,

13                                              District Judge

14                          APPEARANCES

15  FOLEY & LARDNER
         Attorneys for Plaintiff
16  BY:  ROBERT J. SILVERMAN

17  LANDO & ANASTASI
         Attorneys for Defendants
18  BY:  CRAIG R. SMITH

19

20

21

22

23

24

25

MANMKICC

```
 1              (Case called)
 2              MR. SILVERMAN:  Yes, your Honor.  Robert Silverman for
 3     the plaintiff, Kickstarter.
 4              THE COURT:  Good afternoon, sir.
 5              MR. SMITH:  Good afternoon, your Honor, Craig Smith on
 6     behalf of the defendants Fan Funded and Artistshare.
 7              THE COURT:  Let me begin by thanking you for your
 8     patience.  We had a jury verdict come in this afternoon.  At
 9     some point they were going to come back, they just happened to
10     come back at a time that influenced this.  When I went back to
11     speak with the jury they had a lot of questions for me about
12     the litigation process and I, therefore, was kept back there
13     for about half an hour and maybe that would be about 25 minutes
14     longer than I expected.  I thank you for your patience.
15              As I understand it, gentlemen, we are here on two
16     issues.  And one is the continuation, or not, and length, or
17     not, of the deposition of Mr. Camelio from Artistshare.  And
18     the second is the issue of invention date, priority date.
19              Mr. Silverman, let me hear you first on the question
20     of the deposition.
21              MR. SILVERMAN:  Yes, your Honor.  Mr. Camelio is the
22     CEO, founder of Artistshare.
23              THE COURT:  He was here at the last conference.  Take
24     my word for it.
25              MR. SILVERMAN:  I'll take your word for it, your
```

MANMKICC

```
 1    Honor.  Thank you.  He was designated as the Rule 30(b)(6)
 2    designee on every topic that was in our notice to the
 3    defendants.  And we took his deposition on those issues and we
 4    made it clear, your Honor, to Artistshare prior to the
 5    deposition that we were expecting Mr. Camelio would be prepared
 6    on the 30(b)(6) topics.  And there was actually a conference
 7    before your Honor just a day or so before Mr. Camelio's
 8    deposition which took place on August 16.  I think there was a
 9    conference on August 15.
10         THE COURT:  It was the 15th, yes.
11         MR. SILVERMAN:  When he was here.  For whatever
12    reason, there wasn't a court reporter at that conference.
13         Our understanding was that it had come up that
14    Mr. Camelio would, of course, have his individual deposition
15    later on.  The parties had a different memory about that.  But,
16    in any event, we later advised Artistshare that we wanted to
17    have a date for Mr. Camelio's individual deposition and the
18    issue came up, is this necessary and, if so, for how long.
19         From our point of view, your Honor, Mr. Camelio is
20    involved in every aspect of this company and really in every
21    aspect of the issues in this lawsuit.  He was not only the
22    inventor and the founder, main employee of Artistshare, but he
23    also was the person who made the threat to Kickstarter of
24    patent infringement that led to this lawsuit in the first
25    place.
```

MANMKICC

1        So the issue has come up, would this deposition be

2    restricted to four hours and that would be enough to cover the

3    more issues.  But for the more recent events, that we will get

4    to second in your Honor's agenda, but we simply don't know

5    whether four hours would be adequate or not.  Were we to have

6    an individual deposition of Mr. Camelio, we wouldn't want to be

7    restricted going into it.

8        THE COURT:  Thank you.

9        Mr. Smith, you were at the last conference.

10       MR. SMITH:  Yes, your Honor.

11       THE COURT:  As was I, as was my very thoughtful law

12   clerk who took near a transcript of the proceedings.  I trust

13   him implicitly as he has given this to me.

14       And it appears that it was advanced by plaintiff that

15   Mr. Camelio will be produced tomorrow as a 30(b)(6) witness and

16   at that time the Foley & Lardner partner who is not

17   Mr. Silverman said, we may need more than tomorrow alone, but

18   we will have a different view of it at the end of tomorrow.  We

19   would continue the deposition in his individual capacity,

20   prompting me to ask whether he could be a witness in both

21   capacities, and you start to say that the idea of Mr. Camelio's

22   deposition going on for multiple days, when the case is

23   confined to the invalidity issue, seems like they are just

24   taking the head of the company out of business when there is a

25   very small issue left in the case, which did sound about what

MANMKICC

1   you would said.

2           And I said that the risk of putting someone in Mr.

3   Camelio's role forward as the 30(b)(6) witness risks extending

4   the deposition because he has multiple capacities.  I'm not

5   surprised that it might last longer.  It was my hope that the

6   plaintiff would not maliciously extend it.  It's going to be

7   extended.  The four hours is fine.  More than four hours is

8   fine.  Don't be stupid about it.  It was contemplated that it

9   would go on.  If you'll excuse my candor, that's less

10  interesting to me than this priority date issue.  I don't know

11  who wants to speak on it first.

12          Mr. Smith, since you are standing, I'm happy to hear

13  from you.

14          MR. SMITH:  Sure, your Honor.  Thank you.

15          So the issue came up in the context of there has been

16  a number of interrogatories and there has been deposition of

17  Mr. Camelio relating to conception, when he conceived of his

18  idea.

19          THE COURT:  Is it not the case, sir, that the most

20  recent response speaks of a priority date in 2001, when for

21  some period of time the operative priority date or invention

22  date had been the summer of 2000?

23          MR. SMITH:  No, your Honor.  I think Kickstarter was

24  taking language out of a letter, but was suggesting it meant

25  something that it didn't.  And by that, I mean, we have always

MANMKICC

1    put in our interrogatory and we have always stated and Mr.

