**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**KICKSTARTER, INC.,**

      **Plaintiff,**

**v.**

**FAN FUNDED, LLC and ARTISTSHARE,**
**INC.,**

      **Defendants.**

**Civil Action No. 11-cv-6909 (KPF)**

# PLAINTIFF KICKSTARTER, INC.'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*

Dated: June 16, 2014

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

    I.    The Work That Resulted in the '887 Patent........................................................ 2

    II.    Overview of the '887 Patent ................................................................. 4

        A.    The '887 Patent's Disclosure .................................................... 4

        B.    The '887 Patent's Claims........................................................ 6

ARGUMENT ....................................................................................................... 7

    I.    The '887 Patent Is Invalid as Unpatentable Subject Matter ................................ 7

        A.    Legal Standard Concerning Patent Eligibility ............................................. 7

        B.    Defendants' Patent Claims Are Invalid under Section 101 ....................... 9

    II.    The '887 Patent Is Invalid for Failure to Name Thompson as an Inventor .......... 14

        A.    Legal Standard Concerning Co-Inventorship ............................................. 14

        B.    Thompson's Significant Contributions to the Claimed Invention ........... 15

            1.    Thompson Contributed to the Conception of Claims 1, 8 and 24................................................................... 15

            2.    Thompson Contributed to the Conception of Claim 7.................. 16

            3.    Thompson Contributed to the Conception of Claims 13 and 14................................................................... 17

            4.    Thompson Contributed to the Conception of Claim 17............... 18

        C.    Defendants' Responses Do Not Create a Triable Fact Issue .................... 18

    III.    The '887 Patent Is Invalid as an Obvious Combination of Known Elements................................................................... 20

        A.    Legal Standard Concerning Obviousness .................................................. 20

        B.    The Prior Art, Generally ........................................................ 21

            1.    Prior Art On-Line Systems to Crowd-Fund Artistic/Music Projects........................................................ 21

2.      Prior Art Online Fundraising For Artists ..................................... 23

C.    There Is No Genuine Dispute That Each Limitation of the Asserted
      Claims Is Known in the Prior Art ............................................. 23

        1.      Limitations for a "Server Having Application Programs . .
                ." ................................................................................ 24

        2.      Limitations for "Providing Software Tools . . ." ........................... 25

        3.      Limitations for "Receiving Data . . . Regarding at Least
                One Project" and ". . . Regarding Entitlements" ........................... 27

        4.      Limitations for "Transmitting," "Receiving" and
                "Processing" "Acceptance Data" ................................................... 28

        5.      Limitations for "Registering Contact and Marketing
                Information ..." ................................................................... 29

        6.      Limitations for "Managing Communications through Said
                Patron Database" ................................................................... 30

        7.      Limitations for "Allowing Patrons to Demonstrate Interest .
                . ." ................................................................................ 31

        8.      Limitations for "Managing and Viewing Financial and
                Marketing Information . . ." ...................................................... 31

D.    Summary Judgment of Invalidity for Obviousness Is Appropriate .......... 32

IV.   Claims 4, 6 and 10 Have Plain Errors Rendering Them Invalid as
      Indefinite ................................................................................ 34

CONCLUSION ................................................................................ 35

CERTIFICATE OF SERVICE ............................................................. 36

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accenture Global Servs. v. Quidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013)....................................................................9, 12

*Alice Corp. PTY, LTD v. CLS Bank Int'l, et al.*,
No. 13-298 (S. Ct.)...........................................................................................9

*AT&T Corp. v. Excel Communications, Inc.*,
172 F.3d 1352 (Fed. Cir. 1999).......................................................................9

*Bancorp Servs. L.L.C. v. SunLife Assurance Co. of Can. (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012)..............................................................8, 11, 13

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010)....................................................7, 8, 11, 12, 13

*CLS Bank Int'l v. Alice Corp.*,
717 F.3d 1269 (Fed. Cir. 2013) (en banc)......................................................9

*CyberFone Sys., LLC v. CNN Interactive Group, Inc.*,
2014 U.S. App. LEXIS 3599 (Fed. Cir. Feb. 26, 2014) ..........................13

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011).......................................................................9

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012)............................................................9, 10, 13

*Diamond v. Diehr*,
450 U.S. 175 (1981)........................................................................................7

*Dow Jones & Co. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010)......................................................................34

*Ethicon, Inc. v. U.S. Surgical Corp.*,
135 F.3d 1456 (Fed. Cir. 1998)................................................................14, 15

*Exxon Research & Eng'g Co. v. U.S.*,
265 F.3d 1371 (Fed. Cir. 2001)......................................................................35

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997)......................................................................14

iii

*Fort Props., Inc. v. Am. Master Lease LLC,*
  671 F.3d 1317 (Fed. Cir. 2012).........................................................................9

*Gottschalk v. Benson,*
  409 U.S. 63 (1972)............................................................................................8

*Halliburton Energy Servs. v. M-I LLC,*
  514 F.3d 1244 (Fed. Cir. 2008)......................................................................35

*Johnson & Johnston Assocs. v. R.E. Serv. Co.,*
  285 F.3d 1046 (Fed. Cir. 2002) (en banc)........................................................6

*KSR Int'l Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007)........................................................................................21

*In re Kubin,*
  561 F.3d 1351 (Fed. Cir. 2009)......................................................................21

*Mayo Collab. Servs. v. Prometheus Labs., Inc.,*
  132 S. Ct. 1289 (2012)................................................................................7, 12

*Nautilius, Inc. v. Biosig Instruments, Inc.,*
  572 U.S. _ (2014).............................................................................................35

*Pannu v. Iolab Corp.,*
  155 F.3d 1344 (Fed. Cir. 1998) at 1351.........................................................14

*Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC,*
  653 F. Supp. 2d 402 (S.D.N.Y. 2009).............................................................34

*Parker v. Flook,*
  437 U.S. 584 (1978)....................................................................................8, 14

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.,*
  264 F.3d 1344 (Fed. Cir. 2001)......................................................................20

*Solvay SA v. Honeywell Int'l Inc.,*
  742 F.3d 998 (Fed. Cir. 2014)........................................................................14

*Symantec Corp., v. Computer Assocs. Int'l,*
  522 F.3d 1279 (Fed. Cir. 2008)......................................................................20

*Tokai Corp. v. Easton Enters., Inc.,*
  632 F.3d 1358 (Fed. Cir. 2011)..................................................................7, 34

*Western Union Co. v. MoneyGram Payment Sys.,*
  626 F.3d 1361 (Fed. Cir. 2010)......................................................................34

iv

**Statutes**

35 U.S.C. §101 ....................................................................................................7, 9, 10, 14

35 U.S.C. §102(f) ...........................................................................................................14

35 U.S.C. §112 ...............................................................................................................35

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................7

## INTRODUCTION

Plaintiff Kickstarter, Inc. ("Kickstarter") is a groundbreaking platform for creative projects. Thousands of entrepreneurs, filmmakers, and designers have collectively raised over $1 billion from millions of people to fund their projects on the site.

Defendant ArtistShare, Inc. began as a joint project between Brian Camelio and Robert Thompson. However, after a few months Thompson's involvement ended and Camelio on his own filed a patent application directed to their joint project. That application became the patent-in-suit, U.S. Patent No. 7,885,887 ("the '887 Patent"). ArtistShare assigned the '887 Patent to defendant Fan Funded, LLC, which appears to have no employees or operations of any kind, presumably as part of an effort to broadly accuse parties of infringement.

In 2011, Defendants (collectively, "ArtistShare") began threatening Kickstarter and other companies with patent infringement of the '887 Patent – *e.g.*, Camelio sent letters to Kickstarter's registered agent and showed up unannounced at Kickstarter's corporate headquarters. (Dkt. #29 at 1-4.) The purpose of the Declaratory Judgment Act is to permit parties to resolve matters, rather than allow a patent owner to hold a sword over an accused infringer's head. To put an end to ArtistShare's threats, Kickstarter brought this action, seeking declarations that the '887 Patent is invalid and not infringed. (Dkt. #1.)

After the Court construed the claims of the '887 Patent (Dkt. #53), ArtistShare was compelled to withdraw its allegation that Kickstarter infringed, and moved for entry of partial final judgment to pursue an interlocutory appeal. (Dkt. #55 at 1.) Courts disfavor interlocutory appeals and this Court denied ArtistShare's motion. (Dkt. #55.) Kickstarter now moves for summary judgment of invalidity, pursuant to the Court's order (Dkt. #92).

## BACKGROUND

I.    **The Work That Resulted in the '887 Patent**

In March, 2002, in an effort to design a website and start a business, Camelio began

collaborating with Robert Thompson. (JAX5, Thompson Dep. at 77:11-21; JAX45, Resp. to

Interrog. No. 7.) Thompson is a successful, highly qualified participant in the music industry –

he has a Ph.D and MA in music, and a bachelor's degree in music and business. (JAX5,

Thompson Dep. at 14:18, 20:21-21:16, 32:4-19, 33:15-36:24; JAX47.) He has served as a

college professor, teaching courses that instruct students on "new business models within the

arts," and entertainment law. (JAX5, Thompson Dep. at 14-18, 20:21-21:16, 32:4-19, 33:15-

36:24; JAX47.)

