UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KICKSTARTER, INC.,

Plaintiff and
Counterclaim-Defendant,                          Civil Action No. 11-cv-6909 (KPF)

v.

FAN FUNDED, LLC and ARTISTSHARE, INC.,

Defendants and
Counterclaim-Plaintiffs.

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT, AND DEFENDANTS'CROSS MOTION FOR
<u>SUMMARY JUDGMENT OF PATENT VALIDITY</u>**

# TABLE OF CONTENTS

I.     Introduction ...................................................................................................... 1

II.    Background ...................................................................................................... 2

III.   Argument ......................................................................................................... 3

     A.    Legal Standards For Summary Judgment ................................................. 3

     B.    ArtistShare Is Entitled To Summary Judgment of Correct Inventorship ................ 4

          1.    Legal Standards for Inventorship ................................................. 4

          2.    Thompson *Denies* Inventorship, Rendering Corroboration Irrelevant ....... 4

          3.    Mr. Camelio Had Prior Possession of Each of the Elements Kickstarter Alleges Bob Thompson Contributed ........................................ 6

          4.    Mr. Thompson's Alleged Contribution is Insignificant When Measured Against the Full Invention ........................................ 9

     C.    ArtistShare Is Entitled To Summary Judgment That The '887 Patent Claims Patentable Subject Matter ................................................... 11

          1.    The Supreme Court's Subject Matter Eligibility Framework ................. 11

          2.    The Claims of the '887 Patent Do Not Recite an Abstract Idea .............. 13

          3.    The Claims of the '887 Patent Delineate a Specific Invention for Funding and Marketing Creative Works .............................. 15

     D.    ArtistShare Is Entitled To Summary Judgment Of Non-Obviousness ................. 18

          1.    ArtistShare is Entitled to Summary Judgment With Respect to the Asserted Dependent Claims ........................................ 19

          2.    Legal Standards for Obviousness ................................................. 20

          3.    The Claims of the '887 Patent Are Not Obvious ............................... 21

               a.    Overview of Kickstarter's Alleged Prior Art ................... 21

               i.    idealive ................................................................. 23

               ii.    Blackbaud ............................................................... 23

               iii.   Marillion ................................................................. 23

               iv.   November Project ..................................................... 23

               b.    Kickstarter Has Not Provided Any Motivation to Combine ............................................................. 24

               c.    The Alleged Prior Art Does Not Disclose the Limitations of the Claims the '887 Patent ................................... 25

i.      "A system for marketing and funding one or more projects of an artist comprising a server having application programs operable from a remote site for:…" [preamble 1, 17, 18, 35, and 36] ............................................................ 25

ii.     "a server having application programs operable from a remote site for … providing software tools to an artist or Account Manager to manage at least one project" [1a], [17c], [18b], [35b], [36b] .................................................. 26

iii.    "application programs operable from a remote site for … receiving information from the artist … regarding at least one Sales Container … including … a product, a service, and a patronage while the artist retains outright ownership…" [1b], [18a], [18c], [35a], [35c], [36a], and [36c] ............................................................................... 30

iv.     "applications programs operable from a remote site for … providing … software tools to manage communications, through said Patron database…" [1h], [17d], [36g] .......... 31

d.      Kickstarter Failed to Address Secondary Considerations that the Claims of the '887 Patent Are Non-Obvious ....... 32

E.      Claims 4, 6, And 10 Are Definite ......................................................... 33

1.      Legal Standards For Definiteness and Antecedent Basis ........................ 33

2.      Claims 4, 6, and 10 are Definite on Their Face or by Implication ........... 34

IV.     Conclusion ...................................................................................................... 35

# TABLE OF AUTHORITIES

### Cases

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) .................................................................................................................... 11, 17

*Alice Corp. Pty. Ltd v. CLS Bank Intern.*, 134 S.Ct. 2347 (2014) ........................................ *passim*

*Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107 (2012).............. 12

*Bancorp Svcs., LLC v. Sun Life Assure. Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012). 17

*Bard Peripheral Vascular v. WL Gore & Assoc.*, 670 F.3d 1171 (Fed. Cir. 2012)........................ 9

*Bd. of Ed. v. Am. Biocience, Inc.*, No. 4:99-cv-131, 2001 WL 34104924 (N.D. Fla. Oct. 31, 2001) ...................................................................................................................................... 5

*Bilski v. Kappos*, 130 S.Ct. ........................................................................................................ 18

*Cyberfone Sys., LLC v. CNN Interactive Group, Inc.,* 558 Fed. Appx. 988, 992 (Fed. Cir. 2014) ...................................................................................................................................... 17

*Dealertrack, Inc. v. Huber*, 674 F. 3d 1315 (Fed. Cir. 2012) ..................................................... 17

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980).......................................................................... 12

*Eli Lilly and Co. v. Barr Labs, Inc.*, 251 F.3d 955 (Fed. Cir. 2001)......................................... 3, 4

*Energizer Hldgs. v. Int'l. Trade Com'n.*, 435 F.3d 1366 (Fed. Cir. 2006) ............................ 33, 34

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998).......................................... 4

*Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324 (Fed. Cir. 2014) ......................................................... 5

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966)................................................... 20

*Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997)............................. 10

*Hoffman-La Roche, Inc. v. Cobalt Pharma., Inc.*,  2010 WL 5392683, at *2 (D. N.J. Dec. 17, 2010)....................................................................................................................................... 5

*In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000)............................................................................. 16

*InTouch Techs., Inc. v. VGO Commc'ns., Inc.*, 751 F.3d. 1327 (Fed. Cir. 2014) ................. *passim*

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342 (Fed. Cir. 2012) ...................... 32

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) .................................................................. 20

*Kyocera Wireless Corp. v. Int'l Trade  Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008) ............... 21, 22

Mayo Collaborative  Servs. v. Prometheus Labs., Inc., 132 S.Ct. 1289 (2012) ........................... 13

*Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238 (2011) ...................................................... 19

*Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372 (Fed. Cir. 2012) ...................................................... 21

*MobileMedia Ideas, LLC v. Apple Inc.*, 595 (D. Del. 2012) ............................................................ 22

*Nartron Corp. v. Schukra USA Inc.*, 558 F. 3d 1352 (Fed. Cir. 2009) ........................................... 9

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014) ............................................... 33

*Ortho Pharma. Corp. v. Smith*, 959 F. 2d 936 (Fed. Cir. 1992) ..................................................... 19

*Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir. 1998) ....................................................................... 4

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) ............................... 25

*Pro-Mold & Tool Co. v. Great Lakes Plastics*, 75 F. 3d 1568 (Fed. Cir. 1996)............................. 6

*Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373 (Fed, Cir. 2002).................................................... 19

*Shum v. Intel Corp.*, 499 F. 3d 1272 (Fed. Cir. 2007) ....................................................................... 6

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113 (Fed. Cir. 1987) ................................. 34

*TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333 (Fed. Cir. 2010)....................................................... 4

*Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151 (Fed. Cir. 2004) ......................... 26

*Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013)............................. 11, 14, 17, 18

### Statutes

35 U.S.C. § 101 ................................................................................................................................ 1, 12

35 U.S.C. § 102(f)................................................................................................................................... 5

35 U.S.C. § 103 ...................................................................................................................................... 22

35 U.S.C. § 282....................................................................................................................... 3, 11, 19

## I.    INTRODUCTION

Kickstarter's summary judgment brief demonstrates why ArtistShare is entitled to summary judgment of validity.  Kickstarter has not provided clear and convincing evidence and no reasonable jury could find for Kickstarter with respect to any of its invalidity theories.  The evidence submitted by Kickstarter shows that the '887 Patent is valid and that Kickstarter does not have clear and convincing evidence sufficient to overcome the presumption of validity.  Not only should Kickstarter's motion be denied, but ArtistShare should be ***granted*** summary judgment because Kickstarter has failed to produce sufficient evidence that could support a jury finding of invalidity by clear and convincing evidence.

First, Kickstarter's allegation that Bob Thompson is an inventor of the '887 Patent is wrong and Mr. Thompson has ***expressly denied that he is an inventor***.  Thus, there is no credible testimony supporting Kickstarter's inventorship theory.  ArtistShare has produced clear evidence that Mr. Camelio conceived of the claims prior to Mr. Thompson's work with ArtistShare.

Second, the '887 Patent claims patentable subject matter under 35 U.S.C. § 101.  Kickstarter failed to apply the correct framework for assessing patentable subject matter.  Kickstarter simply ***presumes*** that the claims of the '887 Patent recite an abstract idea of "crowd-based funding," which Kickstarter never defines.  The '887 Patent claims specific systems for allowing artists to manage creative works and obtain funding for them.  These patented systems do not preclude others from developing different funding systems.

