**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KICKSTARTER, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 11-cv-6909 (KPF)** |
| **FAN FUNDED, LLC and ARTISTSHARE, INC.,** | |
| **Defendants.** | |

**PLAINTIFF KICKSTARTER, INC.'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND**
**PLAINTIFF'S REPLY IN SUPPORT OF ITS SUMMARY JUDGMENT MOTIONS**

Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*

Dated: August 16, 2014

4842-4485-3277.1

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................. 1

I.    Summary Judgment That the '887 Patent Is Invalid Under §101 Is Appropriate ............. 1

      A.    The Court's *CLS* Decision Confirms Unpatentability of the '887 Patent.............. 2

            1.    The Supreme Court's CLS Decision.......................................................... 2

            2.    Application of CLS to the ArtistShare '887 Patent ................................... 3

                  a)    Step one: The '887 Patent Claims an Abstract Idea ...................... 3

                  b)    Step 2: There Is No Inventive Concept Beyond The
                        Abstract Idea That Could Confer Patent Eligibility....................... 5

      B.    The Overwhelming Weight of Authority Establishes Unpatentability.................. 8

II.   Summary Judgment of Invalidity for Incorrect Inventorship Is Appropriate .................. 10

      A.    Thompson Contributed to the "Conception" of Claims of the '887 Patent .......... 10

            1.    ArtistShare's Purported "Prior Invention" Argument, as to All
                  Claims of the '887 Patent, Fails as a Matter of Law................................. 10

            2.    Claims 1, 8 and 24 (Online Auctions and Licensing Rights) ................... 11

                  a)    ArtistShare Wrongly Argues That Thompsons Licensing
                        and Auctioning Ideas Do Not Create Co-Inventorship................ 12

                  b)    ArtistShare's Argument That Thompson's Contributions
                        Were Not Significant Is Plainly Wrong ........................................ 13

            3.    Claim 7 (Fundraising for a Range of Artists – Not Just Musicians);
                  Claims 13 and 14 (Entitlements That Permit Fans to Be Involved
                  in an Artist's Creative Process)................................................................ 15

            4.    Claim 17 (Managing/Viewing Financial and Marketing
                  Information) ............................................................................................ 17

      B.    The Declaration That ArtistShare Obtained from Thompson.............................. 17

            1.    The Declaration is Irrelevant to the Legal Question of Inventorship ....... 18

            2.    The Court Cannot "Correct" the Inventorship Error................................. 19

III.   Summary Judgment of Invalidity for Obviousness Is Appropriate ................................. 21

    A.   There Is No Genuine Dispute That the Prior Art Demonstrates
    Obviousness ................................................................................................. 21

        1.   There Is No Genuine Dispute That the Identified Prior Art
        Discloses All Limitations of the Asserted Claims of the '887 Patent....... 22

            a)   "a system for marketing and funding one or more projects
            of an artist comprising a server having application
            programs operable from a remote site for: ..." [preamble 1,
            17, 18, 35, and 36]" ...................................................................... 23

            b)   "a server having application programs operable from a
            remote site for ... providing software tools to an artist or
            Account Manager to manage at least one project" [1a, 17c,
            18b, 35b, 36b] .............................................................................. 24

            c)   "application programs operable from a remote site for ...
            receiving information from the artist ... regarding at least
            one Sales Container ... including ... a product, a service, and
            a patronage while the artist retains outright ownership ..."
            [1b, 18a, 18c, 35a, 35c, 36a, 36c] .................................................. 26

            d)   "application programs operable from a remote site for ...
            providing ... software tools to manage communications,
            through said Patron database ..." [1h, 17d, 36g] ........................... 28

        2.   ArtistShare Admits That the Prior Art Discloses  All Other Claim
        Limitations ............................................................................................... 29

        3.   There Can Be No Genuine Dispute That Kickstarter Has Provided
        Reasons to Combine the Prior Art References .......................................... 30

        4.   ArtistShare's "Single Publication" Argument Is Meritless ..................... 32

        5.   Even if the Court Finds That Kickstarter Is Not Entitled to
        Summary Judgment, ArtistShare's Summary Judgment Motion
        Must Be Denied ........................................................................................ 33

            a)   Secondary Factors Cannot Save the Patent – the Argument
            Is Waived and Unsupported ......................................................... 33

IV.   Summary Judgment That Claims 4, 6, and 10 Are Indefinite Is Appropriate ................. 35

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013)..........................................................................8, 9

*Aerogroup Int'l v. Marlboro Footworks*,
   1997 U.S. Dist. LEXIS 6252 (S.D.N.Y. May 7, 1997) ........................................22

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)........................................................1, 2, 3, 4, 5, 6, 7, 8

*Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012), *cert. denied*, 82 U.S.L.W. 3746 ......................8, 10

*Bilski v. Kappos*,
   561 U.S. 593, 130 S. Ct. 3218 (2010)..............................................................3, 4, 8

*Board of Ed. v. American Bioscience, Inc.*,
   2001 U.S. Dist. LEXIS 19480 (N.D. Fla. Oct. 31, 2001), *aff'd-in-part,
   vacated-in-part, remanded*..................................................................................19, 20

*Briese Lichttechnik Vertriebs GmbH v. Langton*,
   2011 U.S. Dist. LEXIS 6340 (S.D.N.Y. Jan. 10, 2011) .........................................34

*Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*,
   12 F.R.D. 531 (S.D.N.Y. 1952) ..........................................................................22

*Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*,
   2014 U.S. App. 3599 (Fed. Cir. Feb. 26, 2014).......................................................9

*Dealertrak, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012)..............................................................................9

*Diamond v. Diehr*,
   450 U.S. 175 (1981)................................................................................................3

*Dow Jones & Co. v. Ablaise Ltd.*,
   606 F.3d 1338 (Fed. Cir. 2010)............................................................................30

*Eaton Corp. v. Rockwell Int'l Corp.*,
   323 F.3d 1332 (Fed. Cir. 2003)..................................................................10, 18, 20

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998)............................................................10, 12, 15, 18

iii

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) ................................................................................3

*H-W Tech., L.C. v. Overstock.com, Inc.*,
  2014 U.S. App. LEXIS 13148 (Fed. Cir. July 11, 2014) ........................35

*Hess v. Advanced Cardio. Sys., Inc.*,
  106 F.3d 976 (Fed. Cir. 1997) ................................................................15

*IP Innovation L.L.C. v. Red Hat, Inc.*,
  2010 U.S. Dist. LEXIS 145350 (E.D. Tex. Oct. 13, 2010) (Rader, J.) ..................................32

*John Wiley & Sons, Inc. v. DRK Photo*,
  2014 U.S. Dist. LEXIS 22292 (S.D.N.Y. Feb. 21, 2014) ......................34

*Kowalski v. Mommy Gina Tuna Res.*,
  2008 U.S. Dist. LEXIS 16019 (D. Haw. Mar. 3, 2008) ........................27

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .............................................................21, 22, 23, 30

*In re Kubin*,
  561 F.3d 1351 (Fed. Cir. 2009) ..............................................................21

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
  545 F.3d 1340 (Fed. Cir. 2008) ........................................................32, 33

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*,
  2014 U.S. Dist. LEXIS 15679 (D. Del. Feb. 7, 2014) ..........................19

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011) (Breyer, J., concurring) ....................................1

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ..........................................11, 18, 23, 24

*Mueller Brass Co. v. Reading Indus., Inc.*,
  352 F. Supp. 1357 (E.D. Pa. 1972) ........................................................20

*Nartron Corp. v. Schukra U.S.A., Inc.*,
  558 F.3d 1352 (Fed. Cir. 2009) ........................................................13, 14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................................................35

*O'Connor v. Donaldson*,
  422 U.S. 563 (1975) ..................................................................................9

iv

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)..........................................................................34, 35

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed. Cir. 1998)...................................................................................14

*Parker v. Flook*,
    437 U.S. 584 (1978)........................................................................................................3

*Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.*,
    75 F.3d 1568 (Fed. Cir. 1996).....................................................................................11

*Shu-Hui Chen v. Bouchard*,
    347 F.3d 1299 (Fed. Cir. 2003)...................................................................................11

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013).........................................................................1, 9, 10

*VS Techs., LLC v. Twitter, Inc.*,
    2012 U.S. Dist. LEXIS 59475 (E.D. Va. Apr. 26, 2012)..........................................32

*WildTangent, Inc. v. Ultramercial, LLC*,
    134 S. Ct. 2870 (2014)..............................................................................................1, 9

**Statutes**

35 U.S.C. § 101.............................................................................................................1, 2, 3, 10

35 U.S.C. §102...................................................................................................................10, 19

35 U.S.C. § 103............................................................................................................................22

35 U.S.C. §116.............................................................................................................10, 12, 16

35 U.S.C. § 256............................................................................................................................20

**Other Authorities**

Fed. R. Civ. P. 56(c) ...................................................................................................................18

Fed. R. Evid. 701 .........................................................................................................................18

Southern District of New York Local Rule 56.1 .........................................................................2

v

## ARGUMENT

ArtistShare makes a variety of incorrect statements about Kickstarter and the history of the present dispute, including facts Judge Crotty already found against ArtistShare. Kickstarter will not spend the space refuting them, however, as none are material to summary judgment.

### I.      Summary Judgment That the '887 Patent Is Invalid Under §101 Is Appropriate

As shown in Kickstarter's Summary Judgment Memorandum ("KS Mem."), the '887 Patent claims the ***abstract idea*** of raising money from fans to support an artistic work, often referred to as "crowdfunding." (KS Mem at. 7-14.) In response, ArtistShare's Opposition ("AS Opp'n") offers a variety of incorrect legal arguments, virtually none having any legal support.

To start, the parties appear to agree that §101 is a legal question appropriate for summary judgment. (AS Opp'n at 18.) ArtistShare nevertheless incorrectly argues for application of the clear and convincing evidence standard. Section 101 patentability is a matter of law for which there is no burden of proof. *See, e.g., Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring) ("Where the ultimate question of patent validity turns on the correct answer to legal questions . . . today's strict standard of proof has no application."). Surely, no burden of proof was cited or applied ***in any of the Supreme Court cases cited by the parties***. ArtistShare (Opp'n at 11-12) cites only *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013). The Court, however, vacated *Ultramercial* after issuing its "*CLS*" decision (discussed below) which affirmed a holding of <u>un</u>patentability. *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014). Contrary to ArtistShare's assertion that *Ultramercial* was "vacated on other grounds" (Opp'n at 12), the case was vacated on the ***merits***.

