UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
KICKSTARTER, INC.,                                    :
                                                      :
                               Plaintiff,             :
                                                      :
                    v.                                :
                                                      :
FAN FUNDED, LLC, *et al.*,                            :
                                                      :
                               Defendants.            :
                                                      :
------------------------------------------------------X

┌────────────────────────────────┐
│ USDC SDNY                      │
│ DOCUMENT                       │
│ ELECTRONICALLY FILED           │
│ DOC #: _____         │
│ DATE FILED: June 29, 2015      │
└────────────────────────────────┘

11 Civ. 6909 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Kickstarter, Inc. ("Kickstarter") brought this action against

Defendants Fan Funded, LLC ("Fan Funded") and ArtistShare, Inc.

("ArtistShare"), seeking declaratory relief that U.S. Patent No. 7,885,887 for

"Method and apparatuses for financing and marketing a creative work" (the

"'887 Patent") is invalid, and thus that Plaintiff does not (and, indeed, cannot)

infringe it.  Before the Court are the parties' cross-motions for summary

judgment on the sole issue of the '887 Patent's validity.  A careful read of that

patent, and of recent decisions on patent eligibility from the Supreme Court

and the United States Court of Appeals for the Federal Circuit, makes plain

that the '887 Patent claims only the abstract and time-honored concept of

patronage, and even the addition of an element of computer use is insufficient

to render it valid under Section 101 of the Patent Act, 35 U.S.C. § 101.

Plaintiff's motion for summary judgment on that ground is therefore granted,

and Defendants' motion is denied.

## BACKGROUND[1]

### A.    The Parties

Plaintiff Kickstarter is a Delaware corporation with its principal place of business in New York.  (Compl. ¶ 2; Ans. ¶ 2).  It is a web-based funding platform for a wide variety of creative projects, including those relating to music, film, art technology, design, food, and publishing.  (Compl. ¶ 9; Cntrcl. ¶ 6).

Defendant ArtistShare is a Delaware corporation, also with its principal place of business in New York, that assists artists in acquiring funding to produce creative works by marketing their projects directly to individuals and entities interested in the projects.  (Compl. ¶ 4; Cntrcl. ¶¶ 1, 16).  ArtistShare was listed as the assignee on the patent at issue, the '887 Patent.  ('887 Patent

---

[1]    The Court notes that, insofar as the issue of patent eligibility is concerned, the instant summary judgment motions could have been, and perhaps should have been, styled as motions for judgment on the pleadings.  *See OIP Technologies, Inc.* v. *Amazon.com, Inc.*, No. 2012-1696, — F.3d —, 2015 WL 3622181, at *4 (Fed. Cir. June 11, 2015) (Mayer, J., concurring) ("Addressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents.").  To forestall accusations of "Monday-morning quarterbacking," however, the Court notes that such a course may not have been as obvious prior to the Supreme Court's June 2014 decision in *Alice Corp. Pty.* v. *CLS Bank Int'l*, 134 S. Ct. 2347 (2014), and the Federal Circuit jurisprudence that has developed in its wake.  In any event, the parties have engaged in considerable discovery (particularly relating to invalidity contentions unrelated to eligibility), resulting in a substantial record on summary judgment.  In ruling on these motions for summary judgment, the Court considered the entire record before it; however, the Court here sets forth only those facts pertinent to its decision, which is made on eligibility grounds.  The facts set forth herein are drawn primarily from the '887 Patent itself (on the record as Joint Appendix ("JAX") Ex. 1); Plaintiff's Complaint ("Compl.") (Dkt. #1); Defendants' Answer ("Ans.") and Counterclaim ("Cntrcl.") (Dkt #30); Plaintiff's Answer to the Counterclaim ("Cntrcl. Ans.") (Dkt. #31); and other documents as cited.  For convenience, Plaintiff's opening brief is referred to as "Pl. Br."; Defendants' opening brief and opposition is referred to as "Def. Br."; Plaintiff's opposition and reply is referred to as "Pl. Opp."; and Defendants' reply is referred to as "Def. Reply."

at [73]).  Defendant Fan Funded is a Delaware limited liability company with its principal place of business in Delaware; it is a wholly-owned subsidiary of ArtistShare.  (Compl. ¶ 3; Cntrcl. ¶¶ 3, 17).  ArtistShare has assigned the '887 Patent to Fan Funded.  (Cntrcl. ¶ 4).

## B.    The '887 Patent

The '887 Patent, entitled "Method and Apparatuses for Financing and Marketing a Creative Work," was issued by the U.S. Patent and Trademark Office (the "PTO") on February 8, 2011.  ('887 Patent at [45], [54]).  The '887 Patent claims "a system and method for raising financing and/or revenue by [an] artist for a project, where the project may be a creative work of the artist." (*Id.* at [57]).  The '887 Patent recites 37 claims, which includes six independent claims (Claims 1, 15, 17, 18, 35, and 36) and 31 dependent claims (Claims 2-14, 16, 19-34, 37).[2]

Claim 1 of the '887 Patent is representative:[3]

---

[2]    Defendant originally contended that Plaintiff infringed 25 claims of the '887 Patent, only five of which (1, 17, 18, 35, and 36) were independent claims.  (*See* Jan. 18, 2013 Opinion and Order ("Jan. 18, 2013 Op.") 2 n.1) (Dkt. #53).  Following the Court's claim construction opinion (*see id.*), Defendant stipulated that Plaintiff did not infringe the '887 Patent as construed (*see* Dkt. #56 at 1 n.2).

