Cchki1c1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KICKSTARTER, INC.,

                    Plaintiff,

          v.                          11 Civ. 6909 (PAC)

PAN FUNDED, LLC,
ARTISTSHARE, INC.,
                                      Markman Hearing
               Defendants.

------------------------------x

                                      New York, N.Y.
                                      December 17, 2012
                                      9:30 a.m.

Before:

          HON. PAUL A. CROTTY

                                      District Judge


          APPEARANCES


STEPTOE & JOHNSON LLP
     Attorneys for Plaintiff
BY:  TIMOTHY BICKHAM
     MICHAEL J. ALLAN


LANDO & ANASTASI LLP
     Attorneys for Defendants
BY:  CRAIG R. SMITH
     WILLIAM J. SEYMOUR

1              (Case called)

2              THE COURT:  Good morning.  Who is going to be speaking

3    for Kickstarter?

4              MR. BICKHAM:  I'll be the principal speaker.  Mr.

5    Allan will say a few words, if that's all right with the Court.

6              THE COURT:  How long do you want?

7              MR. BICKHAM:  I believe your Honor set this hearing

8    for about three hours.

9              THE COURT:  Just because I did that, you don't have to

10   take all the time.  If you can do it in less time, that would

11   be fine.

12             MR. BICKHAM:  We'll try to get through it quickly.  If

13   we split the time evenly and say 90 minutes each side, we would

14   like to go a little bit more than an hour and then save a few

15   minutes for rebuttal.

16             THE COURT:  Fine.  Do you want to go ahead?  How about

17   you, Mr. Smith?

18             MR. SMITH:  Your Honor, it is up to you in terms of

19   how you handle it.  In a claim construction here to instead of

20   having one side go and present all of its evidence on all of

21   the terms and then let the other side come up and give all of

22   their evidence, I think it is sometimes helpful to have one

23   side present on one term, have the other side present on the

24   same term, so you hear the arguments right next to each other.

25             THE COURT:  That makes sense.  Do you want to do it?

1          MR. BICKHAM:  Your Honor, we will do it however you

2     would like.  In our experience flow is much smoother if we just

3     give our presentation.  Frankly, it is done most times,

4     presentation-presentation.

5          THE COURT:  Go ahead, start your presentation.

6          MR. BICKHAM:  Your Honor, we have some copies of our

7     slides.  If I may approach?

8          THE COURT:  Sure.  Go ahead.

9          MR. BICKHAM:  Good morning, your Honor.

10          THE COURT:  Good morning.

11          MR. BICKHAM:  What we would like to do is take a very

12     brief couple of minutes to go through, set the context for

13     today's hearing, to give a little bit of background, speak to

14     the legal principles just briefly, and then get right into the

15     claim terms.

16          The patent that we are talking about is U.S. patent

17     number 7,885,887.  For abbreviation --

18          THE COURT:  '887?

19          MR. BICKHAM:  Yes, your Honor.  We refer to it as the

20     '887 patent.  It is directed to a method and system for raising

21     finance or revenue by an artist for a project.  Essentially,

22     this is crowd funding for artists.

23          There are nine disputed claim terms.  Logically they

24     fall into two categories.  Category one are claims that are not

25     the software tools claims.  There is fan and client, both of

1    which appear in the specification.  The entitlement, including

2    at least one of the products they service in a patronage, is

3    actually a phrase that the parties are asking the Court to

4    construe.  "Patron" is a critical term in the patent, and

5    "patron database."

6         The second group of terms is the software tool terms.

7    These are software tools provided to the artist or account

8    manager to do certain things in various claims, so software

9    tools to manage at least one project, software tools to manage

10   communications through the patron database, software tools to

11   design an artist-specific web page, and software tools to

12   present at least one project.

13        Crowd funding is an old concept.  There is a great

14   example of crowd funding not far from the courthouse.  That is

15   the Statue of Liberty.  The French people gave the United

16   States the statue, but the United States had to pay for the

17   pedestal.  To do that, the government didn't have money, so a

18   crowd funding system was used to generate money for the

19   pedestal.

20        This is Joseph Pulitzer.  He ran these advertisements

21   or notices in his newspapers.  Basically, he said if you give a

22   dollar, you will get a replica; if you give $5, you get a

23   bigger replica.  Through this campaign they raised the $300,000

24   or so that was required to build the pedestal.

25        Legal principles.  They are not really in dispute, but

1    the parties take a different view of them.  The purpose of the

2    claim construction hearing is for the Court to define the

3    disputed claim terms and to give meaning to the claim language

4    so that the jury will have something to work with, something

5    that they understand.  The construction is done as a matter of

6    law.  In the construction, the Court looks through the lens of

7    the hypothetical person of ordinary skill in the art to

8    interpret the claim.

9         THE COURT:  You have a dispute about that, don't you?

10        MR. BICKHAM:  Yes, your Honor, we do.  We provided a

11   definition of a person of ordinary skill in the art in our

12   opening brief.  Defendants did not; we are not sure why,

13   because that is the framework that you need to look at the

14   claims.  Then, in the response brief they submit a definition

15   of somebody skilled in the art as being self-taught computer

16   programmer with some understanding of the music industry.

17        Frankly, your Honor, this definition of person of

18   ordinary skill doesn't make much sense and, it's also so low

19   that my third-grade is almost a person of ordinary skill in the

20   art.  Self-taught programming and some knowledge of the music

21   industry.

22        THE COURT:  Should we ask your son to construe the

23   claims here?

24        MR. BICKHAM:  I don't think so.  Defendants do, but we

25   don't think so.

1           Also, the <u>Phillips</u> case says that you can't construe

2      the claim terms in a vacuum.  You have to look at the context.

3      Here the context is really important.  The evidence that the

4      Court looks to in this case is only the intrinsic evidence.

5      Neither side is asking the Court to look to extrinsic evidence.

6      The intrinsic evidence is the patent prosecution history and

7      all the prior art that is included with the prosecution

8      history.

9           In this case the prosecution history is big.  It's

10     about 470 pages, and there's a lot of information in there.

11     It's important for the Court to consider that information when

12     construing the claims.

13          The file history is so large in part because there was

14     a lot of interaction back and forth between the inventor and

15     the Patent Office.  The patent was filed in March of 2003.  It

16     sat around for a while before the Patent Office made a

17     response.  Then there were six amendments, there were four

18     interviews with the examiner.  There's a lot of information in

19     there.

20          Another significant thing about this time line is we

21     see from the prosecution history the specification that was

22     filed with the Patent Office is static.  It doesn't change.

23     The claims change.  Over this time it's clear that the things

24     that are claimed in the patent are the Artistshare system.  It

25     is the system that is being used and worked in the public that

1    is being claimed.  There are repeated references to the special

2    features of the Artistshare system overcoming the prior art.

3            An example of how the patent changed originally, there

4    was claim 15 that was submitted with the specification.  Claim

5    1 of the patent as issued, the main claim, is quite a bit

6    different.  It has terms that are not defined in the patent.

7    They don't appear in the specification other than the claims.

8    For example, the software tools don't appear in the

9    specification, your Honor, they just appear in the claims.

10            You're going to hear several themes from the parties

11   today, including that the words in the claims are carefully

12   worded and they were put there purposely and they need to be

13   given their proper weight in view of the context of the claims,

14   the specification, and the prosecution history.  Some of the

15   terms are ambiguous, and the Court needs to look at how a

16   person reading the intrinsic evidence would interpret these

17   claims.

18            We believe that the defendants have taken a selective

19   construction to arrive at their proposed constructions.  They

20   look at the terms in isolation, not in the context claims.

21   When the prosecution history and the statements that were made

22   to the Patent Office are considered, it's only the Kickstarter

23   proposed construction that gives any basis for the disputed

24   claim terms or for many of the disputed claim terms.

25            With that, your Honor, we're going to start with the

8

1    nonsoftware tool claim terms.  Mr. Allan will address the first

2    three.

3               THE COURT:  All right.

4               MR. ALLAN:  Good morning, your Honor.  We'll start

5    with "fan."  This is the first term we will construe today.

6    This is a term that the defendants would like construed.  Here

7    is the basic construction.  Our construction is "a consumer

8    admirer, follower, mentor, or any other individual interested

9    in the artist's work."  That comes directly from the

10   specification through the definition of this term in the

11   patent.  The defendants want to limit this to "any individual."

12              So, as a basic matter in tentative claim construction

13   law, where the term is specifically and clear defined, that is

14   the construction your Honor should use.  Here it is in fact

15   plainly defined in the specification.  Moreover, our definition

16   makes common sense, where the other side's doesn't.  I'll get

17   to that in a moment.

18              Here is the language from the specification.  It's

19   taken directly from there.  "A fan may be, but is not limited

20   to, a consumer, admirer or follower, mentor, and any other

21   individuals interested in the artist's work."

22              What the defendants have a problem with is this "may

23   be, but is not limited to" language.  They argue essentially

24   that that allows them to take everything out of the definition,

25   including this critical piece, "interested in the artist's

1    work."

2            The fact that somebody is interested in the artist's

3    work is the common denominator to the definition of "fan."  The

4    fact that a fan may be a consumer, admirer, or anybody else, a

5    judge, a clerk, a lawyer, a garbage truck driver, clerk,

6    whoever, those people all have to be interested in the artist's

7    work.  That is the common denominator.  That is in our

8    definition, it is not in theirs.

9            Although, they do admit in their brief, and this comes

10   from their brief, that that is the definition, "any other

11   individual interested in the artist's work."  So the critical

12   language from the term that they take out they admit in their

13   brief should be there.

14           Why are they wrong?  Their construction makes no

15   sense.  I'll give you an example.  A fan, your Honor, is

16   somebody that likes something.  It's not just anybody.

17   Opposing counsel is from Boston.  We are going to have a lot of

18   disagreements today.  This is one thing I think we will

19   possibly agree on.

20           People that like the Yankees don't like the Red Sox,

21   people that like the Red Sox don't like the Yankees.  Under

22   their definition of "any individual," a Yankee fan is also a

23   Red Sox fan.  That just doesn't make any sense on a number of

24   different levels.  So from a common sense perspective, their

25   construction doesn't make sense.  It also completely ignores

 1      the definition that is included in the patent.

 2              By limiting "fan" to any individual as opposed to any

 3      individual who has shown an interest in an artist's work --

 4              THE COURT:  You say any individual limited.

 5              MR. ALLAN:  Let's go back to the term.  It's any

 6      individual interest in the artist's work.  If I said "limited,"

 7      I misspoke.

 8              THE COURT:  "Any individual" doesn't have any

 9      limitation.  In the construction you're seeking, you do have a

10      limitation.  The limitation is "interested."

11              MR. ALLAN:  Sure.

12              THE COURT:  You say any individual, that's the

13      limitation.  But "any individual," the way I read it and common

14      sense terminology, "any individual" is not limited, it's any

15      individual.  It's broad.

16              MR. ALLAN:  Right.  But we are not talking about any

17      individual, we are talking about a fan.  The individual has to

18      have an interest in somebody to be a fan.  If you're not a fan

19      of the Jets, then you're still any individual but you're not

20      interested in the Jets.  That's the distinction.

21              THE COURT:  For your definitional purposes, then, a

22      fan is someone who is interested?

23              MR. ALLAN:  Any individual interested in the artist's

24      work.

25              THE COURT:  The operative term, the critical term for

1    you is "interested"?

2              MR. ALLAN:  The critical phrase are these words:  "Any

3    individual interested in the artist's work."  These are

4    examples that are provided directly out of spec, "the consumer,

5    admirer, follower, mentor, and any other individual interest in

6    the artist's work."  But the interested in the artist's work

7    has to apply to anybody, any individual; otherwise, they are

8    not a fan, by their own definition and by common sense.

9              THE COURT:  All right.

10             MR. ALLAN:  One point I do want to make, your Honor,

11   is that they make the point in the briefing that the patent

12   examiner confirmed that "fan" is broadly encompassed by "any

13   individual."  The patent examiner did not make that

14   confirmation.

15             The cite to the record is actually a citation to their

16   own response to an office action where they state, "Applicant

17   agrees that 'fan', as used and described in the spec, is a

18   broad term, as it encompasses any individual."  That is their

19   own self-serving statement.  That is not a reference to

20   anything that the examiner cites, and there is indeed nothing

21   in the record to suggest that the examiner veers from the

22   definition that is contained in the patent.

23             In summation here on this term, Kickstarter's

24   construction is based on the very clear definition contained in

25   the specification, including the common denominator we

1    mentioned, it is also based on common sense, and we think it

2    will help the jury.

3           Next term up is "client," your Honor.  Kickstarter

4    proposes to define "client" as "a computer terminal or device

5    used by a fan that receives offer data from the server."  The

6    defendants propose to define it as "a device capable of

7    communicating across a network."

8           One of the tenets of claim construction that Mr.

9    Bickham mentioned and that I don't think there is any dispute

10   on in terms of the law is you've got to read the claim term

11   that is at issue in the context of the claim.  "Client" as a

12   term that we would like the Court to construe is only in claim

13   1 of the patent.  I have highlighted here the section that

14   references "client" because the context of the term is really

15   critical to the proper construction here.

16          With respect to "client" in claim 1, is it is very

17   clear that the client that is referenced is the client of the

18   fan, transmitting offer data from a server to a client via a

19   network; receiving at the client, the fan's client, the fan's

20   computer, the fan's device, such offer data and presenting the

21   offer to the fan; transmitting the acceptance data back to the

22   server from the client, from the fan's client; accepting the

23   offer.

24          Artistshare's construction is based on the

25   specification.  They reference the overall system portion of

1    the specification, which speaks to a variety of different types

2    of clients, not necessarily all within the embodiment that is

3    covered by these claims.

4         THE COURT:  I can't read this.  That is in reference

5    to what column?

6         MR. ALLAN:  This is column 8, your Honor, lines 38 to

7    45.  And there are references to the client computer of an

8    investor, client computer of a fan, client computer of a retail

9    establishment, an industry professional, and a manufacturer.

10        The thing is, your Honor, that in the context of the

11   claim -- again, we are only talking about claim 1 that this

12   term is at issue -- the only client that is referenced in these

13   examples that has any reference to that claim in context is

14   that of the fan.