2    Camelio has stated in his deposition that his recollection is,

3    he came up with the idea in the summer of 2000.  What was in

4    the letter that Kickstarter had cited to is the fact that we

5    also put into the letter that we have evidence showing

6    different things that he worked on.  One of the things that he

7    was working on was the source code relating to the idea that he

8    had come up with.  And some of that is dated in the 2001 time

9    frame.

10           And so we had identified for them in one of our

11   interrogatory responses some of the documents and information

12   that we have been able to discover about what he was working on

13   after the conception date, after he came up with the idea, what

14   was he doing and what did he come up with.  And so the 2001

15   date was one data point that we were showing.  You can see

16   here, he is working on source code for the invention.  And so

17   we have highlighted that for them in our interrogatory

18   response.

19           From July of this year, we had put forward an

20   interrogatory indicating details about a whole narrative

21   relating to his recollection of how he came up with the idea,

22   things that he had worked on, was specifically mentioned that

23   he had started working on source code after he came up with the

24   idea, and we had given to Kickstarter the opportunity to

25   inspect the source code that we had, and they never did it.

MANMKICC

1    They never came in and said, let's look at source code that you

2    are talking about.

3            At his deposition Mr. Camelio testified consistent

4    with what the interrogatory states, that he conceived of the

5    idea in 2000, that he was working on various aspects of the

6    idea after the summer of 2000, including source code.  He

7    indicated that he didn't remember working on specific types of

8    source code.  He also indicated that he thought all that source

9    code had been disclosed to Kickstarter in this case, which it's

10   our belief that it had been because we had made it available

11   for inspection.  None of that was addressed at Mr. Camelio's

12   deposition because none of it had actually ever been reviewed

13   by Kickstarter.

14           And then subsequent to that, Mr. Camelio discovered

15   that one of the hard drives that he thought was unreadable,

16   because he couldn't get access to it, he was able to figure out

17   a way to get access to it.  So there was some additional source

18   code that we discovered, and we then produced that to

19   Kickstarter and said we have discovered additional source code,

20   we will make that available for inspection so you can see it.

21   We also supplemented our interrogatory response to indicate

22   that we had discovered this additional information so that they

23   would be aware of it.

24           I think what we are looking at now is an issue of

25   Kickstarter wants to file a motion, I think, for summary

1   judgment to limit what date we get to rely upon.  And it's our

2   position, they certainly can do that.  It's our position --

3           THE COURT:  They certainly can file the motion.

4   You're not consenting to it.

5           MR. SMITH:  Exactly.  What are we going to say?  We

6   are not going to agree to the motion.  We obviously oppose the

7   motion.  But the timing of it, to us, doesn't make a lot of

8   sense, meaning there is already a deadline for motions for

9   summary judgment.  I think what's likely going to be the most

10  efficient way to deal with things is that they are going to let

11  us know at some point whether it's an expert discovery or at

12  the time that they file their motion for summary judgment which

13  prior art they are actually relying upon, meaning they have

14  given us a whole laundry list of prior art that they might rely

15  upon, prior art that they are going to say invalidates the

16  patent in this case.

17          At that point in time that would be an important point

18  in time to determine whether or not we need to even address

19  this issue.  The reason I say that is, if you look at the

20  dates, meaning the date that's fixed in time or the date when

21  the application was filed, so there is a provisional

22  application filed and then there was the utility application

23  that was filed.  Those dates are fixed in time.  They have

24  picked prior art, which goes back before those dates.  Now,

25  some of those dates go back far enough that this whole issue of

MANMKICC

1     what date they were relying upon doesn't make any difference.

2     It's totally irrelevant.

3          There are other pieces of prior art that they might

4     rely on that might fall in between the date where Mr. Camelio

5     said we conceived of the idea and reduced it to practice and

6     the date that he actually filed his patent application.  There

7     could be a piece of prior art that they rely upon that falls in

8     there.  If they did, we would have the argument to say, now you

9     have put forward this prior art that falls within this range

10    here, and we can argue that we actually believe that because we

11    have a prior invention date, that piece of prior art wouldn't

12    actually qualify as prior art.

13         But for our way of thinking, until we know that they

14    are going to rely on art that fits in there, this seems a

15    little academic because if they decide not to rely on any prior

16    art that is in that range, to us that whole issue doesn't

17    really seem to come into play.

18         THE COURT:  Let me ask you this question.  What is the

19    invention date?  What are the operative dates here?  Because I

20    do remember from the last conference, there was a little bit of

21    a moving target nature to the dates.  I'm not saying that was

22    intentional.  I'm saying that was just my perception.  So I

23    want to know, there is now a final answer on the question of

24    when the invention date was?

25         MR. SMITH:  There are a number of different dates.

MANMKICC

1          THE COURT:  I actually want all of them, all of the

2     operative dates.

3          MR. SMITH:  For example, there is the date when the

4     utility application was filed, so that's the application that

5     ultimately matured into the patent that's in this particular

6     case.  And so the filing date of that, I can't remember if it's

7     December of 2002.  I don't have a copy of it in front of me, so

8     I can't give you the exact date.  But prior to that there is

9     what's called a provisional application which also has a fixed

10    date.  That date is July 8, 2002.  That's another fixed date.

11    In some litigations there is no argument about any date before

12    that date, meaning there is no discussion of what happened

13    before the filing of your patent application because the

14    patentee doesn't rely on anything that gets them back before

15    that date.