As of 2002, Thompson was the Director of Publishing at Universal Edition, a music

publishing house, where he was in charge of developing publications for the music industry.

(JAX5, Thompson Dep. at 22:19-25:2, 25:15-26:17; JAX47.) By 1998, Thompson was

publishing music and "maximizing the value of the catalog [of music controlled by Universal

Edition]." (JAX5, Thompson Dep. at 27:2-15; 26:18-29:4.)

Thompson met Camelio through a mutual friend and musician named Maria Schneider,

who had been Thompson's graduate school classmate. (JAX5, Thompson Dep. at 51:20-52:6,

58:17-59:15.) Thompson also produced an album for Schneider. (JAX5, Thompson Dep. at

51:20-52:6, 58:17-59:15.) During production of Schneider's album, Thompson "realized that

[because of] the overhead and . . . the deal that she had with Enja Records [] there was no way

she was going to make any money." (JAX5, Thompson Dep. at 52:6-20.) After Thompson

expressed this insight, Schneider proposed introducing Thompson to Camelio (whom Schneider

was dating, at the time). (JAX5, Thompson Dep. at 51:20-52:6, 58:17-59:15; 178:7-15.)

On March 14, 2002, Camelio emailed Thompson, stating that "Maria thought it would be

4822-8963-6379.6

a good idea to contact you with regards to my latest project. I have developed a solution to the music/file sharing problem." (JAX50.) Camelio included a PowerPoint that outlined the "project" he was working on. (JAX51.) The PowerPoint identified illegal copying of music as a problem that can never be solved, however there is no disclosure of any solution to that problem or any reference to crowdfunding, raising money in advance for producing albums, or a computer system.

Thompson and Camelio met on March 18, 2002, when they conducted a "brainstorming" session. (JAX52; JAX5, Thompson Dep. at 179:11-180:9.) The next day (March 19), Thompson sent Camelio an email detailing several additional ideas of Thompson's. (JAX48 at ART-013162.)

Motivated to obtain new funding sources for Ms. Schneider's work, the overall idea was to solicit fans to contribute funds that would normally be advanced by a record label or production company. This notion of patronage through crowdfunding, of course, was not new – services already existed for this purpose, and bands had already used their websites to break away from the record company model and raise funds directly from fans. (Citations to the prior art are included below.)

On March 27, 2002, Camelio sent Thompson an updated version of the PowerPoint presentation that Camelio had previously sent to Thompson on March 14, 2002. (JAX49; JAX53.) According to Defendants' expert, this version was edited on March 19, 2002 – a day after the March 18 brainstorming session with Thompson and on the same day that Thompson emailed additional ideas to Camelio. (JAX46, Monroe Rpt. ¶¶ 103, 104.)  This PowerPoint included the project's first references to crowdfunding.

During their collaboration, Thompson and Camelio met several more times and

3

Thompson was tasked with preparing a "business plan" PowerPoint for potential investors and others.  (JAX5, Thompson Dep. at 77:11-2, 57:19-58-9; JAX7; JAX8.)  This PowerPoint, authored by Thompson, is the first use of the name "ArtistShare" and the first time a workable ArtistShare system that either Thompson or Camelio had detailed.

Without telling Thompson (JAX5, Thompson Dep. at 169:25-172:6.), Camelio later submitted Thompson's PowerPoint to the Patent Office as part of U.S. Provisional Application No. 60/394,974 (the "Provisional Application"), which – according to Defendants – discloses the claimed subject matter of the '887 Patent.  (JAX7, JAX8.) The PowerPoint identifies ***both*** Thompson and Camelio as "The Founders" of "ArtistShare". (JAX7, p. 17; JAX8 at ART-011494.)  The application itself describes the system as "ArtistShare" – a moniker that Thompson originated and for whom he registered ArtistShare.com. (JAX5, Thompson Dep. 53:16-21, 81:12-22; JAX48 at ART-013162; JAX54 at ART-013164; JAX49.)

## II.   Overview of the '887 Patent

Camelio filed Defendants' Provisional Application on July 9, 2002, including the PowerPoint drafted by Thompson. (JAX1, Related U.S. Application Data.) Claiming priority to the Provisional Application, on March 31, 2003, Camelio filed the application that resulted in the '887 Patent-in-Suit. (JAX1 at 1.)

### A.   The '887 Patent's Disclosure

The '887 Patent describes "a system and method for raising financing and/or revenue by [an] artist for a project, where the project may be a creative work of the artist." (JAX1, Abstract.)

The Patent describes several mechanisms for offering consideration in exchange for funds for a project. The Patent refers to these offerings as "Sales Containers" and enumerates these examples: auction, sales item, subscription series, subscription access, pay-per-view, licensing and patron-sponsorship. (JAX1 at 10:45-55.) A "sales item" can include downloadable

4

music, sheet music, a one-hour telephone lesson on songwriting, or some other "inventory item" that can be tracked using a database. (JAX1 at 11:3-25.)  For a subscription offering, a fan pays for access to content, like news, media or regular product deliveries. (JAX1 12:9-19.) The '887 Patent describes presenting offerings to "Fans," and when a Fan accepts the offer, the Fan becomes a "Patron."  (Dkt. #53 at 7.) The acceptance data is processed and information is stored in a "Patron Database." (JAX1 21:34-67.)

The '887 Patent describes two categories of "software tool" functions: (1) "to manage at least one project," and (2) "to manage communications."

Regarding the "software tools  . . . to manage at least one project," the '887 Patent merely lists basic software functions, *e.g.*, auctions or inventory, with little or no disclosure of their implementation.[1] The Patent's absence of detail about how the "software tools" are actually implemented is permissible under patent law because those features are well-known aspects of pre-existing commercial software, which Camelio did not invent. (JAX44, Mollick Rpt. ¶58; JAX2, Monroe Dep. at 220:5-10 ("A. In each of those cases, if you isolate them from the functionality of crowdfunding, no, he didn't invent those things.").)

As to "software tools . . . to manage communications" with Patrons), they are merely well-known database software functions that can be used for to send bulk emails. According to the '887 Patent, "'Mailing' management includes allowing the import and export of names from a mailing list, the ability to create mailing list categories, as well as any other known method of

---

[1] **Project information**: Described as including "project name, and the type of project the project type (e.g., song, album, book, photo, painting, video, movie), language of the project, project description, [etc.]"  (JAX1 at 15:22-32.) **Inventory**: Corresponds to "an inventory record (database) 326, 332 . . . [I]nventory items may include (for example) downloadable files . . . An inventory item could be a service . . . ." (JAX1 at 11:10-25.) **Auctions**: Described as including instances where entitlements are auctioned off to Fans. (JAX1 at 12:20-25.) **Subscriptions**: Described as situations where a fan might pay to access some content or service. (JAX1 at 12:9-19.) **Licensing**: "The contributions to the project may also be obtained through a licensing model. In such an arrangement, generally, the results of the project, i.e., rights to the recorded work, are licensed, for example, to a record company, ..." (JAX1 at 12:31-35.) **News**: "News" items, under the patent, can be added, edited, created, deleted and/or removed.  (JAX1 at 16:28-33.)

4822-8963-6379.6

managing mailing lists." (JAX1 at 16:34-42.) As Defendants' expert admitted, Camelio did not invent this technology either.[2]

## B.    The '887 Patent's Claims

The scope of a patent, for infringement and validity purposes, is defined by the patent claims, *i.e.*, the numbered paragraphs at the end of the patent. *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc).  An independent claim (*e.g.*, Claim 1) does not refer to other claims, as is the case for dependent claims.  For a system or method to be "covered" by a claim, the system or method must meet every limitation exactly.

The meaning of claim terms is determined by the Court.  (Dkt. #53.)  In this case, the Court construed "software tools . . . to manage at least one project" and similar limitations as requiring "computer programs that consist of a suite of features, including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows and images." (*Id.* at 11-12.)

The Court also construed the recited "software tools . . . to manage communications, through said Patron database" to mean that a "patron receives the information directly from the Patron database." (Dkt. #53 at 12.)

ArtistShare has asserted claims 1-11, 17-20, and 33-37. Representative claim 1 is reproduced below. Dependent claims based on claim 1 add minor limitations, *e.g.*, that the artist's project is financed using funds, that the offer includes multiple levels of patronage; that patrons are able to demonstrate interest in a project, or that the project is a musical, visual,

---

[2] (JAX44, Mollick Rpt. ¶59; JAX2, Monroe Dep. at 199:16-21 ("Q. Now, the way those client-server architectures were set up, those weren't things that Mr. Camelio invented, right? A. Well, like the notion of an SQL database, the notion of ASP, the notion of the Internet as a phenomenon, no, I don't think he invented those."), 211:17-24 ("Q. But those methods of using the database to communicate with people's contact information stored in the database, those weren't things that Mr. Camelio invented, right? . . . A. So Mr. Camelio didn't invent the post office, and he didn't invent the phone, and he didn't invent e-mail. So I can verify that."), 212:1-7 ("Q. Did he invent using a database to contact people electronically? A. I guess it depends what other functionality is included in the -- Q. I'm talking about that specifically. A. In abstract, I would say -- I would say that that's not something he invented.")).)