Third, the '887 Patent is not obvious in view of the prior art references cited by Kickstarter.  Notably, Kickstarter has not challenged the validity of any of the dependent claims asserted by ArtistShare on the grounds of obviousness.  Therefore, summary judgment of non-obviousness should at least be granted with respect to the dependent claims.

Kickstarter ***admits*** that none of its prior art references anticipate Mr. Camelio's

inventions, which means that no reference discloses each and every element of any claim of the '887 Patent. Instead, Kickstarter discusses multiple references, but refuses to explain how to combine them. None of Kickstarter's alleged prior art references, either alone or in combination, disclose all of the limitations of the claims of the '887 Patent and Kickstarter's own citations to the evidence do not support its argument. Kickstarter also has not provided any motivation whatsoever to combine its alleged prior art. A patent owner is entitled to judgment of non-obviousness as a matter of law when there is a total failure to articulate a specific combination of references or a cogent motivation for combining them.

Finally, dependent claims 4, 6, and 10 are definite. The claims are clear that the "interested party" is the Patron. One of ordinary skill in the art would readily understand this. Kickstarter has not produced clear and convincing evidence that claims 4, 6, and 10 are not "reasonably certain."

## II.    BACKGROUND

This case began in September of 2011, when Kickstarter filed a declaratory judgment action in the middle of ongoing business discussions with ArtistShare's owner and the inventor of the '887 Patent, Brian Camelio, after he refused an offer by Kickstarter to purchase the patent. Mr. Camelio had wanted to partner with Kickstarter so that Kickstarter could benefit from Mr. Camelio's years of experience in this field, as his company, ArtistShare, had invented and successfully practiced his innovative "fan funding system" since 2003. After the Court entered its Claim Construction Order on January 18, 2013 (D.I. 43), ArtistShare agreed to stipulate to non-infringement, pending an appeal of the Claim Construction Order, and again sought to dismiss the declaratory judgment claim of invalidity in order to permit an efficient appeal, but Kickstarter refused. *See* D.I. 55. Now, after nearly three years of litigation, Kickstarter has not produced any evidence upon which a reasonable jury could base a finding of obviousness by

clear and convincing evidence.  This case is ripe for final judgment of patent validity.

The '887 Patent describes particular "fan funding" systems that provide a specific suite of online, software tools to allow artists to create an online project, market the project, get the project funded, and allow the artist to communicate with the funders of the project. *See* JAX46, Monroe Rept. at ¶¶ 51-64.  In some embodiments, an artist defines certain entitlements or rewards that are associated with the creative work and members of the public may pledge funds to the project in return for the entitlement.  *Id*. As shown in Figure 8 of the '887 Patent, an artist uses a fan funding platform to log into their account and access various web-based applications for managing their project. *Id*.  The fan funding system allows an artist to manage a project, including setting a start date and end date for a project, the project name, the revenue goal for a project, a project description, and a project photo. *Id*.  The system then presents this information to the public by generating a project web page.  *Id*.

Claim 1 of the '887 patent claims a specifically programmed server hosting remotely operable application programs that provide various software tools to an artist. *Id*.  Among other things, these tools allow the artist to manage an online project, define Sales Containers, and define offers to participate for a predetermined level of funding in return for the items within a Sales Container. *Id*.  The software tools also allow the artist to transmit the offer to client computers, present the offers at client computers, transmit acceptance data, and process that acceptance data upon receipt.  *Id*.  Finally, the software tools allow patrons to register contact and marketing information within a patron database and allows the artist to manage communications to patrons through the patron database.  *Id*.

## III.   ARGUMENT

### A.   <u>Legal Standards For Summary Judgment</u>

"Under the patent statutes, a patent enjoys a presumption of validity, *see* 35 U.S.C. §

282, which can be overcome only through clear and convincing evidence." *Eli Lilly and Co. v. Barr Labs, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).  "Because patents are presumed valid, 'a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise.'" *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010).  On the other hand, a party seeking summary judgment of patent ***validity*** need only "show that the nonmoving party, who bears the burden of proof at trial, failed to produce ***clear and convincing evidence*** … upon which a reasonable jury could invalidate the patent." *Eli Lilly*, 251 F.3d at 962.[1]

### B.   ArtistShare Is Entitled To Summary Judgment of Correct Inventorship

#### 1.   Legal Standards for Inventorship

"Patent issuance creates a presumption that the named inventors are the true and only inventors." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998).  Thus, Kickstarter must produce ***clear and convincing evidence*** that Thompson: "(1) contribute[d] in some significant manner to the conception or reduction to practice of the invention, (2) ma[d]e a contribution to the claimed invention that is not insignificant in quality, …, and (3) d[id] more than merely explain to the real inventors well-known concepts and/or the current state of the art. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350, 1351 (Fed. Cir. 1998) (citation omitted).  "Taken together, ***the alleged co-inventor's testimony*** and the corroborating evidence must show inventorship 'by clear and convincing evidence.'" *Ethicon*, 135 F.3d at 1464.

#### 2.   Thompson *Denies* Inventorship, Rendering Corroboration Irrelevant

Robert Thompson ***denies that he is an inventor of the '887 Patent***.  JAX58, Thompson Decl. at ¶¶2-4.  Since his deposition, Kickstarter's attorneys have repeatedly contacted Mr.

---

[1] All emphasis in the brief is our own unless otherwise noted.

Thompson, a third party witness, in an attempt to purchase the interest they incorrectly believe he holds in the '887 Patent.  *Id.* at ¶3.  According to Mr. Thompson, he has explained to Kickstarter's attorneys "on more than one occasion" that "***I do not believe I am in inventor and have never made that claim***."  *Id.*  Mr. Thompson repeatedly refused to sell any interest that Kickstarter alleges he has in the '887 Patent.  *Id.*  Kickstarter was well aware of these dispositive facts when it filed its motion for summary judgment, yet failed to disclose them to the Court or ArtistShare.

Mr. Thompson's ***denial*** of inventorship and refusal to accept Kickstarter's money supports summary judgment of validity as a matter of law.  The Federal Circuit has made clear that "as a threshold matter, … there must be some evidence that a fact-finder can find reasonable; ***the putative inventor must first provide credible testimony*** that ***only then must be corroborated***."  *See Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324 (Fed. Cir. 2014).  Here, there is no testimony upon which a jury could find that Mr. Thompson is an inventor.  To the contrary, Mr. Thompson has ***flatly denied*** being an inventor "on more than one occasion," even when Kickstarter has offered him money to sell it any alleged rights.   JAX58, Thompson Decl. at ¶3.  This is consistent with Mr. Thompson's deposition testimony, where ***he also denied inventorship***.  JAX5, Thompson Dep. at 173:7-15. Typically, inventorship and validity under 35 U.S.C. § 102(f) is not contested once the alleged inventor denies inventorship under oath.  *See, e.g., Bd. of Ed. v. Am. Biocience, Inc.*, No. 4:99-cv-131, 2001 WL 34104924 (N.D. Fla. Oct. 31, 2001), *aff'd as to inventorship*, 333 F. 3d 1330, 1339-40 (Fed. Cir. 2003).

Any remaining question as to Mr. Thompson's status has been mooted because Mr. Thompson has assigned whatever (unlikely) interest he may have in the '887 Patent to ArtistShare.  JAX58, Thompson Decl. at ¶4.  *See Hoffman-La Roche, Inc. v. Cobalt Pharma.,*

*Inc.*,  2010 WL 5392683, at *2 (D. N.J. Dec. 17, 2010) ("Cobalt has failed to offer evidence …

that correction of inventorship under § 256 is barred ….").

### 3.  Mr. Camelio Had Prior Possession of Each of the Elements Kickstarter Alleges Bob Thompson Contributed

Kickstarter has failed to produce ***any evidence*** showing that Mr. Thompson conceived of

any of the claimed subject matter in the '887 Patent before Mr. Camelio did.  The evidence

produced by Kickstarter either post-dates clear evidence of Mr. Camelio's conception and

reduction to practice, or is simply irrelevant to the claims of the '887 Patent.

"Conception is the touchstone of inventorship, and each joint inventor must generally

contribute to the conception of the invention."  *Shum v. Intel Corp.*, 499 F. 3d 1272, 1277 (Fed.

Cir. 2007) (citation omitted).  "Conception is the 'formation in the mind of the inventor, of a

definite and permanent idea of the complete and operative invention, as it is hereafter to be

applied in practice.'"  *Id*.  "An idea is definite and permanent when the inventor has a specific,

settled idea, a particular solution to the problem at hand, ***not just a general goal or research***

***plan he hopes to pursue***."  *Pro-Mold & Tool Co. v. Great Lakes Plastics*, 75 F. 3d 1568, 1575

(Fed. Cir. 1996).