More important, ***ArtistShare's continual retreat to the irrelevant burden-of-proof issue belies ArtistShare's inability to identify any genuinely disputed material fact***. Indeed, the notion of presenting §101 to a jury is unworkable – the Federal Circuit Bar Association Model

Patent Jury Instructions (Feb. 2012) do not even include instructions on §101, surely because (so far as the undersigned can ascertain) §101 has never been presented to a jury. ArtistShare's repeated insistence on "clear and convincing evidence" is a legally incorrect sideshow.[1]

**A.   The Court's *CLS* Decision Confirms Unpatentability of the '887 Patent**

**1.   The Supreme Court's CLS Decision**

The Supreme Court issued its decision in *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ("*CLS*") three days ***after*** Kickstarter's Summary Judgment Memorandum. Because of this timing, this brief is Kickstarter's sole opportunity to discuss the decision.

The Federal Circuit *CLS* decision invalidated 208 claims across four patents. 717 F.3d 1269 (Fed. Cir. 2013). The Supreme Court treated claim 33 (*see* JAX82-5) as representative. Claim 33 included limitations requiring a computer, such as for manipulating credit records, debit records, and shadow records for each via "exchange" and "supervisory" institutions.[2]

The Supreme Court affirmed unpatentability, holding that the claims were "drawn to the abstract idea of intermediated settlement . . . merely requiring generic computer implementation fails to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2352.

The Supreme Court applied a two-part test: (i) are the claims directed to a patent-ineligible abstract idea, and (ii) if so, does it add an "'inventive concept' – *i.e.,* elements

---

[1] There are no facts listed in ArtistShare's response to Kickstarter's Statement of Undisputed Facts.  In its statement of undisputed facts, ArtistShare cites matters that are not factual at all (*e.g.*, what a claim covers – a question of law) or facts that – whether or not disputed – are not material. (*See* Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, pp, 5-7; *see also* Defendants' Local Rule 56.1 Counterstatement of Undisputed Material Facts in Opposition to Kickstarter's Motion for Summary Judgment, pp, 1-2.)

[2] "A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of: (a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions; (b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record; (c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party's shadow credit record or shadow debit record, allowing only these transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order, and (d) at the end-of-day, the supervisory institution instructing on[e] of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions." *CLS*, 134 S. Ct. at 2352.

2

'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 2355, 2357.

For step one, the Court held that, "[o]n their face, the claims before us are drawn to the concept of intermediated settlement, *i.e.,* the use of a third party to mitigate settlement risk." *Id.* at 2356. The Court analogized to the patent claims in *Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218 (2010) ("*Bilski*"), concluding that "'fundamental economic practice[s]'" of the types in *Bilski* (hedging risk) and *CLS* fit squarely within the "abstract ideas" category. *Id.* at 2356. The many claim limitations (*see supra* n.2) did not make the claim less abstract, just as the details of hedging risk (*e.g.*, using Monte Carlo simulation on massive data) did not in *Bilski*. *Id.* at 2358.

For step two, the Court analogized the facts to its "guidepost" cases of *Bilski, Benson*, *Flook* and *Diehr*[3] – analogies addressed in Kickstarter's Memorandum and for which ArtistShare has been completely silent – and held that, "taking the claim elements separately, the function performed by the computer at each step of the process is '[p]urely conventional.'" *CLS*, 134 S. Ct. at 2359. For example, the Court held that "[u]sing a computer to create and maintain 'shadow' accounts amounts to electronic recordkeeping – one of the most basic functions of a computer . . . The same is true with respect to the use of a computer to obtain data, adjust account balances, and issue automated instructions." *Id.* The Court concluded that these limitations did not "improve the functioning of the computer itself . . . [n]or do they effect an improvement in any other technology or technical field." *Id.* at 2359-60. The claims were, therefore, held unpatentable under §101. *Id.* at 2360.

### 2.    Application of CLS to the ArtistShare '887 Patent

#### a)    *Step one: The '887 Patent Claims an Abstract Idea*

As Kickstarter demonstrated (KS Mem. at 10-12), the '887 Patent attempts to claim a

---

[3] *Gottschalk v. Benson, 409 U.S. 63* (1972) ("*Benson*"); *Parker v. Flook*, 437 U.S. 584 (1978) ("*Flook* ); *Diamond v. Diehr*, 450 U.S. 175 (1981) ("*Diehr*").

"fundamental economic practice," *i.e.*, "crowdfunding." The '887 Patent expressly claims "a system and method for raising financing and/or revenue by [an] artist for a project, where the project may be a creative work of the artist" – *i.e.*, "crowdfunding" for artists. (JAX1, '887 Patent Abstract; KS Mem. at 4.) Absent a general-purpose computer, the "system" amounts to nothing more than securing patronage for artists. (JAX1 at 21:33-63; KS Mem. at 4-6, 10-12.)

A system for raising funds from fans, as the '887 Patent claims, is a "fundamental economic practice" (*CLS*, 134 S. Ct. at 2356) – the same as "intermediated settlement" in *CLS* and "hedging risk" in *Bilski*.  Such techniques have been used throughout history, including in 1883, when funds for the Statue of Liberty were raised by soliciting donations of $1 or $5, for models of the Statute of various sizes, through newspaper ads. (JAX74 at KS0006105.)

The '887 Patent's dependent claims confirm the patent's abstract nature, adding to the abstract idea that "funds are used to finance the project," "the project is an incomplete [or] completed project," or "allowing Patrons to demonstrate interest." (JAX1 at 21:64-67, 22:26-30.)

ArtistShare responds (Opp'n at 13) by arguing that the '887 Patent is not drawn to an abstract idea, because "crowd-based funding" is somehow incomprehensible, or inconsistently, that the term was not coined until 2006. This argument is irrelevant. The term "crowdfunding" is shorthand for the attempt to claim "raising financing and/or revenue by [an] artist for a project, where the project may be a creative work of the artist." (JAX1, Abstract; KS Mem. at 4, 7-14.) There is no meaningful distinction between "fan funding," which ArtistShare uses, and "crowdfunding," which ArtistShare claims not to understand.

Nor can ArtistShare maintain that "crowd-funding" is incomprehensible, where its ***own expert witness*** used this very nomenclature. (*See* JAX2, Monroe Dep. 220:5-10 (testifying that, outside the context of "crowdfunding," Camelio did not invent anything).)

In any event, "crowdfunding" is merely a label for the abstract idea of raising money from a crowd of fans or potential fans/patrons. The concept could be called "raising money from patronage" or even given some nonsensical label. No matter the label, the '887 Patent is directed to a "fundamental economic practice."

Last, ArtistShare argues (Opp'n at 13-14) that the '887 Patent does not claim an abstract idea, because "it cannot be described as preempting crowd-based funding." ArtistShare further argues (Opp'n at 14) that "the claims cover particular systems for . . . financing a creative work." ArtistShare is wrong, but also muddies the analysis. Preemption concerns **step 2** under *CLS – i.e.*, whether sufficient inventive concepts have been added. 134 S. Ct. at 2358. Kickstarter addresses these incorrect arguments in their proper place below.

> ### b)   *Step 2: There Is No Inventive Concept Beyond The Abstract Idea That Could Confer Patent Eligibility*

ArtistShare cannot identify any "inventive concept" beyond the abstract idea of crowdfunding that might render its claims patentable – it did not even try (and a reply brief is too late). Indeed, there is none. Even ArtistShare's own expert admitted that, apart from "crowdfunding," Camelio did not "invent" anything. (JAX2, Monroe Dep. 220:5-10) ("isolate[d] . . . from the functionality of crowdfunding, no, he didn't invent those things.")

The '887 Patent specification expressly states that it is not limited to any particular system or software: "The invention may make use of a combination of existing, proven business models including banking, patron systems, merchandising partnerships, direct marketing, publishing . . . ." (JAX1 at 12:41-44, *see also id.*, 4:10-15; KS Mem. at 11-12.) According to the '887 Patent, "**any method of raising capital may be incorporated for use with the invention**" (*id.*, emphasis added) and that it is not limited to any "particular system":

> One of skill in the art will appreciate that the computer systems outlined above which may be used with any of the embodiments of the invention, may include various hardware and

> operating software, familiar to those of skill in the art, for running software programs, browsing the Internet, communicating and/or operating with any device, including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device.

(JAX1 at 8:54-9:6.) As to software, the '887 Patent again relies on generic, known components. (JAX1 at 4:10-15 ("use of a combination of existing [] file sharing and internet networking, file compression, audio/video technologies, and online auctions (for example).")); 9:15-19 (the system "may be setup and run on the World-Wide-Web, thus using a plurality of websites and web pages, using, for example, html, xml and java programing"); KS Mem. at 11-12.)

ArtistShare nevertheless asserts (Opp'n at 14-15), without support, that limitations for "application programs," "providing software tools," and "receiving," "transmitting" and "processing" data are "specific limitations of the claims [that] remove the '887 Patent from the realm of abstract ideas." ArtistShare invites legal error.

The same argument could be made for every court decision finding claims ineligible, including *CLS*. Details of managing accounts and shadow accounts, among various institutions, "render[] it a particular system for managing, financing and administering," ***but that is not enough***. 134 S. Ct. at 2358. Such limitations do not add inventive concepts that render an abstract idea patent eligible. *Id.* at 2360 ("not 'enough' to transform an abstract idea").

ArtistShare (Opp'n at 16) further alleges that Kickstarter improperly discussed individual elements of the claim rather than the system as a whole. However, Kickstarter did (KS Mem. at 4-7, 9-14) – even so, ArtistShare never articulates how looking "at the whole" alters the result. Even worse, ArtistShare again invites legal error. In *CLS*, the Court began and ended by "taking the claim elements separately" and determined that "the function performed by the computer at each step of the process is '[p]urely conventional.'" 134 S. Ct. at 2359, 2357. ArtistShare's criticism of dissecting individual elements applies equally to the Supreme Court's *CLS* decision.