[3]    Having reviewed the '887 Patent, the Court agrees with Plaintiff that Claim 1 is representative.  (*See* Pl. Br. 10 & n.4).  Defendants are correct that each claim contained in the '887 Patent is presumptively valid.  (Def. Br. 11 (citing 35 U.S.C. § 282)).  *But cf. Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (Mayer, J., concurring) ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned — much less applied — any presumption of eligibility.  The reasonable inference, therefore, is that while a presumption of validity attaches in many contexts, ... no equivalent presumption of eligibility applies in the section 101 calculus." (citation omitted)).  However, where, as here, the claims are "substantially similar and linked to the same abstract idea," the Court may dispose of the other claims in less detail.  *Content Extraction & Transmission LLC* v. *Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("*CET*"); *see id.* (finding the district court "correctly determined that addressing each claim of the asserted patents was unnecessary" and approving the court's selection of a representative claim); *id.* (rejecting patentee's argument that failure to address each claim individually was

Claim 1. A system for marketing and funding one or more projects of an artist comprising a server having applications programs operable from a remote site for:

providing software tools to an artist or Account Manager to manage at least one project, the project comprising at least one creative work;

receiving information from the artist or Account Manager regarding at least one Sales Container associated with the at least one project, each Sales Container including at least one of a product, a service, and a patronage, while the artist retains outright ownership of the project and the creative work;

transmitting offer data from a server to a client via a network, the offer data comprising an offer to Fans concerning the at least one Sales Container associated with at least one project, wherein the offer is for a Sales Container at a predetermined level of patronage in exchange for funds for the project;

receiving at the client such offer data and presenting the offer to the Fan;

transmitting acceptance data back to the server from the client accepting the offer;

processing the acceptance data by the server;

registering contact and marketing information regarding Patrons in a database; and

providing the artist or Account Manager software tools to manage communications, through said Patron database, to Patrons regarding the sales and marketing of one or more projects.

---

inconsistent with statutory presumption of validity of each claim); *see also Bilski* v. *Kappos*, 561 U.S. 593, 611-12 (2010) (determining that 11 claims in a patent application were invalidly abstract after analyzing only two of the claims in detail). Additionally, the dependent claims of the '887 Patent "recite only slight variations of the independent claims," and so the Court need not consider them distinctly. *Planet Bingo, LLC* v. *VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) (unpublished decision); *see also CET*, 776 F.3d at 1349 ("[W]hile [the dependent] claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea.").

('887 Patent col.21 l.35-63).[4]   The Patent describes the invention as, *inter alia*, a method for "generating capital for a project of an artist" by offering "entitlement[s[5]] which may be related to the artists at a predetermined level of patronage among a plurality of levels of patronage." (*Id.* at col.4 l.28-34).   It describes several mechanisms for offering consideration (i.e., an "entitlement") in exchange for funds for a project, referring to these mechanisms as "Sales Containers."   The "Sales Container" may consist of an auction, a sales item, a subscription series, subscription access, pay-per-view, licensing, and patron sponsorship.  (*Id.* at col.10 l.43-53).   A "sales item" may include, for example, downloadable music, sheet music, an hour-long telephone lesson from the artist on songwriting, or some other "inventory item."  (*Id.* at col.11 l.3-25).   A subscription may include access to recording session videos, recorded jam sessions, and other production-related media or products.  (*Id.* at col.12 l.9-19).   The Patent describes making offerings to "fans" — a term construed to include "a consumer, admirer or follower, mentor, and any other individual(s) interested in the Artist's work."  (Jan. 18, 2013 Op. 9).   Once a "fan" accepts an offer, that fan becomes a "patron."  (*Id.* at 7).   Such acceptance data and information is stored on a "Patron database."  ('887 Patent col.21 l.60-63).

The "Field of the Invention" portion of the '887 Patent indicates, in part:

> The invention is directed to a new business and distribution paradigm for creative works.   More

---

[4]    The Court assumes familiarity with Judge Paul A. Crotty's January 18, 2013 Opinion and Order (Dkt. #53) construing disputed terms of this and other claims.

[5]    As it is used in the '887 Patent, an "entitlement [ ] includes at least one product, and at least one service, and at least one patronage."  (Jan. 18, 2013 Op. 11).

> particularly, the invention is directed to methods and
> systems for obtaining financing from interested
> individuals to produce a creative work in exchange for
> an entitlement from the author of the work.    The
> invention is also directed to methods and systems for
> presenting an artist-centered business model paradigm
> (using the entertainment industry as an example).

('887 Patent col.1 l.14-21).  The "Background of the Invention" section describes the "problem[s] with the current recording business model" (*id.* at col.2 l.11-12) and the consequent "need for a method and/or system which will allow artists … to raise capital on their own and profit for producing a creative work, preferably prior to producing the work, and preferably without a recording contract with a recording company" (*id.* at col.2 l.18-22).  The "Summary of the Invention" section indicates that the invention is intended to fill this need (*id.* at col.2 l.34-39), and explains, "The invention may make use of a combination of existing proven business models including banking, patron systems, merchandising partnerships, direct marketing, publishing, file sharing and internet networking, file compression, audio/video technologies, and online auctions (for example)" (*id.* at col.4 l.11-15).

The "Detailed Description of the Preferred Embodiments" portion of the '887 Patent describes the overall system plus three embodiments, each with a different focus.  ('887 Patent col.6-21).  In describing the embodiments of the patent, this section notes:

> One of skill in the art will appreciate that the computer
> systems outlined above which may be used with any of
> the embodiments of the invention, may include various
> hardware and operating software … for running
> software programs, browsing the Internet,
> communicating and/or operating with any device,

6

> including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device.   Such computer system may also include … internal and external components which may be used for carrying out the operations of the computer and the embodiments of the present invention.