15        Here is an example of why that is.  What we did here,

16   your Honor, is we took the language from claim 1 and we plugged

17   in one of the other claim examples that the defendant are

18   relying on for their construction.  It absolutely makes no

19   sense in context.  "Transmitting offer data from a server to a

20   manufacturer client via network, the offer data comprising an

21   offer to fans" -- right off the bat it is not making sense,

22   because the manufacturer is not providing any offer to fans --

23   "concerning at least one project wherein the offer is for a

24   sales container at a predetermined level of patronage in

25   exchange for funds."

 1          Then "receiving at" -- in context it should be the

 2     client of the fan, but here we are plugging in the client of a

 3     computer manufacturer -- "such offer data and presenting the

 4     offer to the fan."  Again, it makes to sense to have these

 5     examples in.  Finally, "transmitting the acceptance data back

 6     to the server from the manufacturer" makes no sense.  It's the

 7     fan.  That's the way you need to look at this in context.

 8          So, that is what we have done.  We read the claim in

 9     context.  The entity that receives the offer to the fan in

10     claim 1 is the fan.  We contend, your Honor, that defendants'

11     construction ignores the context of the claim, which is not

12     what you are to do under the well-settled and black letter

13     claim construction law.  By focusing the scope of this

14     construction to the term in context, you will add some clarity

15     for the jury.

16          THE COURT:  Let me ask you a question.  Is "client"

17     defined anywhere in the lexicon of computers?  Isn't there a

18     standard definition for "client" independent of this patent,

19     independent of the claims and specifications?  Isn't there a

20     standard definition for "client"?

21          MR. ALLAN:  There may be, your Honor.  We don't have

22     that evidence in front of us today.  We would be happy to

23     submit something if you like.  Do think, though, that

24     "client" --

25          THE COURT:  I have a reference here, what is a client,

1   a word definition from The Computer Dictionary.  It says, "an

2   application that runs on a personal computer or work station

3   that relies on the server to perform some operations."  That is

4   what a client is.

5            MR. ALLAN:  That's a program, your Honor.  What we are

6   talking about here is a device.  The patent talks about a

7   BlackBerry or an iPhone or some sort of a computer or device,

8   not necessarily an application program.  So there is a bit of a

9   distinction based on how the inventor used the term "client"

10  here.

11           THE COURT:  You contend what?  How did he use it here?

12           MR. ALLAN:  Let's go back to the proposed definition.

13  In the beginning it's sort of the same, "a computer terminal or

14  a device."  They say "a device"; it's not necessarily an

15  application program.  When I think of "client" in terms of

16  general computer parlance, I think of Microsoft Outlook is a

17  client that I use email on or Lotus Notes is a notes-based

18  application program client.  What the patent speaks to is the

19  device.

20           If you look at the terms, it's the device that the fan

21  is receiving the offer data on.  It's not a program.  It's a

22  terminal, a computer or device of some sort, at least how it is

23  used in this particular patent.

24           THE COURT:  All right.

25           MR. ALLAN:  Next up, your Honor, is "entitlement,

1    including at least one of a product, a service, and a

2    patronage."  Before I get into this much further, I think it is

3    important for your Honor to note that we are not asking the

4    Court to construe the term "entitlement."  We are asking the

5    Court to construe this particular phrase.

6            THE COURT:  You say this is conjunctive?

7            MR. ALLAN:  That's right.  We think this is just plain

8    meaning.

9            THE COURT:  The defendants say it is disjunctive?

10           MR. BICKHAM:  That's right.

11           MR. ALLAN:  That's right.  In our view, "and" means

12   and.  If they had meant to say "or," then they should have said

13   "or" in the patent, in the prosecution history.  But they did

14   not do that, your Honor.

15           This is, in our view, a situation where it is simply

16   plain English grammar.  If you say something includes at least

17   one of an A, a B, and a C, it has to have at least one of an A,

18   a B, and a C.  You can't then say or A or B or C.  To do so

19   would change the scope of what they claimed in terms of the

20   patent.

21           They claim that it is internally inconsistent, your

22   Honor.  I would submit to you that it is not at all internally

23   inconsistent.  I can give another sort of example.  If you

24   think of Thanksgiving dinner including at least one of a

25   turkey, a pumpkin pie, and mashed potatoes, the Thanksgiving

dinner has to include all three of those elements.  If you have

just a pumpkin pie, it is not a Thanksgiving dinner.  It is

exactly the same situation here.

You obviously picked up, your Honor, on the issue.

There is nothing inconsistent here.  They cite to some

references in the prosecution history, your Honor, to try to

argue that they meant "or" when they instead said "and," but

there is absolutely nothing in the prosecution history that

rebuts the presumption that the plain and unambiguous plain

meaning of the term should apply.

they make references to the fact that "entitlement" is

used singularly as opposed to plurally sometimes in the

prosecution history and the specification.  That does

absolutely nothing to change the scope of the term we are

talking about.  "Entitlement," that word is in a number of

spots throughout the patent.  What we are asking is a

construction on this particular claim.

There is also a reference in their papers, your Honor,

that I think it is claim 32, which is a dependent claim,

requires that the components of an entitlement be digitized.

There is nothing to suggest that the components to an

entitlement in this context can't be digitized, and they have

submitted nothing to suggest that's the case.

I think importantly here, your Honor, we are heavily

supported by Federal Circuit and Southern District of New York

1    case law.  I've got copies of the Superguide case and the

2    Touchtunes case if your Honor is interested in reviewing them.

3         I thought to give you some context, this is the claim

4    term that the Federal Circuit construed in the Superguide case,

5    and it is basically identical, the same component and set-up

6    that we are asking you to do right now:  At least one of

7    program start time, program end time, program service, and

8    program type.

9         The patentee in that case wanted "and" to be "or."

10   The Federal Circuit disagreed.  With basically pure grammar,

11   you can read the phrasing right from the court's ruling.  What

12   the Court did was they broke out Strunk and White Elements of

13   Style and they figured out if you have a series of categories,

14   when you use "and," it's a conjunctive list.

15        (Continued on next page)

1        _Touchtunes_, Judge Sweet's case, dealt with the same

2   issue, just a couple of years ago.  And again, I've included

3   the claim term that was at issue there and exactly what Judge

4   Sweet stated:  "At least one of" and "is conjunctive."

5   Requires at least one of each category.

6            Now, you may hear my opposing counsel mention a couple

7   of cases to try to distinguish _Superguide_ and _Touchtunes_.

8   There is no case that we're aware of, your Honor, and I don't

9   think there's a case that you will hear about today, that

10  required a complete deviation from the plain language of the

11  rules.  Reading everything in the conjunctive literally made no

12  sense.

13           There's a case I'm aware of, I think it's an earlier

14  Southern District case, the _Joao_ case in which there were four

15  or five elements related to a bank transaction.  The claim

16  clearly called for only one piece of the transaction.  Yet, the

17  conjunctive elements all required them to be there, and it

18  literally made no sense, and the judge in that case said

19  because of that, I can't construe it in the conjunctive.  And I

20  think there may be another case like that.  But you won't find

21  any case, your Honor, I don't think, at least that we're aware

22  of, that deviates from the plain meaning unless there is some

23  scenario in which it makes no sense at all.

24           THE COURT:  Is that the _Sleepy Hollow Bank_ case you're

25  talking about?

 1                MR. ALLAN:  Yes, your Honor, it is.

 2                In that case also, the Sleepy Hollow case, there was

 3     also a figure in the patent that listed the elements of the

 4     proposed claim term in the disjunctive, so there were a number

 5     of factors in that case that led the judge in that case to

 6     deviate from the ordinary meaning.  None of those factors is

 7     present here.

 8                THE COURT:  Very well.

 9                MR. ALLAN:  Thank you, your Honor.

10                THE COURT:  Patron.

11                MR. BICKHAM:  Yes, your Honor.

12                Patron is a key term in the patent, and it appears in

13     actually most of the claims that are being asserted, and this

14     is a claim where it's particularly important to look at the

15     claim in its context.  The proposed constructions are,

16     Kickstarter says, "a fan who registers with an artist and who

17     provides a contribution to a project of an artist in exchange

18     for certain entitlements."

19                ArtistShare says patron is "one or more individuals

20     who contribute to one or more projects" or "is registered to do

21     so."  So the question for the Court is really what definition

22     of patron does the claim refer to.  There are two types of

23     patron in the patent that are described in the specification.

24     There are patrons who register with the ArtistShare system;

25     those are essentially members.  And there are also patrons who

1    are patrons of a specific artist.  And the language here comes

2    from the specification, one for patron upon registration, one

3    for patron of the artist.

4          In the context of the claims, it's Kickstarter's

5    construction that makes sense.  The claim language speaks about

6    a patron in terms of interacting with an artist.  And, your

7    Honor, there's only one patron that the jury should be

8    instructed about in connection with the claims, as opposed to

9    the specification.  The claims require Kickstarter's

10   construction.

11         Now, this is a dense concept looking at the

12   specification and the claims.  So here is an illustration.  How

13   does Joe Public become Joe Patron?  He starts becomes

14   interested in the artist's work.  That makes him a fan.

15         Step two, register with ArtistShare.com.  That makes

16   him a patron, patron member of the system, and that's where

17   ArtistShare or defendants would have the Court stop.  That's

18   the threshold or baseline.  But under our definition, and

19   supported by the specification, there needs to be registration

20   with an artist and a contribution made to a project.  Then Joe

21   Public is Joe Patron of an artist.  So Kickstarter's

22   construction comes directly out of the specification, and this

23   language in the specification also supports the fact that there

24   is a member type of patron, somebody who becomes a patron

25   merely by registering with the system.

1            THE COURT:  Let me ask you a question with respect to

2     fan.  You define fan as set forth in the '887 patent at column

3     six, line 61, correct?  That's the definition.  Why don't you

4     accept the definition that's set forth in line 64 from patron?

5     You skip forward, further into the patent specifications.

6            MR. BICKHAM:  Yes, sir.

7            THE COURT:  Why isn't this definition a good one?  If

8     fan is defined properly in the patent, why isn't patron defined

9     properly?

10            MR. BICKHAM:  A couple of reasons.

11            THE COURT:  Yes.

12            MR. BICKHAM:  First of all, the key is not what is the

13     proper definition in the patent; it's what the proper

14     definition of patron in the claims is.  And this is the wording

15     in the patent, "the patron may be but is not limited to a fan,"

16     and then in parentheses, "has a consumer, admirer, follower,"

17     what Mr. Allan was just speaking to, "that registers with

18     ArtistShare and/or," so that's the member patron, by

19     registration.  "And/or contributes to or purchases an artist's

20     project, work, or the actual artist."  So that's the patron of

21     the artist.  This is a two-part definition, and it actually

22     doesn't make sense because you can't purchase an artist.

23            Kickstarter's definition makes sense in view of the

24     claims.  So, for example, if your Honor looks at claim 36 in

25     the patent.

 1              THE COURT:  All right.  36, system for marketing, and

 2     so forth?

 3              MR. BICKHAM:  Yes, sir, or even at the top of that

 4     page, 35, in claim 35.

 5              THE COURT:  Okay.

 6              MR. BICKHAM:  So these claims all require something

 7     beyond mere registration.  They require an affirmative act of

 8     the fan to accept the offer from the artist and then they're a

 9     patron.  These claims don't talk about just registration and

10     stop.  They talk about the patron who accepts the fan's or the

11     artist's offer.  In 35, at the bottom of 35, this is column 24,

12     so the offer is transmitted to the fan or the patron, and then

13     the claim continues at the top of column 25, receiving

14     acceptance of patronage from the patron.

15              So now, so there's a difference between fan or patron,

16     that until they receive and accept that offer, they're not a

17     patron.

18              THE COURT:  They're not patrons.  Is that what your

19     point is?

20              MR. BICKHAM:  Yes, sir.

21              THE COURT:  They're not patrons until they've --

22              MR. BICKHAM:  Yes, sir.

23              That's also illustrated in column 36, at the top,

24     registering the fan as a patron.  This is once they accept the

25     offer.  Then there's registration of the fan as a patron in a

patron database.  So here again, the fan becomes a patron after

they accept an offer, and we could have done slides for each of

the independent claims here, but the concept is the same.  The

claims talk about one of the types of patron, and they don't

refer to both kinds of patron that are in the definition and

specification.  And it's how the claim terms are used in the

claims that the Court needs to construe.

THE COURT:  All right.

MR. BICKHAM:  Another problem with ArtistShare's

construction is this.  It defies common sense, really.  Members

are also described in the patent and the specification as

people who register with the system.  So registrants of the

system are patrons and members, and the term is used somewhat

interchangeably, and it's confusing.  But under ArtistShare's

construction, a patron can either be a member or someone who

actually contributes to the project.  This runs counter to the

common sense of patron.

For example, I can enroll with Amazon.com.  I can

register with them, but that doesn't make me a patron in the

normal sense of a patron, not until I make a contribution.  Or

the Kennedy Center, I can enroll with them and become a member,

but until I give them something, that's not the common

definition of patron.  And so we submit that ArtistShare's

generic definition is divorced from the claim language, which

is the focus.

1              The next term follows on to patron database.

2     Kickstarter proposes this to be an artist-specific database

3     that contains certain information, contact, sales, and

4     demographic information, of his or her patrons gathered from

5     the artist's projects.  So this is information gathered from

6     the patron after the patron has accepted an offer.  ArtistShare

7     uses a very broad definition, "a database containing

8     information relating to one or more patrons."  Now, that uses

9     the patron/member definition of patron.

10             So Kickstarter's approach to interpreting this claim,

11    we started with the claim.  Which patron is being referred to?

12    We went to the prosecution history.  Patron database is not in

13    the specification.  Patron database is not in the

14    specification.  So we went to the prosecution history.  There

15    are a number of statements in the prosecution history, that the

16    system, which is the invention, is artist specific.  And this

17    is an example of where patron database comes up in the claims.

18    And so the patron database is the database of patrons that

19    contains the sales and marketing information.

20             I mentioned that the prosecution history is important,

21    and so this is the prosecution history.  September 2010, that's

22    seven years after the specification was filed with the patent

23    office, Mr. Camelio, the inventer, said that the patron

24    database is specific to a particular artist.  Those are the

25    words in his response to the office action, and the page

1    number, 437, refers to the prosecution history that we

2    submitted in my declaration.

3              THE COURT:  That's Exhibit 2, Bates No. 437?

4              MR. BICKHAM:  Yes.  And he distinguishes the prior art

5    based on this artist-specific system.

6              Then this is consistent with the specification that

7    says that the artist may control her database.  She may share,

8    sell, license, her database to other artists or third parties.