16          THE COURT:  But you do.

17          MR. SMITH:  But we do.

18          THE COURT:  Mr. Silverman would be happy if you were

19    just relying on the provisional application date, but I know

20    that's part of the reason we are here today.

21          MR. SMITH:  Exactly, your Honor.

22          So the information that Mr. Camelio has testified

23    about, which is in the summer of 2000 he came up with the idea,

24    we don't have a napkin or something that says, you know, I,

25    Brian Camelio, have come up with this idea on this particular

1    date on such and such day in 2000.  We don't have something

2    like that.  We have information from Mr. Camelio saying, this

3    is what I was working on at this time.  We put that into our

4    interrogatory response to try to give Kickstarter the

5    understanding that we have as to how Mr. Camelio came up with

6    the idea and the time frame.

7          Then what we have are documents showing what he was

8    working on to get to the point where he said, okay, I not only

9    had the idea, but I have now been able to sort of put into

10   implementation this particular idea.

11         So what we have been providing to Kickstarter is that

12   information, meaning what are those dates where we show them

13   source code that Mr. Camelio worked on in 2001 or other

14   information that he was working on in that time period.  So we

15   produced documents relating to those time periods.  But there

16   is no one date that we have where we say, well, this is the

17   date where we say he conceived of the idea and that's a date

18   certain.  Because he doesn't have enough of a memory from 13

19   plus years ago to say, here is the day I came up with.  What we

20   have is his testimony about when he came up with the idea and

21   then documents showing what he was working on after the

22   conception of the idea.

23         THE COURT:  Thank you very much.  Let me hear from

24   Mr. Silverman.

25         Mr. Silverman, I may have misinterpreted plaintiff's

MANMKICC

1    letter to me, but I thought there was some suggestion that

2    there was an 11th hour change of heart by your adversary

3    regarding a particular date.  He is suggesting that there

4    isn't, that they have been very consistent with what they have

5    said to you.  If you disagree, tell me why.

6              MR. SILVERMAN:  I do disagree, your Honor.  If I may,

7    I have a copy of the most recent interrogatory response.  I can

8    hand this up to your Honor if your Honor --

9              THE COURT:  I'll let you read it from there.  Thank

10   you.

11             MR. SILVERMAN:  The problem that we have encountered,

12   your Honor --

13             THE COURT:  Let me stop you for a moment.

14   Mr. Smith, you are aware of the document from which he

15   is reading?

16             MR. SMITH:  If it's our last interrogatory response

17   from October 15, yes.

18             MR. SILVERMAN:  Yes, your Honor, it is the October 15

19   response.

20             The problem that we encountered and the problem we

21   raised in our October 3 letter to your Honor was that when

22   Artistshare amended their interrogatory response the first time

23   on July 19, 2013, so this was roughly a month before the

24   Camelio deposition.

25             THE COURT:  Therefore, a month before the conference

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MANMKICC

1     before me where it was not raised.

2              MR. SILVERMAN:  Exactly.

3              THE COURT:  That doesn't help you.

4              MR. SILVERMAN:  I'll tell you exactly why the issue

5     was raised the way it was.  That interrogatory response said

6     that the invention was conceived in or about the summer of

7     2000, and there was a single document that was identified as

8     potentially relating to that summer of 2000 date.  There is

9     also the patent application mentioned, but we know that that's

10    significantly later.

11              The document that was mentioned, and I can hand this

12    up, your Honor, if you like, it wasn't very helpful to us and

13    it's sort of almost a napkin that Mr. Smith had in mind.

14    That's ART11398.  And we asked Mr. Camelio at his deposition

15    what is this document?  Explain the conception.

16              Mr. Camelio didn't recognize the document.  He didn't

17    provide any other information that would lead us to believe

18    that anything happened in the summer of 2000.  Therefore, we

19    felt, well, now we understand that he has got a feeling that he

20    invented something earlier or came up with it earlier, but it's

21    not clear at all.  And, therefore, we think that we should just

22    remove this summer of 2000 date from the possibility of being

23    an invention date of the patent and work with the date that is

24    on the patent application itself, the July 2002 date.

25              We proposed this to Artistshare.  We said Mr. Camelio

1       was the 30(b)(6) designee.  Your interrogatory response

2       identified one document that might possibly be before the

3       filing date of the patent.  And he didn't know anything about

4       it.  Therefore, Kickstarter asked Artistshare to withdraw its

5       contention that there was a date of invention prior to the date

6       that the application was filed or the priority application was

7       filed.

8                  THE COURT:  When did you make that inquiry of

9       Artistshare?

10                 MR. SILVERMAN:  I believe it's in our letter to your

11      Honor.  It was after the Camelio deposition, which was in

12      August.  So I imagine it was some time in September that that

13      request was made, but I can't seem to find it in front of me.

14                 In responding to our October 3 letter, we saw that on

15      October 7, Artistshare wrote to your Honor saying that Mr.

16      Camelio had prepared figures for the application at least as

17      early as 2001, based on the copyright notice.  We have sort of

18      maybe 2001 is the date they are relying on.  It's a little

19      unclear.  And since it's mentioned here in the sentence, I want

20      an opportunity to inspect source code.  Because Artistshare had

21      not in their interrogatory response identified any source code

22      that we should be looking at, we didn't think there was any

23      point in looking at source code that was perhaps embodying the

24      current product.  Depending on the issues in the case, there

25      may have been a need to look at that.  It was never brought to

MANMKICC

1   our attention that that might evidence an invention or

2   reduction to practice.

3           THE COURT:  Mr. Smith, you're talking that the source

4   code is evidence of reduction to practice?