6

service, or written project. (JAX1 at 21:33-26:20; JAX44, Mollick Rpt. ¶44.) The other asserted

independent claims (claims 17, 18, 35, 36) and their associated dependent claims are generally

rearrangements of claim 1 and its dependent claims, with minor variations. (*Id.*)

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute of material facts. *See*

Fed. R. Civ. P. 56(c). "Summary judgment is as available in patent cases as in other areas of

litigation." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011).

**I.      The '887 Patent Is Invalid as Unpatentable Subject Matter**

    **A.      Legal Standard Concerning Patent Eligibility**

The categories of patentable subject matter are identified in 35 U.S.C. §101 as "any new

and useful process, machine, manufacture, or composition of matter, or any new and useful

improvement thereof." Something may be new and inventive when created, for example, a Van

Gogh painting, but nevertheless not be the type of creation eligible for patent protection.

The Supreme Court has identified exceptions for patentable subject matter under §101,

whereby "laws of nature, natural phenomena, and abstract ideas" are not patent eligible.

*Diamond v. Diehr*, 450 U.S. 175, 185 (1981). The Court has further held that claims are not

patent-eligible if their elements – separate from the abstract idea or law of nature – are merely

"well understood, routine, conventional activity already engaged in by" others in the relevant

field. *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012).

As a result, the Supreme Court has invalidated computer-implemented claims to an

abstract idea. *See Bilski v. Kappos*, 130 S. Ct. 3218, 3223-24 (2010) (making investments to

hedge risk, using a Monte Carlo simulation on years of data, which would require a computer);

*Parker v. Flook*, 437 U.S. 584, 585-86 (1978) (calculating and storing  an alarm condition in a

petrochemical plant); *Gottschalk v. Benson*, 409 U.S. 63, 65, 73 (1972) (performing on specific

hardware – a shift register – a binary-to-binary coded decimal conversion).  In each case, once the abstract idea was removed, only the conventional remained.  *See, e.g.*, *Bilski* (without the idea for the investment approach, there claims were merely conventional purchasing of securities to hedge risk); *Parker* (without the abstract idea/formula for how to calculate the alarm condition, it was merely routine setting of an alarm); *Benson* (without the algorithm for performing the conversion, it was just routine computer components like a shift register).

The Courts have examined patents in the context of funding/investing in several cases. While there is no formal bar against patent eligibility for any particular type of patent, patents directed to fundraising and investments have routinely been found invalid, likely because the only novel element is the abstract idea:

- **Bilski, 130 S. Ct. 3218**: In *Bilski*, claims to the concept of hedging risk were invalid. *Id.* at 3231. The claims recited, *e.g.*, a "Monte Carlo simulation" using multiple years of data,. *Id.* 3223-4. The claims were ineligible, because they "attempt to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation." *Id.* at 3231.

- **Bancorp Servs. L.L.C. v. SunLife Assurance Co. of Can. (U.S.), 687 F.3d 1266 (Fed. Cir. 2012)** (cert. pending): The court found 118 claims for a method and computer system for administering Corporate Owned Life Insurance policies invalid. The court found that, without the abstract idea of the investment, the claimed invention used computers only in known/routine ways – e.g., for "calculating," "determining" and "storing." Id. at 1276-7.

- **Fort Props., Inc. v. Am. Master Lease LLC, 671 F.3d 1317 (Fed. Cir. 2012)**: Claims to

8

"an investment tool designed to enable tax-free exchanges of property" were found to be an upatentable abstract idea. *Id.* at 1322. Claims "requiring a computer to 'generate a plurality of deedshares'" were invalid because merely "operating an electronic device that features a central processing unit" constitutes no more than "insignificant post-solution activity." *Id.* at 1323-4.

- *CyberSource Corp. v. Retail Decisions, Inc.*, **654 F.3d 1366 (Fed. Cir. 2011)**: The court held that a method for verifying credit card transactions over the Internet was unpatentable. *Id.* at 1370-7. "The general approach of obtaining information about credit card transactions utilizing an Internet address and then using that information in some unidentified manner to determine if the credit card transaction is valid" did not make the abstract idea patent eligible. *Id.* at 1376-7.

- *CLS Bank Int'l v. Alice Corp.*, **717 F.3d 1269 (Fed. Cir. 2013)** (en banc)(cert. granted *Alice Corp. PTY, LTD v. CLS Bank Int'l, et al.*, No. 13-298 (S. Ct.)): A plurality of the court found the claims to be patent ineligible, because computer limitations were insignificant and/or incidental to the claims. *Id.* at 1286 (finding that the computer limitations in the method claims "could scarcely be introduced with less specificity" and were merely "'insignificant post-solution activity' relative to the abstract idea"); *id.* at 1312 ("even assuming the method claims require use of a computer in some unspecified way, this implicit reference to computer 'implementation' is not, by itself, enough").[3]

**B.    Defendants' Patent Claims Are Invalid under Section 101**

Whether a patent claim is invalid for failing to recite patent-eligible subject matter under

---

[3] *See also Accenture Global Servs. v. Quidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) (claims that "only contain generalized software components arranged to implement an abstract concept on a computer" are ineligible); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) (that a claim is "computer aided" does not make an abstract idea patentable).

9

§101 is an issue of law. *AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1355 (Fed. Cir. 1999). Here, the '887 Patent is directed to the abstract idea of crowd-based funding and provides no purported innovation beyond that.  This is confirmed by the claims, the patent specification, and even the testimony of Defendants' hired expert.

Claim 1 is representative and recites:[4]

| Claim 1 | Comment |
| --- | --- |
| A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for: | Abstract idea of crowdfunding for artist projects, with a general reference to a computer system. |
| [1a] providing software tools to an artist or Account Manager to manage at least one project, the project comprising at least one creative work | Providing software tools is known, to say the least, other than the context of crowd-funding.[5] |
| [1b] receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work; | The artist makes an offer for sale to raise money for a project, *i.e.*, the idea of crowd-funding. |
| [1c] transmitting offer data from a server to a client via a network, the offer data comprising an offer to Fans concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project; | The offer is made over a computer network (the Internet), as was happening millions of times a day, before this patent. |
| [1d] receiving at the client such offer data and presenting the offer to the Fan; | The offer is received by a Fan. |
| [1e] transmitting acceptance data back to the server from the client accepting the offer; | The offer is accepted by the Fan. |
| [1f] processing the acceptance data by the server; | The order is processed. |
| [1g] registering contact and marketing information | A database of customers/patrons is maintained. |

---

[4] As above, dependent claims based upon claim 1 add minor limitations, *e.g.*, that the artist's project is financed using funds, that the offer includes multiple levels of patronage, that patrons are able to demonstrate interest in a project, or that the project is a musical, visual, service, or written project. (JAX1 at 21:33-26:20; JAX44, Mollick Rpt. ¶44.) The other asserted independent claims (claims 17, 18, 35, 36) and their associated dependent claims are generally rearrangements of claim 1 and its dependent claims, with minor variations. (*Id.*)

[5] None of these ideas actually was original to the named inventor, but for purposes of a Section 101 analysis, it is what was claimed as the invention. (JAX2, Monroe Dep. at 220:5-10.)

| | |
|---|---|
| regarding Patrons in a database; and | |
| [1h] providing the artist or Account Manager software tools to manage communications, through said Patron database, to Patrons regarding the sales and marketing of one or more projects. | Communications can be made to crowdfunding investors/Patrons, "through" the e-mail database, which is what those are for. |

There cannot be any genuine (legal) dispute that claim 1 recites no specialized hardware or software.  It simply describes the abstract idea of crowd-funding, and then recites generic steps and tools for implementing the abstract idea. Therefore, just like the claims in *Bilski* (which recited a known technique applied to hedging risk in energy markets) and just like the claims in *Bancorp* (which recited computer calculations and communications for the abstract idea of a particular Corporate Owned Life Insurance policy, with a stable value protected investment), the claims of the '887 Patent are unpatentable.

The '887 Patent specification itself confirms the intent to claim an abstract idea, rather than a specialized computer system.  The '887 Patent states:

- "One of skill in the art will appreciate that the computer systems outlined above which may be used with any of the embodiments of the invention, may include various hardware and operating software, familiar to those of skill in the art, for running software programs, browsing the Internet, communicating and/or operating with any device..." (JAX1 at 8:54-9:6, 20:33-38.)

- "One skilled in the art will appreciate, however, that *any method of raising capital may be incorporated for use with the invention*" (emphasis added). (JAX1 at 12:41-44.)