Mr. Camelio originally conceived of the idea of a fan funding system in the summer of

2000, almost two years before meeting with Mr. Thompson.  *See* JAX46, Monroe Rept. at ¶¶65-

91.  Over the next two years, Mr. Camelio built the components of his system, all while teaching

himself the computer languages he needed to build the software.  *Id*.  By March of 2002, and

before meeting with Mr. Thompson, Mr. Camelio had created a prototype of his invention by

building a mock project for Ms. Maria Schneider, who would eventually become ArtistShare's

first artist.  *Id*.  Images of Ms. Schneider's fan funding project, which are dated prior to Mr.

Camelio's first meeting with Mr. Thompson, corroborate Mr. Camelio's prior invention.  *See,*

*e.g.*, JAX60-67.

Kickstarter's inventorship claim is almost entirely based on a single email from Bob Thompson to Brian Camelio, dated March 19, 2002 at 10:39 PM.  *See* JAX48.  This email was sent by Thompson the day after he and Mr. Camelio first met to discuss Mr. Camelio's invention. *See* JAX52; JAX5, Thompson Dep. at 55:14-17 ("And ***it was his idea***."); JAX58 at ¶¶2-4. By that time, Mr. Camelio had already conceived of and reduced his invention to practice. JAX46, Monroe Rept. at ¶ 91. Kickstarter has not produced ***any evidence regarding any supposed contribution by Mr. Thompson prior to this March 19 email***, which does not show any inventive contribution.

In his March 19 email, Mr. Thompson listed several ***potential vendors***. JAX48 ("We might also want to look into establishing relationships with the following:  "Amazon.com … Ebay.com … Net4Music.com …").  There is no evidence that Mr. Thompson thought of these features on his own.  Rather, the evidence of record demonstrates that Mr. Camelio had prior possession of each of the features of his invention before Mr. Thompson's email.

**Claim 7.**  Mr. Camelio had possession of the subject matter of claim 7 prior to Mr. Thompson's March 19 email.   In a PowerPoint presentation that was last modified by Mr. Camelio at 2:27 PM on March 19, 2002, ***more than 8 hours prior to receiving Mr. Thompson's March 19 email at 10:39 PM***, Mr. Camelio wrote: "PeopleForTheArts.com is no longer limited to music.  It also provides a platform for visual artists, authors, filmmakers, photographers, creative computer/interactive design, animators, new art forms not yet conceived…"  JAX53 at ART-018635.  This presentation clearly pre-dates the April 16, 2002 presentation that Mr. Thompson worked on and which Kickstarter cites as "corroboration."  *See* JAX59 (screenshot of metadata associated with JAX53).  Indeed, Mr. Thompson did not even begin working on the

April 17 presentation until Mr. Camelio *provided his pre-existing presentation* to Mr. Thompson on March 27.  JAX49.  Furthermore, Mr. Thompson testified that the presentations he made were based on information supplied by Mr. Camelio.  *See* JAX5, Thompson Dep. at 57:21-24 ("*This is … a business plan that I put together with information supplied by Mr. Camelio*.").

**Claims 13 and 14.**  Prior to Mr. Thompson's March 19, 2002 email, Mr. Camelio wrote about allowing patron participation in the creative process *and* providing sheet music as an entitlement.  *See* JAX53 at ART-18630. In his presentation, Mr. Camelio describes an exemplary list of entitlements for a fan funding project, including "*spend a day in the recording studio with the Artist.*"  *Id*.  ArtistShare has also produced image files among its early source code that are prior to Mr. Thompson's March 19 email and demonstrate that Mr. Camelio already envisioned offering access to the creative process.  JAX60 (Entitlement 1 includes "All access to studio and related events" and Entitlement 2 includes "All access to rehearsals.").  *See also* JAX61 (screenshot of JAX60 metadata).   Another source code image shows a "Featured Artist" page that was last modified on March 15, 2002.  JAX62-63.  The March 15 file states that project "[m]embers have access to live concert footage *and Maria's 'online scores*.'"  *Id*.

**Claim 17**.  An early image of Maria Schneider's artist web page shows that Mr. Camelio envisioned generating financial and marketing reports at least by tracking funding progress and generating a list of patrons.  JAX64.  This image was last modified by Mr. Camelio on March 15, 2002, before he ever met with Mr. Thompson, and shows a "Funding Meter" that would track and report her financial progress.  *Id*; JAX65.

Ms. Schneider's Artist Page also provided a link in the "Team" section of her project page to generate a report on all patrons.  JAX64. The "teamlist.png" image was last modified on March 19, 2002 at 9:03 AM and shows a report listing all of the patrons for a mock project.

JAX66-67.  These images were prepared by Mr. Camelio before any of the evidence cited by Kickstarter even existed.

Claim 1.  Mr. Camelio was already well aware of software tools for auctions before even meeting Mr. Thompson because he had previously built such software tools.  For example, Mr. Camelio had already built online auctions for his WebstoreAmerica.com website at least as early as March 2, 2001, more than a year before meeting with Bob Thompson.  *See* JAX68; JAX43, Camelio Dep. at 484:10-488:4.

Mr. Thompson's suggestion of "a security trading and marketing system" for the "[s]ale or auction of copyrights and/or publishing rights of Artists' work product" has **nothing to do with claims of the '887 Patent**.  *See Bard Peripheral Vascular v. WL Gore & Assoc.*, 670 F.3d 1171, 1180 (Fed. Cir. 2012) ("a joint inventor must … make a contribution to the **claimed** invention").  Claims of the '887 Patent require that "the artist **retains outright ownership** of the project and the creative work…"  *See, e.g.,* JAX1 at Claim 1.  Thompson's alleged idea would teach away from this requirement by encouraging artists to sell their ownership rights in the underlying creative work.

### 4.  Mr. Thompson's Alleged Contribution is Insignificant When Measured Against the Full Invention

The contributions that Kickstarter alleges Mr. Thompson made, even if true, would not qualify him as an inventor.  Mr. Thompson's alleged suggestions at best represent well-known concepts or the current state of the art.  *See Nartron Corp. v. Schukra USA Inc.*, 558 F. 3d 1352, 1356 (Fed. Cir. 2009) ("One who simply provides the inventor with well-known principles or explains the state of the art without ever having a firm and definite idea of the claimed combination as a whole does not qualify as a joint inventor.").

With respect to claim 1, Mr. Thompson's reference to "ebay" in his March 19, 2002

email cannot qualify him as an inventor because Mr. Thompson was merely referencing a well known concept – that items may be auctioned online.  Mr. Camelio was already well aware of this fact, having already built an auction website himself.  *See* JAX68.  *See also Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 981 (Fed. Cir. 1997) (specifying a suitable prior art product to meet the inventors' needs does not qualify one as an inventor).

With respect to claim 17, Mr. Thompson did not invent "managing and viewing financial and marketing information" by identifying "Counterpoint Systems."  Mr. Thompson was pointing out a potential vendor for supplying ***royalty accounting services***, which has nothing to do with ***the claimed invention*** and does not relate to offering entitlements in return for funds for a creative project.  *See Hess*, 106 F.3d at 981 ("Mr. Hess was 'doing nothing more than … supplying a product to them for use in their invention'").

Mr. Thompson did not make an inventive contribution when he wrote "Net4Music.com – printed sheet music of artists" in his March 19, 2002 email.  Again, this line in his email represents an available product, nothing more.  The identification of an available product for use in the invention does not make one an inventor, as a matter of law.  *Id.*

Finally, Mr. Thompson did not contribute to dependent claim 7 because, as explained above, Mr. Camelio clearly had prior possession of the idea that his invention could be used for any creative art form, not just music. JAX53 at ART-018635; JAC59.  Furthermore, recognizing that Mr. Camelio's invention would be suitable for financing other types of projects would not represent a significant contribution to the invention.

Thus, Kickstarter has not presented clear and convincing evidence regarding its inventorship claim.  ArtistShare's motion for summary judgment on inventorship should be granted.

## C.   ArtistShare Is Entitled To Summary Judgment That The '887 Patent Claims Patentable Subject Matter

After Kickstarter filed its motion for summary judgment, the Supreme Court decided *Alice Corp. Pty. Ltd v. CLS Bank Intern.*, establishing a clear framework for determining subject matter eligibility for computer-implemented patent claims.  134 S.Ct. 2347 (2014).  ArtistShare is entitled to summary judgment of subject matter eligibility under 35 U.S.C. § 101 because the claims of the '887 Patent do not meet *Alice's* threshold question of "whether the claims at issue are directed to a patent-ineligible concept," such as "the category of abstract ideas."  *Id*. at 2350. Kickstarter has not explained how the claims of the '887 Patent are directed to an abstract idea except to say that it is directed to "crowd-based funding," which Kickstarter **never defines or even attempts to identify in claim 1**.  *See Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("the court must first '**identify and define** whatever fundamental concept appears wrapped up in the claim.").   Notably, the term "crowdfunding" was not even coined until 2006, three years ***after*** Mr. Camelio applied for the '887 Patent. *See, e.g.,* D. Glass, Crowd Funding: How to Raise Money with the Online Crowd, at ix (2011).  Even assuming claim 1 recites an abstract idea, which it does not, the claims delineate **particular** computer systems for managing, marketing and financing a creative work, and therefore are patentable subject matter.