6

Thus, the Supreme Court emphasized that "[u]sing a computer to create and maintain 'shadow' accounts amounts to electronic recordkeeping – one of the most basic functions of a computer . . . . The same is true with respect to the use of a computer to obtain data, adjust account balances, and issue automated instructions." 134 S. Ct. at 2359. The Court specifically rejected the patentee's argument that the claims were patentable as directed to a particular system, as readily as this Court should reject ArtistShare's arguments. *Id.* at 2359-60.

Here, each of the '887 Patent claims recites basic computer functions.  The limitations of claim 1, for example, "providing software tools," "receiving information from an Account Manager," "transmitting" and "receiving . . . offer data" and "acceptance data" and "registering" account information (JAX1 at 21:34-63) are even more basic functions described than those in *CLS*, such as "creating . . . shadow credit record[s]" and automated instructions via "supervisory" and "exchange institution[s]." 134 S. Ct. at 2352. ArtistShare cannot genuinely argue otherwise.

Last, ArtistShare argues (Opp'n at 13-14) that Kickstarter has not established that its claims "preempt" the abstract idea of crowdfunding. ArtistShare omits the *CLS* Court's holding that "[g]iven the ubiquity of computers . . . wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* The lack of anything beyond a "generic computer implementation" in the '887 Patent establishes unpatentability, and ArtistShare does not articulate any reasoning to the contrary.

Like *CLS*, the '887 Patent claims "do not, for example, purport to improve the functioning of the computer itself . . . [n]or do they effect an improvement in any other technology or technical field." *Id.* Instead, the '887 Patent takes the abstract idea of crowdfunding and puts it on a computer – any computer. As a matter of law, this cannot confer patent eligibility. *Id.* at

7

2360 ("the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer.").

**B.      The Overwhelming Weight of Authority Establishes Unpatentability.**

The '887 Patent claims are strikingly similar to those in *CLS* and *Bilski*, albeit even less complicated. (*See* JAX78; JAX82-5.) ArtistShare has not, and cannot, distinguish the Supreme Court guidepost cases on their facts. ArtistShare's reliance on the very same arguments that failed in those cases, therefore, necessarily fails here. As Kickstarter showed (Mem. at 8-9), the overwhelming weight of Federal Circuit authority also establishes unpatentability.

ArtistShare attempts to distinguish *Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012), *cert. denied*, 82 U.S.L.W. 3746, because, according to ArtistShare, "the claim specified a purely mathematical process." (AS Opp'n at 17.) In actuality, as the Court held, the claims were to a computer system that administered the abstract idea of a "Corporate Owned Life Insurance Policy including a Surrender Value Protected Investment Component," *i.e.*, a "particular system" for managing a specific investment vehicle. 687 F.3d at 1269. The 118 invalidated claims included very specific computer systems and software modules (*See* JAX80-1.) *Bancorp* held that claims are not patent-eligible when "without the computer limitations nothing remains in the claims but the abstract idea." *Id.* That is precisely the case with the '887 Patent – without the computer, all that remains is the abstract idea of enabling artists to raise money from fans.

Likewise, ArtistShare attempts to distinguish *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336 (Fed. Cir. 2013) as corresponding to a "generic system." (AS Opp'n at 17.) The *Accenture* claims (*see* JAX79) involved a computerized system for "generating tasks to be performed in an insurance organization" including a "data component that stores, retrieves and manipulates data," a client component that "transmits and receives data

8

to/from the data component," and an "insurance transaction database" and a "task library database." *Accenture*, 728 F.3d at 1338. The claims were very much like the '887 Patent's.

ArtistShare (Opp'n at 17) turns to *Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*, 2014 U.S. App. 3599 (Fed. Cir. Feb. 26, 2014), describing the claims as being drawn to "the abstract idea of using categories to organize, store, and transmit information" (quotations omitted). The argument fails to distinguish *Cyberfone* at all. "[T]he well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible." 2014 U.S. App. 3599 at *7. Likewise, here, recitation of a computer database and other generic computer terms is insufficient to confer patent eligibility. (KS Mem. at 13.)

ArtistShare similarly makes no genuine attempt to distinguish *Dealertrak, Inc. v. Huber*, 674 F.3d 1315, 1331 (Fed. Cir. 2012), where the patent recited "[a] computer aided method of managing a credit application," as well as limitations for "selectively" "receiving," and "forwarding" data. The *Dealertrack* holding is equally applicable here. As with the '887 Patent, "[s]imply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." *Id.* at 1333.

Finally, against this overwhelming and consistent weight of authority that opposes its position, ArtistShare (Opp'n at 17-18) relies on a single, ***defunct*** decision, *Ultramercial*. On June 30, 2014, for the second time, the Supreme Court vacated a decision finding the claims patent-eligible (*WildTangent*, 134 S. Ct. 2870); *Ultramercial* no longer holds precedential value. *See, e.g., O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975). Moreover, the Court vacated *Ultramercial*, but denied cert. in *Bancorp* (*see* 82 U.S.L.W. 3746), invalidating claims where, like the '887 Patent, beyond the abstract idea, only a generic computer was recited.

9

In short, a determination that the claims of the '887 Patent are patent-eligible would be unprecedented. It would stand alone in § 101 jurisprudence. As in each of the cases cited above, this Court should find that the '887 Patent's claims are unpatentable as a matter of law.

## II.    Summary Judgment of Invalidity for Incorrect Inventorship Is Appropriate

Patents must name the true and correct inventors; this is not optional and the patent is invalid, unless and until it does so. 35 U.S.C. §102(f); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003). Inventorship is assessed on a claim-by-claim basis because a joint inventor of a patent need "not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. §116; *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("A contribution to one claim is enough."). As discussed below (*see also* KS Mem. at 14-20), undisputed facts demonstrate that Robert Thompson is a co-inventor of the '887 Patent.

### A.    Thompson Contributed to the "Conception" of Claims of the '887 Patent

As shown in Kickstarter's Memorandum (pp. 14-20), Thompson contributed significantly to the conception of at least claims 1, 5, 7, 8 13, 14, 17 and 24 of the '887 Patent (the "Identified Claims"). It was, for example, Thompson's idea to expand the ArtistShare ideas beyond musical artists alone, to involve fans in the creative process, to incorporate escrow services, to provide the export of financial and accounting information, and to provide functionality for auctioning licensing rights in a creative work. (KS Mem. at 15-20.) The PowerPoint that Thompson drafted (JAX6, JAX7) comprises a substantial part of the Provisional Patent Application that, according to ArtistShare, discloses the claimed subject matter. (JAX45 at 23-24 & Ex. B.) Moreover, the corroboration for Thompson's contributions is voluminous and indisputable.

#### 1.    ArtistShare's Purported "Prior Invention" Argument, as to All Claims of the '887 Patent, Fails as a Matter of Law

As an initial matter, without reference to *any* particular claims or limitations, ArtistShare

argues (Opp'n at 6) that Camelio alone conceived everything claimed in the '887 Patent in the summer of 2000. This argument fails as a matter of law. To prove sole inventorship, ArtistShare must establish that Camelio "conceived" of every limitation of each claim of the patent. "Conception exists when a definite and permanent idea of an operative invention, ***including every feature of the subject matter sought to be patented***, is known." *Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1575 (Fed. Cir. 1996) (emphasis added). "It is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony." *Shu-Hui Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed. Cir. 2003).

Amazingly, ArtistShare (Opp'n at 6) has not offered any testimony at all from Camelio concerning the alleged conception of any claim of the '887 Patent, nor a single relevant document dating from the summer of 2000, when Camelio's conception allegedly occurred.[4] The cited Monroe expert report (Opp'n at 6), in turn, relies upon no evidence from the summer of 2000, but simply repeats (nearly verbatim) an interrogatory response (JAX45 at 8-9) that also identifies no contemporaneous evidence. Without ***any*** offered proof, from Camelio or its expert, that Camelio conceived of ***each limitation*** of ***any claim*** (let alone, ***every*** claim) in the summer of 2000, ArtistShare fails to raise any genuine issue of fact. Both legal requirements – proof of conception of the limitations and independent corroboration of it – are absent. *See Pro-Mold*, 75 F.3d at 1575; *see also MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (conclusory expert opinions cannot raise a triable issue of fact, on summary judgment).

### 2.     Claims 1, 8 and 24 (Online Auctions and Licensing Rights)

The Court construed Claim 1 to require "computer programs that consist of a suite of

---

[4] At deposition, Camelio testified that he could not recall any detail, beyond the notion that artists might raise money over the Internet, from the summer of 2000. When asked what he could remember, Camelio answered:  "I recall that I had an idea for a system which could have been internet based and software to go along with that that would allow artists to fund their creative projects." (JAX42, Camelio Dep. 81:5-14.) Nothing more.

features, including [] *auctions* [and] *licensing*" (Dkt. #53 at 11-12.) Auctions and licenses are also specifically recited in Claims 8 and 24. Documents, from the time of his collaboration with Thompson, show that *Camelio believed and acknowledged that Thompson contributed these ideas*. Camelio agreed that the idea "about creating a 'mini stock market' for the trading of music publishing rights" was "his [Thompson's] idea and I [Camelio] will not use it." (JAX55 at ART-018776; JAX55 at ART-018761-4.) Yet, "use it" is precisely what Camelio did, when he claimed Thompson's ideas as his own. ArtistShare attempts to manufacture factual disputes with mere denials and mischaracterizations of the record. As shown below, each attempt fails.

> a)   *ArtistShare Wrongly Argues That Thompsons Licensing and Auctioning Ideas Do Not Create Co-Inventorship.*

ArtistShare wrongly argues (Opp'n at 9) that a system for selling or auctioning an artist's copyrights or publishing rights in their work "has nothing to do with claims of the '887 Patent." The Court has already construed Claim 1 to require "computer programs that consist of a suite of features" that include "auctions" and "licensing." (Dkt. #53 at 11-12.) Notably, ArtistShare's own expert witness confirmed that the *only* purpose for "auction[s]" in the '887 Patent was "for auctioning subsequent licensing rights." (JAX2, Monroe Dep. 57:13-22.)