(*Id.* at col.8 l.54-67).

In sum, Claim 1, as a representative claim, has the following relevant limitations: (i) a computer operating either on the Internet or other network with access to a server; (ii) providing software tools with a suite of features allowing management of one or more creative projects; (iii) making certain types of offers associated with the project in exchange for funds for the project; (iv) facilitating the acceptance of offers by fans; (v) storing contact and marketing information of those who have accepted offers in exchange for funds in a database; and (vi) providing software tools that enable and control the exchange of information with a fan through the database.   (*See generally* Jan. 18, 2013 Op.).

## C.   **Procedural History**

On September 30, 2011, Kickstarter commenced this action against ArtistShare and Fan Funded for declaratory judgment of patent invalidity and non-infringement.   (Dkt. #1).   On February 3, 2012, Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, arguing that there was no case or controversy because the parties were in a business negotiation that did not involve a claim of infringement or threat of suit.   (Dkt. #20).   On April 10, 2012,

Judge Paul A. Crotty, to whom this case was originally assigned, denied that motion, finding sufficient controversy between the parties that was both immediate and real.  (Dkt. #29).  On April 24, 2012, Defendants submitted an Answer to the Complaint and a Counterclaim of infringement (Dkt. #30), and on May 15, 2012, Plaintiff answered the Counterclaim (Dkt. #31).

The case proceeded to discovery.  (Dkt. #33).  About midway through discovery, in late 2012, the parties submitted claim construction briefing and a *Markman* hearing was held.  (*See* Dkt. #42-52).  *See generally Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370 (1996).  On January 18, 2013, Judge Crotty issued an Opinion and Order construing disputed terms.  (Dkt. #53).  In February 2012, because they were of the view that the Court's claim construction was determinative of the issue of non-infringement, Defendants requested that the Court enter at least partial final judgment so that they could appeal the Court's claim construction opinion.  Judge Crotty denied that request.  (Dkt. #55).  Defendants therefore stipulated as to Plaintiff's non-infringement under the Court's claim construction, and the parties pursued discovery limited to the validity *vel non* of the '887 Patent.  (Dkt. #56).

The case was reassigned to the undersigned on June 25, 2013 (Dkt. #67), and discovery continued.  The parties submitted cross-motions for summary judgment on the validity of the '887 Patent beginning June 16, 2014. (Dkt. #92).  Those motions, which are now before the Court, were fully briefed on September 10, 2014.  (Dkt. #96-107, 110).  Plaintiff moves for judgment of invalidity of the '887 Patent on four grounds, and Defendant moves for

judgment of validity on those same grounds: (i) patentability of the subject matter; (ii) correctness of the named inventor; (iii) obviousness in light of prior art; and (iv) definiteness of claims.

## DISCUSSION

### A.    The Summary Judgment Standard[6]

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

It is well-established that "[s]ummary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG* v. *Murata*

---

[6]    When deciding issues in a patent case, a district court applies the law of the Circuit in which it sits to non-patent issues and the law of the Federal Circuit to issues of substantive patent law. *See In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999). Accordingly, a district court decides summary judgment motions under the jurisprudence of its regional circuit. *See Digitech Image Techs., LLC* v. *Electronics for Imaging, Inc.*, 758 F.3d 1344, 1348 (Fed. Cir. 2014).

*Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984).  While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, the party opposing the motion must point to an evidentiary conflict created on the record with facts set forth in detail, using affidavits or similar documents, *Anderson*, 477 U.S. at 248, 250.  "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted); *see also Anderson*, 477 U.S. at 248, 250.  On the other hand, the established facts, as well as any inferences of fact drawn from such facts, must be viewed in the light most favorable to the opposing party.  *See Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *Anderson*, 477 U.S. at 255.  When deciding cross-motions for summary judgment, such as the motions pending before the Court, a district court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Children First Found., Inc.* v. *Fiala*, No. 11-5199, — F.3d —, 2015 WL 2444501, at *4 (2d Cir. May 22, 2015) (citing *Byrne* v. *Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

**B.    Applicable Law**

**1.    Patent Eligibility Under Section 101 of the Patent Act**

"Whether a claim is drawn to patent-eligible subject matter under [Section] 101 is a threshold inquiry[.]"  *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) ("*Bilski I*"), *affirmed sub nom. Bilski* v. *Kappos*, 561 U.S. 593 (2010)

("*Bilski II*").  If a claim is not drawn to patent-eligible subject matter, it "must be

rejected even if it meets all of the other legal requirements of patentability."  *Id.*

The determination of whether a claim is drawn to patent-eligible subject matter

is a pure question of law.  *See Fort Properties, Inc.* v. *Am. Master Lease LLC*,

671 F.3d 1317, 1320 (Fed. Cir. 2012); *see also Bilski I*, 545 F.3d at 951

(explaining that patent validity under § 101 is an "issue of law").[7]  Under the

---

[7]     Defendants argue that this Court must apply a "clear and convincing" standard to
determine whether Plaintiff has met its burden of proof as to each of its invalidity
contentions.  (*See* Def. Br. 4, 11-12; Def. Opp. 7-8).  While it is true that, to the extent
the Court as factfinder must make *factual* determinations, the "clear and convincing"
standard applies (e.g., whether a patent's elements existed in prior art), to the extent
that the Court is drawing legal conclusions (e.g., whether the subject matter is patent-
eligible under Section 101), no such standard applies.  In arguing that the Court must
apply a "clear and convincing" standard to determine subject matter eligibility,
Defendants conflate an evidentiary burden with legal analysis.  The case Defendants
cite for this argument is *Ultramercial, Inc.* v. *Hulu, LLC*, 722 F.3d 1335, 1342 (Fed. Cir.
2013) ("*Ultramercial I*"), which the Supreme Court vacated and remanded to the Federal
Circuit for further consideration in light of *Alice.  See WildTangent, Inc.* v. *Ultramercial,
LLC*, 134 S. Ct. 2870 (2014).  On remand, in keeping with *Alice*, the Federal Circuit did
not mention, much less apply, a "clear and convincing" standard in coming to its legal
conclusion that the claims at issue were directed at a patent-ineligible abstract idea.
*See Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 713-17 (Fed. Cir. 2014) ("*Ultramercial
II*").  In a recent concurrence, Justice Breyer offered useful guidance concerning
application of the "clear and convincing" evidentiary standard in this context:

> [I]n this area of law as in others the evidentiary standard of proof
> applies to questions of fact and not to questions of law. ...  Thus a
> factfinder must use the "clear and convincing" standard where
> there are disputes about, say, when a product was first sold or
> whether a prior art reference had been published.  Many claims of
> invalidity rest, however, not upon factual disputes, but upon how
> the law applies to facts as given.  Do the given facts show that the
> product was previously "in public use"?  35 U.S.C. § 102(b).  Do
> they show that the invention was "nove[l]" and that it was "non-
> obvious"?  §§ 102, 103.  Do they show that the patent applicant
> described his claims properly? § 112.  Where the ultimate question
> of patent validity turns on the correct answer to legal
> questions — what these subsidiary legal standards mean or how
> they apply to the facts as given — today's strict standard of proof
> has no application. ... Courts can help to keep the application of
> today's "clear and convincing" standard within its proper legal
> bounds by separating factual and legal aspects of an invalidity
> claim, say, by using instructions based on case-specific
> circumstances that help the jury make the distinction or by using
> interrogatories and special verdicts to make clear which specific
> factual findings underlie the jury's conclusions.  *See* Fed. R. Civ.

Patent Act, all patents are "presumed valid," and "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims."  35 U.S.C. § 282(a).

Section 101 defines the categories of inventions eligible for patent protection.  It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  Section 101 thus "recites four categories of patent-eligible subject matter: processes, machines, manufactures, and compositions of matter."  *Bilski I*, 545 F.3d at 951.  The Supreme Court recognizes "three specific exceptions to [Section] 101's broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'"  *Bilski II*, 561 U.S. at 601 (quoting *Diamond* v. *Chakrabarty*, 447 U.S. 303, 309 (1980)).  Although absent from the text of Section 101, "these exceptions are ... consistent with the notion that a patentable process must be

---

[P.] 49 and 51.  By isolating the facts (determined with help of the "clear and convincing" standard), courts can thereby assure the proper interpretation or application of the correct legal standard (without use of the "clear and convincing" standard).  By preventing the "clear and convincing" standard from roaming outside its fact-related reservation, courts can increase the likelihood that discoveries or inventions will not receive legal protection where none is due.

*Microsoft Corp.* v. *i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (citations omitted); *see also Alice*, 134 S. Ct. at 2355 (setting forth the legal framework for determining whether a claim is ineligible as an abstract idea without reference to the "clear and convincing," or any, evidentiary standard).  Because this Court determines that as a matter of law the '887 Patent is drawn to patent-ineligible subject matter, and is thus invalid under Section 101, it does not have occasion to weigh facts using the "clear and convincing" evidentiary standard.

'new and useful.'"  *Id.*  The Supreme Court has construed Section 101 and its predecessors in this manner for 150 years.  *See Alice*, 134 S. Ct. at 2354.

As the Court has explained, "the concern that drives this exclusionary principle [i]s one of pre-emption."  *Alice*, 134 S. Ct. at 2354; *see also Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012) (stating, in finding process not patent-eligible, that "upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries"); *Bilski II*, 561 U.S. at 611-12 (finding concept not patent-eligible because allowing patent "would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea").  "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work,"  *Gottschalk* v. *Benson*, 409 U.S. 63, 67 (1972) ("*Benson*"), and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," thereby undermining the Patent Act's purpose, *Mayo*, 132 S. Ct. at 1293; *accord Alice*, 134 S. Ct. at 2354-55.

On the other hand, the Court has also cautioned against too broadly interpreting the Section 101 exceptions, "[f]or all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo*, 132 S. Ct. at 1293; *see id.* ("The Court has recognized ... that too broad an interpretation of this exclusionary principle could eviscerate patent law."); *see also Alice*, 134 S. Ct. at 2354 ("[W]e tread

13

carefully in construing this exclusionary principle lest it swallow all of patent law."). Although laws of nature, natural phenomena, and abstract ideas are themselves not patentable, the Court has made clear that "'[a]pplications' of such concepts 'to a new and useful end' ... remain eligible for patent protection." *Alice*, 134 S. Ct. at 2354 (quoting *Benson*, 409 U.S. at 67 (alterations omitted)). Accordingly, in applying the Section 101 exceptions, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, ... thereby transforming them into a patent-eligible invention." *Id.* (citations, internal quotation marks, and brackets omitted).

### 2.     The Two-Step *Alice* Framework

The Supreme Court in *Alice* clarified the two-step framework, first set forth in *Mayo,* that courts must use in "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims at issue are directed to one of those patent-ineligible concepts. *Id.* Second, if so, then the court must determine whether there is something else in the claims — an "inventive concept" — "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* Before applying this framework to the '887 Patent, however, the Court reviews *Alice*, its predecessors, and its progeny, all of which provide guidance to district courts in differentiating between eligible and ineligible subject matter.