9              If this were not a patron-specific database, the

10   reference would be saying that one artist can sell, license, or

11   share patron information of other artists.  It only makes sense

12   that an artist can share, sell, or license information from

13   their own patrons, and that's where we come with the

14   artist-specific part of the definition.

15             The patron database contains more than just

16   demographic information or contact information.  And the

17   prosecution history talks about that.  It's the functionalized

18   database where the artist may access the precise data on the

19   patron's demographics and sales patterns.  Now, demographics

20   and sales patterns do not come from a registration.  That

21   doesn't come from patron/member patron.  That comes from

22   patrons of an artist patron.

23             There's also another place in the prosecution history,

24   we don't have a slide for it, but page 363 of the prosecution

25   history talks about the system transforming routine data into

1   the valuable ports and functionalized database wherein the

2   artist may access precise data on a patron's demographics.  We

3   didn't just come up with demographics out of the air.  That's

4   363 of the prosecution history, first full paragraph, lines

5   three and four.

6           THE COURT:  The system transforms routine data into

7   the valuable ports, is that what you're referring to?

8           MR. BICKHAM:  Yes, your Honor.

9           THE COURT:  That's page 363; in other words, page

10  seven of the reply to office action?

11          MR. BICKHAM:  Yes, your Honor.

12          So this is more than just mere registration that we're

13  talking about.  That's it for the nonsoftware tools.

14          THE COURT:  All right.  Why don't we hear from

15  Mr. Smith on the nonsoftware tools.

16          MR. SMITH:  Thank you, your Honor.

17          THE COURT:  That's fan, client, patron database, and

18  the entitlement about that, piece one prong.

19          MR. SMITH:  Let me make sure I've got this straight.

20  Fan, patron, patron database.

21          THE COURT:  He went into the order of fan, client,

22  entitlement for at least one project, patron, and patron

23  database.

24          MR. SMITH:  Your Honor, if you would, I have some

25  paper copies of ours, to make it easier.

```
1              THE COURT:  Thank you.  Go ahead.

2              MR. SMITH:  Thank you, your Honor.

3         For our presentation, we had some initial slides from

4    the beginning that give sort of an overview of some of the

5    issues that were in play relating to funding projects.  I

6    wasn't sure if you were interested in getting some of that

7    background or if you want me to dive right into the claims.

8              THE COURT:  If you think it's helpful for me to have

9    the background, go ahead.

10             MR. SMITH:  I'll do it quickly to sort of frame some

11   of the arguments that are going to come up today.

12        One of the things that artists could do prior to the

13   inventions that are disclosed in the '887 patent, many artists,

14   especially if you're in the music industry, you have a

15   situation where the only way to really get yourself recognized

16   and get funding for whatever you wanted to do is to have some

17   sort of a contract with a recording company.  And so there was

18   this difficulty about how do you get money in order to be able

19   to fund any of your projects.  And sort of a little bit of an

20   illustration that I'll show on slide three of our slide deck,

21   where what it's really showing is the notion of an artist who

22   has to give up a lot in order to get a little.

23        The artist has to give up their rights to the work.

24   They have to give their creative work to the production

25   company.  The production company then takes over and they do
```

the marketing.  They do the sales of it.  Then the artist is

the one that gets a little bit of money back from the

production company.  This model has been in place for many

years, and many artists felt like it just doesn't work for

them.  Unless you're a very well-known big artist, you never

get recognized.  You never get any money for any of the work

that you want to do, even if you're fortunate enough to get a

contract with one of these production companies.  And the

patent goes into some detail describing some of the problems

that artists had when they were trying to get funding and how

difficult it was.

So, there was a need for a better solution to this

problem, and the patent, the '887 patent, describes solutions

for this problem.  So instead of having this model where you

have to really sort of get a production company or some other

company to fund you to get you moving, here is a model where

you could get others to fund your projects, even before they

were created, and allow you to then use those funds to put

forward your project.  Some of the benefits are it allowed the

artists to be able to have the money ahead of time and be able

to fund their projects and bring them to fruition, whereas in

the past that might never have happened.

The concepts behind the inventions are disclosed here.

It's sort of helpful to understand it from the concept of

what's going on.  These system claims in the patent are talking

1    about this notion of you have this system that is going to

2    allow artists to come in and create a description of what their

3    project is, be able to market it, and then allow that to go out

4    to people so that other people could see it.  Anybody could see

5    it.  It could be on the Internet, on any Web page, where you

6    would be able to see what these artists are doing, what they're

7    up to, and then be able to use that to create interest in what

8    you're working on and get people to then fund you as a result

9    of it.

10          There are several different aspects of the invention

11   described in the specific figures of the patent.  You heard a

12   little bit of Kickstarter's suggesting that there is no

13   disclosure of what kind of tools that the artist could use for

14   purposes of managing their project or presenting their project,

15   when, in fact, if you look through the patent, there are

16   something like 60 figures which go into detail about what each

17   of these aspects could look like in terms of what the artist

18   could use in terms of managing a project, presenting a project.

19          Also, one of the lead aspects of the particular seven

20   inventions that are disclosed in the patent is this idea that

21   you give people something in return for committing to funding

22   your project.  It could be a product, it could be a service, it

23   could be a patronage.  The patent calls those entitlements.

24          Finally, the inventions also allow communications with

25   the people who are either looking at different projects, they

1   might be interested in them, they might not be, and people who

2   decide they want to fund the project and then go forward and

3   actually commit to funding.  It allows communications with all

4   those people.

5        I think you have already heard a little bit about the

6   claim construction law, so I'm not going to belabor the point.

7   I do think there are a couple of key points worth emphasizing

8   for purposes of our conversation.

9        The first is although there are claim terms that both

10  sides say are in dispute, it's up to the Court to decide

11  whether or not every term actually needs to be construed.

12  There are times when claim terms on their face are easily

13  understood, and I think we've got a number of them here where

14  the Court can decide whether or not it actually has to be

15  construed after other terms are already construed.

16       THE COURT:  You say there are only two terms that have

17  to be construed?

18       MR. SMITH:  That's correct, your Honor.

19       THE COURT:  And those two terms are?

20       MR. SMITH:  Fans and patrons.

21       I think the most critical aspect of the claim

22  construction law comes out of the Federal Circuit's Phillips

23  case, the en banc decision in Phillips.  It goes through in a

24  lot of detail how the Court should proceed and look at claim

25  construction.  The most important element that comes out of

1    that case is the notion that the claims are going to be given

2    their ordinary and customary meaning.  That's the meaning that

3    should control the claims, and although there are some limited

4    exceptions to it, that's what the Court should be focusing on,

5    what is the plain and ordinary meaning.

6           The two exceptions that the courts have been willing

7    to say we're going to deviate from the plain and ordinary

8    meaning --

9           THE COURT:  Where the patent actually discloses, this

10   is the normal meaning, here's the meaning for this one, and he

11   defines it.

12          The second one is, what, estoppel?

13          MR. SMITH:  That's where if you disavow the full claim

14   scope by something you say in your specification or prosecution

15   history, and there it has to be clear and unmistakable, and

16   ambiguities as to whether or not there was any disavowal don't

17   count.

18          THE COURT:  The way I read the papers, both sides

19   agree on what the legal definitions are.

20          MR. SMITH:  I think that's right, your Honor.  I think

21   there is an emphasis that changes if you read through their

22   briefing.  A lot of what they say is you should read these

23   limitations into the claims, but that's all the exception to

24   the rule, and I think framing it to make sure it's clear, the

25   rule is you should be entitled to the full scope of your

claims.

The exception is what they're arguing for their claim construction.  They're saying it's the exception to the rule that always applies, that in every one of their instances, you should take something from either the specification or the prosecution history and incorporate it into the claim language, even though that claim language doesn't have that limitation there.

Courts have also emphasized the notion that you shouldn't read limitations into the claims.  That's not the purpose of the specification, to be taking things and incorporating them into the claims.  It's the claims that define the invention, not the specification.  Again, prosecution disclaimer has to be clear.  It can't be ambiguous.

I was going to jump right into starting with fans.

THE COURT:  Why don't you.  I'm ready to hear what you have to say.

MR. SMITH:  Right.

As you've heard, there's a dispute as to what fans means.  Our definition of fans means it's any individual. Kickstarter's definition is much narrower than our definition. Their definition requires that it can be several different types of people, but as you clued into in your questioning of Kickstarter's counsel, their key limitation is the notion that every one of those individuals has to be interested in the

```
 1    artist's work.  That, they say, comes from the specification,

 2    meaning they say they're just taking the definition from the

 3    specification, but they're not really because the definition in

 4    the specification, as we put up on this slide, specifically

 5    says "a fan may be but is not limited to a consumer, admirer,

 6    or follower, mentor, and any other individuals interested in

 7    the artist's work."

 8              THE COURT:  Let me ask you a question.  I know nothing

 9    about this.  I'm a complete innocent when we're dealing with

10    project funding.  Am I a fan?

11              MR. SMITH:  I think you could be.  Sure.

12              THE COURT:  No.  Am I?

13              MR. SMITH:  Yes.

14              THE COURT:  Even though I know nothing about this?  I

15    have no interest in music.  I have no interest in supporting an

16    author or creative artist.  I'm a fan under your definition?

17              MR. SMITH:  Correct, your Honor.

18              The way they're describing fan is anyone who can come

19    in, take a look at what's going on and say am I interested or

20    not.  It doesn't have to be someone who has some preconceived

21    notion of, Oh, I'm already interested in this particular artist

22    and therefore I'm a fan of it.

23              THE COURT:  I'm a cheapskate.  I'm not interested in

24    giving anybody anything for any kind of entitlement.  There is

25    no inducement you can offer me.  Am I still a fan?
```

```
 1                MR. SMITH:  sure.  You could still go on and look.

 2                THE COURT:  I have no interest in doing that.  I'm a

 3    Luddite.

 4                MR. SMITH:  Under our definition, you could still be a

 5    fan.

 6                THE COURT:  How about somebody that doesn't have a

 7    computer?

 8                MR. SMITH:  They could be a fan, too.  Would they fall

 9    within everyone, would someone who doesn't do anything,

10    actually be involved?

11                THE COURT:  I know there are further steps.  I'm

12    talking about the first step, the definitional step.

13                MR. SMITH:  Sure.

14                THE COURT:  You mean any individually, using that

15    quite literally?

16                MR. SMITH:  Quite literally.  Any individual.

17                The patent is written to be clear that a fan can be

18    anyone.  They had to pick a term that could be used to describe

19    what it is that is going to be involved in people going and

20    looking at a Web site, seeing if they're interested.

21                THE COURT:  How is it Kickstarter's definition excess?

22    I know you caution against taking excess verbiage, but what

23    they want to do is use your own verbiage.  How is that excess?

24    You define fan in column six, I think.  That's your language.

25                MR. SMITH:  That's correct.  That's the language from
```

1    the specification.

2         What they're trying to do is to say you've defined it

3    like this, making it clear that it's broader than just what you

4    said in the spec, but not limited to, it can be other people,

5    and saying we're going to cut out but it's not limited to and

6    say it's only these people.  And so our argument is you can't

7    just take words from the spec and say, Okay, now we're going to

8    say that this is the only thing a fan can be; it can only be

9    these limited people because that's what you said.  In fact,

10   what we said is it's not limited to those people, but those are

11   examples of people who could be fans.

12        THE COURT:  It says "consumer, admirer, follower, or

13   mentor."  Those are people who are, by definition, interested.

14        MR. SMITH:  Yes.

15        THE COURT:  Any other individual interested, so you

16   define classes of fans who have an interest.  If you're a

17   consumer, you're a fan, right?

18        MR. SMITH:  You could be.  You don't have to.  I could

19   think of consumers going to the site and seeing a whole list of

20   potential artists.  Do you have to be interested in that

21   specific artist?

22        THE COURT:  In the common sense, doesn't consumer

23   indicate you've actually bought something, you've consumed

24   something?  It doesn't deal with potential.  It deals with

25   someone who has actually done something.

```
 1              MR. SMITH:  I don't think that consumer connotes in

 2   this interpretation that the consumer has to have already

 3   purchased something from a particular artist.

 4              THE COURT:  How about admirer or follower?  That

 5   indicates an affirmative act, you know something about the

 6   object.  You admire it, through some kind of active conscience

 7   or mind act that's going on.

 8              MR. SMITH:  I agree with you, your Honor.  I think the

 9   admirer or follower is more specific than just consumer.

10              THE COURT:  Mentor suggests there is some type of

11   relationship between the fan and the artist.

12              MR. SMITH:  Correct.  I don't think it necessarily

13   goes as far as to say a mentor has to be interested in the

14   person's work.  A mentor could be just interested in helping

15   someone, but I don't think you have to be interested in the

16   artist's work in order to be a member.

17              THE COURT:  They would have to be interested in

18   something.

19              MR. SMITH:  Interested in helping.  I like to do pro

20   bono work.  I'm interested in helping, but I don't have to

21   necessarily be interested in whatever the people are doing.

22              THE COURT:  Go ahead.

23              MR. SMITH:  Again, we base our definition of any

24   individual based on how broadly the patentee described it.  We

25   also look at specifically if you go to the specification, it
```

1    talks about fan very broadly as well.  It talks about a fan can

2    access the ArtistShare home page and view public Web pages of

3    the artist.  That sounds like any individual.  You don't have

4    to be any specific type of fan to just go and look at a

5    specific Web page on a specific site.  You could just be

6    someone who is just interested in music and you can go and look

7    and see, Oh, I notice that there are a number of bands who are

8    looking for funding for this particular project.

9          We also looked at the prosecution history to see how

10   does that support our particular definition of what a fan

11   should be.  During the prosecution history, the patentee was

12   questioned during the examiner interview, where you're allowed

13   to go talk to the examiner about what are the examiner's

14   concerns, what are things going on that the examiner wants to

15   talk about.  And one of the issues was the examiner noting that

16   the term "fan" seemed very broad.  And here, the applicant is

17   specifically saying to the examiner, so that there is a clear

18   understanding during the prosecution of this patent, "the

19   applicant agrees that fan as used and described in the

20   specification is a broad term, as it encompasses any

21   individual."

22         So there was no ambiguity with respect to the examiner

23   as where the examiner understood what ArtistShare was saying a

24   fan is.  It was clear they were saying a fan is any individual.

25         THE COURT:  Where is that from?  Can you go back one

1      slide?  What page is that?