5           MR. SMITH:  That's correct, your Honor.

6           THE COURT:  Mr. Silverman, you now know that their

7   belief is that that source code is evidence of reduction to

8   practice.

9           MR. SILVERMAN:  I learned that, your Honor, on October

10  7.  But then on October 15, which was the date of the second

11  supplemental response to interrogatories 7 and 8.  Actually,

12  since interrogatory number 8 is also about conception of the

13  invention, the invention date, it incorporates by reference the

14  response to interrogatory 7.  So both of them were essentially

15  amended.

16          In that response, there is still this statement about

17  December of 2000.  But this response of October 15, which is

18  the last day of the discovery period, goes on to identify many

19  other documents.

20          THE COURT:  You are saying they had not been

21  identified previously, but they had been produced to you

22  previously, correct?

23          MR. SILVERMAN:  That's correct, your Honor.  They had

24  been produced.  I should say, some of the documents had been

25  produced.  They also produced quite a few documents right near

MANMKICC

1    the end of the discovery period, I believe October 7, so a week

2    before the close of the discovery period.  But even though some

3    of these documents were produced, none of these documents that

4    appear in the October 15 amendment to the interrogatories were

5    brought to our attention as revealing any theory of invention

6    or conception or reduction of practice.

7            THE COURT:  Remember, we don't practice patent law.

8            MR. SILVERMAN:  Except for the ART11398 document,

9    which Mr. Camelio wasn't able to identify and couldn't give us

10   any information about anyway, so that document was not much of

11   a concern.

12           What was a concern is all these other documents that

13   are identified that involve a range of dates.  There is one

14   document, ART18421, that supposedly evidences work as early as

15   October 2000.  There is a document, ART18417, that deals with

16   events supposedly on February 2001.  And this goes on and on

17   for quite a few more documents.

18           We are left, I think, with a couple of problems.  The

19   threshold issue, your Honor, is, if we are not permitted to

20   seek a motion, file a motion seeking to restrict the date of

21   invention to the filing date, then to what extent is

22   Artistshare committed to make this amendment, producing some of

23   these documents a week before the close of discovery and then

24   finally articulating to some extent -- I say articulating

25   because we still don't have a very clear sense from this second

1    time amended response exactly when the conception date was and

2    exactly when all the elements were in the mind of Mr. Camelio.

3          THE COURT:  Let me stop you for a moment, sir.

4          You heard Mr. Smith speak to me a few moments ago.

5    And what he was describing to me was the fact that this

6    process, process that ended up in the filing or that resulted

7    in the filing of the provisional application and then the

8    utility application was not something that could be done sort

9    of overnight.  It is not as though Mr. Camelio woke up one

10   morning with a fully-formed idea.

11         It's not surprising to me, although I will concede

12   this is not my normal line of work, that someone could have the

13   germ of an idea on one day and then identify other days at

14   which the germ took form.  It was planted.  It grew roots,

15   whatever.  I can carry the metaphor only so long.  That's not

16   surprising to me that there would be multiple dates.

17         I believe what Mr. Smith is saying is each of these

18   things that has been identified to you demonstrates the

19   evolution of the idea.  And so while there is not a whole lot

20   in terms of the summer of 2000, they have at least identified

21   for you what, in their view, are the various pieces of evidence

22   that demonstrate the evolution of the product for which the

23   provisional application was filed.  So that I do understand.

24         Now, what you are saying is some of them were produced

25   to you late and the identification of their relevance came to

1    you later than would you like and perhaps at the end of

2    discovery.  But what you are asking for, I think, and, is that

3    you'd like to establish through the partial summary judgment

4    motion is the idea that the earliest date that Artistshare can

5    claim is the date of the patent application, correct?

6             MR. SILVERMAN:  Yes, your Honor.  Now, if I may.

7             THE COURT:  Please understand my skepticism with that

8    date because that sort of presupposes the very scenario that I

9    began with, which is, one day Mr. Camelio woke up with a

10   fully-formed idea.  It's illogical for me to believe that it

11   would come out that way.  I do think it's too much to limit

12   them to the date of the application.

13            To the extent there is any prejudice, and I'll talk to

14   Mr. Smith as to whether he thinks there is any prejudice and I

15   will resolve that issue.  To the extent there is any prejudice

16   by sort of what you alleged to be the late identification of

17   the significance of materials to you, could that not be

18   alleviated by just extending fact discovery and allowing --

19   don't worry, Mr. Smith.  I'll hear from you on this -- allowing

20   Mr. Camelio to speak further on these things that have been

21   identified following his deposition as things that were sort of

22   in his mind or that became the very steps in the evolution of

23   the patent?

24            MR. SILVERMAN:  Thank you, your Honor.

25            The issue of prejudice has a number of different

1    aspects to it.  Because of our understanding of what the date

2    of invention was, at least certainly since July of this past

3    summer, we had been gearing our analyses and our prior art that

4    Mr. Smith referenced, thinking that, okay, there is this

5    argument about summer of 2000, but that's, we think, completely

6    unsupported by anything, including Mr. Camelio's testimony.

7    And then we have the date of the patent.  So we are much more

8    comfortable sort of gearing our last discovery in the past few

9    months toward that target, if you will.

10          It's not simply that, oh, we have a new date now and

11   we can simply take some time, add some time to the discovery

12   period and adjust.  It would really require us to recalibrate a

13   lot of our thinking and analysis as to what is the time frame

14   for that person of ordinary skill in the art.  That could

15   change a lot in the computer fields from 2000 to 2001 to 2002,

16   and which references were available to which people and could

17   have spoken to someone at those various points in time.

18          I'll say it's a more complicated issue than simply

19   saying, oh, you can now have more discovery on what Mr.