- "The invention may make use of a combination of existing, proven business models including banking, patron systems, merchandising partnerships, direct marketing, publishing, file sharing and internet networking, file compression, audio/video technologies, and online auctions (for example)." (JAX1 at 4:10-15.)

11

- "One skilled in the art will appreciate[] that any method of managing mailing lists may be incorporated with the other features of the invention." (JAX1 at 16:38-42.)

- "The ArtistShare system may be setup and run on the World-Wide-Web, … using, for example, html, xml and java programing, ..." (JAX1 at 9:15-19.)

In short, "one skilled in the art will appreciate" that the '887 Patent is directed to an abstract idea, no matter how it is implemented. That is precisely what the Supreme Court has held is not patent-eligible. *See, e.g., Mayo*, 132 S. Ct. at 1298 (claims patent-ineligible that recite an abstract idea and "well understood, routine, conventional activity already engaged in by" others in the relevant field); *Bilski*, 130 S. Ct. at 3231.

Indeed, the experts in this case agree: ***outside of the abstract idea of crowdfunding, the patent discloses only conventional computer software and hardware, none of which was invented by Defendants***.  Defendants' expert admitted that leaving aside the abstract concept of "crowdfunding," Camelio invented nothing. (JAX2, Monroe Dep.at  220:5-10 ("A. In each of those cases, if you isolate them from the functionality of crowdfunding, no, he didn't invent those things.").) Prof. Mollick explained that at the time of the '887 Patent's purported inventions, a person or ordinary skill in the art would be familiar with the well-known systems and software that could be used for crowd-funding. (JAX44, Mollick Rpt. ¶¶53-59.)

Defendants have nevertheless argued (wrongly) that an aggregated collection of "software tools" (*i.e.*, "including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows and images") confers patent eligibility. (Dkt. #90 at 2.)  *This argument invites legal error*. Using known software tools (as Defendants' expert admitted) for use with an abstract concept is precisely the type of activity that is *insufficient* to confer patent eligibility.  *See, e.g., Accenture*, 728 F.3d 1345 (claims not patent-eligible even

though the specification "contains very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer."); *see also CyberFone Sys., LLC v. CNN Interactive Group, Inc.*, 2014 U.S. App. LEXIS 3599, *7 (Fed. Cir. Feb. 26, 2014) (addressing data use, communication and storage, holding that "the well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible.").

Thus, *Bilski*'s intricate and extensive Monte Carlo simulation of data (presumably using new or old Monte Carlo simulation software) did not make the abstract idea of hedging risk in energy markets patent eligible – this is because "use of well-known random analysis techniques" is not the type of additional work that confers patent eligibility. 130 S. Ct. at 3231. Similarly, the many software tools recited in, for example, the *Bancorp* patent (including software for "generating a life insurance policy," as well as for "storing" and "accumulating" information) did not confer patent-eligibility either.  687 F.3d at 1270-1.

Put another way, if the abstract idea of crowdfunding is stripped out of the claims, there is nothing left but a known computer system, with known software tools such as for on-line auctions, subscriptions, tracking inventory and bulk e-mailing.  (JAX2, Monroe Dep. at 220:5-10.) Conversely, if the computer limitations are removed, there is nothing left but the abstract idea of crowdfunding. *See, e.g., Bancorp*, 687 F.3d at 1279-80 (". . . without the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results . . . . Bancorp's claimed abstract idea impermissibly 'preempt[s]' the mathematical concept of managing a stable value protected life insurance policy."); *Dealertrack*, 674 F.3d at 1334 (patent

13

ineligible where claims are to a "process using any existing or future-devised machinery."); *see also Flook*, 437 U.S. at 590, 593 ("The concept of patentable subject matter under § 101 is not 'like a nose of wax which may be turned and twisted in any direction.'").

Accordingly, summary judgment that the claims are not patent-eligible is appropriate.

## II.     **The '887 Patent Is Invalid for Failure to Name Thompson as an Inventor**

### A.     **Legal Standard Concerning Co-Inventorship**

The creation of an invention requires both conception and reduction to practice. *Solvay SA v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 (Fed. Cir. 2014). "[C]onception is the 'formation, in the mind of the inventor, of a definite and permanent idea of a complete and operative invention.'" *Id.*

Under 35 U.S.C. §102(f), a patent is invalid if the named inventor "did not himself invent the subject matter sought to be patented."  With respect to co-inventorship,

> [a]ll that is required of a joint inventor is that he or she (1) contribute in some
> significant manner to the conception or reduction to practice of the invention, (2)
> make a contribution to the claimed invention that is not insignificant in quality,
> when that contribution is measured against the dimension of the full invention,
> and (3) do more than merely explain to the real inventors well-known concepts
> and/or the current state of the art.

*Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350, 1351 (Fed. Cir. 1998) at 1351 (citing *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) and *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998)). Inventorship is a question of law based on underlying facts. *See, e.g., Ethicon*, 135 F.3d at 1460.

Inventorship is determined on a claim-by-claim basis.  If an inventor (*e.g.*, Thompson) contributed only to a single claim in a patent, then this person must be named as a co-inventor or the patent is invalid under § 102(f).  *See, e.g., Ethicon*, 135 F.3d at 1460.

"[F]or the conception of a joint invention, each of the joint inventors need not make the

same type or amount of contribution to the invention. . . . Rather, each needs to perform only a part of the task which produces the invention." *Ethicon*, 135 F.3d at 1460 (quotations omitted).

Testimony of an alleged inventor alone, however, cannot establish inventorship. Because of the inherent bias in a claim of inventorship (whether by Thompson or Camelio), courts require corroboration of an inventor's testimony. *Ethicon*, 135 F.3d at 1461. "Whether the inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason' analysis." *Id.* Consequently, Kickstarter must provide corroboration of Thompson's contributions. Similarly, to the extent Defendants claim Camelio had conceived the full invention before meeting with Thompson, Defendants must provide independent corroboration of that conception. *Id.*

### B.   Thompson's Significant Contributions to the Claimed Invention

#### 1.   *Thompson Contributed to the Conception of Claims 1, 8 and 24*

There is no genuine dispute that Thompson conceived of and contributed the idea of incorporating auction and licensing functions into the fundraising platform, or that this was independently corroborated.  Thompson testified that he originated the idea to allow bidding on items such as "executive producer credit" or "intellectual property" associated with an artist. (JAX5, Thompson Dep. at 92:25-94:17.)

That this is a significant contribution to Claim 1 is likewise beyond genuine (legal) dispute.  Claim 1 recites "software tools . . . to manage at least one project" ('887 Patent at 21:34-63), and the Court construed this to mean "computer programs that consist of a suite of features, including [] ***auctions*** [and] ***licensing*** . . ."  (Dkt. #53 at 11-12). (emphasis added.)  Even the summary of the invention refers specifically to "the ability to re-sell (outright sale or auction) [artists] rights at any time."  Claim 1's scope plainly covers Thompson's ideas.  Claims 8 and 24 also specifically recite presenting offers as "an auction" and "a license."  (JAX1 at 22:15-18, 24:10-13.)

15

The corroboration for Thompson's contributions is voluminous and undisputable. ArtistShare's own contemporaneous documents show that *Camelio believed and acknowledged that Thompson contributed these ideas*.   Camelio stated, in emails:

> The thing Bob wants is for me to say that I will not use his idea about creating a 'mini stock market' for the trading of music publishing rights. *I will agree that it was his idea and I will not use it* . . ."

(emphasis added). (JAX55 at ART-018776.)  Further, ArtistShare produced, from Camelio's files, an unsigned exit agreement he wrote that acknowledged: "It also is understood that you [Thompson] created a security trading and marketing system and that ArtistShare and Brian Camelio will not create a security trading and marketing system as part of the ArtistShare project without your permission." (JAX55 at ART-018761-4.)

Furthermore, Thompson's PowerPoint, that was submitted with the Provisional Application, is the first identification anywhere of the "[s]ale or auction of copyrights and/or publishing rights of Artists' work product." (JAX8 at ART-011497; JAX7, p. 20.)  Answering "How Does ArtistShare Work?" the business plan states, *inter alia*, that "[i]nvestors join the project through the trading or auctioning of shares of the publishing rights to the music being recorded." (JAX8 at ART-011490, 502; JAX7, p. 13, 25 ("Online Auctions").)  All of these statements were introduced to the PowerPoint through Thompson; this is certain because these ideas appear in documents that existed only *after* Thompson's involvement began that he authored (*see* JAX49; JAX53 at ART-018622; JAX7, JAX8), and *not* in documents pre-dating Thompson's involvement (*see* JAX50; JAX51).