With respect to the dependent claims, ArtistShare is entitled to summary judgment as a matter of law because Kickstarter has not put forth any evidence or arguments concerning the dependent claims.  Kickstarter's failure to address each claim is fatal to its obviousness case.  *See* 35 U.S.C. § 282.

### 1.   The Supreme Court's Subject Matter Eligibility Framework

Kickstarter bears a heavy burden of proof to show, by clear and convincing evidence, that

each of the claims of the '887 Patent is ineligible for patent protection.  *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013), *vacated and remanded for further consideration on other grounds*, --- S.Ct. ----, 2014 WL 2921707 (2014).  "[T]he high level of proof applies to eligibility as it does to the separate patentability determinations. Accordingly, any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence." *Id.*  Kickstarter has not, and cannot, meet this heavy burden of proof.

Patentable subject matter includes "anything under the sun that is made by man." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).  Patent protection is available to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  However, the Patent Act "contains an implicit exception for '[l]aws of nature, natural phenomena, and abstract ideas.'" *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107, 2116 (2012). This narrow exception is intended to "distinguish patents that ***claim the 'buildin[g] block[s]' of human ingenuity***, … from those that ***integrate the building blocks into something more***, … thereby 'transform[ing]' them into a patent-eligible invention." *Id*. at 1294.

In *Alice Corp.*, the Supreme Court applied a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible ***applications*** of those concepts."  *Alice Corp.*, 134 S.Ct. at 2355.  First, courts must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*.  The Court cautioned that "[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas'" and warned that "an invention is not rendered ineligible for patent simply because it ***involves*** an abstract concept."

*Id*. at 2354 (citation omitted). "'*[A]pplication[s]*' of such concepts 'to a new and useful end,' …
remain eligible for patent protection." *Id*.   Second, if the claims are directed to an ineligible
concept, the courts must "examine the elements of the claim to determine whether it contains an
'*inventive concept*' sufficient to 'transform' the claimed abstract idea into a *patent-eligible
application*.'" *Id*. at 2357 (citing Mayo Collaborative  Servs. v. Prometheus Labs., Inc., 132 S.Ct.
1289, 1294 (2012).  The second step asks whether the "additional features" of the claim ensure
that it "is more than a drafting effort designed to monopolize the [abstract idea]."  *Id*. (citing
*Mayo*, 132 S.Ct., at 1297).

### 2.   The Claims of the '887 Patent Do Not Recite an Abstract Idea

ArtistShare is entitled to summary judgment that the '887 Patent claims patent-eligible
subject matter because the claims of the '887 Patent do not recite an abstract idea, as a matter of
law.   Kickstarter ignores the first step under *Alice Corp.*, and simply *presumes* that the '887
Patent is drawn to an abstract idea of "crowd-based funding."  Kickstarter's conclusory statement
that "the '887 Patent is directed to the abstract idea of crowd-based funding" is without support
or merit.  Kickstarter's brief at 10.  Kickstarter never explains what "crowd-based funding" is or
how the claims of the '887 Patent are supposedly "designed to monopolize" "crowd-based
funding."   By failing to provide any definition for crowd-based funding or any analysis of it,
there is no way for the Court to assess whether the claims are directed to that undefined concept.
Accordingly, Kickstarter failed to properly analyze whether the claims are abstract.  *See Alice
Corp.*, 34 S.Ct. at 2355.

The hallmark of a claim directed to an abstract idea is one that would likely preempt
*nearly any application* of that abstract idea by others.  *See, e.g., Alice Corp.*, 34 S. Ct. at 2354
("We have described the concern that drives this exclusionary principle as one of pre-emption.
… We have 'repeatedly emphasized this … concern that patent law not inhibit further discovery

by improperly tying up the future use of' these building blocks of human ingenuity.") (citation omitted). Only those patent claims that "'would risk **disproportionately** tying up the use of the underlying' ideas" are ineligible. *Id*. The detailed and specific limitations of the claims of the '887 Patent cannot be described as preempting crowd-based funding. For example, none of the alleged prior art references produced by Kickstarter would have been preempted by any of the claims of the '887 Patent. *See* § D(iv)(d), *infra* (discussing the secondary factor of long felt but unresolved need); JAX, Monroe Rept. at ¶¶ 539-540.

The claims of the '887 Patent do not cover an abstract idea. Nor do they recite the fundamental steps of "crowdfunding" at a high level of abstraction. Rather, the claims cover **particular systems for managing, marketing and financing a creative work**. They do not even arguably preempt the idea of crowd-based funding. *See, e.g., Ultramercial*, 722 F.3d at 1352 ("Viewing the subject matter as a whole, the invention involves an extensive computer interface. … Likewise, it does not say 'sell advertising using a computer,' and so there is no risk of preempting all forms of advertising, let alone advertising on the Internet."). For example, claim 1 of the '887 Patent claims **a particular system that allows users to automatically create, manage and fund their own projects**, using a specific collection of software tools that are "operable from a remote site." *See, e.g.,* JAX1 at claim 1. In addition, a Patron database is used for managing information relating to a project of the user. Claim 1 requires that the system include "application programs operable from a remote site for:"

- "receiving information … regarding at least one sales container…" This aspect of the invention allows users to define what rewards they intend to offer in return for funds.

- "providing software tools … to manage at least one project." The Court has construed this limitation as requiring computer programs that provide a suite of 12 specific features, "including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows and images."

- "transmitting offer data from a server to a client … receiving such offer data and presenting the offer to the Fan … [and] transmitting acceptance data back to the server…"  These software tools allow the transmission, presentation, and acceptance of offer data, based on the sales container information defined by the user in the database.

- "processing acceptance data by the server."  This allows the system to organize and maintain the acceptance data by storing the information in the database, including the fan accepting the offer, the sales container they selected, the amount of funds they contributed to the project, or any changes to the Artist's inventory.

- "providing … software tools to manage communications, through said Patron database to Patrons…"  This element of the claims allows the artist to communicate with his or her patrons, by using the information stored in the database.

These and other **specific limitations** of the claims remove the '887 Patent from the realm of abstract ideas and renders it a **particular** system for managing, financing and marketing a creative work.

To hold that the claims of the '887 Patent are drawn to an abstract idea would mean that **any** invention even loosely related to crowdfunding is ineligible for patent protection.  Such a far-reaching holding would be contrary to the law and run afoul of the Supreme Court's guidance under § 101.  *See Alice Corp.*, 134 S.Ct. at 2354:

> At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. … At some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." … Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. … "[A]pplication[s]" of such concepts "'to a new and useful end,'" we have said, remain eligible for patent protection.

The claims of the '887 Patent are not highly generalized.  Instead, the claims are narrowly tailored **systems** for marketing and funding a creative works.   As such, it is patent-eligible, and ArtistShare is entitled to summary judgment of patent eligibility as a matter of law.

### 3. The Claims of the '887 Patent Delineate a Specific Invention for Funding and Marketing Creative Works

Only if the claims of the '887 Patent are held to cover abstract ideas does the court need to consider the second step of *Alice Corp.*  Under the second step, the court "consider[s] the

15

elements of *each* claim both individually and '*as an ordered combination*' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice Corp.*, 134 S.Ct. at 2355. The second step asks whether the claim limitations, either alone or in combination, show an "'inventive concept' — i.e., an element *or combination of elements* that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* Kickstarter never considered the combination of elements for *any* of the claims of the '887 Patent and therefore summary judgment in favor of ArtistShare is warranted.

Here, the claims of the '887 Patent clearly demonstrate an inventive concept in the *provision* of a specific combination of *remotely operable* software tools for the creation, implementation, and management of marketing and funding a creative project. Mr. Camelio invented systems that allow artists to manage, market and fund their creative works using remotely operable software tools, regardless of their level of skill in computer science and whether or not they have the ability to design a web page, a database, or configure a server to perform commercial transactions.