Further, each of Claim 8 (which depends from Claim 1) and Claim 24 explicitly require an "offer" that can be "presented in" "an *auction*" and "a *license*" (JAX 1 at 22:15-17, 24:10-12) (emphasis added). ArtistShare's Opposition failed to address inventorship for Claims 8 and 24; therefore, summary judgment that Thompson is a co-inventor of these claims, and thus the entire patent, should be granted. *See* 35 U.S.C. §116; *Ethicon*, 135 F.3d at 1460 (one claims is enough).

ArtistShare's argument (Opp'n at 9) that auctioning licensing rights is inconsistent with (or "teach[es] away from") Claim 1's recitation that the artist "retains outright ownership" does not raise any genuine fact issue. First, Claim 8 depends from Claim 1; thus, Claim 1 necessarily

12

covers the auctioning of license rights. Second, the '887 Patent specification confirms that an artist may retain ownership in a creative work, while auctioning licensing rights, because third parties can "bid on the exclusive manufacturing, distribution, publishing rights to ArtistShare projects," which is not a transfer of ownership. (JAX1, 19:49-52; *see also* 19:27-33.) Third, Claim 24 does not depend from Claim 1 and is not subject to the "outright ownership" limitation; thus, if an artist's "outright ownership" were in conflict with auctioning license rights, the conflict would not affect Claim 24 and Thompson is still a co-inventor.

ArtistShare (Opp'n at 9) contends that Camelio and Thompson could not be co-inventors of Claim 1, as it pertains to auctions, because Camelio was already aware of online auctions before he started working with Thompson (on March 18, 2002). ArtistShare (Opp'n at 9) cites to an earlier project of Camelio ("WebstoreAmerica.com," JAX68) that allowed non-profit organizations to raise funds by, among other things, providing "Auction Hosting" (JAX68). Assuming that the Court would even entertain ArtistShare's newly minted argument,[5] the argument helps ArtistShare not one iota, since there is no testimony from Camelio, nor the legally required independent corroboration from anywhere, that Camelio even did this, let alone that it was ever a part of the conception of any claim.[6]

> b) **ArtistShare's Argument That Thompson's Contributions Were Not Significant Is Plainly Wrong**

The significance of Thompson's contribution to conception of Claims 1, 8 and 24, as well as his status as a co-inventor of these claims, is beyond (legal) dispute. Joint inventorship

---

[5] ArtistShare and Camelio have **never** – in testimony, interrogatory responses regarding the alleged "conception" of the '887 Patent claims, or elsewhere – alleged that Camelio's awareness of any online auctions played a role in the claimed subject matter of the '887 Patent. The Court should not permit ArtistShare to advance new theories at summary judgment. Permitting ArtistShare to do so here would be particularly unfair, as the Court already permitted ArtistShare to redo its conception allegations once, at the expense of Kickstarter having to re-depose Camelio. (*See, e.g.*, Dkt. #83 at 38:2-3.) ArtistShare does not deserve further chances.

[6] There can be no "conception" of an individual claim feature isolated from the rest of the claimed limitations; "conception" requires all the integrated features of an entire claim. *See Nartron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352, 1358 (Fed. Cir. 2009) ("[A] dependent claim adding one claim limitation to a parent claim is still a claim to the invention of the parent claim, albeit with the added feature; it is not a claim to the added feature alone.")

requires a contribution to the conception or reduction to practice of the claimed invention that is "not insignificant in quality, when that contribution is measured against the dimension of the full invention," and that does more than "explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350, 1351 (Fed. Cir. 1998).

Thompson's contributions to Claims 1, 8 and 24 easily satisfy this standard. Again, in the "Summary of the Invention," the '887 Patent spells out the importance of Thompson's idea to auction licensing rights, explaining that the "many benefits from the invention" include the ability of "[i]nvestors and other interested individuals" "to re-sell (outright sale or auction) their rights at any time" and to have a "means to buy, sell and trade publishing rights, copyrights and intellectual property rights in new or existing works." (JAX1, 3:64-4:8.) In addition, "benefits from the invention" for "industry professionals and other individuals" include "[a]ccess to … *licensable content for resale, distribution, syndication etc.*" and "opportunities to purchase *rights for printing and distributing* compact discs." (JAX1, 3:26-27, 44-49) (emphasis added).

The priority patent application of the '887 Patent even includes Thompson's business plan, which identifies Thompson and Camelio as "The Founders" of ArtistShare. (JAX7 at 17; JAX8 at ART-011494). Their identical titles reflect equal status within ArtistShare.

In view of the importance of Thompson's demonstrated contributions to conception, the cases ArtistShare cites are readily distinguished. The invention in *Nartron*, 558 F.3d at 1354-55, related to a "control module that operated on *existing* automobile seats" (emphasis added). The purported co-inventor was said to have contributed only an "extender for a lumbar support adjustor" that the patent identified "as the background upon which the invention is built," *id.* at 1357-58. Here, the patent describes Thompson's contribution in the "Summary of the Invention."

The present case also differs substantially from *Hess v. Advanced Cardio. Sys., Inc.*, 106

14

F.3d 976 (Fed. Cir. 1997) – the alleged co-inventor "did no more than a skilled salesman would do in explaining how his employer's product could be used to meet a customer's requirements." *Id.* at 981. Here, Thompson was not a mere supplier of equipment, but a co-***founder*** on equal footing with Camelio. Thompson's contribution was significant enough that ArtistShare-Camelio felt the need to discuss ownership of the ideas when Thompson left. (JAX55.) Whether the contribution was sufficient is a legal question – here, it was. *Ethicon*, 135 F.3d at 1461-5.

> **3.    Claim 7 (Fundraising for a Range of Artists – Not Just Musicians); Claims 13 and 14 (Entitlements That Permit Fans to Be Involved in an Artist's Creative Process)**

For each of Claims 7, 13 and 14, ArtistShare wrongly asserts that "Kickstarter's inventorship claim is almost entirely based on a single email from Bob Thompson to Brian Camelio, dated March 19, 2002." (Opp'n at 7, citing JAX48). On the contrary, Thompson's co-inventorship is shown by his testimony and numerous corroborating documents – including Camelio's contemporaneous acknowledgement of his contributions. (KS Mem. at 16-18.)

ArtistShare seeks to rely on never-before-asserted arguments based on never-before-produced metadata to show that Camelio had conceived the above claims before launching his venture with Thompson. The evidence itself is incompetent and inadmissible, but even so it only further corroborates Thompson's contributions to these claims. First, there is no competent evidence to authenticate it or expert opinion to decipher it.  (Opp'n at 6-10). To permit ArtistShare to rely on this late production unfairly deprives Kickstarter of an opportunity to examine the facts behind this late disclosure. This is particularly true where, as here, the metadata itself is facially inconsistent, stating that files were created (in December 2013) after they supposedly were last modified (March 2002). (JAX65.)

Second, the newly cited evidence actually corroborates Thompson's contribution to the conception of the claims. For the type of artist claim (Claim 7), ArtistShare (Opp'n at 7-8)

alleges that a PowerPoint file was edited on March 19, 2002 – hours before Thompson sent an email detailing many of his ideas – and that, therefore, Camelio had the idea first. The fatal flaw in ArtistShare's argument is that the document (JAX53) was indisputably created **after** their collaboration had started – *i.e.*, after their initial March 18th "brainstorming" meeting.

Camelio's March 14th PowerPoint says ***nothing*** about any artistic work beyond ***music***. (*See* JAX 50) (email sending JAX51). This stands in stark contrast to the presentation (JAX53) created ***after*** the collaboration began, which ***does*** expand the project beyond music.

Thus, irrespective of ArtistShare's new metadata arguments, the evidence only corroborates Thompson's testimony that it was his idea to expand beyond music, to enlist enough artists for the business to be viable. (Thompson Dep., JAX5, 166:24-167:10.) There is ***no*** evidence from Camelio to rebut Thompson's testimony and no genuine dispute that Thompson contributed the idea for Claim 7. Thompson's contribution, here, is sufficient for co-inventorship.[7] It covers the entire scope of the application, and everything that alleged to be an invention in the '887 Patent, and is described as significant. ('887 Patent, JAX1 6:49-54).

ArtistShare's new arguments also serve only to corroborate Thompson's contribution to Claims 13 and 14 (involving fans in the creative process). For these claims, ArtistShare alleges that the supposedly reliable, newly found metadata shows that Camelio had thought of providing sheet music. If so, this again corroborates that Camelio had ***not*** conceived of Thompson's contribution, as recited in the claims, to access "the artist's creative work process." The difference between providing a score and allowing a fan to work with an artist in creating it is, of

---

[7] Notably, Kickstarter is not alleging that Thompson is the ***sole*** inventor of the claims, but that he is a ***joint*** inventor.  Inventions may be "made by two or more persons jointly" and such joint inventors "may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent. 35 U.S.C. §116. ArtistShare's criticisms – to the effect that there is no corroboration of Thompson's contribution that ***predates*** the initial March 18, 2002 meeting or that Thompson "thought of [certain] features on his own" (Opp'n, p. 7) – make no sense. The claimed subject matter is a joint invention developed by Camelio and Thompson together and for this reason Thompson is a co-inventor.

course, profound. Thompson's unrebutted and corroborated testimony establishes that he contributed this. This unrebutted contribution is sufficient to make Thompson a co-inventor. Involving fans/patrons in the creative process was vital – foundational, even (JAX48, ART-013162) – for the ArtistShare system and the '887 Patent itself (JAX1, 3:16-19).

       **4.**        **Claim 17 (Managing/Viewing Financial and Marketing Information)**

Mr. Thompson testified that, while he was affiliated with ArtistShare, he had the idea to include functionality for "royalty accounting," such as a particular software (Counterpoint Systems) that could track sales/downloads. (JAX5, Thompson Dep., 98:4-99:14.)