14

### 3.     Evolving Jurisprudence on Unpatentable Ideas

In 1972, the Supreme Court rejected as ineligible patent claims involving an algorithm for converting binary-coded decimal numerals into pure binary form, holding that the claimed patent was "in practical effect ... a patent on the algorithm itself."  *Benson*, 409 U.S. at 71-72; *see also id.* at 71 ("The mathematical formula involved here has no substantial practical application except in connection with a digital computer.").  Several years later, in *Parker* v. *Flook*, 437 U.S. 584, 594-95 (1978), the Supreme Court held that a mathematical formula for computing "alarm limits" in a catalytic conversion process was also a patent-ineligible abstract idea.  *See also id.* at 586-87 (explaining that "[t]he only difference between the conventional methods of changing alarm limits and that described in [the] application ... [is] the mathematical algorithm or formula"); *id.* at 591 (holding that to be patentable, "[t]he process itself, not merely the mathematical algorithm, must be new and useful").  *But see Diamond* v. *Diehr*, 450 U.S. 175, 177 (1981) (applying *Benson* and *Flook* to uphold a patent claiming a "process for curing synthetic rubber which includes in several of its steps the use of a mathematical formula and a programmed digital computer"); *id.* at 187-88 (reasoning that unlike in *Benson* and *Flook*, the claims in the *Diehr* patent "d[id] not seek to pre-empt the use of that equation," but instead the equation plus additional specific steps rendered the combination patentable as "an application of a law of nature or mathematical formula to a known structure or process").

15

In 2010, the Supreme Court reaffirmed these principles in *Bilski*, rejecting the eligibility of a patent that claimed "the concept of hedging risk and the application of that concept to energy markets." *Bilski II*, 561 U.S. at 609. The *Bilski* Court held that "[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*. Allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 611-12; *see also id.* at 612 (explaining that "limiting an abstract idea to one field of use or adding token post-solution components did not make the concept patentable").

Following *Bilski II*, the Court of Appeals for the Federal Circuit had several opportunities to consider the patent-eligibility of arguably abstract ideas, particularly computer-implemented ideas. From these decisions, it is clear that simply involving a computer in a process does not necessarily ground that process in a tangible, patentable form. For example, in *CyberSource Corp.* v. *Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011), the Federal Circuit concluded that a method of detecting credit card fraud was patent ineligible, notwithstanding the fact that the patent recited the use of existing computers and the Internet. The Court emphasized "that the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium." *Id.* at 1375; *see also*

16

*Dealertrack, Inc.* v. *Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."); *id.* at 1333-34 (concluding that claims drawn to a "computer-aided" method of processing information through a clearinghouse fell outside the ambit of Section 101); *Bancorp Servs., L.L.C.* v. *Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1280 (Fed. Cir. 2012) (rejecting patent as ineligible where "without the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results"); *cf. MySpace, Inc.* v. *GraphOn Corp.*, 672 F.3d 1250, 1267 (Fed. Cir. 2012) (Mayer, J., dissenting) ("While running a particular process on a computer undeniably improves efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a computer-implemented claim is insufficient to bring it within section 101.... Given the ubiquity of computers in contemporary life, allowing a process to become patentable simply because it is computer-implemented or invokes the use of the Internet would render the subject-matter eligibility criteria contained in section 101 virtually meaningless." (citations omitted)).

In 2012, the Supreme Court again considered patent eligibility in *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), and drew a line between patent-ineligible concepts and patent-eligible applications of those concepts. In doing so, the Court set out the two-step framework (later

17

clarified in *Alice*, as set forth above) to determine on which side of that line a given concept fell.  At issue in *Mayo* were

> patent claims covering processes that help doctors who use[d] thiopurine drugs to treat patients with autoimmune diseases determine whether a given dosage level [wa]s too low or too high.  The claims purport[ed] to apply natural laws describing the relationships between the concentration in the blood of certain thiopurine metabolites and the likelihood that the drug dosage w[ould] be ineffective or induce harmful side-effects.

*Id.* at 1294.  In step one of the framework, the Court found that the at-issue patent claims were directed to patent-ineligible laws of nature.  Proceeding to step two, the Court held that the combination of steps recited in the patent application was not enough to render the claimed process a novel application of the law of nature.  It reasoned that "the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field," *id.*, and "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable," *id.* at 1300.  Accordingly, the Court held that the claimed process was patent-ineligible.

The Supreme Court most recently applied the two-step framework in *Alice*, where it considered a patent claiming "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk," in which "[t]he intermediary creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange

18

institutions,' thereby permitting only those transactions for which the parties have sufficient resources." 134 S. Ct. at 2356.[8]  At step one, the Court held the claims were directed at an abstract idea, explaining that "[l]ike the risk hedging in *Bilski*, the concept of intermediated settlement is 'a fundamental economic practice long prevalent in our system of commerce.'" *Id.*  In so holding, the Court emphasized that a "method of organizing human activity" may be impermissibly abstract if it is grounded in a fundamental practice. *Id.* at 2356-57.

Turning to the second step, the Court held that "the method claims, which merely require generic computer implementation, fail to transform that abstract idea into a patent-eligible invention." 134 S. Ct. at 2357.  The Court explained that "[t]he introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Id.*; *see also id.* at 2360 (finding claims merely invoked generic computer functions where they described a "data processing system with a communications controller and data storage unit," which were "purely functional and generic" components for "performing the basic calculation, storage, and transmission functions required by the method claims" (internal quotation marks omitted)).[9]

---

[8]     *Alice* was issued June 19, 2014, just days after Plaintiff's opening brief was due on June 16, 2014.  Defendants discussed *Alice* in their opening brief (Def. Br. 11-18), and Plaintiff had an opportunity to address it in its opposition/reply brief (Pl. Opp. 1-10).