2              MR. SMITH:  We just attached portions that we think

3      are relevant.  This is actually Exhibit B to William Seymour's

4      declaration.  It's at page eight.

5              THE COURT:  Thank you.

6              MR. SMITH:  You've pointed this out during some of the

7      questioning, what is it that's potentially a problem with

8      Kickstarter's definition of fans.  And I think the issue is

9      like many of their interpretations, they're trying to cram

10     additional limitations into terms that don't belong there.

11     Patentees should be entitled to the full scope of what their

12     invention covers.  It was clear that fan could be a much

13     broader term than the one that Kickstarter wants us to

14     interpret it to mean, and that's the reason why we believe

15     Kickstarter's construction is improper.  It's just unduly

16     limiting.

17             THE COURT:  You're on to patron now.

18             MR. SMITH:  That's right, unless you have anything

19     further.

20             THE COURT:  No, I don't.

21             MR. SMITH:  Thank you.

22             Patrons we define as one or more individuals who

23     contribute to one or more projects or is registered to do so.

24     Although Kickstarter says it takes this definition from the

25     specification, it seems to take part of the definition from the

1   specification and limit other parts of what it doesn't like

2   from the specification.

3        For example, if you look at the specification, the

4   specification actually says "a patron may be, but is not

5   limited to, a fan who can be a consumer, admirer, or follower,

6   mentor," and the like, "that registers with the ArtistShare

7   and/or contributes to or purchases an artist's project, work,

8   or the actual artist."

9        THE COURT:  What does "or the actual artist" mean,

10  that hanging, dangling participle?

11       MR. SMITH:  I think it means that you can contribute

12  to the artist directly.  You don't have to contribute to just a

13  project.  A patron can be someone who contributes to the

14  artist, actual artist.  It doesn't mean, as Kickstarter has

15  implied, that you're purchasing the artist.  The clause is

16  "contributes to or purchases an artist's project, work, or the

17  actual artist," so the contribution may be a contribution to

18  the artist, him or herself.

19       THE COURT:  Without going through your patent?  Does

20  the contribution have to be through the system that's covered

21  by the patent, or could it be just outside the patent?

22       MR. SMITH:  In the context of the claim, I think it's

23  clear that what we're talking about is someone who is

24  ultimately going to contribute to a particular project, but

25  that isn't a limitation meaning patrons don't have to

 1    contribute in order to be patrons.  And we're going to see why

 2    that's just abundantly clear when we walk through the claims

 3    and the specification.

 4              THE COURT:  Go ahead.

 5              MR. SMITH:  One of the first examples to show you why

 6    a patron is much more than just someone who has to contribute

 7    to a project, as Kickstarter suggests, again we're at slide 30

 8    on our slide deck, here it's showing a schematic of someone who

 9    can have a patron account or patron information in it.  But

10    there's no requirement that there's any sort of contribution

11    that has to take place in order to have a patron account.  And

12    so a patron can certainly be somebody who hasn't done any

13    contributing but is just simply registered with the fan-funding

14    site.  And that's clarified even in the specification where we

15    cite to the specific language on column 17, lines 45 through

16    47, which say, "upon registration with ArtistShare, the fan

17    (now a patron) may then access a member area," which just

18    generally includes more features and content.

19              So the clear implication is that registration alone is

20    enough to become a patron.  There's no requirement, as

21    Kickstarter suggests, that you have to both register and

22    contribute in order to be a patron.

23              THE COURT:  What's the difference?  If you're a fan

24    and you register, you're still a fan, right?  Upon

25    registration, you become a patron.

1            MR. SMITH:  That's exactly right, your Honor.  Once

2     you register, you become a patron.

3            THE COURT:  How does the system recognize that you're

4     a fan?

5            MR. SMITH:  Any individual who is looking at the site

6     is considered a fan.

7            THE COURT:  What does the fan have to do to move from

8     her status or his status as a fan?

9            MR. SMITH:  You have to either register with the

10    system or you have to contribute to a particular project.

11           THE COURT:  How do you contribute without registering?

12           MR. SMITH:  Most likely, you have to register to

13    contribute, but there could be a situation where you could just

14    contribute.  There may not have to be a registration in order

15    to contribute.

16           THE COURT:  All right.  Go ahead.

17           MR. SMITH:  But, clearly, specification claims do not

18    require that those two steps have to occur in order for it to

19    go forward.  It could be anonymous contributions, as one

20    example.

21           During prosecution, we're looking for how do the

22    claims specification and the prosecution history line up; do

23    they make sense together as a whole.  And here again, during

24    prosecution, it's clear that patron is broader than having to

25    just contribute.  Specifically, in Exhibit B, which is part of

1    the prosecution history to the '887 patent, the May 5, 2010,

2    portion of the prosecution history talks about, for instance, a

3    patron is defined, for example, in paragraph 168 as a fan who

4    has registered with ArtistShare.  Again, registration is enough

5    to become a patron.  There's not a next step that you have to

6    contribute, although a patron could certainly contribute.

7            During Kickstarter's argument, they pointed to a

8    couple of things that they say support their position, but I'll

9    argue, your Honor, that actually they don't; they support our

10   position.  Counsel for Kickstarter pointed you to claims 35 and

11   36 of the patent.  I'd like to see if we can just pull that up

12   for you.

13           So here we are.  I'm showing 35 on the screen.  And

14   what they pointed to and suggested that, Well, a patron has to

15   be someone who's contributed because they look down on -- this

16   is now claim 35, which starts on column 24, at about line 53,

17   and then continues on to column 25, ending about line four.

18           THE COURT:  Right.

19           MR. SMITH:  And they indicated that because, if you

20   look at the end of the claim, where it says that "receiving

21   acceptance data for an entitlement at a predetermined level of

22   patronage from the patron," they're suggesting that that's the

23   point at which you become a patron, but that wouldn't make any

24   sense in light of the language which precedes it, which says,

25   "transmitting offer data to said fans and/or patrons."  The

1   patron here could clearly be someone who hasn't yet contributed

2   to this particular artist.  So the preceding step, I would say,

3   argues against Kickstarter's construction which clearly shows

4   that you're transmitting offer data to fans or patrons, and

5   it's not indicated that that person has done anything to

6   actually contribute to a project.

7           THE COURT:  Which person do you make reference to, the

8   fan or the patron?

9           MR. SMITH:  It says, "transmitting offer data to said

10  fans and/or patrons."  So I'm looking at column 24, line 65.

11  This is the claim element that just precedes the portion that

12  Kickstarter's counsel was referring to.

13          THE COURT:  Okay.

14          MR. SMITH:  So looking at Kickstarter's construction,

15  the problem we have with it is they're trying to take a term

16  that we think is pretty easy to construe and add limitations

17  into it to make it narrower than either the specification or

18  the prosecution history ever intended and, I submit, even the

19  claims as they're written and Kickstarter pointed to would ever

20  be because now they're saying that patron has to have two

21  elements, these two specific elements.  They have to both

22  register and contribute, and then they add an additional

23  element in exchange for certain entitlement, again, additional

24  verbiage which we don't think is supported by just the term

25  "patron."

45

```
 1          THE COURT:  And in your definition, you become a
 2    patron by registering or contributing, either one?
 3          MR. SMITH:  Correct, your Honor.  It could be both,
 4    but you just need one to become a patron.  You don't need both
 5    of them.
 6          THE COURT:  If you don't have to do both, you could do
 7    one or the other, what distinguishes the patron from the fan
 8    with regard to registration?
 9          MR. SMITH:  Registering means that you're actually
10    telling the system that you want to be part of the system.  So
11    you want to be able to --
12          THE COURT:  But you're a fan before that, aren't you?
13          MR. SMITH:  Correct.  Before you become a patron.
14          THE COURT:  And on registration, are you always a
15    patron then?  You've lost your status, your status is no longer
16    that of fan; you're a patron?
17          MR. SMITH:  After you've register, yes.  I'd submit
18    that you have now moved from a fan to a patron because once
19    you've registered with the system, the patron gets entered into
20    a database, and that would be a point where I've narrowed it,
21    where now a fan is no longer just any individual, now you've
22    registered with the system, now you are actually a patron.
23          THE COURT:  All right.  Do you want to say a few words
24    about the remaining three nonsoftware tools?
25          MR. SMITH:   Yes, your Honor.  Do you want to talk
```

1    about patron database?

2            THE COURT:  Yes.

3            MR. SMITH:  Patron database I don't think actually

4    needs to be construed simply because we've already described

5    what a patron is.  I think the Court will define for us what it

6    believes a patron is, and patron database doesn't need to be

7    independently construed because neither party is asking the

8    Court to construe what the term "database" means.  So we submit

9    that once you've construed patron, patron database will

10   actually be already construed.  But if the Court sort of

11   decides that it wants to construe patron database, then we

12   submit patron database is a database containing information

13   relating to one or more patrons.

14           Kickstarter takes a different approach and wants to

15   incorporate a large number of additional limitations into the

16   term "patron database."  They want it to be artist specific.

17   They want it to include certain specific information.  And they

18   want to define how that information is gathered.  So they want

19   three new limitations added into the claim for patron database.

20   None of those, in my estimation, should be added to them.

21           First off, Kickstarter wants to add a bunch of

22   information that has to be in the database.  They list out

23   three different categories of information that have to be in

24   the database.  That's on slide 33 where they have that.  We

25   submit that the claims already talk about what has to be in the

 1   database, meaning the claims themselves specifically talk about

 2   registering contact and marketing information for purposes of

 3   claim one.  Claim 17 talks about registering contact

 4   information.  Claim 36 talks about registering the fan as a

 5   patron in a patron database.

 6          All of those claims already talk about what it is that

 7   is getting put into the database.  And the notion that now

 8   we're going to take the term "patron database" and add

 9   additional limitations that are not found anywhere in the

10   claims themselves, in my view, violates the whole view of claim

11   construction where you're not supposed to be reading

12   limitations into the claims.  We're supposed to be interpreting

13   the claims, and what Kickstarter is doing is adding limitations

14   that don't exist in the claims and are actually much narrower

15   than the claims themselves actually say is what goes into the

16   database.

17          One issue that I think needs vetting, too, is we refer

18   a lot to patron database, but I think it's important, if you

19   look at claim 17 of the patent, to see specifically how this

20   database gets used in the claims.  Claim 17, which is at

21   approximately column 23, I'm going to be starting at around

22   line 23, says, "allowing patrons to demonstrate interest in one

23   or more projects, prior to, during, and after the creation,"

24   and then it says, "registering contact information regarding

25   interested patrons in a searchable database."

 1          So here it's talking about taking the information

 2     about the particular patron and putting it in a searchable

 3     database.  That's all it says about how this database is

 4     initially put together.  It doesn't require any specific

 5     limitations as to whether it's artist specific or anything

 6     else.  And then later in the claim term, when we get down where

 7     it says "managing communication," which is about line 34, it

 8     says, "managing communications through said patron database."

 9          So there it's referring to the database that was

10     referenced above where you're registering contact information.

11     Here again, talking about a generic database.  The patent talks

12     about databases in terms of centralized database, database for

13     the system.  There is nothing in the claim that would require

14     this to be some form of specific database that only applies to

15     a specific artist.  It's just a general database where patron

16     information is put into.

17          Also, this language here further confirms what we were

18     talking about earlier about patrons, where it talks about

19     allowing patrons to demonstrate interest in one or more

20     projects.  Here is a patron who hasn't done anything yet; now

21     it's interested in someone's project and now it does something

22     with it.

23          THE COURT:  Doesn't the patron have to indicate his

24     interest in some specific artist project though?

25          MR. SMITH:  No.

 1            THE COURT:  No?  It could just be any project, music,

 2    or a book?

 3            MR. SMITH:  Could be any project that is available.

 4            THE COURT:  Piece of art?

 5            MR. SMITH:  Sure.  There's no specific project that it

 6    has to be related to.

 7            The three limitations they try to add in are artist

 8    specific, specific data that goes into it, and where the

 9    information is gathered from.  We already talked about how the

10    claims already talk about what is in the database; you

11    shouldn't be adding more information in there than what the

12    claims specifically tell us.  It talks about where it believes

13    the information is gathered from.  Again, the claims I just

14    read to you from one of the claims talks about simply upon the

15    interest of the patron, all of a sudden, information goes into

16    this searchable database.  It doesn't say that it's gathered

17    from an artist's project.  And again, the notion that they're

18    trying to limit it to an artist-specific database, in our view,

19    doesn't make sense because there's nothing about the databases

20    that are described in the claims that have to be artist

21    specific.  And I'd submit that it also ignores the fact that

22    the specification specifically talks about centralized

23    databases and not just databases that are limited to a specific

24    artist.

25            During Kickstarter's discussion, they focused you on a

portion of the prosecution history where they were saying, Oh,

here's where the patentee said that it has to be specific to a

particular artist.  What they didn't explain is the context of

when that statement is made.  They already distinguish all the

prior art that the examiner had said that the examiner thought

was relevant to discussing their invention and thrown in

another reference that they said was analogous art, meaning

that it might be related to some fan-funding concept.  And the

patentee said, No, this isn't really related to the systems

that we're talking about, and went on to explain a bunch of

reasons why it's not related to it.  And so this isn't a

situation where the patentee was trying to distinguish a piece

of prior art based on a specific limitation, the type of

disclaimer that would be necessary for a court to say, Oh, yes,

you gave up some scope of your claim language.

Here, it was just the examiner had thrown a piece of

prior art at them and said, Oh, we think this might be

relevant, and the patentee is saying no, it's not even close,

it's not even relevant to what we're talking about, here is why

it's not relevant.

THE COURT:  Do you want to say a few words about

clients and entitlement?

MR. SMITH:  The client appears on slide 41.  I think

you picked up on this during your questioning of Kickstarter.

A client does have definitions that refer to sort of computer

1   and applications.  I think there are some standard definitions

2   of client.

3         In the patent, they use client very broadly just to

4   refer to the large number of things that you can use to

5   communicate across a network.  We try to capture that

6   definition in our proposed construction where the client is

7   going to be a device capable of communicating across a network.

8   We think that's a pretty honest assessment of the specification

9   of what the patent claims describe.

10        Kickstarter again wants to add some limitations into

11   that.  They want it to be something that has to be used by a

12   fan that receives offer data from the server.  They want to

13   craft in a couple of extra limitations that the term "client"

14   doesn't ordinarily get and shouldn't get in these particular

15   claims.

16        THE COURT:  Do you draw a distinction between computer

17   terminal and a device?