20   Camelio's understanding was.  I wanted to address that point.

21          THE COURT:  The summer of 2000 date has been around.

22   I appreciate that you did not give it a tremendous amount of

23   credence because of the experience that you had at the

24   deposition.  Summer 2000 was always the earliest possible date,

25   so I appreciate why you made the decisions you did with respect

1    to the sort of prior art analyses you've been doing, but the

2    fact was, you had fair warning that summer 2000 was a date that

3    you should be focused on.

4               MR. SILVERMAN:  If I may, your Honor, there is another

5    aspect to this.  And part of the problem that we all deal with

6    is this sort of clunky 19th century metaphysics of patent law.

7    And, your Honor, completely correctly, I think, characterized

8    the way individuals come up with ideas as sort of an

9    evolutionary process, and you might have one piece of that idea

10   on one day, might be some time later that you combine it with

11   another one.

12              But the patent law definition of conception is when

13   all those pieces come together.  The definitions that you see

14   in the cases are the definite formation in the mind of the

15   complete invention as it would be set forth in practice and

16   that sort of thing.  So the evolution, the sort of prehistory

17   of the invention, is done when we get to the date of

18   conception.  The date of the conception is when all the pieces

19   are together.  It's simply a matter of putting it into

20   fabrication or building a machine that has been already fully

21   formed in one's mind.  So the Athena, fully formed in the mind

22   of Zeus Coleman, is the date of conception.

23              THE COURT:  Are you saying that you take issue with

24   counsel's identification of the summer of 2000 as the

25   conception date because to you conception date means more than

MANMKICC

1    the germ of the idea, but a less inchoate version of the idea.

2    Let me hear that.

3          Mr. Smith, if indeed it's just a germ, I guess I need

4    to know if you understood conception date as Mr. Silverman has

5    just described it to me, and if there is another date that I

6    should be aware of that is the conception date as he terms it.

7          I'll start with you, Mr. Silverman.

8          MR. SILVERMAN:  Yes, your Honor.  I don't think I

9    misunderstood Artistshare or Mr. Smith.  I was using what I

10   thought was the correct understanding for date of conception.

11         I think another problem with the response that we got

12   on October 15, because it sort of gives this narrative of

13   various dates, various documents, including those late-produced

14   ones that I mentioned, your Honor, this does not show all the

15   pieces together.

16         So if we were to proceed, assuming your Honor would be

17   inclined to allow Artistshare to not have to step away from

18   this supplemental interrogatory response of October 15, we

19   would request that it be a more comprehensive response that

20   identifies the pieces of the claim, the elements of the claim,

21   and whether or not they are in the various documents

22   referenced.

23         Because it's similar to a problem that came up, I

24   think, on August 15, your Honor, when we were faced with the

25   provisional application.  The provisional application differs

MANMKICC

1  in form from the utility application, the nonprovisional

2  application.  Patent lawyers should come up with a better word

3  than nonprovisional, such as it is.  And we had presented that

4  issue to your Honor and your Honor said it was indeed proper to

5  have Artistshare articulate which elements of the invention

6  appeared in which parts of that more rough application, and

7  they have done so.

8          We would ask the same thing confronted with this sort

9  of even less concrete response of October 15, because I think

10  your Honor raises an excellent point in terms of our

11  understanding between the parties that if indeed Mr. Smith and

12  Artistshare was saying that Mr. Camelio was really just getting

13  the germ of the idea back in the summer of 2000, maybe we were

14  just having different understandings of what conception of the

15  invention meant.  And perhaps it's the case that the

16  fully-formed invention with all the pieces that make up the

17  elements of the claims were not together until somewhere

18  further down the narrative that is presented in the several

19  pages of the October 15 supplemental response.

20          THE COURT:  Mr. Smith, let me take you to part of

21  Mr. Silverman's colloquy with me where he mentioned that under

22  patent law you cannot patent or you cannot use as your

23  conception date the first date you had some thought, however

24  random, about the idea.  I presume what it is is there is some

25  tipping point where the idea is far enough along that you can

MANMKICC

1    call it a conception date.

2            Do you agree with his recitation of what the

3    conception date is?

4            MR. SMITH:  I don't agree with the entire

5    presentation.  I think he is right that conception isn't

6    just -- I think I might have an idea that could be relevant,

7    meaning conception requires more than that.  It requires that

8    you have sort of a fully-formed idea that you could go forward

9    with.  So in certain technology areas that could be really just

10   the idea that, oh, I am going to do this particular thing and

11   that's conception.

12           In other areas, where it requires a lot of

13   experimentation, for example, in the chemical or biological

14   arts, you might think that a particular compound would work,

15   but you may not be able to say you could conceive that it would

16   work until you have done more with it.

17           In this context I think conception can be the idea of

18   what Mr. Camelio described, which is he came up with this idea

19   of how can we make it easier for artists to be able to fund

20   their projects.  You could have a website that would allow them

21   to market their projects and have fans being able to directly

22   fund them before they actually had to even make the project

23   that they are doing.

24           So instead of having the requirement that you go

25   through a record label or that you have some backer that is

MANMKICC

 1  going to provide the money to you, you could have a situation

 2  where your own fans could be the people who are saying, here,

 3  we are going to give this to you to start you off and, in

 4  return, we will get your next CD or copy of your next painting.

 5         It's our belief that in the summer of 2000, Mr.

 6  Camelio had the conception that was necessary for his

 7  invention.  He then started to diligently work on how he would

 8  implement that, which we refer to in patent law as reduction to

 9  practice.  And so he had the conception.  I don't want to say

10  it was just sort of the germ of the idea.  But it was actually

11  the idea that, yes, this could actually work.