### 2.   *Thompson Contributed to the Conception of Claim 7*

Thompson testified that he conceived the idea to expand the ArtistShare ideas beyond Camelio's original focus of music projects. (JAX5, Thompson Dep. at 166:24-167:10.)  Claim 7 recites: "[t]he system according to claim 1, wherein the project is selected form the group

16

consisting of: music/audio projects, film projects, printed/written projects, services project, visual art projects, multimedia projects, syndicated content projects and any creative work or service and any combination of the foregoing." (JAX1 at 22:9-14.)

This testimony is corroborated by the slides Camelio sent to Thompson before Thompson's involvement, which listed only problems with copying of music files, as well as the PowerPoint Thompson created, which identified ArtistShare "Divisions" and states an intent to "[o]ffer this business model not only to Musicians but to Visual Artists, Film Makers, Authors/Writers, Actors, Dancers, etc." (JAX8 at ART-011492, ART-011496, JAX7, p. 15, 19.)[6]

### 3.   Thompson Contributed to the Conception of Claims 13 and 14

Thompson explained that he conceived of the idea of allowing "the opportunity to be involved in the artist's creative work process may include at least one of access to rough mixes, photos or videos from recording sessions or outtakes, invitations to recording sessions, and access to sheet music accompanying the work," as in claim 13, as well as offering "sheet music or scores, music lessons, custom song writing, personal interaction between artist and Patron," as in claim 14. (JAX1 at 22:36-40, 41-46; JAX5, Thompson Dep. at 164:22-165:10.)

As corroboration, in a March 19, 2002 email, Thompson told Camelio "perhaps fans could 'bid' on a [sic] participating in their artist next recording project . . ." and suggested that two look into offering "printed sheet music of artists ..." through certain services. (JAX48 at ART-013162.)  Once again, the first reference in any contemporaneous documentation illustrates that it was Thompson who suggested the ideas ultimately recited in the claims.  The form of the email further corroborates that it was a proposal of a new idea. (JAX48 at ART-013162.)

---

[6] While "TVShare.com" appears in the PowerPoint presentation that Camelio forwarded to Thompson on March 27, 2002 (*see, e.g.,* JAX49; JAX53 at ART-018622), ArtistShare's expert contends the document was lasted edited March 19, 2002 (*see, e.g.,* JAX46, Monroe Rpt. ¶¶ 103, 104) – *after Thompson and Camelio began working together.* The version of the PowerPoint Camelio sent to Thompson on March 14, 2002 did not contain any reference to "TVShare.com." (JAX50; JAX51.)

### 4.   *Thompson Contributed to the Conception of Claim 17*

Thompson also testified that he conceived of the idea to include claim 17's recited "managing and viewing financial and marketing information relative to projects supported through the system" (JAX1 at 23:37-38), which the patent specification describes as "the ability to manage the generation of reports for the various aspects of the account . . ." (*id.* at 17:4-13). (JAX5, Thompson Dep. at 99:4-14.)

Once again, the first contemporaneous reference to these ideas originated with Thompson. Thompson wrote to Camelio about "providing a software solution for royalty accounting," and subsequently instructed that the software export to "Quickbooks" accounting software. (JAX48 at ART-013162; JAX56.)

### C.   **Defendants' Responses Do Not Create a Triable Fact Issue**

Defendants' expert has tried to belittle Thompsons' contributions on the ground that Thompson is not a computer programmer and therefore could not contribute meaningfully. (JAX46, Monroe Rpt. ¶ 96.)  This assertion is both logically unsound and factually incorrect – Thompson's contributions are corroborated, therefore his background is irrelevant.

Indeed, ArtistShare's expert's contention utterly misses the point of the claimed invention.  There is no actual software code disclosed in the '887 Patent.  The '887 Patent is about the (abstract) idea of crowdfunding and the use of a general purpose computer and known software to perform functions in that setting.  *This is a business and creative decision as much or more than a programming decision*, as Defendants' expert testified: the software features to offer "[i]t's a – *it's a technical – it's an artistic/creative and a business decision*." (JAX2, Monroe Dep. at 143:17-144:8 (emphasis added).)  Although his background is irrelevant here, Thompson was an executive in the music publishing industry, a musician and an academic with multiple graduate degrees and a bachelor's in "music and business" – clearly qualified.

Defendants next argue that Thompson contributed only prior art.  (Dkt. #88 at 3.) As an initial matter, ***Kickstarter agrees that the '887 Patent claims only well-known concepts found in the prior art.***  As discussed below, the patent is invalid for that reason as well.

But, *to the extent the Patent purports to claim an invention, Thompson is a co-inventor.* Defendants describe the invention as a particular combination of software features/tools for crowd-funding. Thompson put some of those claimed tools into toolbox – he is a co-inventor.

Last, Defendants argue, summarily, that Thompson is not a co-inventor because Camelio "conceived of everything" before he met Thompson. (JAX46, Monroe Rpt. ¶ 113.) ArtistShare cannot back up this gross generalization.  ArtistShare's response to Interrogatory No. 7 contains its contention as to Camelio's alleged conception of the '887 Patent's subject matter. (JAX45, Resp. to Interrog. No. 7.) There, ArtistShare does not make any allegation about when Camelio is alleged to have possessed in his mind a definite and permanent idea of the complete and operative invention. (*Id.*)  Nor does ArtistShare's response identify any documents showing that Camelio conceived the entire claimed subject matter prior to Thompson's involvement. (*Id.*) As to the computer files identified in ArtistShare's interrogatory response, all are generic (*i.e.*, could have been used for projects other than ArtistShare),[7] and certainly there is no suggestion that any were directed to those things Thompson contributed (*e.g.*, auctions, sale of licensing rights or providing financial reporting).

A generic contention that "yeah I thought of it first" is precisely the type of

---

[7] Monroe admitted: "Yeah. There's nothing that's in those files that tells me what the business arrangement was that Mr. Camelio was working under at the time." (JAX2, Monroe Dep. at 88:11-89:1.) At the time the files were generated, Camelio was working as a programmer for Dgolpe.com, a Latin music website. (*Id.*) As to the identified "TEST" database, Monroe testified that "[t]his was a component of a system that could have multiple uses." (JAX2, Monroe Dep. at 90:6-11.) Monroe agreed that an "upload" file could be used to upload anything, again, that "[i]t has multiple uses," including uses irrelevant to the '887 Patent. (JAX2, Monroe Dep. at 92:5-21 ("A. It has multiple uses. Q. Right. Including those relevant to the patent and those irrelevant to the patent – A. That's right.  Q. . . Okay. And the same is true for the database. It could have may uses, those relevant to the patent and those irrelevant to the patent – A. Um-Hum. . . . "A. . . . Yes. A database of that nature could be used for multiple things."), 93:4-5 ("A. It could be used for multiple things relevant to '887 and beyond.").

4822-8963-6379.6

uncorroborated testimony that has caused Courts to impose a strict requirement of independent corroboration, and to exclude evidence that lacks it. *See, e.g., Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) (corroborating testimony must be from "someone other than the alleged inventor"). Corroboration of earlier conception must establish not that Camelio was working on ArtistShare, but that he was in possession of all the limitations of the claim. This is something Defendants have not done and cannot do. Without corroboration that Camelio was already in possession of the ideas Thompson contributed, Defendants' argument fails as a matter of law and does not create a fact issue for trial. *See, e.g., Symantec Corp., v. Computer Assocs. Int'l*, 522 F.3d 1279, 1296 (Fed. Cir. 2008)(an uncorroborated declaration fails to raise a genuine issue of material fact as to co-inventorship).

In short, the '887 Patent was the result of a collaboration between Camelio and Thompson as "Founders" of ArtistShare. That Camelio ultimately submitted the jointly drafted business plan Thompson wrote as part of a patent application, without informing Thompson, does not make Camelio a sole inventor or permit him to rob Thompson of his contributions.

For this additional reason, summary judgment of invalidity based on incorrect inventorship is appropriate.

## III.     The '887 Patent Is Invalid as an Obvious Combination of Known Elements

### A.     Legal Standard Concerning Obviousness

"Obviousness is a question of law based on underlying findings of fact." *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). "An analysis of obviousness must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness." *Id.* (citations omitted).

"[A] patent for a combination which only unites old elements with no change in their

20

respective functions . . . obviously withdraws what is already known in the field of its monopoly and diminishes the resources available to skillful men." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415-16 (2007). Thus, to be patentable, a combination of old elements "must do more than yield a predictable result." *Id.* at 416.

### B.    The Prior Art, Generally

The idea that motivated Camelio and Thompson was to raise funds directly from fans to support an artistic work (*i.e.*, crowdfunding), meaning a record label or production company would unnecessary to accomplish the project. As above, this idea is not only abstract, but it is found throughout the prior art. The '887 Patent ultimately claims only the aggregation of known software tools to implement this abstract idea.

#### 1.    *Prior Art On-Line Systems to Crowd-Fund Artistic/Music Projects*

The prior art includes multiple systems that could be used to raise funds to support artistic works, among other things.

**idealive.**   One example, was idealive.  idealive was an online system specifically for marketing and funding artistic "projects;" "[t]ypical projects might include recording, producing, and releasing a new CD; shooting and printing photos for a photo exhibition and associated book; a documentary film; or a series of paintings around a theme." (JAX9.)