The detailed elements of the claims of the '887 Patent, in combination, cover specific systems for financing and marketing a creative work. Kickstarter improperly argues that some of the individual elements of the claims, when taken out of context and considered as an isolated component, were already known in computer science. However, that *is not the test for subject matter eligibility*, and the Supreme Court warned against such impermissible dissection. *See Alice Corp.*, 134 S.Ct. at 2355 n.3 (noting "the general rule that patent claims '*must be considered as a whole*.'"). It is a bedrock principle of patent law that "[m]ost if not all inventions arise from a combination of old elements." *In re Kotzab*, 217 F.3d 1365, 1369-70

(Fed. Cir. 2000).   Thus, Kickstarter's improper dissection of the claim limitations mischaracterizes the '887 Patent and its objectionable questioning of ArtistShare's expert on this basis is irrelevant.

All of the Federal Circuit decisions cited by Kickstarter are readily distinguishable based on the facts and claims at issue.  In *Accenture*, the claims covered a generic system to list work required after an insurance event and the requirements of a given insurance contract.  728 F.3d at 1338.   *Cyberfone Sys., LLC v. CNN Interactive Group, Inc.* is an unpublished decision concerning claims covering the abstract idea of "using categories to organize, store, and transmit information."  *See,* 558 Fed. Appx. 988, 992 (Fed. Cir. 2014).  The patents at issue in *Bancorp* claimed "systems and methods for administering and tracking the value of life insurance policies in separate accounts."  *Bancorp Svcs., LLC v. Sun Life Assure. Co. of Canada (U.S.)*, 687 F.3d 1266, 1269 (Fed. Cir. 2012).  The claim specified *a purely mathematical process.  See id*. at 1270-71.  Finally, in Dealertrack, Inc. v. Huber, 674 F. 3d 1315, 1319 (Fed. Cir. 2012), the claim only recited the basic steps necessary to communicate a credit application over the Internet.  *Id*. at 1319.  The court **contrasted** the Dealertrack patent with the claims at issue in "*Ultramercial*, where th[e] court found that the patent claimed *a practical application with concrete steps requiring an extensive computer interface*."  *Id*. 1334.

In *Ultramercial*, the asserted patent claimed a specific 10-step method for paying for online content (e.g. a TV show) with advertising revenue.  *Ultramercial, Inc.*, 722 F.3d. at 1350.  The Federal Circuit concluded that the claims were simply too detailed to be drawn to an abstract idea.  The court reasoned that "[e]ven at this general level, *it wrenches meaning from the word to label the claimed invention 'abstract.'* The claim does not cover the use of advertising as currency disassociated with any specific application of that activity. *It was error for the district*

*court to strip away these limitations and instead imagine some 'core' of the invention*." *Id.*

The claims of the '887 Patent define detailed and specific systems for funding and marketing a creative work through the Internet and do not simply recite some generalized steps for crowdfunding.  For example, claim 1 of the '887 Patent defines more than a dozen limitations, including a specifically programmed server, complete with a specifically designed database, and a suite of remotely operable software tools.  Indeed, the fact that claim 1 defines such a specific *system* (*i.e.*, a specifically programmed *server*) is strong evidence of patent eligibility.  *See Bilski v. Kappos*, 130 S.Ct. at 3227 ("This Court's precedents establish that the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101.").

As in *Ultramercial*, "the claims in this case are not highly generalized. Instead, the … specific steps in the claim limit any abstract concept within the scope of the invention.  … [C]ommon sense alone establishes that these steps are not inherent in the idea of [crowdfunding]. There are myriad ways to accomplish that abstract concept that do not infringe these claims." *Id*. at 1353.  Because the claims of the '887 Patent are based on more than a dozen "concrete, palpable, tangible limitations," including software features required to "manage at least one project," they are not abstract.  The '887 Patent claims a narrowly tailored *invention* for marketing and funding a creative work on the Internet.  As such, it is patent-eligible, and ArtistShare is entitled to summary judgment of patent eligibility as a matter of law.

### D.   ArtistShare Is Entitled To Summary Judgment Of Non-Obviousness

ArtistShare is also entitled to summary judgment of non-obviousness because Kickstarter's alleged prior art fails to disclose each and every limitation of the '887 Patent. Furthermore, Kickstarter has failed to identify *any* motivation for combining its numerous references.  This failure is fatal to Kickstarter's invalidity claim.  Finally, neither Kickstarter nor

its expert ever considered the evidence of secondary considerations which precludes Kickstarter's obviousness argument, as a matter of law.

### 1. ArtistShare is Entitled to Summary Judgment With Respect to the Asserted Dependent Claims

Notably, Kickstarter has failed to present *any* evidence that *any* of the dependent claims of the '887 Patent are obvious.  In its brief, Kickstarter ***does not include any obviousness arguments regarding the dependent claims***.  Instead, Kickstarter belittles the dependent claims but never even asserts that they are obvious.  *See, e.g.,* Kickstarter's Brief at 6-7 ("Dependent claims based on claim 1 add minor limitations").  Kickstarter has not attempted to set forth a prima facie case of obviousness with respect to the dependent claims.   Therefore, summary judgment of non-obviousness at least with respect to the dependent claims 2-11, 19-20, 23-28, and 33-34 is appropriate.

"A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." 35 U.S.C. § 282.  *See Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2242 (2011).  The Federal Circuit has held that § 282 requires "a party challenging the validity of a claim…, ***must submit evidence*** supporting a conclusion of invalidity of ***each claim*** the challenger seeks to destroy."  *Ortho Pharma. Corp. v. Smith*, 959 F. 2d 936, 942 (Fed. Cir. 1992).  A finding that dependent claims are obvious cannot be sustained in the absence of any evidence relating to those separate claims.  *See Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1379-80 (Fed, Cir. 2002) ("The district court erred by not separately addressing each claim, and on remand should do so.").

Here, Kickstarter has not put forth *any evidence or arguments* that support a separate

finding of obviousness with respect to the dependent claims.   Clearly, Kickstarter has not produced clear and convincing evidence that could support a jury finding of obviousness with respect to the asserted dependent claims.   *See* JAX46, Monroe Rept. at ¶¶ 145-154, 170-175, 215-224, 248-258, 284-293, 321-331, 354-363, 386-395, 422-435, 463-474, 502-514.   As such, ArtistShare should be granted summary judgment of validity at least with respect to dependent claims 2-11, 19-20, 23-28, and 33-34 as a matter of law.

### 2.        Legal Standards for Obviousness

A patent is invalid for obviousness only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."   *InTouch Techs., Inc. v. VGO Commc'ns., Inc.*, 751 F.3d. 1327, 1347 (Fed. Cir. 2014) (reversing finding of invalidity for obviousness).   "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness."   *Id.* (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)). "Courts **must consider all four Graham factors** prior to reaching a conclusion regarding obviousness."   *Id.* (citation omitted).

"A party seeking to invalidate a patent on obviousness grounds **must 'demonstrate 'by clear and convincing evidence** that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Id.* at 1347 (citation omitted). While an analysis of any teaching, suggestion, or motivation to combine elements from different prior art references should be "flexible," there must be "an apparent reason to combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis

should be made explicit." *Id.* (quoting *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415 (2007).

"The district court ***must consider*** evidence showing objective indicia of nonobviousness, which constitute 'independent evidence of nonobviousness.'" *InTouch Techs.*, 751 F.3d. at 1347. Objective indicia "may often be the most probative and cogent evidence of nonobviousness in the record." *Id.*   "These objective criteria help inoculate the obviousness analysis against hindsight." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012).

### 3.        The Claims of the '887 Patent Are Not Obvious

Kickstarter has not produced ***any*** prior art references that anticipate the claims of the '887 Patent.  *See* JAX69, Mollick Dep. at 109:17-110:11.  Accordingly, ArtistShare should be granted summary judgment of no anticipation.

Kickstarter attempts to assemble a collage of prior art references and then argue that the patent was obvious, more than eleven years later.  However, Kickstarter ***ignores*** basic features of the claims of the '887 Patent, which preclude its theories of obviousness as a matter of law. Furthermore, because Kickstarter has still refused to ***identify its proposed prior art combinations to the Court and ArtistShare***, its undisclosed obviousness theory should be precluded as a matter of law.

#### a.  Overview of Kickstarter's Alleged Prior Art

None of the prior art references relied on by Kickstarter – idealive, Blackbaud, Marillion, or November Project – should be treated as single prior art references.  For each of these alleged prior art references, Kickstarter has produced a collection of separate publications, each having a separate publication date and separate disclosures.  Yet, Kickstarter presumes to treat these publications as a single prior art reference without ever explaining its basis for doing so or submitting any apparent motivation to combine them.  Kickstarter ***has not*** produced any direct evidence relating to any underlying systems, such as source code or actual software.  Thus,

Kickstarter is limited to the individual disclosures of the various alleged publications it has produced, and not the underlying systems it continually references, which it has not produced and for which there is no direct evidence.  *See Kyocera Wireless Corp. v. Int'l Trade  Comm'n*, 545 F.3d 1340, 1351 (Fed. Cir. 2008) (finding eleven different references with separate dates of creation describing the GSM standard did not constitute a "single prior art reference").