This testimony is corroborated by Mr. Thompson's email (March 19, 2002) to Mr. Camelio that proposes Counterpoint Systems software as a "solution for royalty accounting" (JAX48, at ART-013162) and a follow-up email exchange (March 20, 2002) with Mr. Camelio, in which they discussed software for generating accounting reports. (JAX56, ART-018610-11.) ArtistShare (Opp'n at 8) again does not offer any evidence to dispute or doubt Mr. Thompson's contribution. Instead, ArtistShare says that a so-called "Funding Meter" graphic on a page of a mock website (JAX64) shows that Mr. Camelio "envisioned generating financial and marketing reports." But, again, the (new, unreliable) evidence shows only a "Funding Meter" – not a report that permits Claim 17's "managing . . . financial and marketing information." (JAX1 3:26-28, 54-59) ("benefits from the invention" include "provid[ing] . . . tools for analyzing patterns of online sales, so that the interested party may make an informed decision to develop products while reducing risk and production expenses.").) Once again, the argument only serves to further confirm what Camelio's silence proves; that Thompson contributed to Claim 17.

       **B.**        <u>**The Declaration That ArtistShare Obtained from Thompson**</u>

ArtistShare contends (Opp'n at 4-5) that the declaration it obtained from Thompson – stating, in conclusory fashion, that he no longer regards himself as an inventor (JAX 58, ¶¶2-4) –

negates the inventorship issue. ArtistShare is wrong as a matter of law.

As a preliminary matter, ArtistShare alleges (Opp'n at 5) that "Kickstarter was well aware [of the substance of Thompson's declaration] when it filed its motion for summary judgment, yet failed to disclose them to the Court or ArtistShare." The statement is *utterly false*; Thompson always claimed to have made the contributions discussed above, always contended that he came up with ideas embodied in the patent claims,[8] and Kickstarter saw the declaration *for the first time* when ArtistShare served its Opposition. (JAX76, Silverman Decl., ¶¶ 5-12.) Certainly, Kickstarter *never* had an opportunity to take discovery on ArtistShare's latest twist.

In any event, the declaration changes nothing. The patent is invalid unless corrected, *Eaton*, 323 F.3d at 1344, and there has been no request to correct it. Were one ever made, Kickstarter would contest the ability to correct, on statutory grounds.

### 1.    The Declaration is Irrelevant to the Legal Question of Inventorship

Inventorship is *not* a matter of personal belief, as ArtistShare suggests, rather it is a legal determination that depends on factual findings concerning an individual's contributions to the "conception" of one or more claims of a patent. *See, e.g., Ethicon*, 135 F.3d at 1460-61. The declaration addresses neither the legal standard for inventorship nor even one relevant fact. Expressions of personal belief on legal matters, such as Thompson's (even if truly held), amount to nothing more than inadmissible lay opinions, Fed. R. Evid. 701, and thus are not relied upon in weighing a summary judgment motion. Fed. R. Civ. P. 56(c)(2) & (4).

Even if admissible (it is not), conclusory statements do not create a genuine fact dispute that might stand in the way of summary judgment. *See MLB Props.*, 542 F.3d at 311.

ArtistShare (Opp'n at 5) also incorrectly suggests that, on account of Thompson's expression of personal belief regarding inventorship, "there is no testimony upon which a jury

---

[8] (*See* JAX5, Thompson Decl., 162:2-166:23; 172: 21-173:4; 177:2-20; 179:14-180:9; 198:25-199:18.)

4842-4485-3277.1

could find that Thompson is an inventor." On the contrary, as Kickstarter has already shown in detail (*see* Mem. at 15-18), his sworn deposition testimony establishes an uncontroverted factual basis for his contribution to the conception of multiple claims.  Significantly, ***nothing in the declaration purports to take back or alter Thompson's deposition testimony about the facts.*** Thompson's inadmissible and conclusory lay opinion on inventorship has no bearing on the admissibility or even the credibility of his testimony regarding the ***facts*** of his collaboration.

Further, ArtistShare incorrectly contends (Opp'n at 5) that "[t]ypically, inventorship and validity under 35 U.S.C. §102(f) is [*sic*] not contested once the alleged inventor denies inventorship under oath" – an assertion that is not supported by the cited case, *Board of Ed. v. American Bioscience, Inc.*, 2001 U.S. Dist. LEXIS 19480 (N.D. Fla. Oct. 31, 2001), *aff'd-in-part, vacated-in-part, remanded,*[9] 333 F.3d 1330 (Fed. Cir. 2003). ArtistShare's citation to this case is misleading; in that case, the parties ***agreed*** that a certain person was not a true inventor – a position that the district court did not even analyze, *Board of Ed.*, 2001 U.S. Dist. LEXIS 19480 at *45, and that was not raised on appeal, 333 F.3d at 1339-40.

In any event, there is no support for ArtistShare's claims of "typical," this is hardly a "typical case," and there are cases that do the opposite. For example, the District of Delaware recently granted summary judgment in a case where the added co-inventor testified that he contributed an idea (double-sided linear motors), but did not regard himself as an inventor (because he did not think there was an invention). *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, 2014 U.S. Dist. LEXIS 15679 (D. Del. Feb. 7, 2014) (JAX89).

### 2.    The Court Cannot "Correct" the Inventorship Error

ArtistShare also incorrectly contends (Opp'n at 5-6) that the question of Thompson's

---

[9] ArtistShare (Opp'n at 5) incorrectly characterizes the district court opinion as "*aff'd as to inventorship*."  *See Board of Ed.*, 333 F.3d at 1344 ("The district court erred in its determination of inventorship.").

inventorship is "mooted" because ArtistShare purports to have obtained an assignment of his

rights in the '887 Patent, apparently assuming that it could correct the inventorship of the '887

Patent, under 35 U.S.C. §256. Until the patent is corrected, it is invalid, *Eaton*, 323 F.3d at 1344

– and there is no request before the Court to correct it.

Were ArtistShare to seek correction, a separate proceeding is required, but that

proceeding would be unsuccessful, notwithstanding Thompson's status as a co-inventor.

Correction under §256 requires a court having jurisdiction to hear the matter, but only "on notice

and hearing of all parties concerned." Such a proceeding would necessitate discovery since the

new declaration and the purported assignment post-dated the close of discovery. This Court has

not been asked, but were the Court asked, any such request should be denied.

In addition, the peculiar circumstances of Thompson's declaration and purported

assignment raise other serious questions barring correction and enforcement of the patent. *See,*

*e.g., Board of Ed.*, 333 F.3d at 1344 ("[P]atents have in the past been held unenforceable for

failure to correctly name inventors in cases where the named inventors acted in bad faith or with

deceptive intent.") (citing *Frank's Casing Crew v. PMR Techs., Ltd.*, 292 F.3d 1363 (Fed. Cir.

2002) and *PerSeptive Biosys. v. Pharmacia Biotech*, 225 F.3d 1315 (Fed. Cir. 2000)).

Such concerns are particularly acute here. To begin with, ArtistShare's procurement and

reliance upon Thompson's conclusory statement of (non)inventorship is troublesome, because

Thompson is not qualified to assess the complex legal issue of inventorship – "one of the

muddiest concepts in the muddy metaphysics of the patent law." *Mueller Brass Co. v. Reading*

*Indus., Inc.*, 352 F. Supp. 1357, 1372 (E.D. Pa. 1972).

Far worse, ArtistShare's attorneys drafted a declaration for Thompson that conflicts with:

(1) his own sworn factual testimony establishing his inventorship; (2) his prior demand that

ArtistShare compensate him for his "creative and/or intellectual contribution" (JAX55 at ART-18772); (3) ArtistShare's admission of facts demonstrating Thompson's co-inventorship of at least Claims 1, 8 and 24; as well as (4) ArtistShare's unsuccessful attempt, in 2003, to get Thompson to sign away his patent and other intellectual property rights (JAX55 at ART-18763).

In short, it appears that ArtistShare's counsel somehow induced Thompson to sign a declaration on a complex legal issue, which they wrote for him, stating a conclusion sharply at odds with his deposition testimony and other facts of record in this case. It is difficult to imagine that  a court would permit correction and enforcement of a patent that has been so tainted.

III.   **Summary Judgment of Invalidity for Obviousness Is Appropriate**

As shown in Kickstarter's Memorandum (pp. 20-33), summary judgment of invalidity for obviousness is appropriate – there is no genuine dispute of material fact that the identified prior art teaches each limitation of the '887 Patent claims and the reason to combine was known and predictable, merely a result of applying common sense. In response, ArtistShare's Opposition (pp. 18-34) mischaracterizes the prior art and the relevant reasons to combine them.

A.     **There Is No Genuine Dispute That the Prior Art Demonstrates Obviousness**

"An analysis of obviousness must be based on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness." *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). In view of these facts, the Court determines, ***as a matter of law***, whether "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing 35 U.S.C. § 103(a)).

The Supreme Court has explained that "[i]f a person of ordinary skill can implement a

predictable variation, and would see the benefit of doing so, §103 likely bars its patentability" and "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill." *KSR*, 550 U.S. at 401. As a result, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

ArtistShare does not appear to dispute that the references discussed in Kickstarter's Memorandum are prior art to the '887 Patent. Nor is there any dispute as to the level of ordinary skill in the relevant art. ArtistShare's Opposition contests only whether the identified prior art references contain all of the claim limitations at issue, whether this leads to the conclusion that the asserted '887 Patent claims are invalid, and whether any "objective evidence" (often called "secondary factors") of nonobviousness should be considered.

ArtistShare's Counterstatement to the Undisputed Material Facts ("ACSMF") purports to contest that the prior art webpages from the Wayback Machine are admissible. (ACSMF at 23-25.) In discovery, however, ArtistShare was asked to identify all of its contentions in response to Kickstarter's prior art. (JAX45 at 24.) ArtistShare did not contest authenticity or admissibility. (*Id.* at 24-41.) This failure is a waiver of any challenges to the references as prior art.[10] Moreover, the references are authenticated by the affidavit from the Office Manager at the Internet Archive and by deposition testimony in this case. (*See* JAX12; JAX3; JAX4; JAX6.)