[9]     There is no material difference between the "system" claims set forth in the '887 Patent and the "method" claims discussed in *Alice* and other cases.  *See Alice*, 134 S. Ct. at 2360 ("[T]he system claims are no different from the method claims in substance.  The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea.").

The Federal Circuit has since had several opportunities to apply the framework and reasoning of *Alice*. Following *Alice*, the Federal Circuit reversed course in its decision after remand in *Ultramercial II*, 772 F.3d 709. The district court had invalidated the patent-in-suit as a patent-ineligible abstract idea; the invention was directed to a method for distributing copyrighted media products over the Internet where a consumer received a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser paid for the copyrighted content. *See id.* at 712-13.[10] The Federal Circuit had originally reversed, finding, *inter alia*, that the invention "involve[d] an extensive computer interface." *Ultramercial I*, 722 F.3d at 1352. On remand for reconsideration in light of *Alice*, however, the Federal Circuit affirmed the district court's invalidation, noting, "The Court in *Alice* made clear that a claim that is directed to an abstract idea does not move into [Section] 101 eligibility territory by 'merely requir[ing] generic computer implementation.'" *Ultramercial II*, 772 F.3d at 713.

In a "straightforward" application of *Alice* in *buySAFE, Inc.* v. *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), the Federal Circuit affirmed a district court's invalidation of claims directed to "methods and machine-readable

---

[10]   The Court listed the invention's pertinent steps as including: "[i] receiving copyrighted media from a content provider; [ii] selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; [iii] offering the media for sale on the Internet; [iv] restricting public access to the media; [v] offering the media to the consumer in exchange for watching the selected ad; [vi] receiving a request to view the ad from the consumer; [vii] facilitating display of the ad; [viii] allowing the consumer access to the media; [ix] allowing the consumer access to the media if the ad is interactive; [x] updating the activity log; and [xi] receiving payment from the sponsor of the ad." *Ultramercial II*, 772 F.3d at 714-15.

media encoded to perform steps for guaranteeing a party's performance of its online transaction." 765 F.3d at 1351.[11] First, the Court found the claims were aimed at an abstract concept: "The claims are squarely about creating a contractual relationship — a 'transaction performance guaranty' — that is beyond question of ancient lineage." *Id.* at 1355. The fact that dependent claims narrowed the claims to "particular types of such relationships" made no difference. *Id.*; *see also id.* ("This kind of narrowing of such long-familiar commercial transactions does not make the idea non-abstract for Section 101 purposes."). Next, the Court found that the claims' invocation of computer functionality — by which a computer "receiv[ed] a request for a guarantee and transmit[ted] an offer of guarantee in return" — added "no inventive concept." *Id.*

More recently, in *OIP Techs., Inc.* v. *Amazon.com, Inc.*, No. 2012-1696, — F.3d —, 2015 WL 3622181 (Fed. Cir. June 11, 2015), the Court considered claims directed to the concept of "offer-based price optimization" that recited a "method of pricing a product for sale." 2015 WL 3622181, at *3.[12] Finding

---

[11]   The Court summarized the representative claim as "a method in which [i] a computer operated by the provider of a safe transaction service receives a request for a performance guarantee for an 'online commercial transaction'; [ii] the computer processes the request by underwriting the requesting party in order to provide the transaction guarantee service; and [iii] the computer offers, via a 'computer network,' a transaction guaranty that binds to the transaction upon the closing of the transaction." *buySAFE*, 765 F.3d at 1351.

[12]   The Court found the relevant limitations of the representative claim were: "[i] testing a plurality of prices; [ii] gathering statistics generated about how customers reacted to the offers testing the prices; [iii] using that data to estimate outcomes (i.e. mapping the demand curve over time for a given product); and [iv] automatically selecting and offering a new price based on the estimated outcome." *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *2.

that "offer based pricing" was "similar to other 'fundamental economic concepts' found to be abstract ideas by the Supreme Court and this court," the Court held that "[c]onsidered individually or taken together as an ordered combination, the claim elements fail to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* (internal quotation marks omitted). The Court agreed with the district court that patent-in-suit claimed "no more than an abstract idea coupled with routine data-gathering steps and conventional computer activity," and upheld invalidation. *Id.* at \*1; *see also CET*, 776 F.3d at 1345 (affirming invalidation of method patent using "automated digitizing unit," i.e., computer scanner, for extracting, recognizing, categorizing, and storing information from hard-copy documents, e.g., checks by ATM machines); *Planet Bingo*, 576 F. App'x at 1006 (invalidating, in "straightforward application" of *Alice*, computer-aided methods and systems for managing the game of bingo).

In only one case since the issuance of *Alice* has the Federal Circuit held a computer-implemented method patent to be eligible, and there it was a divided panel. *DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In *DDR Holdings*, the Federal Circuit held that claims covering "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant" passed muster under Section 101. 773 F.3d at 1248. The composite web page prevented third-party merchants from luring visitor traffic away from a host website. *Id.* Rather than being redirected to a merchant's website, a linked

advertisement would take the visitor to a composite web page that displayed product information from the third-party merchant while maintaining the host website's "look and feel." *Id.*

The Federal Circuit adverted to, but did not fully engage in, the first step of *Alice*: while acknowledging that the claims were directed to an abstract idea, it did not identify the precise nature of that idea. *Id.* at 1257. Instead, it observed that, however characterized, *Alice*'s second step was met because the claims did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but instead, "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Id.* The Court found the claims at issue distinguishable from ineligible computer-implemented methods because they "[did] not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)," and the claims "specif[ied] how interactions with the Internet are manipulated to yield a desired result — a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. In other words, "the limitations of the ... asserted claims [ ] taken together as an ordered combination ... recite[d] an invention that [wa]s not merely the routine or conventional use of the Internet." *Id.* at 1259. *But see id.* at 1263-66 (Mayer, J., dissenting) (lamenting the "staggering" scope of DDR's patents, which "describe[d] a goal — confusing consumers by making two web pages look

23

alike — but disclose[d] no new technology or inventive concept for achieving

that goal," and "arguably cover[ed] vast swaths of Internet commerce" (citations

omitted)).