18        MR. SMITH:  I think, yes, they can be different

19   things.  Computer terminal could be similar to the terminal

20   that is sitting on your desk whereas a device could be a much

21   different unit.  It could be anything from a mobile device --

22        THE COURT:  Under your definition, as distinct from

23   Kickstarter's.  They talk about a computer terminal.  You only

24   talk about a device.

25        MR. SMITH:  Right, because I think a device could be a

1  computer terminal.

2          THE COURT:  Device is a broader term in your

3  terminology.

4          MR. SMITH:  Correct, your Honor.  I think our

5  definition would encompass a computer terminal.

6          THE COURT:  Right.

7          MR. SMITH:  So a couple of limitations that

8  Kickstarter adds in.  There's nothing in there that requires

9  that it be used by a fan.  We don't have to incorporate client

10  that is being used by fan.  In fact, if you read the claims,

11  the claims are all system claims.  It's talking about what the

12  system is providing to people who want to access the system.

13  It's not talking about what the client is actually doing.

14          THE COURT:  All right.

15          MR. SMITH:  The specification clearly describes the

16  client.  It says, "each of the clients may communicate with the

17  host via a computer network which may comprise the Internet;

18  clients may be any wired or wireless device,"" and it's a very

19  broad definition because client is something that could be

20  many, many things as long as you're able to communicate with

21  it.

22          THE COURT:  All right.

23          MR. SMITH:  I was going to move on.

24          THE COURT:  To entitlement including at least one of a

25  product or service or patronage?

CchMki92

53

```
1            MR. SMITH:  Correct, your Honor.

2            That's on slide 53 of our slide deck.  Here, the big

3    dispute is how do you interpret "including at least one of."

4    And the language of the claim is "an entitlement, including at

5    least one of a product, a service, and a patronage."

6            Kickstarter's definition reads the entire language "at

7    least one of" out of the claim.  They just say an entitlement

8    is a product, a service, and a patronage.  That can't be the

9    right construction because you're totally eliminating the exact

10   language that was used by the patentee to say an entitlement

11   includes --

12           THE COURT:  Wait a minute.  The language of the

13   patentee is the word "and."  Correct?

14           MR. SMITH:  Correct.

15           THE COURT:  But the way you define the term, it says

16   "and."  It becomes "or."

17           MR. SMITH:  I think it's proper to construe, I agree

18   with you, yes, that "or" is, you can construe it to mean a

19   product or a service or a patronage.  And I think the way the

20   patentee did that is just saying "at least one of," so one of

21   the A, B, or C, not all three together, because that wouldn't

22   be consistent with the way the claims are written and how the

23   specification is written.

24           THE COURT:  The language of the Federal Circuit though

25   seems to be against you in that.
```

54

```
 1              MR. SMITH:  I don't agree, your Honor.  They cited to
 2    a couple of cases that talk about using the "at least one of"
 3    language.  But if you look, it's a little different because the
 4    language here says "at least one entitlement," and then it says
 5    including these other things.  So an entitlement, including at
 6    least one of.  So the entitlement is singular, and it's
 7    describing different types of entitlements.  It's not saying
 8    the entitlement has to be these three things, and I think what
 9    the Federal Circuit has said is where you have a situation like
10    this where Kickstarter is suggesting there's some ambiguity
11    here, that it doesn't mean "and" and it doesn't mean "or," you
12    look to the specification, and cases cited by Kickstarter fully
13    support this, you look to the specification and say does the
14    specification support that kind of construction, and it
15    doesn't.  And nor do the claims.
16              THE COURT:  Why do you use the word "and" then?  This
17    is your language.
18              MR. SMITH:  Right, your Honor.  I didn't prosecute
19    this.
20              THE COURT:  I know it's not your language, but on
21    behalf of the patentee, you're stuck with the language that the
22    patentee uses in the patent.  Right?
23              MR. SMITH:  Right.
24              THE COURT:  Why do they use the word "and" if it
25    really means, as you say now, "or"?
```

1          MR. SMITH:  Because I think they've used that same

2    language in multiple claims, always meaning one, not meaning

3    all.  And I can point you to a couple of examples where they

4    use the exact same language in the other claims.  Here is claim

5    eight, "a system according to claim one wherein the offer is

6    presented in at least one of the following manners, an auction,

7    a point of sale, a subscription, a license, and a sponsorship."

8          There's nothing in here that suggests that "at least

9    one" means all of those things have to happen.  You have to do

10   it in an auction, a point of sale.  It wouldn't make sense that

11   you're now doing it in every way.

12         In claim 24, the patentee also uses that same language

13   where it says "an offer is presented in at least one of the

14   following manners" and gives the list of the specific manners.

15   So I think the patentee reasonably used that language, "at

16   least one," to make clear that it's talking about one of a list

17   of things, and although it used the word "and," I don't think

18   "and" is interpreted to mean all of the above because in the

19   context, "at least one of" has to modify that.  Otherwise, why

20   would you use it?

21         THE COURT:  You don't want construction of the word

22   "and," you want a construction of the words "at least one."

23         MR. SMITH:  That's right, your Honor.

24         Our view is it's clear from the patent claims, it's

25   clear from the specification that the "at least one" language

1   never meant to encompass every one of those, because then you'd

2   look at these other claims, and it would make no sense if you

3   used that interpretation.

4              THE COURT:  All right.

5              MR. SMITH:  Your Honor, dependent claims also support

6   that view as well because if you go to page 32 of the patent,

7   it talks about an entitlement and it says, "converting the

8   received entitlement into a digital format."  Claim 32 of the

9   patent.  This is a dependent claim that's referring back to the

10  single entitlement and referring to saying you're going to

11  convert the single entitlement into a digital format.  That

12  dependent claim would make no sense if the entitlement had to

13  be a service, a patronage, and a product.  How are you

14  converting a service into a digital format?  Or how are you

15  converting a patronage into a digital format?  It doesn't make

16  any sense.  That dependent claim would be meaningless because

17  it would be suggesting that you're doing something that you

18  can't do.

19             THE COURT:  Thank you, Mr. Smith.

20             Mr. Bickham, do you want to talk about the

21  software-related terms?

22             MR. BICKHAM:  Your Honor, would it be okay if we

23  addressed some of the comments and just wrap up the nonsoftware

24  tools?

25             THE COURT:  Two or three minutes.

 1                MR. ALLAN:  Your Honor, I'll address very quickly the

 2      fans, the clients, and the software tool limitations.

 3                In terms of fans, I think this is very

 4      straightforward.  It's defined.  The common denominator is

 5      there.  The fact that the "including, but not limited to"

 6      language may allow for others, other individuals, does not

 7      change the fact that the definition, according to the patent,

 8      the individual, whoever it is, a mentor, a follower, a taxicab

 9      driver, a boat captain, whoever it is has got to be interested

10      in the artist's work.  We've belabored this a bit, so I won't

11      continue.  I don't think there is any inconsistency.  We're not

12      trying to limit this at all beyond what they've spoken about.

13                THE COURT:  All right.  Go ahead.

14                MR. ALLAN:  In terms of clients, again, there are a

15      number of different clients that are referenced in the patent,

16      in the specification, but claim one speaks to one specific type

17      of client.  You heard nothing different from opposing counsel.

18      We're not trying to limit this in any way.  We're trying to

19      provide the correct context to the term that's at issue in the

20      one claim that is at issue.  That's claim one.

21                Finally, with respect to the --

22                THE COURT:  Patron?

23                MR. ALLAN:  No.  Mr. Bickham will handle that in just

24      a minute.

25                "Entitlement including at least one of," when I think

 1   of this, I think of what is the definition of "is."

 2              THE COURT:  President Clinton told us that.

 3              MR. ALLAN:  President Clinton.  Exactly.

 4              They said "and," your Honor.  They didn't say "or."

 5   And the Federal Circuit and the Touchtunes case by Judge Sweet

 6   make abundantly clear that Mr. Smith's argument that we're

 7   reading "at least one of" out of the claim is absolutely wrong.

 8   Those cases a hundred percent found that this definition, the

 9   phrase we're asking your Honor to construe, is a legitimate,

10   unambiguous, clear, plain Strunk & White version of the English

11   language, and it means "and."  There's just no other way to get

12   around it.  There is a presumption that the plain language, the

13   ordinary meaning that they've offered and have put in the

14   language controls.  There's nothing to overturn that

15   presumption, your Honor.

16              Thank you.

17              THE COURT:  Not the language at least one?

18              MR. ALLAN:  I'm sorry?

19              THE COURT:  Not the language at least one?

20              MR. ALLAN:  No.  It's at least one of three different

21   things, and it's exactly the same situation that Superguide

22   spoke to.

23              THE COURT:  Thank you.

24              Mr. Bickham.

25              MR. BICKHAM:  Your Honor, just briefly regarding the

1   term "patron," ArtistShare basically acknowledges that there

2   are two types of patrons described in the specification.  And

3   the language that they pointed to was from column 17 in the

4   patent, and we refer to column 18.  Column 17 is up on the

5   screen, your Honor.

6           THE COURT:  I can't see that far.  Where are you in

7   column 17?

8           MR. BICKHAM:  Line 41, your Honor.

9           THE COURT:  Okay.

10          MR. BICKHAM:  So they were talking about figure 23,

11  and in the middle of that column, around 45, it says, "upon

12  registration, the fan, now a patron."

13          Directly across from that, in column 18 and down a

14  little bit, down to line 54, this talks about the other kind of

15  patron.  And line 55 says, "a patron is a fan who registers

16  with an artist and who provides monetary contribution to a

17  project."  That's the patron of the artist.  So there are two

18  kinds of patron, and that's our point.  There are two kinds of

19  patron, and the claims only refer to one kind.  They don't

20  refer to the member patron.  They refer to the patron of the

21  artist.

22          THE COURT:  The patron who contributes?

23          MR. BICKHAM:  The patron who contributes, yes, your

24  Honor.

25          The claim language that they pointed to in claim 36,

1    where the patron is registered, that's after the patron has

2    accepted the offer.  That's after they've crossed the threshold

3    and become patron No. 2, patron of the artist.

4          In claim 17, your Honor noticed that the patron has to

5    express an interest before their information is stored.  Now,

6    that's an affirmative act.  And registering, it's an

7    affirmative act with an artist, and that's beyond mere

8    registration.

9          THE COURT:  Okay.  I understand the dispute here.

10         Do you want to go on to the software-related terms

11   now, please?

12         MR. BICKHAM:  Yes, your Honor.

13         These software-related terms were added at the end of

14   the prosecution, and they don't appear in the specification.

15   Software tools to manage at least one project, not in the

16   specification.  Kickstarter proposes this definition.  It's

17   computer programs that do a number of things.

18         Project management software.  ArtistShare has their

19   definition.  There's been some to-do made about what is the

20   definition of a software tool.  To us, that's a side issue.

21   That's a sideshow.  A software tool is a computer program.

22   It's software.  A software tool is software.  And a tool, when

23   it refers to a tool in the later claims, that's software.

24   That's the same thing.  It's a program that does something.

25   It's not a hammer, it's not a saw.  It's a tool.

         1          We have a long construction here, your Honor.  But we

         2    didn't come up with this.  These are from the specifications,

         3    actually.  We went to the claim itself.  Software tools to

         4    manage a project is big.  So under Phillips, you go to the

         5    specification, there's nothing.  You go to the prosecution

         6    history, not in the original claims.  It was inserted in May of

         7    2010.  Seven years after the application was filed, it was

         8    inserted into the claims.

         9          Earlier, in the prosecution, the applicant,

        10    Mr. Camelio, has already started saying that the functionality

        11    of the tools provided to the artist using the ArtistShare

        12    system, the invention, are not anticipated by the prior art.

        13    So in the December 2009 amendment, they're already equating the

        14    system with the invention.  And then, after that, the invention

        15    was demonstrated to the examiner.  The examiner says, Brian,

        16    that's Mr. Camelio's first name, showed a Web site,

        17    ArtistShare.com, his invention.  So the invention is

        18    ArtistShare.com.

        19          Mr. Camelio defined project management tools in this

        20    figure seven, and it has a number of features.  And this is

        21    where we get our definition.  That's the project management

        22    tools.  This right here says "managed project," and these are

        23    the tools.

        24          In May of 2010, he explained that to the examiner, and

        25    he says the full listing of the management tools, project

 1   management tools, that are available to the artist, are set

 2   forth in figure seven under the block managed projects.  That's

 3   what we just showed.  It includes the ability to view 11

 4   different functionalities.  Those are the things in our

 5   definition.

 6        He goes on to say each of those functionalities is set

 7   forth in greater detail in figures eight through 18, and this

 8   has the same 11 functionalities.  It's also under the project

 9   management box.  This was used in ArtistShare's slides.  Just a

10   couple of minutes ago, it was describing the general overview

11   of the invention, the patent.  It's consistent.  That's what

12   Camelio said to the patent office.  It's very clear.

13        So where the term is not in the specification and it's

14   ambiguous, the Court has to look through the lens of the person

15   of ordinary skill in the art.  What guidance in the

16   specification or the prosecution history does a person have to

17   know what things are being discussed?  He has the exact words.

18   It's not a disclaimer situation.  He's defining it.  He's not

19   disclaiming it.  This is an affirmative definition.

20        He goes on, same page, "the specific management

21   function, the project management tools, provided to the artist

22   pursuant to the ArtistShare system, differentiate the instant

23   invention from all cited prior art."

24        Your Honor, we're just taking the definition that

25   Mr. Camelio told the examiner and told the public.  So

1    ArtistShare's construction is wrong for a couple of primary

2    reasons.  First of all, they want to define software tools as

3    computer-aided features.  Software tool or a program, I don't

4    see how that's a computer-aided feature.  Feature is vague.  If

5    we tell a jury that they are to look for a computer-aided

6    feature in the accused product, that's not going to be helpful

7    for them.  If we tell them computer program, that's helpful.

8            They turn their backs on what Camelio said as far as

9    seven and eight are essential parts of the invention.  He

10   defined that term.  We're not weaving in limitations and it's

11   not a disclaimer.  He said that's what it is.  And a project,

12   ArtistShare would have the Court define project as representing

13   a creative work, and I don't see how a project, it may be a

14   creative work, it's not representing a creative work.  The word

15   "project" is fairly simple.

16           Kickstarter's construction is the only one that has

17   support in the specification.