12         I think the problem that we are having is that

13  Kickstarter would like there to be the magical document that

14  says, oh, on this particular date this particular thing

15  happened, the light bulb went off eureka, I now have my

16  invention.  It doesn't work that way.  There is not that type

17  of document that says, I came up with this idea on this

18  particular date in this year of 2000.

19         And so what we have done is given them the best that

20  we have.  We have given them Mr. Camelio's testimony.  We have

21  put it into a interrogatory response as to how he came up with

22  the idea, what he was working on at the time, that sort of the

23  confluence of different factors that came together so that he

24  came up with this idea.  And then we provided to them the

25  things that he was working on that we can document to show.  So

25

MANMKICC

1    he had the idea, now he was starting to write computer code, to

2    actually implement it.

3         And so in our July interrogatory response we do

4    specifically mention they started working on source code after

5    he came up with this idea.  So the notion that they had no high

6    no idea that the source code was relevant to this I take

7    exception to.  We did mention in our interrogatory response in

8    July and we did also indicate to them that they could come and

9    inspect the source code that we are referring to, and they

10   never did.

11        And then they took Mr. Camelio's deposition.  They

12   asked him about conception.  He did tell them the story about

13   what he remembers about coming up with the idea.  And he also

14   indicated that he started working on source code and he thought

15   that source code was available to Kickstarter.  And, again,

16   they didn't show him any of the source code.  They didn't talk

17   to him about what the source code was.

18        And so the fact of the matter is that the

19   supplementation which Kickstarter is representing as late was

20   not late.  It was produced during the discovery period and it

21   was produced shortly after we discovered that there was

22   additional source code.  It's not as if this was out of nowhere

23   we came up with this and said, now, there is source code

24   relevant to this case.

25        THE COURT:  I care about that, but I also care about

MANMKICC

the element of gamesmanship, not to suggest that there is any,
but there is an appearance of gamesmanship of having stuff
produced or being identified on the last date of fact
discovery.

MR. SMITH:  Kickstarter did the same thing.  They
updated their interrogatories with a huge amount of additional
prior art that they are now relying upon.  On the exact same
day that we sent them our interrogatory response saying, we
found some additional source code, we are updating our
interrogatory response to reflect that, they supplemented their
interrogatory response with a huge number of additional charts
and information on prior art.

It seems a little bit like they don't like when we do
it during the discovery period, but it's okay if they do it
during the discovery period.  I think we both did it.  We both
found out information that had to be produced.  I don't think
there is any way we could have said to the Court or to
Kickstarter, we found this information and we are not giving it
to you.

We had to give it to them and we had to update our
things according to the rules.  We couldn't hold it back.  The
notion that there was gamesmanship I think is not true because
Mr. Camelio searched and searched to try to find the
information that was relevant.  We produced the stuff that he
had found.  And then he was able to figure out how one of his

1  computer drives that hadn't been working, he could get

2  information off of it.  When he told us that he was able to get

3  some additional information off of this drive, we produced it

4  immediately.  And so it wasn't the situation where the source

5  code was something that we had and we waited until the last day

6  of discovery and then finally produced it.  That's not the

7  situation.  We had source code, we produced it back in July.

8  We mentioned it in our interrogatory response and then we found

9  some more source code and we produced it to them.  I don't

10  think there is any prejudice here because they had the

11  information.  The fact is, when they had source code they never

12  looked at it.  They never asked our witness about it.

13          THE COURT:  Presumably you would let them look at it

14  today.  It's certainly available for their inspection.

15          MR. SMITH:  Certainly.  They asked that question, they

16  are going to say now that discovery is over that we can't look

17  at it.  We said no.  You can certainly look at it and inspect

18  it and see the source code and that's not a problem to us.  And

19  we feel like we have not said that Mr. Camelio is not going to

20  get deposed again.  Our only issue was, it seems like they have

21  already covered a huge number of the pieces of information they

22  want both on a personal level and a corporate level.

23          Our concern is, it just seems like it's starting to

24  veer into a little bit too much.  We were acting for

25  restrictions.  I know that issue has already been addressed.

MANMKICC

It's just that that is the framework within which all of this
came about.  And so I don't think there is any prejudice here
because both sides did exactly the same thing, which is when
they had to supplement, they supplemented.

THE COURT:  And you are claiming no prejudice from
their late supplementation of their responses?

MR. SMITH:  No, your Honor.  We feel like, obviously,
we would love everything sooner.  But the fact of the matter
is, they supplemented within the fact discovery period.  So
would we like things earlier?  Sure.  But we are not saying
that they have done something wrong by giving it to us on the
last day.  If it turned out that they had this sitting in their
pocket for six months, we might have an objection, but there is
nothing yet to suggest that that's the case.  So we feel like
both parties understood that they could supplement and could
provide additional documentation up until the end of the fact
discovery period and that's what we did.

THE COURT:  Thank you.

Mr. Silverman, I am not able to prevent you from
filing a motion for partial summary judgment, but I can hint as
to how I would rule.  And so let me give you this as the hint.
Tell me what we can do within reason in terms of an extension
of the discovery period to remediate any prejudice you think
you have.  Because I have read the materials and I have thought
about them, too, and I can't stop you.  I only have the ability

MANMKICC

1    to deny.  And that's not a threat.  It's simply an inclination.

2    And you may be able to persuade me with something longer than

3    three pages that there is more there.  But I prefer, my own

4    just philosophy, as much as one can develop a judicial

5    philosophy in four months, is I would prefer the full and fair

6    exchange of ideas to sanctions or preclusion or limiting

7    people.