To create an offering, idealive disclosed software tools to create "basic" and "advanced" listings. (JAX21; JAX23.) "Basic" listings were away to gain "visibility and support" for the artist. (JAX21.) "Advanced" listings included additional detail about projects like "the amount required" and "time period" for the project, as well as allowing the artist to include various types of multimedia. (JAX23.)

To facilitate interactions between artists and fans, idealive used online applications to collect contact and other information. (JAX28 ("idealive investor Member Application" form

that requires, *e.g.*, name, address, email, and telephone numbers).) idealive then allowed communication through a database by email, online "bulletin boards" or a "chat system." (JAX22; JAX29.)

**Blackbaud.**   Another example of prior art that could be used to raise funds to support an artistic work was Blackbaud.   Blackbaud, was a suite of software tools used for raising funds on the Internet generally. (JAX12 at KS0010757-8 ("Offers a turnkey solution for online fund-raising.").)   Blackbaud would have been understood by a person of ordinary skill in the art to be suitable to be used to raise funds to support an artistic work as well any other type, as that was its marketed purpose. (JAX2 at 191:6-16; JAX44, Mollick Rpt. ¶¶ 69, 383, 407, 418, 425.)

Blackbaud had a broad array of customization features that would enable different sorts of incentives to be offered in exchange for contributed funds. (JAX12 at KS0010757-8.)   It likewise included specific software for managing donor information and communications with donors. (JAX12 at KS0010753, KS0010752; JAX13 at BLACKBAUD0000006 ("All of these components rely on services hosted by Blackbaud. We maintain the servers, host the RE:NetSolutions Web pages, and collect the constituent data entered from these Web pages.").)

Using products like Blackbaud to support any kind of endeavor, for example, an artistic work was well known at time, as outlined in how-to books. For example, "The Fundraiser's Guide to the Internet" authored by Johnston ("Johnston") is one of multiple books that details on-line fund-raising examples and strategies for the Internet. (JAX31.) Johnston describes (among other things) "Direct donations (Members and Donors)," "Pledges online," "Merchandise sales," "Online auctions," and "Online lotteries." (JAX31 at KS0004208-32.) Johnston also describes "online surveys," "listservs," "email discussion groups," "online programs, " "chat rooms and bulletin boards online" as examples of ways to communicate with

22

donors. (JAX31 at KS0004343-63.)

### 2.     *Prior Art Online Fundraising For Artists*

The prior art also contains multiple instances where musical artists used their band

websites to raise funds to support music recording costs, and connect with fans.

**Marillion.**  For example, Marillion was a band who used its website to raise funds from

fans to support the future recording of an album, *i.e.* for the same purpose articulated in the

Patent – to cut out the record label and retain ownership of the album.  "The revolutionary pre-

order idea for Anoracknophobia was a first for the music industry . . . In total 12674 albums were

pre-ordered by fans, which allowed us to own our own songs for the first time in our career!"

(JAX16.) Marillion was widely acknowledged for this innovation. (JAX38.)

Fans who contributed to the Marillion album would receive a physical CD, as well as

special thanks in the CD artwork and on the Marillion website. (JAX15.)  Marillion publicized

its CD pre-sale by interacting with fans through the band's website. (*Id.*)  Marillion's website

also included fan club features that allowed fans to provide contact information to gain access to

special content and notices from the band. (JAX15; JAX39.)

**November Project**. November Project was another band who used its website to raise

funds to support the future recording of an album, with varying levels of patronage. (JAX17

("Depending on the amount you contribute, you will receive a number of appealing premium

items, listed below, whose limited availability should make them collectible. At whatever level

you choose to join, you'll receive one of more copies of a special CD").) As with Marillion,

November Project collected contact and marketing information from fans through its website.

(JAX40 ("To join our e-mail list and receive N-POP!, our fan-based newsletter, please fill out

the form…"); JAX6, Morrison Dep. at 37:14-40:18.)

### C.     **There Is No Genuine Dispute That Each Limitation of the Asserted Claims Is**

**Known in the Prior Art**

The '887 Patent's claims are obvious, because the claimed software tools were available for fundraising in idealive and in BlackBaud. It would have been obvious to adapt those tools to the fund-raising models of bands like Marillion and November Project, because that is exactly what those services were for – to permit varied and tailored approaches to on-line fund-raising with the suite of tools provided by idealive or Blackbaud.

Defendants purport to dispute the presence in the prior art of almost every limitation in the claims.  (JAX45,  p. 32-36.) Accordingly, each is addressed below.

### 1.    Limitations for a "Server Having Application Programs . . ."

| |
|---|
| *[preamble 1]* "a server having applications programs operable from a remote site" |
| *[preamble 17]* "a server having application programs operable from a remote site" |
| *[preamble 18]* "a server having application programs" |
| *[preamble 35]* "a server having application programs" |
| *[preamble 36]* "a server having application programs" |

Defendants' expert opined that a webpage itself would be considered to be a computer program that is provided, *i.e.*, "served" from a web server. (JAX2, Monroe Dep. at 191:6-16 ("Q. So the web page itself, if I'm understanding this correctly, can be essentially a computer program that's served from the web server? Is that correct? A. Yes. And then it may have executable scripts and functionality in the – the code, if you will, of the web page that may be executed locally.").) There is no genuine dispute that the prior art discloses this limitation.

**idealive.**  idealive used a MySQL database behind a PHP package on an Apache webserver. (JAX3, Reid Dep. at 71:1-8, 32:14-33:3, 50:7-52:3, 77:1-6.)  As ArtistShare's expert admitted, one of ordinary skill in the art would have understood idealive to operate on a server and have applications programs operable from a remote site. (JAX2, Monroe Dep. at 191:6-16; JAX44, Mollick Rpt. ¶¶ 65, 383, 407, 418, 425.)

**Blackbaud**.  Blackbaud was an online software product that offered "a turnkey solution

for online fund-raising" called "The Raiser's Edge" that allowed users to "customize your giving page and online acknowledgements without knowing HTML," using software running on servers that Blackbaud hosted. (JAX12 at KS0010757; JAX13 at BLACKBAUD0000006 ("RE:NetSolutions is comprised of a number of components, working together, connecting you with your donors.  All of these components rely on services hosted by Blackbaud. We maintain the servers, host the RE:NetSolutions Web pages, and collect the constituent data entered from these Web pages."); JAX14 at BCONNORS0000155; JAX44, Mollick Rpt. ¶¶69, 383, 407, 418, 425.)  Once again, Defendants' expert admitted, one of ordinary skill in the art would have understood Blackbaud to operate on a server and have applications programs operable from a remote site. (JAX2, Monroe Dep. at 191:6-16; JAX44, Mollick Rpt¶¶69, 383, 407, 418, 425.)[8]

### 2.    Limitations for "Providing Software Tools . . ."

| |
|---|
| **[1a]** *"providing software tools to an artist or Account Manager to manage at least one project"* |
| **[17c]** *"providing to the artist or Account Manager software tools to design, create, and implement an artist-specific web page for the purpose of marketing said artist's projects to existing and new Patrons"* |
| **[18b]** *"providing tools for the artist or Account Manager to present the at least one project to at least one of Fans and Patrons"* |
| **[35b]** *"providing tools for the artist or Account Manager . . . to present the at least one project to at least one of Fans and Patrons"* |
| **[36b]** *"providing tools for the artist or Account Manager to present the first project to Fans of the artist"* |

The Court has construed "software tools . . . to manage at least one project" and similar limitations as requiring "computer programs that consist of a suite of features, including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows ***and*** images" (emphasis added). (Dkt. #53.)

These tools were all known in the prior art.

**idealive.**  For "project information," idealive disclosed software tools to create "basic"

---

[8] In addition, Marillion and November Project also raised funds over the Internet which necessarily means that they had servers and served the web pages to its visitors.  (JAX44, Mollick, ¶¶66, 67, 383, 407, 418, 425.)

4822-8963-6379.6

and "advanced" listings for their artistic projects. (JAX21.)  For "inventory," idealive teaches

projects for a "tangible product," selling "shares" and delivering "MP3s, video clips, and

images" through the idealive system. (JAX22; JAX9.) As to "auctions," idealive used a "Dutch

auction" if there were many bids on a project. (JAX3, Reid Dep. at 74:25-75:14; JAX1 at 12:41-

44.)  idealive teaches subscription services for providing selective access to "members-only

MP3s, video clips, and images, and apply for other goodies not available to the general public,"

and "VIP Lounges."  (JAX22; JAX24.) As to "licensing," idealive teaches providing shares in

"project(s) to individual investors, who will get some form of financial reward from you for

doing so (some percentage of the profits, for example)." ( JAX23.) For "personnel," idealive

discloses that its artist's "[r]egistration is a simple semi-automated process that lets you define

who you are, what you do, what sort of audience(s) you have, what you're looking, for, etc. . . . "

( JAX21.) For "news," idealive included "news" and a "newsletter" as well as content-specific

"news" (*e.g.*, "Music News," and "Film News"), as well as a "Studio Diary." ( JAX25; JAX26

("Buzz!"); JAX27.) As to "mailings," idealive discloses using email to send notices to Fans

about offerings, in addition to using "bulletin boards." (JAX28; JAX22-1; JAX29;[9] idealive's

ability to provide "MP3s, video clips, and images" also constitutes "media shows" and "images"

recited in the Court's construction. (JAX22.)