Each of Kickstarter's various documents (*i.e.,* each individual web page printout) is a separate alleged prior art publication.  In *Kyocera*, the Federal Circuit held that different publications relating to the same "GSM standard" could not be treated as a single prior art reference because they were authored by different subsets of authors at different times.  *Id*. at 1351.  Thus, publications, such as web pages, are treated as "several prior art references with separate dates of creation, rather than a single prior art reference."  *Id*.  Here, Kickstarter's alleged prior art publications were allegedly stored by the Wayback Machine within wide date ranges.  *See, e.g.,* Marillion (October 2000 to October 2001); November Project (August 2000 to April 2001); and idealive (May to October of 2000).  There is no legal basis for treating these separate web pages as a single reference.

Where, as here, **separate** documents are used to allegedly render a patent obvious, there must be some articulated motivation for combining them.  *See, e.g. MobileMedia Ideas, LLC v. Apple Inc.*, 595-596 (D. Del. 2012) (finding that publications relating to the GSM Standard could not be treated as a single prior art reference and then assessing whether Apple's expert had provided any motivation for combining the references pursuant to 35 U.S.C. § 103).  Here, neither Kickstarter nor its expert has provided ***any*** motivation for combining the various web pages Kickstarter has produced.  Kickstarter's presumption that its various publications do not need to be combined is fatal to its obviousness arguments and ArtistShare is entitled to summary

judgment on this basis alone.  *See, e.g. InTouch Techs.*, 751 F.3d. 1347 (reversing finding of invalidity when the defendants' expert "fail[ed] to … identify sufficient reasons or motivations to combine the asserted prior references").

### i.   idealive

The idealive references are a collection of documents from between May and October of 2000 relating to an online service that allegedly allowed users to offer equity in creative projects to potential investors online by posting a "prospectus" that artists would prepare manually, through consultations with idealive site administrators.  JAX23 at KS0002955.

### ii.   Blackbaud

The Blackbaud documents from 1999 to 2001 describe an alleged program called "Raiser's Edge for Windows" for accepting donations by a charitable non-profit organization and does not relate to the field of raising funds for a creative project.  Using the Raiser's Edge for Windows software, customers could add a donation link to their pre-existing web pages. JAX13 at BLACKBAUD00000014.

### iii.   Marillion

The Marillion documents are a collection of web pages that purport to have been "captured" by the Way Back Machine between October 2000 and October 2001.  *See* JAX46, Monroe Rept. at ¶ 197. These publications represent manually-prepared web pages for pre-ordering an album by the band, Marillion.

### iv.   November Project

The November Project references are a collection of web pages that were purportedly "captured" on the Way Back Machine between August 2000 and April 2001.  *See* JAX46, Monroe Rept. at ¶ 227.  November Project was another band that manually created a web page to allow fans to pre-order one of their albums online.  *See* JAX6, Morrison Dep. at 37:14-39:20;

103:6-104:12.

### b. Kickstarter Has Not Provided Any Motivation to Combine

Kickstarter has not supplied any reason why one of skill in the art would have been motivated to combine its alleged prior art references or how they should even be combined. In *InTouch Techs.*, the Federal Circuit recently reversed a holding of obviousness based on allegations closely similar to Kickstarter's. *See* 751 F.3d. at 1347. The court reasoned that the evidence of obviousness "did not even come close" because its expert did not articulate any non-conclusory motivation to combine the alleged portions of the prior art references: *Id.* at 1348. The court reasoned that the expert's "testimony was vague and did not articulate reasons why a person of ordinary skill in the art at the time of the invention would combine these references." *Id.* at 1351. In this case, Kickstarter's so-called motivations to combine are even more vague and conclusory than those provided in *InTouch*. Kickstarter simply concludes, without support, that the prior art should be combined because it would supposedly be "straightforward." *See* Kickstarter's Brief at 33. Kickstarter does not provide *any support* for this conclusion.

Kickstarter's expert, Mr. Ethan Mollick, also failed to provide any motivation to combine. *See, e.g.* JAX69, Mollick Rept. at ¶ 70 ("*To the extent* that one or more projects of an artist is not explicitly or inherently disclosed in Blackbaud, it would have been obvious to a person of ordinary skill in the art to combine Blackbaud with idealive, Marillion, November Project and/or knowledge of a person of ordinary skill in the art. As shown above, *each of idealive, Marillion and November Project discloses raising funds for artistic works*."). Mr. Mollick admitted to providing "87 billion" potential prior art combinations, JAX69, Mollick Dep. at 172:23-173:21, without *any* explanation as to why one of skill in the art would have been motivated to do so. In any event, simply declaring that alleged prior art references are generally from the same field of endeavor is insufficient to support a motivation for combining specific

prior art references.[2]  *See InTouch Techs.*, 751 F.3d. at 1351.  Thus, neither Mr. Mollick nor

Kickstarter has provided ***any*** motivation to combine Kickstarter's alleged prior art references.

Accordingly, ArtistShare is entitled to summary judgment as a matter of law.

### c.  The Alleged Prior Art Does Not Disclose the Limitations of the Claims the '887 Patent

#### i.  "A system for marketing and funding one or more projects of an artist comprising a server having application programs operable from a remote site for:…" [preamble 1, 17, 18, 35, and 36][3]

Claim 1, for example, requires "a server having application programs ***operable from a***

***remote site for:***" providing the series of features defined within the claim.  *See Pitney Bowes,*

*Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  Kickstarter has failed to

show that any combination of the prior art references discloses each of the features of claim 1

that are "operable from a remote site."

**idealive**.  Kickstarter has not cited to ***any documentary evidence*** suggesting that idealive

had any "application programs ***operable from a remote site***" because there is none.   Kickstarter

references the ***uncorroborated***, faulty recollection of Mr. Hamish Reid, who recalled using a

MySQL database behind a "PHP package" on an Apache webserver.  Simply using the PHP

scripting language does not mean that idealive offered ***any "application programs operable***

***from a remote site***," let alone, the series of application programs required in claim 1.  None of

the documents relating to idealive disclose ***any*** remotely operable application programs, and the

---

[2] ArtistShare has submitted herewith a motion to strike Mr. Mollick's Expert Report as to obviousness for these and other reasons.
[3] Kickstarter grouped many claim limitations together in its brief and in its Expert report without regard to the significant differences between the different claims.  Kickstarter's improper groupings invites reversible error.  *See Dayco Products, Inc. v. Total Containment, Inc.*, 329 F. 3d 1358, 1370 (2003).  For example, Kickstarter groups limitation [1b] "receiving information from the artist or Account Manager regarding at least one ***Sales Container*** associated with the at least one project," with limitation  [35a] "receiving data from an artist or Account Manager regarding at least one project by an Artist." These limitations have different requirements and should not be grouped together.   To aid the Court's review, ArtistShare has organized its arguments based on the same groupings.  ArtistShare's claim limitation references (i.e. [1a], [1b], etc.) correspond to those used in Kickstarter's Brief.

testimony of Mr. Reid in this regard was faulty, at best.  *See, e.g.* JAX3, Reid Dep. at 32:25-33:5 ("I don't remember whether it was actually used like that at all … Again, ***without any remembrance of any of the details of this at the moment***."). This is precisely why the uncorroborated, faulty testimony of someone like Mr. Reid's is legally insufficient to prove the substance of prior art as a matter of law.  *See Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004) ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent.").

Likewise, Kickstarter's citation to Mr. Monroe's deposition is simply wrong.  Mr. Monroe testified that web pages may include executable script, which has ***nothing to do*** with whether any of the idealive publications ***disclosed*** any remotely operable application programs. *See* (JAX2, Monroe Dep. at 191:6-16).[4]

 **Blackbaud.**   The Blackbaud documents refer to "the Raiser's Edge for Windows," a program for organizing and managing information relating to a donation campaign for a charitable non-profit.   *See* JAX46, Monroe Rept., at ¶¶ 299-300.   None of the Blackbaud publications disclose "[a] system for marketing and funding ***one or more projects of an artist.***"

> ii. **"a server having application programs operable from a remote site for … providing software tools to an artist or Account Manager to manage at least one project" [1a], [17c], [18b], [35b], [36b]**

The Court has construed "software tools . . . to manage at least one project" and similar limitations as requiring "computer programs that consist of a suite of features, including project information, inventory, auctions, patrons, subscriptions, licensing, personnel, news, mailings, media shows ***and*** images." D.I. 53 at 12.  Kickstarter has not identified any prior art references

---

[4] Kickstarter cites to this same passage in Mr. Monroe's deposition in an attempt to plug the clear gaps in the disclosures of its various prior art references.  However, the fact that servers may serve executable script has nothing to do with any of Kickstarter's asserted prior art references or the specific, remotely operable features of the claims of the '887 Patent.  Kickstarter has not cited to ***any*** relevant executable script in its alleged prior art references.

that provide this suite of remotely operable computer programs for managing a project.