### 1. There Is No Genuine Dispute That the Identified Prior Art Discloses All Limitations of the Asserted Claims of the '887 Patent

As Kickstarter previously showed, there can be no genuine dispute that the claims of the '887 Patent are nothing more than a combination of elements found in the prior art, in a

---

[10] *See, e.g.*, *Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 12 F.R.D. 531, 544 (S.D.N.Y. 1952) ("all interrogatories inquire into the answering party's contentions . . . [the party] is pretty well bound by its answer *Aerogroup Int'l v. Marlboro Footworks*, 1997 U.S. Dist. LEXIS 6252, at *10 (S.D.N.Y. May 7, 1997) (same).

predictable way. (KS Mem. at 24-33.) The prior art contains numerous examples of fundraising for artistic works on the Internet, including idealive, Marillion and November Project, as well as entire software suites and how-to publications on using the Internet to raise money. ArtistShare concedes the point for many claims. The disputed claims, however, are discussed below.

a)      *"a system for marketing and funding one or more projects of an artist comprising a server having application programs operable from a remote site for: ..." [preamble 1, 17, 18, 35, and 36]"*

Kickstarter's Memorandum (pp. 24-25) demonstrated that idealive and Blackbaud taught a webpage operating from a web server with application programs operable from a remote site. (*See* JAX44, Mollick Rpt. ¶¶ 65, 383, 407, 418, 425; JAX2, Monroe Dep. 191:6-12.)[11]

For Blackbaud, ArtistShare argues only that "[n]one of the Blackbaud publications disclose '[a] system for marketing and funding one or more projects *of an artist*.'" (AS Opp'n at 26.) ArtistShare cannot (and has not) contested that it would be obvious to use Blackbaud for this purpose; Blackbaud was intended for fund-raising and artists are an obvious constituency for raising funds. *KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Clearly, a person of ordinary skill in the art would have reason to combine Blackbaud (for raising money) with idealive (for raising money for artists), and Marillion and November Project (both raising money for bands). (JAX44, Mollick Rpt. ¶ 70; JAX75, Connors' Decl. ¶ 12 ("Blackbaud directed its services to entities in the nonprofit space – which includes a wide variety of artistic, literary, educational, scientific and educational organizations . . . ."); KS Mem. at 24, 32-3.) ArtistShare's conclusory assertions fail to create a genuine issue of fact. *See MLB Props.*, 542 F.3d at 311.

For idealive, ArtistShare raises technical arguments that are similarly incorrect. (And, given Balckbaud's applicability, the Court need not reach them.) As a preliminary matter, the

---

[11] ArtistShare failed to address that Marillion and November Project also had servers and served the web pages to its visitors. (*See* AS Opp'n at 25-26; KS Mem. at 25 n.8.)

limitation at issue concerns the standard use of the Internet. The Internet includes servers, which serve web pages to individuals who access the site. (JAX88 at [0013] ("The organization puts the selected applications on line, i.e. the application is posted on a server attached to the Internet.").) An application program operable from a remote site refers a standard function of the internet: the click of a button on a webpage that then causes an application to run. (*See id.*) Of course, ArtistShare cannot rightfully claim to have invented applications running over the Internet – the '887 Patent expressly states it did not. (JAX1 at 8:54-62 ("One of skill in the art will appreciate that the computer systems outlined above . . . may include various hardware and operating software . . . for . . . browsing the Internet . . ."); JAX2, Monroe Dep. 199:16-21 ("Well like . . . the notion of the Internet as a phenomenon, no, I don't think [Camelio] invented those.").)

ArtistShare's responsive arguments are irrelevant and wrong. ArtistShare attacks Mr. Reid's (a principle in idealive) memory of details of idealive, but does not contest those details in relevant part – namely, that idealive used a "PHP" (a server-side scripting language for web development) running on an Apache web server. (KS Mem. at 24.) ArtistShare argues that idealive's use of "PHP" "does not mean that idealive offered any 'application programs operable from a remote site.'" (AS Opp'n at 25.) However, ArtistShare's own expert admitted that web pages like idealive could have "executable scripts and functionality in the . . . code" that are "essentially a computer programs that's served from the web server." (JAX2, Monroe Dep. 191:6-12.) ArtistShare's conclusory attempt to mischaracterize the basic nature of webpages and web servers is insufficient to impeach Mr. Reid's testimony or create a genuine issue of fact.

        **b)**      ***"a server having application programs operable from a remote site for ... providing software tools to an artist or Account Manager to manage at least one project" [1a, 17c, 18b, 35b, 36b]***

Kickstarter's Memorandum (pp. 25-27) demonstrated that idealive and Blackbaud, disclosed the "software tools . . . to manage at least one project" as construed by the court.

24

ArtistShare's Opposition presents two arguments regarding this limitation. First, ArtistShare attempts to improperly reopen claim construction. (*See* AS Opp'n at 27.) Second, ArtistShare wrongly asserts that Kickstarter did not identify *any* prior art references or prior art combinations that teach "software tools . . . to manage at least one project." (*See* AS Opp'n at 26-27.)

ArtistShare's first argument that "software tools . . . to manage at least one project" now includes "tools for posting" (*id.*), is moot by the fact that this construction was neither adopted by the Court (*see* Dkt. #53), nor one that ArtistShare previously sought.  (*See* Dkt. #44, 48.) Thus, it is not a requirement of the claim – ArtistShare's argument is irrelevant.[12]

As to the second argument, ArtistShare merely makes conclusory assertions that the software tools do not exist or that testimony is unreliable, but fails to address the specific evidence Kickstarter presented. (*See* AS Opp'n at 27-29.) Again, conclusory assertions are insufficient to rebut summary judgment. (*See supra* 23-24.) Further, ArtistShare's claims that the software tools are absent in the prior art is demonstrably incorrect.

- **Project Information.** ArtistShare's argument that idealive's "basic listing" feature is not a "project" under the '887 Patent is demonstrably incorrect. idealive discloses a "new book and exhibition" and a "CD and MP3 release" as examples of basic listings – clearly "projects," as the '887 defines. (JAX1 at Abstract; 4:44-47; 7:19-24; JAX21.) ArtistShare argues that Blackbaud did not "discuss any features akin to managing a creative project." (AS Opp'n at 28.) As above, this claim is simply incorrect. (*See supra* 23-24.)

- **Inventory.** For idealive, ArtistShare asserts that the evidence is merely "an image of a registration page." But, ArtistShare does not address the content of that image which shows idealive's treatment of inventory items. (AS Opp'n at 27; KS Mem. at 26.) For Blackbaud, ArtistShare does not contest it would be obvious to one of ordinary skill in the art to combine Blackbaud with Marillion and November Project to show inventory. (AS Opp'n. at 29.)

- **Auctions.** For idealive, ArtistShare criticizes Mr. Reid's memory but does not dispute that idealive discloses or would include auctions. (AS Opp'n at 27; JAX3, Reid Dep. 74:25-75:14.) For Blackbaud, ArtistShare claims that the evidence, a presentation, "has nothing to do with Blackbaud." (AS Opp'n at 29.) But, it is a Blackbaud presentation given at a Blackbaud conference by a Blackbaud employee to show Blackbaud's functions – ArtistShare intentionally omits these facts. (JAX14 at BCONNORS0000155.) This does not raise a genuine dispute.

---

[12] In fact, idealive provides tools for posting "an optional thumbnail (logo, photo, whatever) and up to 100 words of simple text . . ." and also news, like the "Studio Diary." (JAX21; JAX27.)

- **Patrons.** For idealive, ArtistShare does not dispute that idealive discloses patrons. (AS Opp'n at 28.) Kickstarter demonstrated through the evidence that idealive teaches patrons. (*See* SUMF ¶11(e); KS Mem. at 28, 30, 31; JAX3, Reid Dep. 74:1-75:14; JAX23; JAX44, Mollick Rpt. ¶ 106.) ArtistShare argues only that Blackbaud "has nothing to do with managing a creative project" and therefore does not disclose patrons. (AS Opp'n at 28.) However, as discussed above, this contention is demonstrably false. (*See supra* 22-24.)

- **Subscriptions.** For idealive, ArtistShare argues that the evidence is merely "a standard registration page." But ArtistShare does not address the content of that page, which clearly shows idealive's treatment of subscription items. (AS Opp'n at 28; KS Mem. at 26.) ArtistShare argues only that Blackbaud "has nothing to do with managing a creative project" and therefore does not disclose subscriptions. (AS Opp'n at 28.) However, as above, this contention is demonstrably false. (*See supra* 23-24.)

- **Licensing.** For idealive, ArtistShare mistakenly equates a "financial reward" to investors with stripping outright ownership of the project and the creative work. (AS Opp'n. at 28.) This is plainly incorrect. (*See supra* 23-24.) For Blackbaud, ArtistShare does not contest it would be obvious to one of ordinary skill in the art to combine Blackbaud with idealive to show licensing. (AS Opp'n. at 29; KS Mem. at 27; JAX44, Mollick Rpt. ¶¶ 120, 386, 410, 421, 427, 438.)

- **Personnel**. For idealive, ArtistShare argues that the evidence is just "a registration page." But, ArtistShare does not address the content of that page, showing idealive's treatment of personnel items. (AS Opp'n at 28; KS Mem. at 26; JAX21; JAX9 ("An artist could be an individual or a team of collaborators such as a musical band or even a theatre group.").) ArtistShare argues only that Blackbaud "has nothing to do with managing a creative project" and therefore does not disclose personnel. (AS Opp'n at 28.) Again, as discussed above, this contention is demonstrably false. (*See supra* 23-24.)

- **News.** ArtistShare does not dispute that idealive taught news as a software tool. (AS Opp'n at 28; KS Mem. at 26.) For Blackbaud, ArtistShare improperly groups news with mailings , thereby failing to address news. (AS Opp'n at 29; KS Mem. at 27.)

- **Mailings.** For idealive, ArtistShare incorrectly distinguishes between "registration pages" and "mailings pages." (AS Opp'n at 28.) idealive collected email addresses from its users and disclosed that it "may use customer contact information from the registration form to send you information about idealive, special offers and news, as well as promotional material . . . ." (KS Mem. at 26; JAX22, JAX28, JAX29; JAX1 at 16:34-42; JAX2, Monroe Dep. 193:3-14 ("if they ask you for your e-mail, then you may have that functionality [of contacting people].") For Blackbaud, ArtistShare improperly attempts to distinguish "standard email" from "mailings." (AS Opp'n at 29.) Blackbaud clearly teaches "mailings", stating "[a]s you communicate with your donors, collect e-mail addresses and send . . . ." (KS Mem. at 27; JAX12 at KS0010774.)