## C.   Application of the Two-Step *Alice* Framework to the '887 Patent

In broad summary, Plaintiff argues that the claims of the '887 Patent fall

outside Section 101 because they teach the "abstract idea of crowd-based

funding" (Pl. Br. 10), or of "raising money from fans to support an artistic work"

(Pl. Opp. 1), or of "raising money from patronage" (*id.* at 5); the addition of a

computer does not render the material patentable, inasmuch as the Patent only

"recites generic steps and tools for implementing the abstract idea" on a

computer.  (Pl. Br. 11).  Defendants assert that the '887 Patent is not directed

towards an abstract idea, and counter that because Plaintiff has "fail[ed] to

provide any definition for crowd-based funding," there is "no way for the Court

to assess whether the claims are directed to that undefined concept."  (Def. Br.

13).  Defendants further argue that the '887 Patent would not preempt other

applications of the idea of crowd-based funding, necessitating the conclusion

that it is not abstract, and that its claims cover "particular systems for

managing, marketing, and financing a creative work" (*id.* at 13-14), or "a

particularized and novel system for providing software tools for preparing,

launching, and managing a fan funded project" (Def. Reply 11).  As a fallback

position, Defendants assert that even if the '887 Patent is directed to an

abstract concept, its elements — when considered as "an ordered

combination" — transform its claims into patent-eligible applications of that

idea.  (Def. Br. 15-18; Def. Reply 11-12).  Applying the Supreme Court's two-step framework, and guided by the recent precedent discussed above, the Court agrees with Plaintiff that the '887 Patent claims a patent-ineligible abstract idea.

### 1.   The Claims of the '887 Patent Are Directed Toward a Patent-Ineligible Concept

The '887 Patent's claims are directed to the concept of crowd-funding or fan-funding, i.e., raising funds for a project from interested individuals in exchange for incentives.  Whether the abstract idea in play here is defined as "crowd-funding," "crowd-based funding," "fan-funding," "incentive-based patronage," "incentivized crowd-funding," or some other combination of these words is of no moment: the abstract concept at play in the Patent remains the same.  Claim 1 broadly recites a "system for marketing and funding one or more projects of an artist" ('887 Patent col.21 l.35-36) and the specification describes the invention as "methods and systems for obtaining financing from interested individuals to produce a creative work in exchange for an entitlement from the author of the work" (*id.* at col.1 l.15-20).  These claims are squarely about patronage — a concept that is "beyond question of ancient lineage."  *buySAFE*, 765 F.3d at 1355.  (*See also* JAX Ex. 44 (Expert Report of Ethan Mollick) at ¶ 10 (noting that "offering rewards for various levels of financial support" has a "history dating back centuries" and is the "same approach taken by [the Public Broadcasting Service] and [National Public Radio]")).

Moreover, this concept of incentive-based funding is incontestably similar to other "fundamental economic concepts," and to other types of "organizing human activity," both of which have been found to be abstract ideas by the Supreme Court and the Federal Circuit. *See*, *e.g.*, *Alice*, 134 S. Ct. at 2357 (intermediated settlement); *Bilski II*, 561 U.S. at 611 (risk hedging); *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3 (offer-based price optimization); *buySAFE*, 765 F.3d at 1355 (transaction performance guarantee); *Ultramercial II*, 772 F.3d at 715 (using advertising as an exchange or currency); *CET*, 776 F.3d at 1347 (data collection); *Accenture Global Servs., GmbH* v. *Guidewire Software, Inc.*, 728 F.3d 1336, 1346 (Fed. Cir. 2013) (generating tasks in an insurance organization); *Planet Bingo*, 576 F. App'x at 1008 (managing a game of bingo). Just because the claims do not preempt all crowd-funding does not make them any less abstract. *See Bilski*, 561 U.S. at 612 ("*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable."); *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3 ("And that the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."); *see also buySAFE*, 765 F.3d at 1355 (collecting cases).[13]

---

[13]    Curiously, in arguing that the '887 Patent does not preempt all crowd-based funding, Defendants provide as an example that "none of the prior art references produced by Kickstarter would have been preempted" (Def. Br. 14), but Defendants do not point to any present-day crowd-funding platform that would not be preempted.

26

### 2.    There Are No Additional Elements Sufficient to Transform the Nature of the Claim

Nothing about the '887 Patent transforms the concept of crowd-funding into patent-eligible subject matter.  Beyond the abstract idea of patronage, the claims merely recite "well-understood, routine conventional activities," by requiring either conventional computer activities or routine data-gathering steps.  *Alice*, 134 S. Ct. at 2359 (alterations omitted).  Considered individually or taken together as an ordered combination, the claim elements fail "to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (citation omitted).  For example, Claim 1 recites "application programs" providing "software tools" to manage projects, transmitting and receiving "offer data" and "acceptance data," "registering contact and marketing information" of individuals in a database, and providing "software tools" to communicate with those in the database.  ('887 Patent col.21 l.35-63).  Just as in *Alice*, "all of these computer functions are well-understood, routine, conventional activities previously known to the industry." *Alice*, 134 S. Ct. at 2359 (internal quotation marks and alterations omitted); *see id.* (finding that the "use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions" was not an inventive concept); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network — with no further specification — is not even arguably inventive."); *Ultramercial II*, 772 F.3d at 716 ("[T]he steps of consulting and updating an activity log represent insignificant 'data-gathering steps,' ... and thus add nothing of practical significance to the underlying abstract idea." (citation omitted)); *Bancorp Servs.*,

27

687 F.3d at 1278 (holding a computer "employed only for its most basic function ... does not impose meaningful limits on the scope of those claims").