18           THE COURT:  All right.

19           MR. BICKHAM:  Regarding software tools to manage

20   communications through said patron database.  Same arguments

21   with respect to software tools, but we're not going to talk

22   about that.  But we're focusing on managed communication

23   through said patron database.  These were carefully selected

24   words.  They were put into the claim on September 7, 2010.

25   This was the sixth amendment to the claims.  This was the

1    amendment here.  It was originally put into the claims in

2    December of 2009.  And it read like this, "software tools to

3    manage communications directly to patrons."

4            Now, "directly to patrons," that's not in the issued

5    claim.  He gave up that up.  He turned his back.  He changed it

6    in view of the prior art.  The examiner said, Well, the prior

7    art shows direct communications between an artist and/or

8    creator and the public.  This is not from the '887 patent.

9    This is from a prior art patent that was discussed by the

10   patent examiner.  And this is actually part of the portion that

11   the examiner says, there it is, interactive dialogue with Web

12   site viewers.

13           So ultimately, in September of 2010, he makes this

14   change in the claims.  So now he takes out "directly."  He adds

15   in "through said patron database."  So "directly" is gone and

16   the communication goes through the patron database.  And that's

17   clear.

18           THE COURT:  Why do you use the word "directly"?  In

19   your definition, you use the word "directly," don't you?

20   Computer program used by the artist or account manager to

21   enable control or exchange of information with a patron wherein

22   the patron receives the information directly.  That's at page

23   33.

24           MR. BICKHAM:  Yes, your Honor.

25           We do use that, and we use the "directly" to talk

```
 1   about the patron database.  The communication goes, going

 2   through the database means it's going through the database.

 3   It's going artist, database --

 4            THE COURT:  Patron?

 5            MR. BICKHAM:  Patron.  Yes, your Honor.  That's

 6   through the database.

 7            THE COURT:  Maybe I'm a little bit slow this morning,

 8   but you say "directly" was taken out of the patent claim?

 9            MR. BICKHAM:  Yes, your Honor.  "Directly" was taken

10   out.

11            THE COURT:  Then you have it in here in the definition

12   you want.

13            MR. BICKHAM:  The communication, your Honor, was

14   directly between the artist and the patron.  Now, it's artist,

15   database, patron.

16            THE COURT:  Okay.

17            MR. BICKHAM:  Directly through the database is

18   different than directly to the patron, which is what was given

19   up.  And so the word "directly" might be a clumsy word in our

20   definition, but the point is it's not going directly between

21   the artist and the patron.

22            THE COURT:  All right.

23            MR. BICKHAM:  So there's more prosecution history on

24   this.  There's this Massey patent, and that's the one I just

25   showed a moment ago.
```

1            THE COURT:  Yes.

2            MR. BICKHAM:  I'm not going to belabor that point.

3    Through the patron database means directly.  This addresses

4    your Honor's point, slide 74.

5            Moving to the next term, "software tools provided to

6    the artist or account manager to design, create, and implement

7    an artist-specific Web page."  Again, under the Phillips

8    instructions, we go to the claim.  Software to implement the

9    artist-specific Web page, we think, is ambiguous.  We go to the

10   specification.  That's not in the specification.  We go to the

11   prosecution history and it was inserted, and we construe this

12   as artist specific means artist specific.

13           Computer programs used by the artist or account

14   manager to design, create, and implement a web page.  That's

15   pretty much from the claim itself.  It's from the claim itself

16   and dedicated to the marketing of a single artist's projects.

17   The whole patent talks about being artist specific and not

18   project specific.  And so under this definition, a Web site

19   that is an artist-specific Web page would have one project.

20   The artist has two projects.  It would have both of them, but

21   it's not going to have some other artist's work on their own

22   artist-specific Web page.  That defeats artist specific.

23           The criticism here comes down to what is the artist.

24   We look at the patent and the specification for what is the

25   artist, and column six and column ten give us guidance.  Artist

 1    may be an individual of various types, or it could be other

 2    individuals.  It can be an individual or it can be members of a

 3    band, a singular unit.  A band is an artist.  It says that

 4    right in the specification, "an entity (such as a band)."

 5         Artist-specific Web page was added by amendment in

 6    December 2009.  And there's discussion about how the

 7    ArtistShare system is indeed artist specific.

 8         Mr. Camelio differentiated the claims to the

 9    ArtistShare system from the prior art by saying prior art is

10    project specific.  ArtistShare, in the claims, is artist

11    specific.

12         THE COURT:  What's the difference between project

13    specific and artist specific?

14         MR. BICKHAM:  I think the difference and how that's

15    applied is if I'm an artist and I have three projects, those

16    projects are going to be on my dedicated Web page.  And if I

17    have three projects, I'm not going to have three

18    project-specific Web pages.  So if I'm an artist who writes a

19    song, does a movie, and something else, I'm not very creative

20    to come up with these things.

21         THE COURT:  Sculptor.

22         MR. BICKHAM:  Something, yes.  Those three things

23    would go on my artist-specific Web page.  They're not going to

24    go on different project Web pages.  And that's the difference.

25         THE COURT:  I'm still having trouble grasping what the

1    difference is.  I understand artist specific.  That means I

2    look up Mr. Smith or you, Mr. Bickham, and say what have you

3    done.  Now, if I wanted a music project, some composition of

4    old style rock and roll, I wouldn't be able to find that?  I

5    wouldn't look on that database, I'd look for an artist?  Is

6    that the difference?

7         MR. BICKHAM:  The database might or might not have

8    that, but the claim requires providing the artist the tools to

9    build an artist-specific Web site.

10        THE COURT:  So it's an artist-specific Web site, and

11   that excludes projects?

12        MR. BICKHAM:  If the projects are done by different

13   artists, yes.

14        THE COURT:  All right.

15        MR. BICKHAM:  So, again, software tools we don't think

16   are computer-aided features, and the portion of artist specific

17   that ArtistShare bases their construction on is based on the

18   false premise that an artist has to be a single individual.

19        Finally, your Honor, software tools to present the "at

20   least one project."  Again, as with the other software tools,

21   start with the claim itself.  "Software tools to present a

22   project," we believe, is ambiguous.  We don't think a jury will

23   know what that is.  We go to the specification.  It's not in

24   the specification.  It's not in the original claims.  It was

25   inserted by amendment.  And we based our construction from

1    Mr. Camelio's own words.

2         So our position is that a person of ordinary skill in

3    the art reading the prosecution history will know that the

4    project, that the software tools to present the project are

5    indeed what he said.  And there's a list of features.  And like

6    the software to manage a project, these features come from the

7    prosecution history and from the figures in the patent.

8         First of all, there's no description of Mr. Camelio

9    saying that the ArtistShare system is the invention.  We're

10   clear about that.  We looked for support in the specification

11   for the term.  The only support we could come up with for

12   presenting the project are the figures that talk about Web

13   pages, the project Web pages or the artist Web pages.  So

14   figure 32 has a number of features to it.  And these are all

15   under the project page, such as figure 32 of the patent, and

16   there's a long list of things under the artist's public pages.

17   Towards the bottom of that list is the artist's project page.

18   The claim term is "tools to present a project."  So under the

19   project page, there are a number of different features,

20   descriptions, listen, watch.  And that's where we get our

21   construction.

22        THE COURT:  So the page headers?

23        MR. BICKHAM:  Yes, sir?  Yes, your Honor.

24        We've said a couple of times, and in relation to these

25   software tools to manage projects, that they're not in the

1    specification, and your Honor doesn't have to take our word for

2    it, although you can see it for yourself.  But there's a

3    pending application based on this same specification, the same

4    one we're talking, the same specification we're talking about.

5    And the patent office said a month or two ago, the examiner

6    said "the examiner has searched the entire specification but

7    couldn't find any description of such tools."  And later, she

8    says what are the tools.  How do they work?  The examiner does

9    not know and the specification doesn't say.

10          Then, later, in the same office action, what are the

11   tools.  Each of these claims that they're talking about refers

12   to tools.  It's confusing.  What are each of the tools, so

13   we're not arguing that these statements from the examiner are

14   to be construe the claims because, frankly, they don't give any

15   kind of guidance on what that term means.  We're using these

16   statements to show the Court that the software tools to manage

17   the projects aren't shown in the specification of the '887

18   patent.

19          Now, ArtistShare says that software tools are

20   computer-aided features -- we disagree with that -- to present

21   a project.  They say a project is representing a creative work.

22   I think that our position is a project is not representing a

23   creative work.  It could be a creative work.  But ArtistShare's

24   construction doesn't have any support.  And that's all we'll

25   discuss on these terms for your Honor.

```
 1                THE COURT:  All right.

 2                Now, what you handed up to me is Exhibit A?

 3                MR. BICKHAM:  Yes, your Honor.  That's the joint claim

 4      construction chart that the parties submitted in October.

 5                THE COURT:  Okay.

 6                Mr. Smith.

 7                MR. SMITH:  Thank you, your Honor.

 8                If you have a preference for a specific order, I'll go

 9      in that order.  I was going to start with the last terms.

10                THE COURT:  Go ahead.  Any way that you wish.

11                MR. SMITH:  Thank you, your Honor.

12                THE COURT:  Just point me to the charts in your book.

13                MR. SMITH:  That would be great.

14                I was going to start with the tools to present the

15      project, which is on slide 62 of our slide deck, and the reason

16      I wanted to start here is I think this helps explain some of

17      the problems that we have in the constructions that we're

18      seeing from Kickstarter.

19                Primarily, what they're doing is adding in limitations

20      that are found nowhere in the claims themselves.  What are they

21      doing?  They're explicitly saying we're looking at the

22      specification and we're taking out of the specification and

23      putting those limitations now into the specific claims.  That

24      is clearly contrary to claim construction law, that you take

25      something from a specification and you put it into the claims
```

1    themselves.  And so they say that they're doing this because --

2              THE COURT:  I may be wrong here, but they're saying

3    it's in the claims.  But the language of the claim is not

4    defined by the specification because there's nothing in the

5    specification.  So they've gone to the diagrams to look for it

6    because that's part of the patent.

7              MR. SMITH:  Right.  The diagrams are part of the

8    specification, but it almost seems like there's an anomaly here

9    because, on the one hand, they're saying it's not in the

10   specification.  On the second hand, they're saying, Here, take

11   this from the specification and put it into the claims.

12             THE COURT:  It's from the charts, isn't it?

13             MR. SMITH:  That's part of it.  Yes.

14             THE COURT:  From your standpoint, that's part of the

15   specification.

16             MR. SMITH:  It is.  There's no dispute, and you're not

17   going to hear Kickstarter and ArtistShare argue over whether

18   the diagrams are part of the specification.  They are.

19             They're trying to put limitations into the claims that

20   we submit just don't belong there, and here is a very clear

21   example of what they're trying to do.  There's no basis for the

22   argument that the words "present a project," so the claim

23   language says "tools to present at least one project," that

24   presenting a project all of a sudden has to include all of

25   these various different things in order to present the project.

         1          In fact, they don't even define what the word

         2   "present" is.  So the parties aren't disagreeing and saying,

         3   Oh, we need to construe what the word "present" is, and it

         4   doesn't seem like they're disputing what the word "project"

         5   means except that they're turning it around and saying instead

         6   of construing the word "project" we're interpreting the word

         7   "project" to now mean something different, and they now call it

         8   an artist project page.

         9          So they have taken the word "project," which is

        10   clearly within the patent and in the specification, they've now

        11   taken the word "project" and changed it, and now they seem to

        12   be defining something other than what's actually in the claim

        13   language itself.  That's clearly at odds with the way claim

        14   construction is supposed to happen, where you're supposed to

        15   look at the claim language itself.  They're not even disputing

        16   the words "present" and "project," which are part of the claim

        17   language.  Instead they're grafting new terms into the claims

        18   and then trying to construct new claims and terms that weren't

        19   there in the first place.

        20          THE COURT:  Can you turn to figure 32 of the '887

        21   patent?

        22          MR. SMITH:  Sure.

        23          THE COURT:  That seems to be the source for the

        24   plaintiff's definition here, but under the header "artist

        25   project page," it talks about "listen, watch, downloads,

1    personal," and so forth.  What's the problem with defining it

2    that way?

3              MR. SMITH:  Because you're doing exactly what the

4    Federal Circuit has repeatedly admonished not to do.  You're

5    taking something that is just a description of one of the

6    embodiments in the patent and you're saying now I'm going to

7    say that the claim, although broader than that, has to be

8    limited to these very specific examples, when there's nothing

9    to support that that would be the case, that to take the word

10   "present" and now say present has to now mean eight or ten

11   different things and throw that into the claim.

12             THE COURT:  Here is the trouble that I have.  You have

13   a patent that was filed, an application that was filed in the

14   early part of the first decade of the 21st Century.  It goes on

15   for eight or nine years, and most of it consists of the patent

16   applicant refining his claims, narrowing his claims.  Right?

17   And now you're saying regardless of the prosecution history and

18   the narrowing that's been engaged in, now we have to read the

19   claims very broadly.  I think that if I understand

20   Mr. Bickham's argument, you've got to take the patent the way

21   it was prosecuted in the office with all its limitations.  You

22   seem to be walking away from those limitations.

23             MR. SMITH:  No, not at all.

24             THE COURT:  You say, in figure 32, that that's just a

25   specific embodiment and you have to read the claim.  And the

1    claim you read is broader than that, correct?

2            MR. SMITH:  That's correct, your Honor.  There has to

3    be a reason.  You can't just say because the patent, which

4    every patent goes through this history of back and forth with

5    the patent examiner asking questions.

6            THE COURT:  Not many go through this process for eight

7    years, do they?

8            MR. SMITH:  Oh, yes.

9            THE COURT:  Really?

10           MR. SMITH:  Oh, yes.  The fact of the matter, as you

11   saw from the initial slide, the patent office, I think, waited

12   five years before actually even telling the patentee what its

13   initial reaction to the patent was.  So there was an initial

14   like five years, nothing happened.  Just because the patentee

15   filed the patent application with the Patent & Trademark

16   Office --

17           THE COURT:  What was going on during those five years?

18           MR. SMITH:  We have no insight into what goes on

19   within the Patent & Trademark Office in D.C.

20           THE COURT:  So from the time they picked up the

21   application, three years, is not abnormal.

22           MR. SMITH:  No, not at all.  Patents take varying

23   amounts of time to get through the patent office.  The patent

24   office is notoriously slow, but this history that they point

25   out to suggest that there was something unusual, that this

1    process of back and forth is some odd thing, happens with every

2    patent.  Every patent goes back and forth.  The examiner will

3    submit a rejection.  The patentee responds to it.  There's a

4    back and forth, a give and take, that takes place in every

5    single one.