8              So since I have now told you that, what can be done?

9    Preferably, what can you and Mr. Smith agree to have done?

10             MR. SILVERMAN:  Reading between the lines of your

11   Honor's remarks --

12             THE COURT:  I am a master of subtlety, but go ahead.

13             MR. SILVERMAN:  Reading between the lines of your

14   Honor's remarks, I would propose the following:

15             First of all, to make sure that the parties have the

16   same understanding about what conception is.

17             And if I may just digress for a second, your Honor, I

18   do apologize.  Some of these issues came to a head yesterday

19   and I sent a letter to your Honor yesterday afternoon.

20             THE COURT:  The 22nd.  All the days are melting

21   together, but I did in fact read this.

22             MR. SILVERMAN:  I realize that somehow it was a little

23   bit out of synch with your Honor's guidelines for civil cases,

24   but it seemed that it might be helpful to have that.  Anyway, I

25   do apologize for that.

MANMKICC

1          By the way, I think in this vain the case that was

2     cited there, Hybritech case in the Federal Circuit, talks about

3     conception being the formation in the mind of the inventor of a

4     definite and permanent idea of the complete and operative

5     invention.

6          So Mr. Smith and I and the parties may have had maybe

7     not quite meeting of the minds as to exactly what conception

8     was, but it would be helpful for Artistshare to take a look at

9     their October 15 supplement and to perform that exercise of

10    saying, okay, here is where the sort of prehistory is

11    occurring.  Here is where we actually have all of the pieces of

12    the invention together.  And then if that's manifest in a

13    document, then they should point to that.  If most of the

14    pieces are manifest in a document, but some aren't, but they

15    are proveable by testimony or some other fashion, that would be

16    helpful to know.

17          THE COURT:  Let me stop you for a moment.

18          Mr. Smith, you just heard this.  Are you familiar with

19    the Hybritech case of which he speaks?

20          MR. SMITH:  Yes, your Honor.

21          THE COURT:  And do you agree that that is an

22    appropriate way of defining the conception date?

23          MR. SMITH:  I have not seen the exact quote that

24    Mr. Silverman was quoting from, but I think it sounds correct.

25          That looks correct, your Honor.

MANMKICC

1              THE COURT:  What Mr. Silverman is saying is, perhaps

2      the parties do not have a meeting of the minds about the

3      conception date, but in the colloquy I just had with you I

4      thought that you did have this understanding of conception date

5      and you're simply saying, for a project of this type or an idea

6      of this type.  The idea could be done in the summer of 2000,

7      even if its reduction to practice took a period of time and a

8      whole lot of source code.

9              Are you telling Mr. Silverman that your answer to any

10     question when was the conception date under a Hybritech theory

11     of the conception date is the summer of 2000?

12             MR. SMITH:  That's correct, your Honor.

13             THE COURT:  So you have an answer.

14             MR. SILVERMAN:  Because we attempted to explore that

15     with Mr. Camelio in his original deposition, but there are many

16     other steps along the way that may ultimately be fallback dates

17     because we feel that still if the alternative is, summer of

18     2000 versus date on which the patent application was filed, we

19     feel as we felt on October 3 when I wrote to your Honor, if

20     that was the dichotomy, we thought there was no question, it

21     cannot be summer of 2000.  If there are all these other dates

22     in between and if Artistshare is sort of reserving on the

23     possibility that maybe the date when all the pieces came

24     together was some time between summer of 2000 and the date when

25     they filed their application, we would want to have that

MANMKICC

articulated in a more complete response.

          THE COURT:  Hold on, Mr. Smith.  Are you pleading in
the alternative here?  Are you suggesting that if I were to
find that the conception date were not the summer of 2000, that
there are other dates, the dates that you've identified and the
source code that you have identified, which would instead
become the conception date?

          You understand, Mr. Silverman, he is speaking of a
binary issue here where it's either 2000 or July of 2002.  I
presume your view is that it's summer of 2000, but if it's not,
is it some date in between those two.

          MR. SMITH:  I think it can be, your Honor.  I think
the issue is that, as I've said, there is not a document in the
summer of 2000.  What they are looking for is, they are looking
for something that shows more than Mr. Camelio's testimony that
there was the conception of the idea.

          THE COURT:  Yes.  But the document that was shown to
him he could not identify, according to Mr. Silverman.

          MR. SMITH:  I understand, your Honor.  I think he
obviously was given a lot of documents at his deposition and
some of them he couldn't remember where they came from.  Again,
these documents are coming from 13 plus years ago, so obviously
there is a long time period that has elapsed between then and
now.

          The issue is, in terms of determining what the date

MANMKICC

1    would be, meaning if they say, okay, you have to fix a date,

2    not just based on his testimony, but based on something else,

3    some document, we have given them documents to be able to try

4    to fix that date.

5              And so we think that, yes, there could be a situation

6    in this case where if the date becomes relevant to any of their

7    prior art, we may have to go and say, okay.  For this

8    conception date we have Mr. Camelio's testimony that he

9    conceived in 2000 and then this document or source code or

10   whatever shows this is what he was working on as of that

11   particular time.  And so this would support the notion of

12   concession, but we don't have a document that says here in the

13   summer of 2000, Mr. Camelio came up with this idea.  We don't

14   have a document.  We have his testimony.