   **Blackbaud**.  Similarly, for "project information," Blackbaud discloses software that

includes "powerful customization options" for raising funds. (JAX12 at KS0010757-8; JAX13 at

BLACKBAUD0000009.) For "inventory," the combination of Blackbaud with Marillion or

November Project teaches, at least, providing "tangible products" in the form of physical CDs.

(JAX16 ("[T]he revolutionary Internet pre-order."); KS0002597-602 ("you'll receive one of

---

[9] idealive's "mailings" are consistent with the '887 Patent's statement that "[o]ne skilled in the art will appreciate, however, that any method of managing mailing lists may be incorporated with the other features of the invention." (JAX1 at 16:39-42.)

more copies of a special CD."); JAX12 at KS0010757-8 ("You can reconcile your online

donations with existing donor records in The Raiser's Edge.").) As to "auctions," Blackbaud had

them. (JAX14 at BCONNORS0000155.) For "patrons," Blackbaud included "membership

management" features.  (JAX12 at KS0010753.) As to "subscriptions," Blackbaud teaches

having "memberships" that can be renewed and expire. (JAX12 at KS0010753.) As to

"licensing," a person of ordinary skill in the art would have been motivated to combine

Blackbaud and idealive based on their shared fundraising teachings and the desire to maximize

the amount of funds raised through increased engagement with supporters and potential supports.

(JAX44, Mollick Rpt. ¶¶120, 386, 410, 421, 427, 438.) For "personnel," Blackbaud included

"Volunteer Management" features. ( JAX12 at KS0010753.) For "media shows," Blackbaud

included the ability to have images, and "interactive . . . [w]ebcasts." (JAX12 at KS0010775;

JAX14 at BCONNORS0000155.) For "news," Blackbaud included sending "newsletters." (

JAX12 at KS0010774.) Further to "mailings," Blackbaud teaches "[a]s you communicate with

your donors, collect e-mail addresses and send occasional …." ( JAX12 at  KS0010774.) As to

"images," Blackbaud instructed users to "[c]ommunicate with images." (JAX12 at KS0010775.)

### 3. Limitations for "Receiving Data . . . Regarding at Least One Project" and ". . . Regarding Entitlements"

| |
|---|
| **[1b]** *"receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage"* |
| **[18a]** *"receiving data from an artist or Account Manager regarding at least one project by an Artist"* <br> **[18c]** *"receiving data from the artist or Account Manager regarding at least one entitlement associated with at least one of the Artist and the project, said entitlement including at least one of a product, a service, a patronage"* |
| **[35a]** *"receiving data from an artist or Account Manager regarding at least one project by an Artist"* <br> **[35c]** *"receiving data from the artist or Account Manager regarding entitlements associated with at least one of the Artist and the project"* |
| **[36a]** *"receiving data from an artist or Account Manager regarding a first project by an Artist"* |

27

> **[36c]** *"receiving data from the artist or Account Manager regarding at least one entitlement associated with the first project, said entitlement including at least one of product, a service, and patronage"*

The prior art idealive and Blackbaud systems manifestly show fund-raising for projects. The Court has construed "entitlement" to mean each of a product, service and patronage, that is offered in a Sales Container to raise funds. (Dkt. #53.) This is known in the prior art as well.

**idealive.** There can be no genuine dispute that idealive teaches "Sales Container" offerings with entitlements in the form of physical products, services including access to downloadable content support for the project, and patronage in the form of investments. (JAX9; JAX22; JAX3, Reid Dep. at 15:19-22, 19:20-23 ("So I think it's split into two parts. One of them was the direct investment; the other part was still, hey, you know, put in ten bucks, you'll probably get a CD.").)

**Blackbaud.** Blackbaud was a general fund-raising tool, and therefore did not specifically address fund-raising for artists. It would have been obvious, however, to adapt Blackbaud based on the band web-sites, however, for the very reasons described in the Patent *and the prior art*, and to raise funds for artist projects so that rights did not have to be assigned to record labels. (JAX44, Mollick Rpt. ¶¶70, 383, 407, 418, 425.)

**Band sites.** Marillion and November Project also teach the funding of an artistic project, by offering an entitlement to receive an item (a CD), levels of patronage and information services. Marillion and November Project disclose delivering at least a physical CD, providing special Fan recognition and support for the project, and levels of membership/patronage. (JAX15; JAX17; JAX32.)

### 4.   Limitations for "Transmitting," "Receiving" and "Processing" "Acceptance Data"

> **[1e]** *"transmitting acceptance data back to the server from the client accepting the offer"*

| |
|---|
| **[1f]** *"processing the acceptance data by the server"* |
| **[18e]** *"receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron* |
| **[35e]** *"receiving acceptance data for an entitlement at a predetermined level of patronage from a Patron"* |
| **[36e]** *"receiving acceptance data from a Fan for an entitlement at a predetermined level of patronage"* |

For these limitations, "transmitted" data must be "received" (as in claims 18, 35 and 36) to be "processed." Regarding processing data, Camelio, testified that processing acceptance data refers to, *e.g.*, simply inserting it into a database. (JAX42, 12/6/2013 Camelio Dep. at 400:10-401:5.) The '887 Patent teaches that once data is processed, funds can be received by "any [] Internet payment method familiar to those of skill in the art," as well as by "check." (JAX1 at 10:4-8.)

**idealive.**  There is no genuine dispute that idealive was used to fund artistic projects, and that it (necessarily) received and processed acceptance data. (JAX3, Reid Dep. at 74:25-75:12 (JAX3, Reid Dep. at 78:18-21; JAX44, Mollick Rpt. ¶¶171, 183.)

**Blackbaud.**  Blackbaud states that "[a]fter the donor makes a donation from your Web page (hosted at Blackbaud), the transaction information is encrypted and *transmitted* to our Internet Gateway, VeriSign, who then *processes* the transaction through a bank processor such as Paymentech, Vital, Nova, etc." (JAX12 at KS0010762-3 (emphasis added).)  In addition, Blackbaud teaches that after contributions are made "[t]he donor will receive an electronic receipt…." (JAX12 at KS0010762-3; JAX44, Mollick Rpt. ¶¶176, 189.)

> **5.**   **Limitations for "Registering Contact and Marketing Information ..."**

| |
|---|
| **[1g]** *"registering contact and marketing information regarding Patrons in a database"* |
| **[17b]** *"registering contact information regarding interested Patrons in a searchable database"* |
| **[36f]** *"registering the Fan as a Patron in a Patron database and storing contact information regarding the Patron"* |

Defendants' expert agreed that having login and registration functions would mean a

29

Patron database is present. (JAX2, Monroe Dep. at 119:10-20 ("Q. So you would infer that if there's a login process there's necessarily a patron database. . . . A. For login and registration I would."), 184:5-186:11.) Monroe testified that, in the 2000 timeframe, there existed more than ten software products for user registration that were compatible with a typical webserver. (JAX2, Monroe Dep. at 186:24-187:20.) It was known.

**idealive.**  There is also no genuine dispute that idealive described registering contact, demographic and marketing information regarding Patrons in a database, *e.g.*, a "handle," password, name, address, email, etc., as well as habits and usage patterns. (JAX28; JAX22; JAX29.)

**Blackbaud.**  There is also no genuine dispute that Blackbaud included registering contact, demographic and marketing information regarding Patrons in a database, *e.g.*, though Blackbaud's "Membership Management" features that include registering "bibliographic information" and renewal status. (JAX12 at KS0010757-8, 753, 752, 753, 774; JAX13 at BLACKBAUD0000085 ("online registration page").)

> ### 6.      *Limitations for "Managing Communications through Said Patron Database"*

| |
|---|
| *[1h]* "*providing the artist or Account Manager software tools to manage communications, through said Patron database*" |
| *[17d]* "*managing communications, through said patron database, from the artist or Account Manager to Patrons*" |
| *[36g]* "*managing communications, through said Patron database, from the artist or Account Manager to Patrons*" |

**idealive.**  There is no dispute that idealive discloses communicating with fans through a Patron database by email, through online "bulletin boards" and a "chat system." (JAX28; JAX22; JAX3, Reid Dep. at 39:16-45:12, 69:3-74:24, 94:9.)

**Blackbaud.**  There is also no genuine dispute that Blackbaud discloses communicating

with fans through a Patron database, *e.g.*, using "RE:NetMail" software to compose emails and "RE:Members" software to send automatically generated renewal notices. (JAX12 at KS0010752-54, 757-8; JAX13, BLACKBAUD0000078-83.)