**idealive.** The "basic listing" feature on idealive was a "semi-automated" process that allowed users to post a paragraph about themselves on idealive, along with a thumbnail image. *See* JAX21 at KS0002952. However, this basic listing feature was not a web page or a project. *Id*. ("we do not supply you with any web presence in the basic listings beyond the single paragraph you submit to us. We expect you to have your own web site(s) and to be able to reference them in the listing."). Therefore, the idealive basic listing is not a "project" as envisioned by the '887 Patent and did not provide the software tools required in claim 1.

With regard to the "advanced listing," idealive ***did not offer any tools*** for posting or managing a project. Rather, a "prospectus" for shareholders was prepared and submitted to idealive ***manually*** and idealive would then ***manually*** prepare web pages ***on behalf of the artist***. *See* JAX23 at KS0002954.  idealive does not disclose that this process involved any online tools or that the user could manage a project, once posted, using any online tools. During his deposition, Mr. Hamish Reid could not even recall whether the process for posting a "prospectus" was automated or manual and confirmed that ***no corroborating evidence*** of this alleged feature of idealive, such as source code, exists.  *See* JAX3, Reid Dep. at 92:15-93:8.

The so-called idealive "features" identified by Kickstarter also have ***nothing to do with any software tools***.  At best, these alleged "features" of idealive are nothing more than descriptions of ***manual*** processes that the idealive administrators envisioned but never actually built or were operated manually by the site administrators, not the artist.

- **Inventory** – JAX 9 ***does not disclose any software tools***.  JAX 22 is merely an image of a registration page, which has ***nothing to do with software tools to manage inventory***.

- **Auctions** – Mr. Reid testified that idealive ***may*** have used a Dutch auction and admitted that "this is 14 --13, 14 years ago ***and not reliable in detail***." JAX3, Reid Dep. at 74:25-75:14. There is also no evidence corroborating "a Dutch auction."

- **Patrons** – Kickstarter appears to ignore this feature entirely when discussing idealive in its brief.

- **Subscriptions** – There is no indication of any software tools for managing subscriptions anywhere in the idealive publications.  JAX22 is a standard registration page, which is irrelevant, and JAX24 shows a *publicly accessible* web page for information relating to VIP *artists* that idealive was promoting.  JAX24 *is not* a members-only web page.

- **Licensing** –JAX23 has absolutely nothing to do with *licensing* and, by definition, brings idealive *outside of the scope of claim 1* of the '887 Patent, which expressly requires that "the artist *retains* outright ownership of the project and the creative work."

- **Personnel** – The standard registration page shown at JAX21 has nothing to do with a "personnel" management capability. Managing "personnel" relates to identifying and managing the personnel related to a project – i.e. the members of a band, a troupe of actors, or the production crew of a film.

- **News** –While JAX27 shows a "Studio Diary," there is every indication that this page was prepared manually by idealive site administrators.  For example, the page identifies idealive administrator and programmer, Hamish Reid, as the owner of the images on the web page. Nothing in JAX27 discloses any software tools or how this web page was even prepared.

- **Mailings** –JAX22 and 28 are *registration pages*, not mailings pages.  JAX29 simply allows users to "opt out" of receiving communications from idealive.  It makes no indication as to whether idealive provided any communication tools *to artists*.

- **Media Shows / Images** –JAX22 is merely a registration page with no disclosure relating to images or media shows.

**Blackbaud.**  Kickstarter admits that Blackbaud discloses nothing more than a service that allowed charitable organizations to "customize your giving page and online acknowledgements without knowing HTML." JAX69, Mollick Rept. at ¶ 69.  Kickstarter does not discuss any features akin to managing a creative project.  Customizing a donation page for a charity is not managing a creative project.  For example, the template for customizing a donation page shown at BLACKBAUD00000033 only allows users to define a web page header and provides a generic detail box.  JAX13.

Again, Kickstarter's evidence fails to disclose the software tools required under the claims of the '887 Patent:

- **Inventory** – Kickstarter has not identified *any* software tools provided by Blackbaud for managing inventory. Kickstarter has argued that both *Marillion* and *November Project* sold CDs on the Internet. However, a mere reference to selling CDs online is insufficient to disclose providing remotely operable application programs for managing inventory. JAX46, Monroe Rept. at ¶ 201. Kickstarter's sole citation to managing *donation records* using the Raiser's Edge is irrelevant because donations do not implicate *inventory*. *See* JAX12 at KS0010757-8.

- **Auctions** – Kickstarter's analysis consists of one sentence – "[a]s to 'auctions,' Blackbaud had them." But this is simply incorrect. The document cited by Kickstarter is a presentation by Mary Kay Phelps, a Senior Director with the American Red Cross. Her presentation on "Online Fundraising" simply lists "auctions" as an example of "[i]nteractive opportunities that draw users to your site and increase visibility" and has nothing to do with Blackbaud. JAX14 at BCONNORS0000155.

- **Patrons and Subscriptions** – Donor-members in the Raiser's Edge cannot be equated with "patrons" or "subscribers" in the '887 Patent because the Court has construed "Patron" as "a fan who registers with an artist and who provides a contribution to a project of an artist in exchange for certain entitlements." The "Raiser's Edge for Windows" had nothing to do with managing a creative project and therefore is not relevant to the '887 Patent. *See* JAX12 at KS10752; JAX46, Monroe Rept. at ¶¶ 303-305.

- **Licensing** – Kickstarter *admits* that Blackbaud does not disclose any tools to manage licensing. *See* Kickstarter's Brief at 27 (only proposing a combination with idealive).

- **Personnel** – Kickstarter provides no reason why tools to manage *charitable volunteers* are somehow the same as tools to manage the personnel related to a *creative project*. The "Raiser's Edge for Windows" had nothing to do with managing a creative project and therefore is not relevant to the '887 Patent. *See* JAX12 at KS10752; JAX46, Monroe Rept. at ¶¶ 303-305..

- **News and Mailings** –Kickstarter cites to a discussion of *standard email* within the Blackbaud references. *See* JAX12 at 10774. This entire discussion falls under the heading "Send e-mail newsletters with links to relevant areas of your Web site," and is a general discussion of fundraising strategies *using standard email.* *Id*. The existence of standard email has nothing to do with providing software tools to manage news or mailings.

- **Media Shows / Images** – Blackbaud does not disclose any tools for managing "media shows," or "images." The "[w]ebcasts" cited by Kickstarter are from a presentation by Mary Phelps of American Red Cross on "Online Fundraising," generally. BCONNORS0000155 simply lists "[w]ebcasts" as an example of "[i]nteractive opportunities that draw users to your site and increase visibility." JAX14. This statement has nothing to do with Blackbaud. With regard to "images," Kickstarter cites to a series of "[t]ips for ensuring your online presence is a success," one of which is to "Communicate with images." *See* JAX12 at KS10775. This passage is a tip for improving charitable web pages, generally, and has nothing to do with any capabilities provided by the "Raiser's Edge for Windows" software.

**iii.** **"application programs operable from a remote site for … receiving information from the artist … regarding at least one Sales Container … including … a product, a service, and a patronage while the artist retains outright ownership…" [1b], [18a], [18c], [35a], [35c], [36a], and [36c]**

These claim limitations requires: 1) remotely operable application programs, 2) for receiving information regarding a Sales Container, 3) that includes at least one product, one service, and one patronage, and 4) "while the artist retains outright ownership of the project and the creative work."  None of the prior art alleged by Kickstarter includes the necessary features of these claim limitations.

**idealive.**  idealive was a platform for selling *equity* in a creative project.  *See* JAX23 at KS0002955 ("The offering includes a prospectus…").  Mr. Reid's vague recollection of a potential "plan" to include shareholder perks for idealive investors, such as a copy of a CD, is insufficient, and ***does not disclose the existence of any remotely operable application programs for defining a sales container.***  Mr. Reid admitted during his deposition that such features were never actually built or offered as part of idealive. *See* JAX3, Reid Dep. at 93:14- 94:4.  In any event, there is nothing to corroborate Mr. Reid's already insufficient testimony regarding shareholder perks.  JAX9 is a general description of idealive that does not disclose any software tools for defining any shareholder perks.  JAX22 is a printout of a generic registration page that does not support any of Kickstarter's assertions.

**Blackbaud.**  Kickstarter *admits* that Blackbaud does not disclose this limitation.  *See* Kickstarter's brief at 28 ("Blackbaud … did not specifically address fund-raising for artists.")