- **Media Shows/Images.** For idealive, ArtistShare argues that the evidence is just "a registration page." But, ArtistShare does not address the content of that page, which shows idealive's treatment of media show and image items. (AS Opp'n at 28; KS Mem. at 26.) For Blackbaud, ArtistShare claims that the evidence, a presentation, "has nothing to do with Blackbaud." (AS Opp'n at 29.) However, the presentation was given at a Blackbaud conference by its employee to show Blackbaud's functionality – ArtistShare intentionally omits these facts. (JAX14 at BCONNORS0000155.)This does not raise a genuine dispute.

    c)   ***"application programs operable from a remote site for ... receiving information from the artist ... regarding at least one Sales Container ... including ... a product, a service, and a***

*patronage while the artist retains outright ownership ..."*
*[1b, 18a, 18c, 35a, 35c, 36a, 36c]*

As to the above limitation, ArtistShare nakedly asserts that the prior art lacks "1)

remotely operable application programs; 2) for receiving information regarding a Sales

Container; 3) that includes at least one product, one service, and one patronage, and 4) "while the

artist retains outright ownership of the project and the creative work." (AS Opp'n at 30.) Yet,

ArtistShare fails to address each of these points in its brief, in particular number 3. (*Id.* at 30-31.)

As shown in Kickstarter's Memorandum and as discussed further below, ArtistShare is

incorrect. For example, idealive plainly was an online service that allowed artists to raise funds

to support their "creative works." (JAX44, Mollick Rpt. ¶ 65; KS Mem. at 21.) That idealive also

allowed contributors to obtain an income stream associated with a work does not implicate

control of the underlying intellectual property rights. *See, e.g.*, *Kowalski v. Mommy Gina Tuna*

*Res.*, 2008 U.S. Dist. LEXIS 16019, at *6 (D. Haw. Mar. 3, 2008) (declaring that "other rights"

granted, such as "a certain percentage of royalty income" "does not grant an outright ownership

interest in the patent itself . . . ."). Indeed, idealive specifically taught artists "you are in control."

(*See* JAX23.) idealive as a webpage operating from a web server with application programs

operable from a remote site (*see* JAX44, Mollick Rpt. ¶¶ 65, 383, 407, 418, 425; JAX2, Monroe

Dep. 191:6-12), also teaches "Sales Containers" with entitlements in the form of physical

products, providing access to downloadable content for the project. (*See* JAX9 ("Typical projects

might include recording, producing, and releasing a new CD; shooting and printing photos for a

photo exhibition and associated book; a documentary film; or a series of paintings around a

theme."); JAX22.) Further, Mr. Reid's testimony that contributors could receive, *e.g.*, CDs is

corroborated by documents that show that being "an idealive member allows you to post to

idealive bulletin boards, talk to the artists themselves, access members-only audio samples, video

27

clips, and images, and apply for other goodies not available to the general public." (*See* JAX11.)

As to Blackbaud, ArtistShare does not dispute that Blackbaud teaches this limitation. (*See* AS Opp'n at 30.) Blackbaud was clearly suitable for raising funds to support any endeavor, including artistic projects. (*See* JAX44, Mollick Rpt. ¶ 70; KS Mem. at 24, 28, 32-33; JAX75, Connors' Decl. ¶ 12.) For November Project and Marillion, ArtistShare incorrectly alleges that each band "created its pre-order website manually" and that they were "manually edited." (*See* AS Opp'n at 30-31.)[13] Whether a website was created manually has nothing to do with claims of the '887 Patent. (*See* JAX1.) Clearly, November Project and Marillion were websites operating from web servers with application programs operable from a remote site. (*See* JAX44, Mollick Rpt. ¶¶ 65, 383, 407, 418, 425; JAX2, Monroe Dep. 191:6-12.) Furthermore, at least Marillion was created using "Dreamweaver," a web development tool, which "had the ability to upload the website to a remote server" as explained by ArtistShare's expert. (*See, e.g.*, JAX2, Monroe Dep. 205:2-208:20; JAX4, Nielsen Dep. 83:1-16.)

> **d)   "application programs operable from a remote site for ... providing ... software tools to manage communications, through said Patron database ..." [1h, 17d, 36g]**

ArtistShare's argument that idealive and Blackbaud do not teach "computer programs that enable and control the exchange of information with a patron wherein the patron receives the information directly from the Patron database" is disingenuous. There can be no dispute that the Court's claim construction did not include requiring ***no*** human interaction. (D.I. 53.) Further, there can be no genuine dispute that it was well known to use a database to manage communications. (*See, e,g.*, JAX2, Monroe Dep. 210:9-212:7.) idealive, *e.g.*, clearly discloses "communicating with fans through a Patron database by email, through online 'bulletin boards'

---

[13] ArtistShare also alleges idealive does not teach "news" as a software tool, because "there is every indication that this page was prepared manually by idealive site administrators." (AS Opp'n at 28.) But, ArtistShare offers no evidence of this conclusory assertion – there is no genuine dispute that idealive teaches news as a software tool.

and a 'chat system.'" (KS Mem. at 30.) ArtistShare attempts to distinguish registration pages requesting e-mails from managing communications but even ArtistShare's own expert admits that a MySQL database can also be a "registration database" and "if you had e-mails from people of using those e-mails to contact people, that may be via e-mail . . ." (JAX2, Monroe Dep. 210:9-212:7.) Blackbaud also discloses communicating with fans through a Patron database in the form of "RE:NetMail" and "RE:Members" software to compose emails and send automatically generated renewal notices. (JAX12 at KS0010752-54, 757-8; JAX13 at BLACKBAUD0078-83.)

### 2. ArtistShare Admits That the Prior Art Discloses All Other Claim Limitations

Notably, ArtistShare has failed to even address the following claim limitations: [1e], [1f], [1g], [17a], [17b], [17e], [18e], [35e], [36e], [36f]. Thus, the prior art teaches at least these limitations and summary judgment of invalidity on these claim limitations is appropriate.

ArtistShare (AS Opp'n at 19) does contend that Kickstarter has not "set forth a prima facie case of obviousness with respect to the dependent claims" of the '887 Patent. The comment is irrelevant as ArtistShare *already admitted* in discovery that the dependent claims stood or fell with the independent claims. In discovery, Kickstarter provided full invalidity contentions, separately addressing each asserted dependent claim. (*See* JAX87 at pp. 17-893.) ArtistShare responded with contentions that grouped the dependent claims with the independent claims, and addressed only the validity of the independent claims. (*See* JAX45 at pp. 32-36.)

Courts have held that interrogatories inquiring what a party will contend are valid and that parties are bound by their answers. (*See supra* p. 22 n.10.) ArtistShare is therefore bound by their interrogatory response and cannot contend that a dependent claim is valid, separate from the independent claim. If summary judgment is appropriate for the independent claims, it is appropriate for the dependent claims as well.

As to ArtistShare's cross-motion for summary judgment of non-obviousness as to the dependent claims, Kickstarter has in fact shown that the dependent claims are obvious. (JAX44, Mollick Rpt. ¶¶ 227-382, 414-417.) ArtistShare does not even dispute that Prof. Mollick's evidence or its own admission that the dependent claims stood with the independent ones – this at least creates a genuine issue of fact, and ArtistShare's cross-motion must be denied.

### 3. There Can Be No Genuine Dispute That Kickstarter Has Provided Reasons to Combine the Prior Art References

ArtistShare's validity arguments highlight why there is so much anti-patent sentiment in the news, in Congress, and at the Supreme Court. ArtistShare uses highly technical arguments to try to justify its attempt to prevent the public from creating crowd-funding websites. The Supreme Court has held that such arguments are of no avail.

Each elements of the claims was known even in the limited universe of on-line fund-raising. The addition or subtraction of any components (*e.g.*, a tool for mass mailing or a member's only web-page) involves no inventive step. There is nothing surprising or unique about doing so. Courts have held that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." (KS Mem. at 33); *Dow Jones & Co. v. Ablaise Ltd.,* 606 F.3d 1338, 1351-52 (Fed. Cir. 2010). This is precisely what the '887 Patent is – an aggregate of known software features for funding artists' projects with no unpredictable results. (KS Mem. at 33.) ArtistShare does not allege, *e.g.*, that Blackbaud would not be suitable for raising money to support artistic works, or that raising money through auctions would be incompatible with idealive, or that the combination of these known features would be unpredictable or produce any unusual response. KSR, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.") In the absence of any fact dispute in that

regard, the claims are obvious as a matter of law.

ArtistShare's claim that Kickstarter has not adequately identified specific reasons to combine (beyond common sense, which is all the law requires as noted above) is also demonstrably incorrect. Kickstarter articulated specific reasons for the combinations, and demonstrated that those combinations are entirely predictable.[14] ArtistShare has not denied this.

Relying on Kickstarter's expert's testimony, ArtistShare's expert's admissions, as well as the '887 Patents admission about the knowledge of a skilled artisan, Kickstarter's Memorandum demonstrates that a person of ordinary skill in the art would indisputably have been motivated to combine the prior art as claimed in the '887 Patent. For example,

> To the extent that Marillion's website did not allow a Patron to receive the information directly from the Patron database, it would have been obvious to a person of ordinary skill in the art to combine Marillion with, e.g., idealive . . . . A person of ordinary skill in the art would have been motivated to combine these references based on their shared fundraising teachings, as well as the well-known principles of managing combinations using database of contacts, providing direct communication with recipients.

(JAX44, Mollick Rpt. ¶ 213.) ArtistShare's own expert agreed that a person of ordinary skill in the art would know how to use a database to communicate with people whose contact information was stored in the database. (*See* JAX2, Monroe Dep. 210:9-212:7.)

ArtistShare (improperly) complains about the vast number of possible prior art combinations that are applicable to the '887 Patent's broad claims. Where the claims describe raising money from fans to support an artistic work, it is unsurprising that that the universe of prior art, which includes "website services used by multiple artists, as well as websites operated by individual artists to market, promote and fund artistic works," is vast. (JAX44, Mollick Rpt. ¶ 49.) That the invention is so well-known in the prior art, and therefore susceptible to many

---

[14] (*See also*, Kickstarter Mem. at 33 ("The motivation to combine these references was also known. For example, Blackbaud was a full-featured online fundraising platform suitable for raising funds for an artistic project. Use of Blackbaud as a platform for artists, e.g., with Marillion and November Project's sites is straightforward and would have been done for the very reasons articulated both in the Patent and in the prior art – to allow owners to maintain ownership over their work."); *see, e.g.*, JAX44, Mollick Rpt. ¶¶ 258, 271, 290, 324.)

combination, highlights obviousness, not the other way around.