Even this "ordered combination of steps recites an abstraction." *Ultramercial II*, 772 F.3d at 715. The process of posting a project online, providing different levels of incentives for different levels of funds, storing the information of individuals who accept offers for incentives in a database, and providing software tools to contact the individuals through the database "all describe an abstract idea, devoid of a concrete or tangible application." *Id.* Defendants' arguments that the claim limitations spell out "a particular system that allows users to automatically create, manage, and fund their own projects using a specific collection of software tools that are operable from a remote site" are simply unavailing. (Def. Br. 14). More to the point, Defendants' repetition of words like "particular" and "specific" in bold italics when referring to the claims in the '887 Patent does not make them so. (*See id.* at 14-15). And while limitations like "operable from a remote site" and the construction of "entitlement" to include "at least one product and at least one service and at least one patronage," might add some degree of particularity, the concept embodied by the majority of the limitations describes[14] only the abstract idea of incentive-based funding or patronage implemented online. *See Ultramercial II*, 772 F.3d at 715; *see also Flook*, 437 U.S. at 593 (rejecting the argument "that

---

[14]  Defendants' semantic sleight-of-hand that the claims do not "describe" an abstract idea, but instead are "directed toward" a system incorporating software for managing a fan-funded project (*viz.*, what this Court has determined is an abstract idea), has no basis in the law and will not be addressed further. (Def. Reply 10-11).

if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of [Section] 101"); *cf. DDR Holdings*, 773 F.3d at 1258 (finding claims eligible where they recited specific manipulation that "over[rode] the routine and conventional sequence of events" preventing the "computer network [from] operating in its normal, expected manner").  Indeed, Defendants' own expert acknowledges that the '887 Patent is a "business model" implemented with a "network-based software solution."  (JAX Ex. 46 (Expert Report of Marshall Monroe) at ¶ 58 ("The '887 Patent describes a system that combines the business model of soliciting funds directly from interested individuals to finance the creation, completion, or distribution of a creative work, among other things, with a network-based software solution.")).

Moreover, the language of the '887 Patent itself belies Defendants' arguments about a "particular system" and "specific software tools."  As Plaintiff points out (Pl. Opp. 5-6), the '887 Patent specification expressly does not limit the invention to any particular system, software, or hardware:

> the computer systems … may include various hardware and operating software … for running software programs, browsing the Internet, communicating and/or operating with any device, including, for example, a printer, a display, a keyboard, a mouse, a modem, a phone, a wireless device, the Internet, a computer network, a sound system, and any other internal or external device.

('887 Patent at col.8 l.54-67).  The specification further admits that the invention "may make use of a combination of existing proven business models including banking, patron systems, merchandising partnerships, direct

marketing, publishing, file sharing and internet networking[.]"  (*Id.* at col.4
l.11-15).  It broadly asserts that the patented system "may be set up and run
on the World-Wide-Web, thus using a plurality of websites and web pages,
using, for example, html, xml, and java programming[.]"  (*Id.* at col.9 l.15-17).

At best, the claims of the '887 Patent describe the use of the Internet or a
computer network to make identifying and soliciting funds from potential
patrons easier and more efficient.  "But relying on a computer to perform
routine tasks more quickly or more accurately is insufficient to render a claim
patent eligible."  *OIP Techs.*, — F.3d —, 2015 WL 3622181, at *3.  While the
concept of fan-funding may have been made a more realistic and fruitful
endeavor with the advent of widespread Internet access, "cloaking [that]
otherwise abstract idea in the guise of a computer-implemented claim" does
not bring it within Section 101.  *Cf. MySpace*, 672 F.3d at 1267 (Mayer, J.,
dissenting).  Quite to the contrary, permitting this type of claim would "render
the subject matter eligibility criteria in Section 101 virtually meaningless" given
"the ubiquity of computers in contemporary life."  *Id.*  Accordingly, because the
'887 Patent claims the abstract idea of incentive-based fan-funding and lacks
an "inventive concept" sufficient to "transform" the claimed subject matter into
a patent-eligible application of that idea, it is invalid under Section 101.[15]

---

[15]   Because the "threshold inquiry" of patent-eligibility is dispositive of invalidity, the Court
need not, and indeed should not, decide the parties' other validity contentions related to
obviousness, inventorship, and definiteness.  *See Bilski I*, 545 F.3d at 950 (holding that
if a claim is not drawn to patent-eligible subject matter, it "must be rejected even if it
meets all of the other legal requirements of patentability"); *Bilski II*, 561 U.S. at 602
(holding that the patent-eligibility inquiry is a "threshold test").  The Court observes that
many of the arguments made for invalidity on these other grounds only bolster the
eligibility determination.  Notably, for example, much of the prior art evidence was not

**CONCLUSION**

For the foregoing reasons, the '887 Patent is drawn to patent-ineligible subject matter.  Plaintiff's motion for summary judgment of invalidity of the '887 Patent is GRANTED, and Defendants' motion for summary judgment of validity of the '887 Patent is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:       June 29, 2015
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

itself patented, suggesting that this evidence operated in the province of ideas.  And it would not be surprising that a purported second inventor would disclaim having "invented" an abstract idea.