6          What's important here, your Honor, as you've pointed

7    out, is the claims are what govern the scope of the invention.

8    Here, they haven't pointed to anything, your Honor, where the

9    tools to present at least one project were limited, where the

10   patentee said to the examiner, Oh, no, our tools to present the

11   project, those are different, that they're limited to what's in

12   here.  They haven't pointed to anything that would suggest that

13   the patentee limited the claim in any way so that presenting

14   now has to include very specific limitations that are found in

15   the figure.  And, in fact, they point to portions of the

16   specification.  They try to convince you that there's something

17   in the prosecution history, but you go through it and there are

18   portions of the prosecution history that never deal with this

19   term.  Never.  So they're trying to get you to agree to take

20   things from the specification and put them into the claims when

21   there's no basis for doing that.

22         THE COURT:  You do agree though whatever Mr. Camelio

23   said in response to these questions raised by the patent

24   examiner, that's part of the patent?

25         MR. SMITH:  That's part of it.

1          THE COURT:  We have to read the patent against the

2     limitations or representations that he made, whatever they

3     were.

4          MR. SMITH:  The patent, the history that was created,

5     as far as that back and forth, is relevant to the understanding

6     of what the claims mean.  It's part of the intrinsic record.

7     The Federal Circuit has said it's less reliable than looking at

8     the claims in the specification because it's ambiguous

9     sometimes to know exactly what was going to between the

10    examiner and the patentee.  So the Federal Circuit has said

11    prosecution history is slightly less relevant because of the

12    ambiguities that take place, that belong there.  That's why the

13    Federal Circuit has been so clear to say the only time we're

14    going to actually take something from the prosecution history

15    and limit what the claims say is when there's a clear disavowal

16    of claim scope.  So we're not just going to do any statement

17    that the patentee say all of a sudden changes the scope of the

18    claims.  No, it's not the law.

19          The law is there has to be a clear statement that gets

20    you a disavowal from the scope.  That's why it's critical that

21    in looking at the arguments being made, it's not just simply

22    that the patency said this to the examiner, therefore, you

23    don't get any of that claim scope.  That's not how it works.  I

24    think here is a perfect example of Kickstarter really trying to

25    convince you that this claim should be limited when, in fact,

 1    they can't point to something that shows you where they limited

 2    that particular term.

 3         It also goes against the notion that the Federal

 4    Circuit has said you don't read embodiments in the claim.

 5    Bedrock claim construction principle.

 6         How to construe this term, "tools to present at least

 7    one project" are fairly clear.  Kickstarter hasn't really

 8    pushed up our construction of what it means to present or what

 9    it means for there to be a project.  There seems to be some

10    dispute over what tools are, but that doesn't seem to be the

11    focus of their argument as to what tools, features, or computer

12    programs.  In some aspects of their brief, they agree with us

13    when we use the words "software tools" and say yes, it's

14    computer-aided features.  In other places they disagree.  Today

15    they seem to be disagreeing with us.  It's not entirely clear

16    what their position is.

17         THE COURT:  What do you mean by tools?

18         MR. SMITH:  Tools we take to be features.

19         THE COURT:  What do you take features to mean?

20         MR. SMITH:  Features could be a different things that

21    allow a user to work with the system that is being provided.

22    So the system is going to show you a Web page, for example.

23    There are going to be many features on there that allow you to

24    say you could download an image.  That would be a feature.

25         THE COURT:  Does tools mean anything other than

1  software?

2          MR. SMITH:  I think tools can be software-related

3  tools.

4          THE COURT:  I know that.  But my question was:  Does

5  it mean anything else other than software?

6          MR. SMITH:  I think tools is more, I look at tools as

7  those being those are the features that the software provides,

8  and in other parts of the claim they call out and say software

9  tools.  So I think tools are sort of things that are going to

10 be aided by the software that's running on the server.

11         THE COURT:  What was the last part, aided?

12         MR. SMITH:  Aided, meaning when you look at a

13 particular Web page and it provides certain features to you, in

14 order for those features to be presented to you, something has

15 to be running on the server to present those particular

16 features to you.

17         THE COURT:  Okay.

18         MR. SMITH:  So tools, just things that you can use on

19 that Web page that will allow you to present your particular

20 creative work.

21         THE COURT:  Let me ask it one more time.  How does

22 that differ?  Doesn't that mean the tools and software are

23 synonymous?

24         MR. SMITH:  I wouldn't say tools and software are

25 synonymous.  I think software tools and tools, those two terms,

1    I think, are very closely related because software tools are

2    features that are being implemented by the software.  And

3    tools, I think, are features that are ultimately implemented by

4    software.  The claim doesn't specifically require it to be

5    software tools, but I think at the end of the day, you're

6    looking at the software tools that are presenting it to the

7    user.  Even though the claim doesn't use the word "software," I

8    think you get that impression.

9         In trying to define what is a project, Kickstarter

10   doesn't describe what a project is.  Project is described in

11   the patent, talks about representing the creative work.  We've

12   used that as our understanding of what a project is, if project

13   has to be defined.

14        I've already talked about the fact that Kickstarter's

15   trying to pull in all of these limitations from figure 32, give

16   you one of many cites to the Federal Circuit saying that's not

17   appropriate.  And you've heard Kickstarter talk about this is

18   just one of the embodiments of the invention, and they want to

19   basically limit the claim to that one specific embodiment.

20        So unless there are other questions, I was going to

21   move on to the other software tool features.

22        THE COURT:  Yes, please.

23        MR. SMITH:  I'm going to go back to the software tools

24   to manage.  Slide 37 is the first place we have that.

25        THE COURT:  Go ahead.

1            MR. SMITH:  So here, just to frame some of the debate,

2      there seems to be some disagreement about what software tools

3      are.  I thought, based on Kickstarter's initial briefing, that

4      we had come to an agreement on what software tools were because

5      in their brief they specifically say with respect to one of the

6      claim limitations that they agree with us, they indicated they

7      agree that software tools with respect to one of the

8      limitations meant computer-aided features.  So we thought we

9      were in agreement and that the parties no longer needed to

10     debate what it is to mean a software tool.  I've pointed to the

11     Kickstarter's opening brief at page 14, where they made that

12     statement.  I thought we were in agreement, but today they

13     seemed to be saying that our definition of software tools isn't

14     correct, which I'm not sure I can reconcile with what they say

15     in their brief.

16            The next portion of the claim term requires that it's

17     software tools to manage at least one project.  Here, it's

18     unclear.  Kickstarter never really defines what the word

19     "manage" is.  It seems to be just again creating limitations

20     into the claim based again on what the specification status is,

21     so taking something from one of the figures and saying these

22     are the things that we're going to say the computer tools need

23     to do, but it's unclear whether or not that's how they're

24     defining "manage the project" or if they're not defining

25     "manage the project" at all.

1            In our view, a project, in our view, the notion of

2    managing the project is clear.  It's just managing at least one

3    description of a creative work.  Again, this goes back to the

4    notion of what is a project.  Kickstarter doesn't seem to be

5    defining what a project is, and so if it does need to get

6    defined, we propose it be defined in this manner.

7            Specification supports the notion of a project being a

8    creative work or representing a creative work.  Kickstarter,

9    like the other claim term that we're talking about, tools to

10   present, here, Kickstarter takes the figure seven and indicates

11   that everything that you see in the figure seven should now be

12   read into the claims when it talks about managing a project.

13   Again, this would be the exception, not the rule, to claim

14   construction, where you would be taking an embodiment and

15   reading that embodiment directly into the claims.  The patent

16   history is specific that the embodiment of the claim is just

17   one example.  They're not intended to be limiting in the

18   claims.

19           Kickstarter spends a lot of time arguing about the

20   prosecution history relating to managing at least one project.

21   Again, in order for them to satisfy what would be required in

22   order to say that there was some disavowal, you need some

23   unambiguous, clear disavowal.  Again, I don't think they ever

24   present to you anything that suggests that there was a

25   disavowal of claim scope.  What they do is they point to

several portions of the prosecution history where what is

happening is the patent examiner has found some prior art

references that are dealing with systems that are looking at

how an artist interacts with a recording studio or something

similar to a recording studio.

You may remember at the beginning of the presentation

I was talking about how some of the problems different artists

are dealing with recording studios and recording companies, and

in each case the patentee was continuing to remind the

examiner, No, our invention is different.  We're talking here

about what you can do where the fans or the fans or patrons can

be able to help an artist, we're different from these recording

and distribution companies that you're seeing in the prior art,

and clearly started to distinguish that.  And they point to and

they say, Well, no, no, they said there are some unique

software tools, and what they do is they take every single one

of those and say we should read those into the claims.  But the

patentee never said every single one of these tools is required

in order for us to distinguish the prior art.

No.  They don't even mention the specific tools.  They

just say there are software tools.  This is one of the benefits

of our invention.  It allows artists to now have these tools

that allow them to manage their projects.  So now they're not

relying on a recording company or a production company to go do

that for them.  Now they're going to do it; they're in control.

1  And that was the important distinction they were making to the

2  patent examiner.  It wasn't this notion that, Oh, we need a

3  list of 15 software tools in order to distinguish the prior

4  art.  They never said it, and it wouldn't make sense that they

5  would list out eight or ten specific tools that would be

6  required.

7        What Kickstarter says is they referred to the fact

8  that there were tools, and, if you look at the figure, we can

9  see where the tools are, so let's take those tools and put them

10  into the claim.  And I submit that's just not the right way to

11  construe the claims.

12        THE COURT:  All right.

13        MR. SMITH:  I'm going to move on, your Honor, to

14  software tools to manage communications to the patron database.

15        THE COURT:  Yes.

16        MR. SMITH:  This starts at slide 33 of our slide deck.

17  Here, again, we have software tools.  I'm not going to repeat

18  the argument.

19        First of all, software tools, I thought we were in

20  agreement what software tools meant.  Manage communications, we

21  have a little bit of debate as to what manage communications

22  means.  We interpret manage communications to enable and/or

23  facilitate the exchange of information.  They require that it

24  must enable and control the exchange of information.  We don't

25  think it's that limiting, and then through the patron database,

 1    we interpret to mean with the aid of the patron database.  They

 2    require that somehow the information comes correctly from the

 3    patron database, which we submit isn't supported by the claims

 4    themselves, let alone by the specification.

 5          THE COURT:  Mr. Bickham, I thought we got rid of the

 6    word "directly" and you were through the database.

 7          MR. BICKHAM:  Yes, your Honor.

 8          THE COURT:  Is this an error here when Mr. Smith puts

 9    out your Kickstarter proposal because it says "directly from

10    the patron database"?

11          MR. BICKHAM:  Your Honor, the claim removed "directly"

12    and changed and put in its place "through the database.  Our

13    construction here is correct, that our position is that the

14    communications need to go artist, database, patron.

15          THE COURT:  Where do you, in your stack of charts,

16    deal with this issue of whether it's through or directly?  We

17    just discussed it.  Page 33, chart 66?

18          MR. BICKHAM:  Yes.  Yes, your Honor.  And the point,

19    your Honor, was not directly to the patrons between the artist.

20    That was the point that we were making in discussing it.

21          THE COURT:  I see.

22          MR. BICKHAM:  So the term should not be construed as

23    communications, artist directly to patrons.  It's

24    communications, artist, database, patron.

25          THE COURT:  Go ahead, Mr. Smith.

1          MR. SMITH:  Just to pick up on that term, how the

2    communications come, they're adding these new limitations into

3    the claims that aren't part of nearly the language that just

4    requires managing communications through said patron database.

5    The language is "managing communications through said patron

6    database."  Now they're requiring certain things that

7    specifically happen.  You have to both enable and control the

8    exchange of information, and now somehow, it's unclear how,

9    that the communications are coming directly from the database

10   to the patron.  It's unclear exactly how that would work or

11   where they would find any support in the patent that would

12   suggest that this information is coming directly from the

13   patron database.

14          In fact, if you look at claims 17 and 32, which I will

15   put up, 17 is up there now.  Here, if you look at what it says

16   when it talks about managing communications to the patron

17   database, at about line 34, on claim 17, it says "managing

18   communications through said patron database from the artist or

19   account manager to patrons."  So, again, the exact language

20   from the claim suggests that communications are coming from the

21   artist to the patron.  So there's direct communication between

22   those two entities.  And we again say "through said patron

23   database" just means that the patron database has information

24   that allows the artist to communicate with the patron because

25   the database, as we discussed earlier, can have contact

information for the specific patrons.  So it's not that the

database is sending its own information to patrons.  It's that

the artist is able to send communications to the patrons using

the patron database because the patron database has this

contact information that allows it to do that.

Claim 36, I'll submit, has the same or similar

language to that in terms of noticing that the managing

communications are from the artist or account manager to the

patrons.

THE COURT:  All right.

MR. SMITH:  Here, looking at what are some of the

differences we're seeing here, the specification from the

patent itself talks specifically about communicating.  It talks

about being able to have mailing list drop down, export names.

All of these things allow the artist to communicate with the

patrons, but it doesn't suggest that the database is

communicating directly with patrons.  No.

What it's calling out is the notion that the artist

can get that information from the database and then use it to

send communications to the patrons.  But there's nothing in the

patent that I've been able to find that would suggest that the

database is sending communications directly to patrons.  I

don't think that would make any sense, but I haven't found

anything that would suggest that would be the case.

Kickstarter, like in some of its other arguments,

1   relies heavily on the prosecution history, suggesting that

2   somehow ArtistShare disclaimed communications that would go

3   directly to patrons.  I don't think that would make sense in

4   the light of the way claims are written, where you're managing

5   communications that are going from artist to patron.  But even

6   so, if you look at the actual language of the prosecution

7   history that they cite to, and here on I'm on slide 47 of our

8   slide deck, again, what they're distinguishing isn't

9   communications through a patron database.  What they're

10  distinguishing is the notion that it's different from what

11  production companies do, which is the production companies are

12  the ones that always communicated with the outside world.  The

13  artists had no control over it.

14         Here, in the system that was described by the

15  patentee, here, you now have the artists being able to manage

16  communications with the patrons, and so that's what they're

17  really talking about, this notion that you can now manage

18  communications with your own patrons, which is interesting and

19  different.  It's not this notion that now the words "through a

20  patron database" was used.  In fact, if you looked at

21  Kickstarter's argument, the argument suggests that by removing

22  the word "directly" we somehow narrowed the claims, which would

23  be a little counterintuitive because if you remove a word from

24  a claim, technically the understanding is you've broadened the

25  claim, not narrowed it.  But there is nothing in the

prosecution history that suggests that "directly" was somehow a

problem and that we had to change it to through a patron

database.