15             THE COURT:  Mr. Silverman.

16             MR. SILVERMAN:  If I may, your Honor, however it's

17   manifest in documents, testimony or testimony admitting the

18   documents together, we don't have a clear understanding from

19   their current interrogatory response what pieces were in place

20   when.  And so if Artistshare were to take a look at the

21   documents that they reference in their interrogatory response

22   and use that in an explanatory fashion, much like they did with

23   their provisional patent application, saying, here is where

24   this element corresponds in this document and here is where

25   this element corresponds, and if they can build up the picture

MANMKICC

1    that way, I understand, there might not be a single document.

2              THE COURT:  There might not.

3              MR. SILVERMAN:  But whatever story they are trying to

4    build out of the documents referenced in their interrogatory

5    responses, what we like to understand -- and actually, I should

6    say, we would like to understand before we take Mr. Camelio's

7    deposition again, assuming he would be the person to explain

8    that.  And also that we would like to know how all of that fits

9    together before we get to expert reports.

10             So I think Mr. Smith's suggestion that we might just

11   delay on this until we see which pieces of prior art are going

12   to be significant, I think that's not very practical.

13             THE COURT:  Mr. Smith, you're being invited to provide

14   additional detail and I suppose you can look at this and say, I

15   don't have the obligation to do that because I have told you,

16   Judge and adversary, that it is the summer of 2000.  I'm simply

17   telling you that there aren't the documents that I would wish

18   for to demonstrate that.  But it is there and my client will

19   testify to that.  You've just heard what Mr. Silverman said.

20   Is that something you can do?

21             MR. SMITH:  I think we could do it, your Honor.

22             THE COURT:  Is it something you would do?

23             MR. SMITH:  I think we would do it.  I think based on

24   the Court's local rules, this seems like it would be better

25   done through a deposition than us trying to write out a

MANMKICC

1   statement.

2          THE COURT:  But who all is going to be the deponent?

3   Because Mr. Camelio, I am not sure he can, with precision, do

4   this.  That's my concern.  If they depose him and he says I

5   don't know, we are going to go back here again and you don't

6   want that.

7          You have pieces of source code, yes?

8          MR. SMITH:  Yes, your Honor.

9          THE COURT:  These are some of the milestones for you

10  in terms of dates.  Are there identifiable dates in the source

11  code?

12         MR. SMITH:  There are, your Honor.

13         THE COURT:  And can you identify the import of the

14  particular piece of source code?

15         MR. SMITH:  Meaning what does it reference or what

16  does it show?

17         THE COURT:  Yes.

18         MR. SMITH:  Yes, we can, your Honor.

19         THE COURT:  Seems that you don't have to depose

20  anybody on it.  I am not going to stop you if you guys want to

21  do it by deposition.  I'm just concerned in seeing you in six

22  weeks and saying Mr. Camelio gave it his very best shot and

23  there were many documents shown to him and it was many years

24  ago, it's unrealistic to think that he could know all of that.

25         My preference would be, if you can and you will do it,

MANMKICC

1    try and do it with reference to the various documents.  But

2    that gets us part of the way there.  I, again, am trying to

3    understand what needs to be done, not what you'd like to do and

4    what remedies I should provide for perhaps bad bets on the

5    conception date.  What needs to be done and how quickly it can

6    be done because I want to get this case moving along.  I'm sure

7    you do, too.

8            Thank you, Mr. Smith.

9            Mr. Silverman, that's one thing.  You have just gotten

10   something.  He has agreed to do it.  I'll leave it to you guys

11   to find a date by which it should be done.  What else do you

12   need?  I presume what you are saying is, you need it prior to

13   the retaking or the day 2 of Mr. Camelio's deposition.

14           MR. SILVERMAN:  Yes, your Honor.  So to sort of make a

15   suggestion about what might happen between today and the next

16   time we are before your Honor, hopefully not on a discovery

17   issue, of course.

18           THE COURT:  Hopefully not.

19           MR. SILVERMAN:  I would say that Mr. Smith and I might

20   confer about whether he could, and would, together with his

21   clients and colleagues, craft another supplemental response

22   that sort of details what each of the documents is to be

23   referencing and which elements of the invention, if possible,

24   came up, what time frame would be feasible for Artistshare to

25   do that, and then assuming we can proceed to a deposition when

MANMKICC

```
 1    a reasonable date for that would be.  That would be my
 2    suggestion as to a path forward.
 3              THE COURT:  I'm not opposed to that.
 4              Mr. Smith, are you opposed?  You have just heard what
 5    he said, correct?
 6              MR. SMITH:  Correct, your Honor.
 7              THE COURT:  Can you meet and confer with him on these
 8    issues?
 9              MR. SMITH:  Certainly, your Honor.
10              THE COURT:  Do you want to do it here and now or would
11    you rather get back to me by the end of the week with a
12    proposal?
13              MR. SMITH:  I think it would be easier if we could
14    just talk and discuss it amongst ourselves and then get back to
15    you.
16              THE COURT:  You are not going to be greedy, correct,
17    with any requests for extensions because I presume this is
18    going to impact other dates in the case management, and I think
19    you should think about looking at the source code because
20    apparently it's there for you to look at if you want to.
21              So today is Wednesday all day.  I say that because my
22    days have been melting together.  By Friday close of business I
23    would like a proposal from the parties as to how we can resolve
24    whatever issues exist on discovery without resorting to things
25    like sanctions or summary judgment motions or motions to
```

MANMKICC

1    preclude or anything of that type.

2                Yes.  There will be a second day of Mr. Camelio's

3    deposition and you guys can work out the specifics of that.

4                I think that was productive.  Is there anything

5    further we need to discuss?

6                MR. SILVERMAN:  Nothing from our side.  Your Honor.

7    Thank you.

8                MR. SMITH:  Nothing, your Honor.

9                                 o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25