### 7.   Limitations for "Allowing Patrons to Demonstrate Interest . . ."

**[17a]** *"allowing Patrons to demonstrate interest in one or more projects prior to, during, and after creation and publication of the project's artistic work"* [10]

Server requests for website pages are routinely considered by persons of ordinary skill in the art to be an expression of interest in the material described on the requested webpage. (JAX44, Mollick Rpt. ¶¶ 366, 384.) A person of ordinary skill in the art would recognize that any Internet-based system would use a client-server architecture, such that remote sites would be able to make requests of the server, so as to demonstrate interest in the content. (*Id.*) Defendants do not dispute this in their expert report.

**idealive.**   There is also no genuine dispute that idealive allowed Patrons to demonstrate interest, at least, through website hits, on bulletin boards, via project recommendations and through a registration process that requests "interests." (JAX22; JAX34 ("Speak Up!"); JAX35; JAX3, Reid Dep. at 67:24-2, 72:2-73:5, 74:1-24, 94:16-20.)

**Blackbaud.**   There is also no genuine dispute that Blackbaud allowed Patrons to demonstrate interest, at least, through website hits, feedback about a project submitted through a "suggestion box," during registration, and by "earmarking" for a cause of interest. (JAX12 at KS0010775, 776 ("earmark their gifts"); JAX13 at BLACKBAUD0000085.)

### 8.   Limitations for "Managing and Viewing Financial and Marketing Information . . ."

**[17e]** *"managing and viewing financial and marketing information relative to projects supported through the system"*

---

[10] Like [17e], claim 11 recites "allowing Patrons to demonstrate interest." (JAX1 at 22:26-30.)

**idealive.**  There is no dispute that idealive included viewing financial and marketing information. During his deposition, Monroe testified that a MySQL database, something Camelio did not invent,  is "a database that is established on a server that can then be queried and communicated with from a client-side application or software program. And those kind[s] of databases are –just have a lot of uses," that it is understood to be searchable and that the types of information that can be stored are "vast." (JAX2, Monroe Dep. at 200:2-201:10.)

Further to Monroe, Prof. Mollick opined that "[a] person of ordinary skill in the art would understand that viewing financial and marketing information relative to projects would be inherent and obvious to idealive's system, which utilized a MySQL database behind a PHP package on an Apache web server, and allowed queries to be run on the database." (JAX44, Mollick Rpt. ¶ 389; JAX23; JAX33; JAX3, Reid Dep. at 71:1-8 ("A. Technically it was a MySQL – mySQL database running behind a PHP package on an Apache webserver.").) idealive also teaches that "[a]fter an offering is successfully closed, you enter the reporting and return phase, where you report periodically to your investors and distribute any returns to them as scheduled." (JAX23.)

**Blackbaud.**  There is also no genuine dispute that Blackbaud included viewing financial and marking information –  Blackbaud could create "reports" and "export data." (JAX12 at KS0010753 ("RE:Member for Membership Management . . . Reports include membership lists and directories, and analytical and statistical reports."); *id.* at 752.)

### D.      Summary Judgment of Invalidity for Obviousness Is Appropriate

As shown above, all of the components of each of the claims was known in the prior art. Idealive was a site for raising funds for artistic project over the Internet and Blackbaud was even more general than that.  Marillion and November Project were two bands that did this using their own sites, for the very purpose described in the Patent.

32

The motivation to combine these references was also known.  For example, Blackbaud was a full-featured online fundraising platform suitable for raising funds for an artistic project. Use of Blackbaud as a platform for artists, *e.g.*, with Marillion and November Project's sites is straightforward and would have been done for the very reasons articulated both in the Patent and in the prior art – to allow owners to maintain ownership over their work.  (*Id.*)

Put another way, the '887 Patent merely recites an aggregation of known software features for the purpose of crowd-funding artists' projects. This idea was known and each of the components was known. As shown above, here summary judgment of invalidity is appropriate because "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1351-52 (Fed. Cir. 2010) (affirming the district court's grant of summary judgment of invalidity); *see also Papyrus Tech. Corp. v. N.Y. Stock Exch., LLC*, 653 F. Supp. 2d 402, 428 (S.D.N.Y. 2009) (granting summary judgment of obviousness, because "[t]o use such well known techniques . . . yields no more than a predictable use or a predictable result that a person of ordinary skill would have foreseen"); *Western Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1372 (Fed. Cir. 2010) (reversing the denial of JMOL on invalidity because "each of the disputed elements of the asserted claims was present in the prior art, that the claimed combination represents no more than 'the predictable use of prior art elements according to their established functions,' and as such, the claims would have been obvious as a matter of law").

Here, there is no genuine dispute that there is nothing unpredictable about the use of any of the related software features. [11]

---

[11] Secondary factors, such as commercial success, can support a conclusion of obviousness.  For this to be  factor, the patentee must come forward with evidence showing (for example) commercial success and a nexus between that factor *and the claimed invention. Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1369-70 (Fed. Cir. 2011) ("Regarding commercial success, this factor 'may have relevancy' to the overall obviousness determination . . . but a

IV.        **Claims 4, 6 and 10 Have Plain Errors Rendering Them Invalid as Indefinite**

Claims 4, 6 and 10 each depend from claim 1 and recite "the interested party." (JAX1 at 22:1-3, 6-8, 22-25.) Claim 1, however, does *not* recite any "interested party." (JAX1 at 21:34-63.) This is referred to as an "antecedent basis" problem, *i.e.*, referring to "the interested party" assumes wrongly that there was an earlier reference in the claim to "an interested party."

"A claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. _, 11 (2014)(§112, ¶2 requires "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."). Indefiniteness is a matter of law resolvable on summary judgment. *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001).

Claims 4, 6 and 10 are indefinite, because "the interested party" could refer to more than one different type of entity.  Claim 1 does recite "an artist," "Fans," Patrons" and an "Account Manager." (JAX1 at 21:34-63.) According to the '887 Patent's specification, these are all potential "interested" parties: "The ArtistShare system *may provide products and services to any one or more* of artists, fans, patrons, investors, industry (retail outlets, distributors, recording companies, corporations, and the like) or other *interested parties*." (JAX1 at 9:7-10)(emphasis added).

The scope of each claim differs, depending on whether "the interested party" is the "fan,"

---

nexus must exist between the commercial success and the claimed invention."). Here, Kickstarter may be a commercial success, but this cannot be due to the claimed invention as Defendants have conceded Kickstarter does not infringe. (JAX41 (". . . ArtistShare has agreed to stipulate that Kickstarter does not infringe the '887 Patent based on the Court's January 18 claim construction order.").)  Similarly, Defendants cannot show that it is practicing the patent either, as Defendants' expert admitted.  (JAX2, Monroe Deposition at 30:22-31:16 ("Q. Do you know whether any claim of the '887 patent covers the ArtistShare site? A. I wouldn't say that's something I know. Again, that would be something I would need to look at in detail in a structured way. And I have not done that.").)

"patron," "artist" or "account manager." While ArtistShare's expert claims the "fan" is "the interested party," he also admits that at least that a "patron" would also be an interested party. (JAX46, Monroe Rpt. ¶ 546.) Admitted uncertainty regarding the meaning of "the interested party" creates improper ambiguity as to claim scope. Without reasonable *certainty*, the error is subject to debate and, thus, uncorrectable. *Nautilius*, 572 U.S. _.

For this additional reason, summary judgment of invalidity as to claims 4, 6 and 10 is appropriate.

## CONCLUSION

For the above reasons, summary judgment of invalidity is appropriate.

Respectfully submitted,

Dated: June 16, 2014

    */s/ Matthew B. Lowrie*
Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*

4822-8963-6379.6

## CERTIFICATE OF SERVICE

Pursuant to the Court's Order (Dkt. #92), the undersigned certifies that on the 16th day of June, 2014, the foregoing PLAINTIFF KICKSTARTER, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was served as indicated below:

**By electronic mail:**

Craig R. Smith (CS-0205)
William J. Seymour (WS-1801)
Lando & Anastasi, LLP
Riverfront Office Park
One Main Street – 11th Floor
Cambridge, MA 02142
T: (617) 395-7000
F: (617) 395-7070
csmith@lalaw.com
wseymour@lalaw.com

/s/      *Matthew A. Ambros*

Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*

4822-8963-6379.6

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was caused to be served on all counsel of record via Court's CM/ECF system (in addition, pursuant to the Court's Order (Dkt. #92), the foregoing document was previously served on Defendants' counsel via electronic mail on June 16, 2014):

Craig R. Smith, Esq.
William J. Seymour, Esq.
Eric P. Carnevale, Esq.
Lando & Anastasi, LLP
One Main Street
Cambridge, MA 02142
csmith@lalaw.com
wseymour@lalaw.com
ecarnevale@lalaw.com

Dated: September 10, 2014

/s/ Matthew A. Ambros

Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*