**November Project.**  November Project created its pre-order website manually and manually edited the website to include the categories of funding. *See* JAX17 at KS2597-KS2599; JAX6, Morrison Dep. at 37:14-39:20; 103:6-104:12.  Mr. Morrison, who prepared November Projects' web pages, admitted that no software tools were available at the time to create and

manage their album pre-order.  *See id.* at 103:24-104:12.

**Marillion.**  Marillion also created its pre-order website manually and manually edited the website to state that "pre-orders will be manufactured and fulfilled by Marillion's own Internet Mail-order company, Racket Records." JAX15 at KS0003357.  *See, e.g.,* JAX4, Nielsen Dep. at 82:23-83:4("Q. How did you go about building that website?   A. Initially I coded it by hand in a text editor.  Then, as websites became more popular, DreamWeaver became the software that I ended up using … to speed up the process of coding it by hand.").  Thus, neither Marillion nor November Project disclosed *any remotely operable application programs*.

> iv. **"applications programs operable from a remote site for … providing … software tools to manage communications, through said Patron database…" [1h], [17d], [36g]**

Kickstarter ignores the Court's claim construction on this claim term, which requires "computer programs that enable and control the exchange of information with a patron *wherein the patron receives the information directly from the Patron database*."

**idealive.**  None of the idealive references disclose *any database* through which communications would be managed.  JAX28 and JAX22 are generic registration pages that do not explain how, if at all, idealive artists managed any communications.   Mr. Reid confirmed that idealive artists would need to request assistance from idealive site administrators to contact their investors. *See, e.g.* JAX3, Reid Dep. at 67:24-68:13 ("At this time I think *it was mostly manual as in the artist would contact us and say can you send this out to all interested parties, and we would do that*.").

**Blackbaud.**  The Raiser's Edge for Windows software was not designed to "receiv[e] the information directly from [a] Patron database." For example, the Raiser's Edge donor database was stored and maintained offline within local programs.  *See* JAX12 at KS0010752-53.  There were no software tools offered through Blackbaud that would allow a user to manage

communications through this database. Instead, users were forced to first manually ***export*** information from the Raiser's Edge database before it could be uploaded and used in the NetDonors email application. There is no suggestion within Blackbaud that the offline, locally stored donor database was capable of sending communications directly from the database.

### d. Kickstarter Failed to Address Secondary Considerations that the Claims of the '887 Patent Are Non-Obvious

Summary judgment of validity is also appropriate because neither Kickstarter nor its expert considered any secondary considerations of non-obviousness, such as commercial success, praise by others, long felt but unresolved need, and unexpected results. *See InTouch Techs.*, 751 F.3d at 1352 ("There was, moreover, ***no effort*** by Dr. Yanco to guard against this hindsight bias by appropriately considering all objective evidence of nonobviousness."). Indeed, Kickstarter's expert utterly failed to discuss these factors in his report, *see* JAX46, Monroe Rept. at ¶ 536, and Kickstarter has not presented any relevant discussion in its Brief. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) ("This court has explained, moreover, that the obviousness inquiry requires examination of all four Graham factors.").

As shown in the responsive expert report of Marshall Monroe, there is credible evidence that the claims of the '887 are non-obviousness under each of the secondary indicia of non-obviousness. ArtistShare has had tremendous commercial success, raising millions for artistic projects; attracting multi-Grammy award winning, Emmy award winning, and Pulitzer Prize nominated artists; as well as funding albums that have received 9 Grammy awards and 20 nominations to date. *See* JAX46, Monroe Rept. at ¶¶ 537-38. A long-felt but unresolved need is also demonstrated in the host of unsuccessful prior art references produced by Kickstarter in this case, which Kickstarter ***admits*** do not anticipate the claims of the patent. ArtistShare's expert

considered each of these alleged prior art references as evidence of long felt but unresolved need, but Kickstarter and its expert ignored them.  *See, e.g., id.* at ¶¶ 539-540.  Each of these prior art references sought to create a system for funding creative projects, but failed to achieve success or public acceptance, *see id.* at ¶542, because they were missing the novel features of Mr. Camelio's inventions.

Lastly, the system of the '887 Patent has also yielded unexpected and superior results, such as the creation of a forum for creative works seeking funding.  *Id.* at 541.  By providing the necessary software tools in an automated fan funding platform, a vibrant forum for projects and artists seeking fan funding on the internet emerges. This synergistic result of the system of the '887 Patent is apparent to anyone who is familiar with ArtistShare or Kickstarter. *See id.*

Kickstarter and Mr. Mollick's failure to address **any** secondary indicia of non-obvious is yet another reason why Kickstarter has failed to produce clear and convincing evidence, and why ArtistShare is entitled to summary judgment of non-obviousness.

**E.**   **Claims 4, 6, And 10 Are Definite**

Claims 4, 6 and 10 are definite because they are readily understood by one of ordinary skill in the art and ArtistShare is entitled to summary judgment that the claims are definite as a matter of law.

**1.**   **Legal Standards For Definiteness and Antecedent Basis**

The claims of a patent may only be found invalid for indefiniteness "if its claims, read in light of the **specification** delineating the patent, and the **prosecution history**, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014).  However, invalidity for indefiniteness based on a lack of antecedent basis is rare because claims need only provide "reasonable certainty" to one of ordinary skill in the art.  *Id. at* 2129.  "Obviously, … the failure to provide explicit antecedent

basis for terms *does not* always render a claim indefinite." *Energizer Hldgs. v. Int'l. Trade Com'n.*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). "When the meaning of the claim would reasonably be understood by persons of ordinary skill when read *in light of the specification*, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'"  *Id*. Moreover, an antecedent basis can be present by implication.  *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1117 (Fed. Cir. 1987).

### 2. Claims 4, 6, and 10 are Definite on Their Face or by Implication

One of ordinary skill in the art would understand that claims 4, 6, and 10 used the term "interested party" to refer to Patrons.  Any reasonable reading of the claims reveals that the "interested party" could only be a *Patron* who has accepted the "offer to Fans concerning the at least one Sales Container associated with at least one project."  *See also* D.I. 53 (Claim Construction Order) at 7 ("'patron' is construed as 'a fan who registers with an artist and who provides a contribution to a project of an artist *in exchange for certain entitlements*.'").  There is no actor in claim 1 to whom the sales container might be delivered other than a Patron who has accepted an offer for a sales container.  Where, as here, the challenged claim term could only refer to one object, the claim is not indefinite for lack of an antecedent.  *See Energizer*, 435 F.3d at 1369 ("anode gel comprised of zinc" was, by implication, the antecedent basis for "said zinc anode"); *see also* JAX46 Monroe Rep. at ¶ 546.

The specification also uses the term "interested party" synonymously with a Patron.  *See, e.g.,* the '887 Patent at Abstract ("accepting the offer *by the interested party* for the entitlement related to the project. The capital may then be forwarded to the artist and *the entitlement provided to the interested party*."); col. 4, lines 23-27; col. 4, lines 35-39; col. 5, lines 29-34; col. 5, lines 51-53.   Because the "interested party" is described in the specification as synonymous with the "Patron," one of ordinary skill in the art would understand that the "interested party" of

claims 4, 6, and 10 is the Patron of claim 1.

The prosecution history also clearly shows that the "interested party" is the Patron. During prosecution, claim 1 of the '887 Patent (prosecution claim 69) originally referred to an "interested party."  In an Amendment dated December 29, 2009, the applicant replaced the "interested party" with the concept of a Fan who becomes a Patron by accepting an offer for an entitlement.  *See* JAX70, December 29, 2009 Amendment.  The substitution of the "interested party" in claim 1 for the Patron leaves no doubt as to the scope of claims 4, 6, and 10.

The undisputed evidence demonstrates that the "interested party" of claims 4, 6, and 10 refers to the Patron of claim 1.  Kickstarter has not pointed to ***any evidence*** to suggest that one of ordinary skill in the art would fail to appreciate this fact, in light of the claims themselves, the specification, and the prosecution history.  Therefore, ArtistShare is entitled to summary judgment of definiteness as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, ArtistShare respectfully requests that the Court grant ArtistShare's motion for summary judgment that the '887 Patent is valid.

Respectfully submitted,

ARTISTSHARE, INC AND FAN
FUNDED, LLC

By its attorneys,

Date: July 18, 2014          By:     /s/ Craig R. Smith____
                                      Craig R. Smith (CS-0205)
                                      William J. Seymour (WS-1801)
                                      LANDO & ANASTASI, LLP
                                      Riverfront Office Park
                                      One Main Street – 11th Floor
                                      Cambridge, MA 02142
                                      Telephone (617) 395-7000

Facsimile: (617)-395-7070
csmith@lalaw.com


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served on counsel of record by electronic mail on this 18th day of July, 2014.


/s/ William J. Seymour
William J. Seymour

36