Thus, there can be no genuine dispute that there is clear motivation to combine the prior art and Kickstarter should be granted summary judgment on the grounds of obviousness.

### 4.    ArtistShare's "Single Publication" Argument Is Meritless

ArtistShare asserts that "[e]ach of Kickstarter's various documents (*i.e.*, each individual web page printout) is a separate alleged prior art publication," requiring a separate motivation to combine. (*See* AS Opp'n at 22.) This is plainly both wrong and irrelevant. The functions of the prior art systems – idealive, Blackbaud, Marillion, and November Project – are disclosed within the websites and webpages that make up each system. Indeed, the '887 Patent itself explains that the alleged invention may consist of "a plurality of websites and webpages," *i.e.*, websites just like the prior art. (*See, e.g.*, JAX1, '887 Patent 9:15-19 ("The ArtistShare system may be setup and run on the World-Wide-Web, thus ***using a plurality of websites and web pages***, using, for example, html, xml and java programing, to establish the system according to the invention and perform the methods according to the embodiments.") (emphasis added).)

Thus, courts have held that collections of web pages from a single website constitute a single publication.[15] ArtistShare cites to *Kyocera Wireless Corp. v. Int'l Trade Comm'n* for the proposition that "publications, such as web pages, are treated as 'several prior art references with separate dates of creation, rather than a single prior art reference.'" (*See* AS Opp'n at 22; 545 F.3d 1340, 1351 (Fed. Cir. 2008.) However, *Kyocera* is easily distinguished. There, the asserted prior art was the "GSM standard," which consisted of "hundreds of individual specifications drafted by approximately ten different subgroups , each with its own title and separate page numbering" and "authored by different subsets of authors at different times." *Id.* That is not the

---

[15] *See, e.g.*,  *VS Techs., LLC v. Twitter, Inc.*, 2012 U.S. Dist. LEXIS 59475, at *19 (E.D. Va. Apr. 26, 2012) (rejecting the argument that pages from a single website with different dates were not a single publication); *cf. IP Innovation L.L.C. v. Red Hat, Inc.*, 2010 U.S. Dist. LEXIS 145350, at *14 (E.D. Tex. Oct. 13, 2010) (Rader, J.) (". . .no error in using multiple references to describe a single prior art system for the purpose of showing anticipation").

case here. The web pages of the prior art systems are all from same prior art websites and the presentations and articles demonstrate how persons in the field used the systems. Furthermore, a person of ordinary skill in the art would consider the web pages to be incorporated as one system as they are linked to one another and have the same domain name within each system.[16]

Ultimately, however, the argument cannot help ArtistShare avoid an obviousness ruling. Items need only be found in a single publication with respect to a conclusion of anticipation by a printed publication. This case involves obviousness based on both publications and, like Blackbaud, systems that were actually in use. Even if a PowerPoint about the Blackbaud system is not a single publication, it is proof of an existing system which is prior art as a public use. Even if it were not a single publication, *a more powerful obviousness argument is impossible to conceive*; one cannot say it would be unobvious to combine the webpages of a website, or that it would unobvious to incorporate the features Blackbaud described for its system, into its system.

### 5. Even if the Court Finds That Kickstarter Is Not Entitled to Summary Judgment, ArtistShare's Summary Judgment Motion Must Be Denied

If the Court finds Kickstarter's arguments to be unpersuasive, the Court should still deny ArtistShare's motion for summary judgment on validity, because ArtistShare has failed to show that there is no genuine dispute that the '887 Patent is valid. In fact, there is no genuine dispute that Kickstarter has proven at least one prior art combination and the motivation to combine such prior art that teaches all of the claim limitation of the '887 Patent. Accordingly, ArtistShare's motion for summary judgment on validity should not be granted.

#### a) Secondary Factors Cannot Save the Patent – the Argument Is Waived and Unsupported

ArtistShare contends that Kickstarter did not address secondary factors in its opening

---

[16] *E.g.*, idealive: JAX9 ("Home-> For Artists Only->Who What When and How"), JAX21 ("Home-> For Artists Only -> Basic Listings Overview"); November Project: JAX17 ("Tour Dates," "Buy!," "Press," "FAQ," "Sounds," "Contact," "Album Project"), JAX19 (same); Marillion: JAX15 ("MOL.Home," "Marillion.Shop," "eWeb.News," "Web.Fans.Clubs," "Discography," "Racket.Club," "Band.Members"); JAX12 at KS0010673 (same).

brief.  That is simply false. (*See* KS Mem. at 33.) What is more, ArtistShare's secondary factors argument approaches, if not crosses the line, into frivolousness.

To begin, ArtistShare has waived this argument. Kickstarter's interrogatories required ArtistShare to identify "***any objective indicia (or secondary factors)*** support[ing] the non-obviousness of any claims of the patent-in-suit." (JAX45 at 24) (emphasis added). Yet, ArtistShare identified ***none***. (*Id.* at 24-41.) ArtistShare is bound by its interrogatory response and may not introduce information, at summary judgment, that it withheld during discovery.[17]  For this reason alone, summary judgment of no-secondary-factors is appropriate.

Furthermore, ArtistShare cannot demonstrate the existence of any secondary factors. "[E]vidence of commercial success, or other secondary considerations, ***is only significant if there is a nexus between the claimed invention and the commercial success***." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-13 (Fed. Cir. 2006) (emphasis added). ***ArtistShare*** was required to demonstrate the existence of such a nexus, by showing the '887 Patent claims cover ArtistShare's and Kickstarter's products and that the claimed invention was the cause of any commercial success. *Id.* Yet, ArtistShare has ***admitted*** that the claims (as construed by the Court) ***do not cover Kickstarter*** (*e.g.* JAX92, ArtistShare Feb. 8, 2013 Letter to Court at 1) and has failed to show that the patent claims cover its own system. Indeed, ArtistShare's expert did not even investigate the issue. (JAX2, Monroe Dep. 30:3-31:16) ("[T]hat would be something I would need to look at in detail in a structured way. And I have not done that.") Moreover, even if ArtistShare could show that it practices the '887 Patent, it would nevertheless need to show that it is commercially successful (at best, a disputed factual issue as ArtistShare loses money).

---

[17] *See, e.g.*, *John Wiley & Sons, Inc. v. DRK Photo*, 2014 U.S. Dist. LEXIS 22292, at *11 n.4 (S.D.N.Y. Feb. 21, 2014) ("Plaintiff may not rely on this document in his opposition to summary judgment, as he did not provide a copy of it to Defendants in discovery."); *Briese Lichttechnik Vertriebs GmbH v. Langton*, 2011 U.S. Dist. LEXIS 6340, at *11 (S.D.N.Y. Jan. 10, 2011) (precluding defendants from "utilizing, either on summary judgment or at trial, any documents not produced to plaintiffs during the specified discovery period").

Without any evaluation of whether ArtistShare actually practices the '887 Patent (hence, no nexus) and no evidence of commercial success, ArtistShare may not rely upon such secondary indicia of alleged non-obviousness in this lawsuit. *Ormco Corp.*, 463 F.3d at 1311-13.

## IV.   Summary Judgment That Claims 4, 6, and 10 Are Indefinite Is Appropriate

As Kickstarter demonstrated in its Memorandum (pp. 34-35), Claims 4, 6, and 10 are indefinite because "the interested party" can refer to more than one different type of entity.

ArtistShare argues that the only reasonable reading for an "interested party" can only be a patron. However, the interested party could be the fan or the artist or any of the other "interested parties" identified in the '887 Patent specification. (JAX1 at 9:7-10 (". . . artists, fans, patrons, investors, industry retail outlets, distributors, recording companies, corporations, and the like or other interested parties.").) ArtistShare's expert agreed that a "fan" and a "patron" could each be an interested party (JAX46, Monroe Rpt. ¶ 546), such as where a patron buys her friend a CD in support of an artist; the friend would not be a patron in this scenario, but would be an interested party. Further, ArtistShare' (Opp'n at 35) discussion of the '887 Patent's prosecution history, in which "the applicant replaced the 'interested party' with the concept of a Fan who becomes a Patron by accepting an offer for an entitlement" actually supports the notion that "an interested party" can be ***both*** a fan and a patron. This type of uncertainty creates ambiguity which provides an uncorrectable error. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). Notably, the Federal Circuit recently ruled that courts cannot amend incorrect patent claims. *See H-W Tech., L.C. v. Overstock.com, Inc.*, 2014 U.S. App. LEXIS 13148, at *7-9 (Fed. Cir. July 11, 2014). Thus, summary judgment of invalidity as to Claims 4, 6, and 10 is appropriate.

## CONCLUSION

For the foregoing reasons, summary judgment of invalidity is appropriate.

35

Dated: August 16, 2014

/s/ Matthew B. Lowrie

Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document was caused to be served on

this day by electronic mail on the following counsel:

Craig R. Smith, Esq.
William J. Seymour, Esq.
Lando & Anastasi, LLP
One Main Street
Cambridge, MA 02142
csmith@lalaw.com
wseymour@lalaw.com

Dated:  August 16, 2014                    */s/ Matthew A. Ambros*
_____

4842-4485-3277.1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was caused to be served on all counsel of record via Court's CM/ECF system (in addition, pursuant to the Court's Order (Dkt. #92), the foregoing document was previously served on Defendants' counsel via electronic mail on August 16, 2014):

> Craig R. Smith, Esq.
> William J. Seymour, Esq.
> Eric P. Carnevale, Esq.
> Lando & Anastasi, LLP
> One Main Street
> Cambridge, MA 02142
> csmith@lalaw.com
> wseymour@lalaw.com
> ecarnevale@lalaw.com

Dated: September 10, 2014

/s/ Matthew A. Ambros
Matthew B. Lowrie
Robert J. Silverman
Matthew A. Ambros
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
mlowrie@foley.com
rsilverman@foley.com
mambros@foley.com

*Counsel for Plaintiff Kickstarter, Inc.*