In fact, the portion that Kickstarter cites to where

they say, Oh, the examiner rejected some of the limitations by

saying that this prior art patent communicates directly with a

patron, the patentee said, No way, I disagree completely.  The

prior does not disclose communicating directly with the patron.

What it does disclose is the production company communicating

with these people who are interested or purchasing things.  It

has nothing to do with the notion --

THE COURT:  So the dropping of the word "directly"

means what?

MR. SMITH:  I think they just changed the language.

THE COURT:  Clearly, they changed the language.  But

what does it mean?  Does it have any meaning at all?

MR. SMITH:  I don't think removing the word "directly"

has any meaning at all because they still kept that you're

communicating from the artist to the patron.

THE COURT:  And that to you is the important modality

here?

MR. SMITH:  That's right, your Honor.

THE COURT:  You've eliminated the record company as

the entity in between the artist and the fan/patron.

MR. SMITH:  That's exactly right, your Honor.  And you

 1   can see this throughout the prosecution history over and over

 2   again where the patentee says, We're different from these guys

 3   because we're letting the artists communicate and manage those

 4   communications.  And how are they doing it, because we've

 5   created this database that allows that.

 6              THE COURT:  And the Massey patent deals with what?

 7              MR. SMITH:  So the Massey patent has to do with, you

 8   could have ownership that you could get in particular rights in

 9   a creative work, let's say a record or something.  So what

10   they're talking about is the notion that you could give away

11   some of your ownership rights in order to get what you want,

12   and Massey was really talking about having some ability for the

13   production company to be able to talk to the people who are

14   interested in the artist's work but not the artist

15   communicating with the interested people.  And they put up a

16   slide that they suggest says, Oh, no, Massey also includes that

17   because it says an interactive Web site.  But what they don't

18   tell you is that nowhere does it say the artist is interacting

19   with anyone like a fan or a patron.  In fact, the

20   communications are all centered on the production company being

21   able to communicate with the fans or the patrons.

22              THE COURT:  Okay.

23              MR. SMITH:  I'm just going to move through some of the

24   differences between what Kickstarter's recommending and what

25   we're recommending.

1          Again, they're requiring that now it has to be that

2    the programs have to be used by the artist when the claim just

3    says you're providing software tools.  It doesn't say that the

4    artist has to use them in order for the claims to be satisfied,

5    and then also requires that you have to enable and control the

6    communications and that the patron receives information

7    directly from the database.  All three of those are new

8    limitations, which the only way they get there is by grafting

9    on new limitations that are really not found in the claims at

10   all.

11         I was going to move on to artist-specific Web page, if

12   that's all right.

13         THE COURT:  Yes.

14         MR. SMITH:  So artist-specific Web page was part of a

15   larger claim term that Kickstarter asked to construe.  That was

16   a claim term that talked about, again, tools relating to the

17   artist-specific Web page.  It seems like we're at the point

18   where the parties agree on most of the definitions.  It says,

19   "artist agrees with Kickstarter's construction for its

20   limitation," and our construction was "computer-aided features

21   to design, create, and implement an artist-specific Web page."

22   It seems like that portion is no longer in dispute.  There is

23   no issue about it.  This is the portion we cite to you, by the

24   way, where we thought we were in agreement with Kickstarter

25   about what the words "software tools" mean, but for this

 1    specific limitation, really the focus --

 2              THE COURT:  Let me interrupt here.

 3              Mr. Bickham, is this right, that you're now agreeing?

 4              MR. BICKHAM:  Mr. Smith has said about six times, he's

 5    referred to this line in our brief, that line is in our brief,

 6    but if we're not in agreement, the position is still what our

 7    position is in the joint claim construction chart submitted to

 8    your Honor and argued in our papers.  That line was intended to

 9    convey that the dispute is on what is artist specific because

10    originally, artist specific was --

11              THE COURT:  Tell me what the difference is between

12    ArtistShare's proposed construction, "one or more Web pages

13    relating to one or more artists," and your definition, "a Web

14    page that is dedicated to the marketing of a single artist's

15    profits."

16              What's the difference?

17              MR. BICKHAM:  Under ArtistShare's construction, your

18    Honor, they can have more than one artist on a Web page.

19              THE COURT:  Is that right, Mr. Smith?

20              MR. SMITH:  No, your Honor.  I think we're actually in

21    agreement on this portion.  I don't want to say complete

22    agreement, because there is a distinction here.  I think the

23    point where we're talking about this issue of where there's

24    agreement, actually, is the claim language that preceded

25    artist-specific Web page.  And it's the language, it's in our

footnote.  I'm sorry.  I don't know if I can make it any larger

for you to read, but the footnote is from Kickstarter's brief

where it says --

          MR. BICKHAM:  Your Honor, we've admitted that that

line is in the brief, and we've said what the intent behind

that is and that our position hasn't changed.  I don't know if

we need to have it said eight or nine times now.

          MR. SMITH:  Your Honor, I was just trying to make sure

you understood where there is a dispute and where there isn't a

dispute.

          THE COURT:  Actually, my question is very simple now.

We have language from ArtistShare and we have language from

Kickstarter, and I'm asking what the difference is.  I know

there are different words, but when you get down to the

different words, what's the difference?  It's got to be

meaningful to a jury.

          MR. SMITH:  Right, your Honor.

          THE COURT:  That's the whole purpose of a Markman

hearing, what am I telling the jury as between Kickstarter's

proposal and ArtistShare's proposal.  I understand there is

different language.

          MR. SMITH:  I think that there is a difference,

meaning when we first proposed these constructions, there was a

concern that when Kickstarter uses the word "single artist's

projects," is it referring to a single person, or can it be a

1   band or an entity?  And from the conversation that you had

2   today with Kickstarter's counsel, it seems to be that we're in

3   agreement that an artist is broader than just a single

4   individual.  An artist could be multiple individuals.  It could

5   be a band, it could be a collection of people, and those would

6   all be considered an artist, and I think that's totally fine.

7   And I think Kickstarter agrees with that, which was one of our

8   bones of contention which is what we thought they were trying

9   to do by using the words "single artist" to suggest that it

10  couldn't be what the patent says an artist is but was more

11  narrowly tailored to something different.

12          I think based on today we're pretty close to what an

13  artist means.

14          THE COURT:  Mr. Bickham.

15          MR. BICKHAM:  Your Honor, the problem here is in

16  ArtistShare's definition as to one or more artists.  Artist in

17  the patent, in the specification, is described as an individual

18  or a collective band, or something like that.

19          THE COURT:  I understood Mr. Smith to say, and maybe I

20  got it wrong, that the artist could have one or more projects,

21  but the projects were always identified with a particular

22  artist.  You wouldn't have projects from an artist identified

23  separately as projects and you wouldn't have the projects where

24  one particular artist is shown on the Web page of another

25  artist.  Do I have that right?

1           Mr. Smith.

2           MR. BICKHAM:  I believe --

3           MR. SMITH:  I'm sorry.  I thought you were asking a

4  question.

5           THE COURT:  I know you were paying attention.

6           MR. SMITH:  Most of that is right, your Honor, whereas

7  you can have --

8           THE COURT:  You always qualify.  You say most of it's

9  right.

10          MR. SMITH:  I just want to clarify.  If I say yes,

11  it's right, we move on, and it's the clarification that never

12  makes it in.

13          The point I want to clarify is, in our definition, the

14  Web page could have multiple Web pages to it, meaning that you

15  could have one project listed on one page and another project

16  listed on another page.

17          THE COURT:  It would always be artist specific.

18          MR. SMITH:  It would.  It would always be artist

19  specific.  That's right.

20          THE COURT:  Say you're an artist, you could have

21  multiple projects described on various Web pages, correct?

22          MR. SMITH:  Correct.

23          THE COURT:  That would not include the artist of

24  Mr. Bickham.

25          MR. BICKHAM:  Not unless he cooperated with me and we

1  worked together.

2            THE COURT:  Don't give me that.  He's a separate

3  artist.

4            MR. SMITH:  If he's separate, then it wouldn't.

5            THE COURT:  Now what's the difference, Mr. Bickham?

6            MR. BICKHAM:  With that, I think we're in agreement,

7  your Honor.

8            THE COURT:  All right.

9            MR. BICKHAM:  And the only difference -- well, we're

10  in agreement on this.  And then the only difference is software

11  tools, is it a feature or is it a computer program.

12            THE COURT:  All right.  Thank you.

13            Mr. Smith, go ahead.

14            MR. SMITH:  Like I said, based on what I've heard

15  today, it sounds like we're pretty much in agreement what an

16  artist means and we're in agreement that the artist can have

17  one project or multiple projects, but as long as they're artist

18  specific, that would be covered.

19            THE COURT:  Page 51, we're not defining the word

20  "artist," are we?

21            MR. SMITH:  I don't think we need to, your Honor.  But

22  initially when we first saw the definitions that were coming

23  through, we thought that there was a dispute as to what an

24  artist is.  I think we just want to make sure it's clear that

25  an artist can be a single individual or multiple individuals?

1    That's all we want to make sure is clear, and I think you heard

2    today that is.

3              THE COURT:  Multiple individuals, as long as they're

4    collaborating on a work of art?

5              MR. SMITH:  Correct, your Honor.

6              THE COURT:  There's got to be some unifying force to

7    these multiple individuals?

8              MR. SMITH:  That's right, your Honor.

9              THE COURT:  What else?

10             MR. SMITH:  I think the only other thing was, I think

11   we've resolved it, but I want to make sure.  In their

12   definition they refer to projects, plural, that it has to be

13   more than one project.  But I thought today heard there could

14   be one or more projects.  But with that I think we're in

15   agreement with the artist-specific Web page.

16             THE COURT:  You agree an artist can have one project?

17             MR. BICKHAM:  Yes, your Honor.

18             THE COURT:  One of the records I have at home is One

19   Hit Wonders.

20             MR. BICKHAM:  Then they would have artist-specific Web

21   sites with their One Hit Wonder.  But if they got a two hit

22   wonder, that would be all on one web site for that artist.

23             THE COURT:  Might or might not be.

24             MR. SMITH:  You could have multiple Web pages, and

25   that would still be artist specific.

1              THE COURT:  Only one artist, but you could have

2    multiple projects.  Consider Picasso, he could have a page, as

3    I understand it, for pictures of his work, sketches of his

4    work, drawings of his work, early works, later works.  They

5    could be on separate web pages, but they would all be listed

6    under Picasso.

7              MR. BICKHAM:  Yes, your Honor.  And Mr. Picasso would

8    be central to all of the Web pages.

9              THE COURT:  Yes, correct.  He would be the dominating

10   feature.  He'd be the artist.  This would be artist specific.

11             MR. BICKHAM:  Yes, your Honor.

12             THE COURT:  Anything else, Mr. Smith?

13             MR. SMITH:  Nothing else, your Honor.

14             THE COURT:  Mr. Bickham and Mr. Allan, do you want to

15   respond?

16             MR. BICKHAM:  Just very briefly, your Honor.

17             THE COURT:  Yes.

18             MR. BICKHAM:  What we are doing with these software

19   tools terms, we're not trying to read limitations into the

20   software claims.  Phillips tells us to look at the claim

21   language through the lens of the person of ordinary skill in

22   the art.  So looking at the intrinsic evidence that's before

23   him, the file history, the specification, and the claims, what

24   would a person of skill in the art be drawn to to have any kind

25   of definition for these terms that are not in the

99

1    specification?  They're not in there, so he has to go into the

2    prosecution history.  What is this term?

3            The prosecution history says the project management is

4    at figure seven.  Project management is at figure eight.  Those

5    two figures show the same thing.  And so the term is being

6    interpreted, and ArtistShare says that Mr. Camelio is a person

7    of skill in the art.  We might have a dispute about that down

8    the road, or not, so if that's how he's interpreting the

9    software management features, and he's telling the patent

10   office that it's those features in figure seven and figure

11   eight that distinguish from the prior art, a person of skill in

12   the art's going to see that, and he's going to say, All right,

13   there it is.

14           THE COURT:  Isn't a person who gets a patent always

15   skilled in the art?  I mean, I thought one of the definitions,

16   as I recall it, you have a college-educated person who is the

17   computer programmer, and Mr. Camelio was not college educated;

18   he's self-taught.  So you would say that Mr. Camelio was not

19   one skilled in the art because he didn't meet the

20   qualifications?

21           MR. BICKHAM:  I think that we haven't had a chance to

22   depose Mr. Camelio.  The Markman hearing is the very beginning

23   of the case.

24           THE COURT:  I understand.

25           MR. BICKHAM:  So we haven't fully vetted what the

1    person of ordinary skill in the art is.  We thought we set an

2    appropriate level, but what ArtistShare has done, they've said

3    here's the level, Mr. Camelio's in it.  And they should be held

4    to it.  That's his interpretation, the prosecution history has

5    his interpretation of these claim terms.  And so we're not

6    adding limitations to the specification.  The cases like <u>Kara</u>

7    <u>Tech</u> are different than these, than what's happening here.

8         In <u>Kara Tech</u>, there were two types of claims.  One

9    type of claim required a certain feature.  The other type of

10   claim did not require the feature.  The second type of claims

11   were being asserted, and there is a Markman hearing and claim

12   construction on that second type of claim.

13        The District Court said that the feature from the

14   first set of claims, which was absent from the second, needed

15   to be in the second, and the Federal Circuit said no, that's

16   not right.  That's reading a limitation that's not there.  That

17   was taking a whole new limitation and putting it in.  What

18   we're doing is we're interpreting the claims, and I think we're

19   giving these claims the only interpretation that is supported

20   by the specification or the file history.

21        THE COURT:  All right.  Thank you very much.  I hope

22   to get this decision out to you shortly.  When we do that,

23   we'll have a conference and plan the next steps.  Thank you

24   very much.

25        MR. ALLAN:  Thank you, your Honor.

1        MR. SMITH:  Thank you, your Honor.

2        MR. BICKHAM:  Thank you, your Honor.

3        THE COURT:  I'd like to have the benefit of the

4   transcript when I turn to this, so would somebody order a copy

5   of the transcript.

6        Thank you very much.

7        (Proceedings adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25